UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PROFESSIONAL SERVICES GROUP, INC., Plaintiff, v. TOWN OF ROCKLAND, et al., Defendants | ) ) ) ) ) ) ) ) ) ) ) | Civil No. 04-11131-PBS |

**TOWN OF ROCKLAND'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM PROFESSIONAL SERVICES GROUP, INC.**

Pursuant to Federal Rule of Civil Procedure Rule 37, the Town of Rockland has moved to compel the production of documents from Professional Services Group, Inc. ("PSG"). There is no valid basis for PSG's refusal to produce the documents, and all of the documents are highly relevant and critical to proving the Town's claims.[1]

## I. BACKGROUND

This dispute arises out of what the Town of Rockland (and the Massachusetts Inspector General) contends was a tainted procurement of a 10-year contract to Plaintiff Professional Services Group, Inc. ("PSG") to operate the Town's Water Pollution Control Facility, and the illegal and improper activities that occurred in relation to that contract. The Town issued a Request for Proposal to operate its Water Pollution Control Facility ("wastewater treatment plant") in 1997. At the time, the plant was being operated by PSG, since PSG had acquired Metcalf & Eddy Services, Inc., which had been awarded a contract to operate the plant three

---

[1]  The plaintiff PSG and the Defendant Town of Rockland are in the process of conducting some depositions that were unable to be completed earlier due to scheduling issues. They have been cooperating on these scheduling issues. Defendant Sausé filed for bankruptcy in March, thus the Town is not proceeding against him, and defendant Gregory Thomson has never appeared.

years earlier. The Town alleges that in 1996, a then-vice president and area manager of PSG, Michael Sausé, promised to help Thomson – who was a part-time Sewer Commissioner – become the Town's first full time Sewer Superintendent in exchange for Thomson's influence in obtaining a long-term contract for PSG. After Thomson became Sewer Superintendent in 1997, with Sausé's assistance, Sausé then used his influence with Thomson to skew the request for proposal and ensure that PSG obtain the contract.

The Town also alleges that, as part of PSG's improper relationship with Thomson, the Town's Sewer Superintendent, Sausé arranged for PSG to divert to Thomson contract funds that were supposed to be rebated to the Town. After PSG won the long-term contract in 1997, Sausé set up a bank account at a Boston Bank through which the Town funds were diverted to Thomson. When Sausé was assigned out of the Boston area to work on some other jobs, PSG's diversion of funds to Thomson continued, although the Boston bank account that Sausé had set up was closed. Thomson opened an account of his own on the South Shore.

In addition, the Town alleges that PSG made thousands of dollars of improper expenditures with Town monies that were supposed to be used to operate the wastewater treatment. These expenses, which were uncovered by the forensic auditor, included such items as T- shirts, sweatshirts, Christmas trees and charitable donations.

The corrupt arrangement between PSG and Thomson became unraveled in 2002 when a bank employee questioned Thomson's deposit of a check from PSG. A forensic auditor was hired by the Town and found a number of improprieties. The State Inspector General's Office became involved and expressed concern about the procurement process and recommended that a new procurement be conducted. As a result, the Town of Rockland terminated the contract with PSG effective April 12, 2004. A criminal investigation was conducted. Thomson and Sausé

were each charged with felonies relating to the embezzlement of the funds that were supposed to be rebated to the Town and both men pleaded guilty.

After the Town terminated the contract, PSG sued the town for breach of contract. The Town counterclaimed, asserting violations of Mass. General Laws Chapter 30B, the state Procurement Act, the state's Conflict of interest law, Mass. Gen. Laws. 268A and Chapter 93A, The Town has also brought claims for contract and breach of the covenant of good faith and fair dealing and conversion.

The Town maintains PSG violated the Uniform Procurement Act (Mass. Gen Laws ch. 30B) by conspiring to cause a contract to be solicited and awarded in violation of the statute. The act provides that the procurement officer shall issue invitations for bids that include "all evaluation criteria to be utilized." Mass. Gen. Laws ch. 30B, §5 (b) (2). Further, it provides that the requests for proposals should contain "all contractual terms and conditions applicable to the procurement." Mass. Gen. Laws ch. 30B, §5 (b)(3). This did not occur; there were no meaningful "evaluation criteria." In effect, the sole criterion was that the bidder had to be PSG. The process so favored PSG that other prospective bidders expressed interest but backed out of the competition.

The Town also alleges that PSG's conduct violated the Conflict of Interest Law, Chapter 268A. Specifically, PSG's conduct violates Sections 2(a), 3(a) and 17(b) of that law. Section 2(a) imposes liability on any person who:

> (a) …directly or indirectly, corruptly gives, offers or promises anything of any value to any…municipal employee…or who offers or promises any such employee…to give anything of value to any other person or entity with intent
> > (1) to influence any official act or any act within the official responsibility of such employee…, or
> >
> > (2) to influence such an employee…to commit or aid in committing, or collude

in, or allow, any fraud, or make opportunity for the commission of any fraud
on…a…municipal agency, or
(3) to induce such an employee...to do or omit to do any act in violation of his
lawful duty;

See Mass. Gen. Laws ch. 268A, §2(a).  Section 3(a), in turn, imposes liability on any person who

"directly or indirectly, gives, offers or promises anything of substantial value to any present or

former…municipal employee…for or because of any official act performed or to be performed

by such an employee…" See Mass. Gen. Laws. ch. 268A, §3(a).  Further, Section 17(b) provides

that "[n]o person shall knowingly…directly or indirectly give, promise or offer [compensation to

a municipal employee in relation to any particular matter in which the town has a direct and

substantial interest.]" See Mass. Gen. Laws. ch. 268A, §17(b).

The Town's breach of contract claim against PSG stems in part from PSG's retention of

certain funds owed to the Town and its diversion of other funds. Under the contract, PSG was

obligated to rebate to the Town certain funds for the last contract year, 2003-2004 and failed to

do so. PSG has improperly retained thousands of dollars of those funds. In addition, the Town

alleges that by diverting funds from the Town to Thomson, PSG committed a breach.


## II.  ALL OF THE INFORMATION THAT THE TOWN SEEKS IS HIGHLY RELEVANT TO THE TOWN'S CLAIMS AGAINST PSG AND ITS DEFENSES TO PSG'S CLAIM FOR BREACH OF CONTRACT

The Requests for Production were served on October 18, 2005.  See Tab 1.  PSG

responded on December 28, 2005.  Tab 2.  For months, the parties have tried to narrow the areas

of disagreement.  After much debate, PSG still has only produced a single box of documents to

the Town.  The Town now brings this motion to seek documents essential to its case.

For the Court's convenience, the requests that are the subject of this motion are grouped

together by topic.

***A. Information Relating to Gregory Thomson, the Rockland Town official with whom PSG allegedly Conspired to Rig the Bidding and Who Received Thousands of Dollars in Funds that PSG was supposed to Rebate to the Town -- Request Nos. 12, 19, 20***

**Request No. 12.** All documentary materials referring to, describing, commenting upon, reporting on, or discussing Thomson in any way.

**PSG's Response:** PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.[2]

**Request No. 19.** All documentary materials (except for materials protected by the attorney-client privilege or work-product doctrine) including, but not limited to, emails, hand written or typed notes, memoranda, correspondence, reports, etc., referring directly or indirectly to Gregory Thomson.

**PSG's Response:** PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**Request No. 20.** All communications between Thomson and any of the following at any time:

    a. PSG
    b. Metcalf & Eddy[3]
    c. U.S. Filter[4]
    d. Sausé

---

[2] PSG's responses to the requests for production begin with 12 "General Objections." There is no indication which of these objections is applicable to which requests. Under Local Rule 34.1 (A) (3), "[e]ach objection and the grounds therefore shall be stated separately" in response to a document request. The Rule further provides:

> When an objection is made to any document request, or sub-part thereof, it shall state with specificity all grounds upon which the objecting parties relies.

Local Rule 34.1(C)(1); see also M2 Software, Inc. v. M2 Commc'ns, LLC, 217 F.R.D. 499, 501 (C.D. Cal. 2003) ("[B]oilerplate 'General Objections' … are not sufficient to raise any substantial, meaningful or enforceable objections to any particular discovery request."). A party, or the Court, should be able to determine, by reading an objection, exactly what the objection is.

In this case, given the litany of "General Objections" raised by PSG, it is impossible to ascertain which objections are intended to apply to which requests. This hide-and-seek approach to discovery has, for some time, been disfavored by the Rules and frowned upon by the Courts. It creates a needless burden and expense on the opposing party to try to determine the basis for the objection, and a burden on the Court to decide the motion. This motion will therefore not address these "General Objections," except to the extent they are restated as individual objections in response to requests.

[3] The two companies listed in addition to PSG – Metcalf & Eddy and US Filter – are intertwined with PSG. As discussed in the Background section, Metcalf & Eddy Services, Inc. was acquired by PSG prior to the tainted procurement and was operating the plant in 1997 at the time the bidding is alleged to have been rigged. At some point after PSG was awarded the contract, PSG became "US Filter" and began operating the plant under that name. The checks that Sausé and Thomson diverted were issued by "US Filter."

[4] See supra note 3.

**PSG's Response:** PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**ARGUMENT:** PSG has objected on the grounds that the requests are "neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." Rule 26(b)(1) of the Federal Rules of Civil Procedure permits "discovery of any matter, not privileged, that is relevant to the claim or defense of any party." The Rule broadly defines relevance to include not only information admissible at trial, but also information which "appears reasonably calculated to lead to the discovery of admissible evidence." Id; see also Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978) (relevance is broadly interpreted "to encompass any matter that bears on, or that reasonable could lead to other matter that could bear on any issue that is or may be in the case"). "[R]elevant information includes any matter that is or may become an issue in the litigation." Multi-Core, Inc. v. Southern Water Treatment Co., 139 F.R.D. 262, 264 n. 2 (D.Mass.1991). In connection with this motion, the Town of Rockland's only burden is to demonstrate an appearance of relevance. The burden then shifts to PSG to establish lack of relevance. Gen. Elec. Capital Corp. v. Lear Corp. , 215 F.R.D. 637, 640 (D. Kan. 2003) ("When the discovery sought appears relevant, the party resisting the discovery has the burden to establish the lack of relevance by demonstrating that the requested discovery (1) does not come within the scope of relevance as defined under Fed. R. Civ. P. 26(b)(1) or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure.").

These requests are highly relevant to a number of claims and defenses. Most obviously, documents that refer to, describe, comment upon, report on, or discuss Gregory Thomson are relevant to the Town of Rockland's claim that PSG had a corrupt relationship with Thomson and used its influence with him to rig the bidding and obtain the long-term contract to operate the

wastewater treatment plant. The Town is entitled to discover all documents that concern Thomson that are not otherwise privileged or protected by the work-product doctrine because such information about Thomson will shed light on the relationship between PSG and Thomson and the corrupt scheme.

PSG's objection that two of the requests are "overbroad" has no justification. It is not as if PSG and Thomson had a number of dealings over many years on many subjects, of which the Rockland wastewater treatment plant was only one. <u>PSG's only known connection to Thomson is as a result of its dealings in connection with him in connection with his role as a Rockland town official, and particularly, in connection with the wastewater treatment plan</u>t. Rockland seeks documents that will shed light on PSG's dealings with Thomson, its exchanges with Thomson concerning the procurement process, the operation of the plant and the use of funds on expenditures that the town's forensic accountant found improper, and the diversion of funds that were supposed to be rebated to the Town under the contract. Because PSG's knowledge and intent when interacting with Thomson are critical to the conflict of interest claim, documents that shed light on that knowledge and intent are therefore relevant.

### B. Information relating to Michael Sausé and his role at PSG –related companies -- Request Nos. 28, 24, 25

**Request No. 28.** All documentary materials referring to Michael Sausé generated or dated since January 1, 1997.

**PSG's Response:** PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**Request No. 24.** All documentary materials (except for materials protected by the attorney-client privilege and work-product doctrine) reflecting, describing, analyzing, commenting upon any work performed by Michael Sausé at any time for Metcalf & Eddy Services, Inc., Professional Services Group, Inc. or U.S. Filter.

**PSG's Response:** PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**Request No. 25**.  All documentary materials (except for materials protected by the attorney-client privilege and work-product doctrine) reflecting, describing, analyzing, commenting upon any work performed by Michael Sausé at any time.

**PSG's Response:**  PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence

**ARGUMENT:**  One of PSG's primary defenses to the claims in this case is that PSG neither

knew of nor encouraged Michael Sausé's illegal activities.  Any documents that concern Sausé,

or describe, analyze, or comment upon his work at PSG are highly relevant to establishing what

Sausé's role was at PSG, the importance of his position, with whom he interacted, PSG's

knowledge of his work and activities and PSG's approval or disapproval of his work and

activities.  The documents are also relevant to PSG's liability for Sausé's conduct under an

agency theory, depending upon whether Sausé was operating within the express or implied

authority conferred upon him by PSG.  These documents would shed light on what PSG had

authorized Sausé to do.

### C.  Michael Sausé communications concerning the Rockland wastewater treatment plant  -- Request Nos. 29, 31

**Request No. 29.**  All written communications between Michael Sausé (or anyone acting on Michael Sausé's behalf) and any of the following since January 1, 1994 concerning, referring to or relating to the [Rockland wastewater treatment] plant:

      a. Metcalf & Eddy Services, Inc.
      b. PSG
      c. U.S. Filter.

**PSG's Response:**  PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**Request No. 31.**  .All documentary materials, including but not limited to emails, notes, memoranda, reports, telephone messages, etc., (except for materials protected by the attorney-client privilege or work-product doctrine) describing, evidencing, referring to communications with or from Sausé (or anyone acting on Sausé's behalf) from January 1, 1993 until July 1, 2004 that refer in any way to the Town of Rockland or to the plant.

**Response:**  PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**ARGUMENT:**    As discussed above, one of PSG's principal contentions in defense of the Town's claims is that  PSG neither knew of nor encouraged Michael Sausé's illegal activities. The requested communications between Sausé and PSG, under both its current and previous name, as well as its predecessor, are highly relevant both to establishing Sausé's behavior toward the Town of Rockland, and PSG's knowledge of that behavior.  Such communications are clearly relevant to PSG's defense that Sausé was acting on his own.

> ### D.  Documents in PSG's Possession Relating to Michael Sausé's use of American Express cards, which in part were apparently paid out of the Boston bank account that he set up for Thomson to divert funds, and other, charge or credit cards  -- Requests Nos.  26, 27, 33

**Request No. 26.**  The account statements of any and all charge cards or credit cards used by Sausé, or submitted by Sausé, including but not limited the account statements of any American Express card used by Sausé.

**PSG's Response:**  PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**Request No. 27.**  All communications between Sausé and PSG, US Filter or Metcalf & Eddy concerning any charge cards or credit cards used by him, including any American Express card since January 1, 1994.

**PSG's Response:**  PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**Request No. 33.**  All documentary materials, including but not limited to, manuals, personnel handbooks, reports, codes, etc., describing or containing any policies of Metcalf & Eddy, PSG or US Filter concerning the use of corporate credit or charge cards that were authored, in effect or implemented at any time from January 1, 1993 to July 1, 2004.

**PSG's Response:**  PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**ARGUMENT:**    One of PSG's primary defenses to the claims is an assertion that Sausé was a "rogue" employee, and that PSG did not know of, encourage or ratify Sausé's efforts to influence Thomson and his illegal activities with Thomson.   The evidence is, however, that corporate American Express charges were paid for by Sausé out of the improper bank account that Sausé

set up in Boston to receive diverted town funds. Also, the Town alleges that Sausé wined and dined Thomson as part of his corrupt relationship with Thomson and his efforts to influence him, and then reward him for steering the long-term contract to PSG. Any information concerning Sausé's charges on the American Express card and other credit card charges which PSG possesses bears directly on these issues. If PSG was paying for charges that Sausé incurred that make his activities apparent, it diminishes any defense that PSG had no idea what he was doing. It is also important to put the charges related to the Town of Rockland in context with whatever other charges Sausé made during his employment. If Sausé regularly made similar charges as a part of his regular job duties, that would be relevant to whether Sausé was operating within the express or implied authority conferred upon him by PSG when he engaged in his activities with Thomson. For example, PSG has claimed it was unaware of Sausé spending corporate funds to influence and reward Thomson with entertainment. If credit card charges that PSG paid on Sausé's corporate credit cards show that PSG paid such entertainment expenses or reimbursed Sausé for such expenses, PSG's assertion would be contradicted, and such evidence would help establish the Town's claims.

Charge records are also relevant to establishing Sausé's activities and whereabouts at particular key times. For example, to the extent Sausé or PSG claims he was not in Rockland or in the Boston area on a particular date, a charge on a corporate credit card may establish otherwise. Furthermore, information about the applicable corporate policies involving such credit cards would provide information about whether Sausé was acting in compliance with those corporate provisions when he conducted his illegal activities. If Sausé was acting consistent with the corporate policies, that would be relevant to whether Sausé was operating within the express or implied authority conferred upon him by PSG when he engaged in his illegal activities. If

Sausé's charges were in violation of the corporate policy, that would be evidence that Sausé's

charges would have come to the attention of PSG.

### E.  Information relating to Damages - Requests Nos.  39, 40, 41

**Request No. 39.**  All documentary materials reports, pro formas, spread sheets, budgets, etc., describing, calculating, analyzing, assessing, commenting upon, or referring to any revenues, earnings and or profit earned, or projected to be earned, by Metcalf & Eddy, PSG, and/or U.S. Filter as a result of the 1994 or 1998 Contract.

**PSG's Response:**  PSG objects to this request on the grounds that it is overbroad, seeks confidential business information, and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**Request No. 40.**  All documentary materials containing or referring to any projections or forecasts of revenue, earnings, and/or profits from the operation of the plant at any time.

**PSG's Response:**  PSG objects to this request on the grounds that it is overbroad, seeks confidential business information, and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**Request No. 41.**  All documentary materials including but not limited to, emails, reports, memoranda, emails, spread sheets, etc., analyzing, commenting upon, projecting, or concerning the profitability of any actual or proposed contract to operate the plant.

**PSG'S Response:**  PSG objects to this request on the grounds that it is overbroad, seeks confidential business information, and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**ARGUMENT:**  The Town of Rockland alleges in this case, among other things, that PSG

violated Massachusetts' Conflict of Interest Law, Chapter 268A.  Under the terms of that statute,

the town's damages are tied to the "economic advantage" that PSG obtained by violating that

statute.  PSG's "economic advantage" can be measured by the profits that it earned on the

contract from the commencement of the contract in March 1998, to the termination of the

contract in April 2004. Information about PSG's revenues, earnings and profits are therefore

essential to the Town to determine its recovery on this count.

PSG has objected to one of these requests, Request No. 39, claiming confidential

business information.  A party resisting discovery on a claim of confidential business

information has the burden of establishing that the information sought falls within the scope of

Federal Rule of Civil Procedure 26(c)(7), which deals with "trade secret[s] or other confidential research, development, or commercial information."  As a general rule, "non-trade secret but confidential business information is not entitled to the same level of protection from disclosure as trade secret information." <u>Littlejohn v. BIC Corp.</u>, 851 F.2d 673, 685 (3rd Cir.1988).  PSG's mere objection on this basis, without any reasoning, is not enough to withhold the documents. The documents requested are financial calculations and projections from contracts that were entered into eight and twelve years ago.  It is hard to imagine how PSG could be commercially disadvantaged by their disclosure today.   Should PSG choose to prevent disclosure of the information altogether on the grounds of confidential business information, and thus seek a protective order, it must provide a detailed account of the documents it refuses to turn over, and mere assertions that the documents are confidential without "legal reasoning and authority" are insufficient.  <u>Baxter Int'l, Inc. v. Abbott Labs.</u>, 297 F.3d 544, 547-48 (7th Cir.2002); see also <u>Bank of New York v. Meridien BIAO Bank Tanzania Ltd.</u>, 171 F.R.D. 135, 143 (S.D.N.Y.1997) (demonstration of "clearly defined and very serious injury to its business" prerequisite to protection under 26(c)(7)). If PSG does not seek a protective order, the documents must be produced.

Furthermore, even if PSG were able to establish that the documents sought fall within the scope of the rule, there is no absolute privilege for confidential business information.  Such documents should still be produced, subject to safeguards that prevent dissemination of the material.  To the extent that any of the requested information is actually confidential, that can be easily be addressed by stipulation or confidentiality order.

**F. Information Concerning PSG's preparation of the bid to the Town of Rockland –**
*Request No.42*

**Request No. 42.** All documentary materials used, consulted upon, or relied upon to prepare any draft or actual price or cost proposal submitted by or on behalf of PSG to the town of Rockland in at any time from 1994 to 1997, including the 1997 price or cost proposal, and including all documentary materials used to calculate, formulate, prepare, analyze or draft any portion of such price proposal (s).

**PSG's Response:** PSG objects to this request on the grounds that it is overbroad, seeks confidential business information, and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**ARGUMENT:** The Town of Rockland has alleged that PSG violated the Uniform Procurement Act, the Conflict of Interest law and Chapter 93A by obtaining a contract through a rigged bidding process and improper influence. Documentary evidence about the manner by which PSG drafted its price proposal to the town in connection with that bidding is therefore highly relevant.

Moreover, the Town alleges that it ended up paying more for the operation of the wastewater treatment plant through the PSG contract because other prospective bidders who had expressed an interest were deterred from bidding and announced – before the price proposals were due – their intentions not to bid. As a result, PSG was able to submit a higher bid, which led to additional damages suffered by the Town. PSG's documents concerning the preparation of the price proposal – including the individuals who worked on the price proposal and the manner in which the price was calculated – are directly relevant to the extent of Sausé's involvement in preparation of the price proposal and the manner in which PSG was able to exploit its improperly secured position as the only bidder.

### G.  Information generated by Michael Sausé's, boss, Steven Kruger, concerning the Town of Rockland,  Sausé or Thomson

**Request No. 17.**  All documentary materials, including, but not limited to, memoranda, email, handwritten or typed notes generated by Steven Kruger since January 1, 1995 concerning any of the following:

      a.  Thomson

      b.  Sausé

      c.  PSG's, Metcalf & Eddy's and/or U. S. Filter's contract or business relationship with the Town of Rockland.

**PSG's Response:**  PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**ARGUMENT:**   As explained above, one of PSG's primary defenses to the claims in this case will be that PSG neither knew of nor encouraged Michael Sausé's illegal activities in obtaining the Town of Rockland's contract.   Any documents authored by Steven Kruger, Sausé's immediate supervisor at PSG, would therefore be relevant to this defense, if they concerned Thomson, Sausé, or the Town of Rockland.  If Kruger had knowledge or participated in any of Sausé's conduct, that evidence directly contradicts any defense that PSG has that Sausé was some sort of rogue employee.

### H.  Organizational Charts of  PSG-Related Companies that Operated the Rockland Wastewater Treatment Plant – Request No. 34

**Request No. 34.**  Organizational charts of the following at all times from January 1, 1994 through June 1, 2004:

      a. Metcalf & Eddy Services, Inc;

      b. PSG

      c. U.S. Filter

**PSG's Response:**  PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**ARGUMENT:**   As discussed in the background section, and in footnote 3 supra**,** the three companies for which the Town seeks organizational charts were all involved during the relevant time period in the operation of the wastewater plant, and were all acquired or became part of PSG. Metcalf & Eddy Services, Inc. was acquired by PSG prior to the tainted procurement and

was operating the plant in 1997 at the time the bidding is alleged to have been rigged. At some point after PSG was awarded the contract, PSG became "US Filter" and began operating the plant under that name. The checks that Sausé and Thomson diverted were issued by "US Filter." The corporate structures and organization are confusing, and where the key figures fit in the corporate structure during each time period is relevant to establishing the operations of the companies during will also give information about what Michael Sausé's position in the company was during the time period in which he engaged in illegal activities, which is relevant to whether he was acting within the express or implied authority conferred upon him by PSG.

### I. Other proposals submitted by PSG -- Request No. 59

**Request No. 59.** Copies of all Proposals submitted by PSG or U.S. Filter to operate municipal or government water pollution control facilities, wastewater treatment plants and sewage treatment plants since January 1, 1994.

**PSG's Response:** PSG objects to this request on the grounds that it is overbroad, unduly burdensome, seeks confidential business information, and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**ARGUMENT:** A discovery request is unduly burdensome on its face only when responding to the challenged request will require the responding party to "engage in mental gymnastics to determine what information may or may not be remotely responsive" to the challenged request. See Aikens v. Deluxe Financial Services, Inc., 217 F.R.D. 533, 538 (D. Kan. 2003). When a discovery request is not unduly burdensome on its face, the responding party bears the burden of coming forward with an evidentiary showing that supports that party's objection. See General Electric Capital Corp. v. Lear Corp., 215 F.R.D. 637, 640 (D. Kan. 2003). Consequently, unless the Court finds a request unduly burdensome on its face, the burden rests with PSG to put forth evidence establishing an undue burden or expense that outweighs the ordinary presumption of broad discovery disclosures. Id. at 640. PSG cannot meet this burden.

The Town of Rockland has alleged that PSG violated the Uniform Procurement Act, the Conflict of Interest Law and Chapter 93A by obtaining a contract through a rigged bidding process and improper influence. Consequently, what language and provisions PSG used in other submissions would be useful in helping the Town compare the language used in other proposals to PSG's proposal to the Town – a proposal that was the result of improper procedures.

PSG's objection that the documents should be produced because they are confidential business information has no merit. See argument with respect to Request No. 39, supra.

### J. Investigations Concerning Bidding Practices -- Request No. 60

**Request No. 60.** All documentary materials submitted by PSG or U.S. Filter since January 1, 1994 concerning any investigations concerning contracts, procurements or bidding to the Federal Bureau of Investigation, the United States District Attorney for any district, the office of any county District Attorney, or any state or local governmental investigating agency.

**PSG's Response:** PSG objects to this request on the grounds that it is overbroad and seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**ARGUMENT:** With respect to the appropriate relevance standard, see the Argument in response to Request No. 12, supra. One of PSG's primary defenses to the claims in this case is that PSG neither knew of nor encouraged Michael Sausé's illegal activities. This defense is implausible if PSG was engaged in other similar illegal or unethical bidding practices during the same time period. PSG has been investigated by a number of governmental agencies with regards to its bidding and procurement practices. If documents from those investigations lend support to the argument that there was a general culture of corruption at PSG, in which Sausé's activities were not unusual, it rebuts PSG's assertion that Sausé was a rogue employee. Furthermore, the very existence of investigations of bidding impropriety is relevant to whether PSG was knowledgeable about Sausé's conduct or willfully blind. If PSG was being investigated for bid-rigging and PSG was thus internally sensitized to the importance of integrity

in the procurement process, then it would be nearly impossible – or at least, far less likely – for Sausé to have conducted his conspiracy of bid-rigging without anyone at PSG noticing.

**Statement Pursuant to Local Rules 7.1(A)(2) and 37.1(B)**

Several discovery conferences were held in March and April 2006 between Joanne D'Alcomo, representing Town of Rockland, and David M. Osborne, representing PSG.  Both attorneys were in their offices in Boston.  The issues not resolved are set forth in this Memorandum.

/s/ Joanne D'Alcomo
Joanne D'Alcomo


TOWN OF ROCKLAND ,
By its attorneys,

/s/ Seth Nesin
_____
Joanne D'Alcomo
BBO #544177
Howard P. Blatchford, Jr.
BBO #045580
Seth Nesin
BBO #650739
JAGER SMITH P.C.
One Financial Center
Boston, MA 02111
(617) 951-0500