UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PROFESSIONAL SERVICES GROUP, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>TOWN OF ROCKLAND, ROCKLAND SEWER COMMISSION, GREGORY THOMSON and MICHAEL SAUSÉ,<br><br>       . | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| TOWN OF ROCKLAND, ROCKLAND SEWER COMMISSION,<br><br>        Plaintiffs-in-Counterclaim<br>        and Crossclaim<br><br>v.<br><br>PROFESSIONAL SERVICES GROUP, INC.,<br><br>        Defendant-in-Counterclaim,<br><br>and<br><br>MICHAEL SAUSÉ,<br><br>        Crossclaim Defendant | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil No. 04-11131-PBS |

## JOINT PRETRIAL MEMORANDUM

Plaintiff Professional Services Group, Inc. ("PSG"), Defendant Town of Rockland (the "Town") and Defendant Rockland Sewer Commission (the "Sewer Commission") submit this

JS\127498.1

joint pretrial memorandum pursuant to Rule 26(a)(3) of the Federal Rules of Civil Procedure and

Local Rule 16.5(D). Defendant Michael Sausé ("Sausé"), against whom PSG, the Town and the

Sewer Commission have claims, filed for bankruptcy in Bankruptcy Court in Delaware and this

matter is stayed as to him. Defendant Gregory Thomson ("Thomson"), against whom PSG has

claims, failed to answer those claims and has not defended himself in this matter.

## I.   **SUMMARY OF THE EVIDENCE**

### A.    **Plaintiff's Summary**

The Sewer Commission is a three-member elected public body with responsibility for

overseeing the Town's sewer operations, including its Water Pollution Control Facility (the

"Wastewater Treatment Plant"). In or around 1994, Thomson became a member of the Sewer

Commission.

PSG provided operation, maintenance and management services for water and

wastewater systems for both public and private clients. PSG and its predecessor, Metcalf and

Eddy Services, Inc. ("Metcalf and Eddy") operated and maintained the Wastewater Treatment

Plant since the 1980's under various contracts with the Sewer Commission and the Town. In

1990, Sausé joined Metcalf and Eddy and became an area manager with responsibility for the

Town contract as well as other projects throughout New England and New York.

In the mid-1990's, the Town's sewer operations were experiencing significant growth,

with two new pumping stations and an expanding collection system. During that time, the Sewer

Commission – a part-time board – had only a single secretary to provide administrative support.

Because it lacked internal resources, the Sewer Commission had to contract with Metcalf and

Eddy to handle many of the day-to-day Sewer Commission affairs on a consulting basis, at

considerable expense to ratepayers.

In 1996, the Sewer Commission concluded that it could eliminate these expensive consulting costs by hiring a full-time superintendent. At its December 1996 meeting, the Sewer Commission voted to appoint a superintendent. Thomson expressed interest the job, resigned his membership on the Sewer Commission and, after a thirty day "cooling off" period, entered into an interim contract to provide consulting services to the Sewer Commission. Before the Sewer Commission created the position, Town Counsel Anne-Marie Hyland provided personal advice to Thomson in writing about the steps he would need to take to apply for the position. The Sewer Commission informed the Board of Selectmen of their decision and included the position in their budget proposal to the Finance Committee. Town Meeting voted to fund the superintendent's position in the spring of 1997, and the Sewer Commission appointed Thomson to the job.

At that time, PSG was operating the Wastewater Treatment Plant under a three-year contract (the "1994 Contract") was due to expire in 1997. One of Thomson's duties as superintendent, as stated in a job description approved by the Town's legal counsel, was to manage the municipal procurement process for the Sewer Commission. In July 1997 the Sewer Commission issued a request for proposals for a new contract (the "1997 RFP"). The 1997 RFP was largely the same as the previous request for proposals that had been prepared in 1994 by the engineering firm of Tighe & Bond (the "1994 RFP"), except that the 1997 RFP included a minimum labor component and a ten year term. The minimum labor component was approved by the Massachusetts Office of the Inspector General ("OIG") and the ten year term was approved by Town Meeting.

Other than PSG, the only prospective bidder that showed serious interest in the 1997 RFP was the firm of Woodard & Curran. Woodard & Curran informed the Sewer Commission that it

wished to submit a proposal that deviated from the 1997 RFP in a number of material respects.

Thomson and the Town's legal counsel discussed this matter with the OIG, which advised that

the Sewer Commission could not award the contract to a bidder whose proposal did not conform

to the 1997 RFP. In the face of this opinion from the OIG, Woodard & Curran decided not to

submit a proposal.

Two other firms that considered bidding on the 1997 RFP decided not to do so for

reasons that had nothing to do with any alleged proprietary specifications. American

Commonwealth Management Services Co., Inc., wrote Thomson that it decided not to bid

because of a "heavier than normal bidding schedule in the New England area" and because the

Town was satisfied with the incumbent operator's services. American Anglian declined to bid

because it was interested in operating both the water and wastewater utilities of the Town – a

self-described "innovative" proposal which American Anglian itself acknowledged was

impossible because the Sewer Commission did not operate the Town's water utility.

For these reasons, PSG was the only firm to submit a proposal in response to the 1997

RFP. In October 1997, after further consultation with the OIG, the Sewer Commission named

PSG the successful bidder and began negotiations over contract terms.

PSG priced its proposal at $1.269 million for the first contract year. Even though PSG

was the only firm to submit a proposal in response to the 1997 RFP, Thomson negotiated PSG's

bid price down by more that five percent, to $1.2 million, and in February 1998 PSG and the

Sewer Commission entered into a new contract (the "1998 Contract") for a ten-year term

commencing March 1, 1998.

Like the 1994 Contract, the 1998 Contract provided that PSG would rebate monies in

certain fixed accounts that did not exceed PSG's expenditures. The Sewer Commission did not

want these funds rebated back to the Town at the end of each fiscal year, however, but instead agreed that PSG should hold the rebate monies and use them to pay Sewer Commission expenses from time to time as instructed by Thomson.

After PSG was selected as the successful bidder in October 1997, Thomson and Sausé went to dinner and a strip club in Providence. Sausé paid for these expenses and sought reimbursement from PSG. After Sausé's supervisor rejected Sausé's request for reimbursement, Sausé and Thomson devised a plan to divert rebate monies from the Sewer Commission to use as their personal "slush fund." Thomson obtained the Town's tax identification number from the Town Administrator, and Sausé used this information to open an account in the Sewer Commission's name at Wainwright Bank (the "Wainwright Account"), with Thomson and Sausé as joint signatories.

In November 1997, Thomson sent a letter to Sausé requesting that PSG release $50,000 in rebatable funds under the 1994 Contract by issuing a check for that amount payable to the Sewer Commission. Sausé caused this request to be processed in accordance with PSG's standard check-issuance procedures. Because Thomson was the agent of a client seeking rebate money to which it was entitled, PSG issued the check as requested. Thomson then endorsed the check and deposited it into the Wainwright Account.

Over the next several months, Thomson sent more check requests to PSG. PSG continued to process these requests routinely, with the understanding that the rebate monies were the Sewer Commission's funds and the Sewer Commission could these funds as it wished. Thomson and Sausé deposited into these checks into the Wainwright Account and used the money to pay their personal expenses, including illegal drugs.

In 1999 Sausé was transferred to PSG's Mid-Coast region. Thomson demanded that Sausé cause PSG to issue rebate checks in Thomson's name, but Sausé refused, explaining that PSG would never agree to issue checks from the Sewer Commission's rebate account in such a form. Thomson opened a second account – this one at North Abington Co-Op Bank – and continued his check diversion scheme, apparently without Sausé's further participation.

Town officials never discovered that Thomson was stealing the rebate funds. It was the North Abington Co-Op Bank that in 2002 alerted the Rockland Police Department to Thomson's banking transactions, triggering an investigation. PSG cooperated with this investigation and with the investigation of an outside accountant who was hired by the Board of Selectmen to audit the Sewer Commission. Indeed, much of the information the Town now relies upon in alleging counterclaims against PSG was obtained by the Town as a direct result of PSG's cooperation. Thomson resigned from the Sewer Commission, Sausé resigned from PSG, and both of them were convicted of larceny in Plymouth Superior Court. No other individuals or entities were charged in connection with the scheme of Sausé and Thomson.

The audit prepared by the Town's outside accountant was issued on February 25, 2004. It was erroneous in many respects, but significantly it concluded that the Sewer Commission members "have not provided oversight of the Sewer Commission adequate to protect the Town from fraud and abuse of public funds. The [Sewer Commission] hired a full time Superintendent [Thomson] and then did not provide the supervision to prevent him from opening unauthorized accounts and converting money to personal use that was due back to the Town." The audit recommended abolition of the Sewer Commission, but the Sewer Commission continues to oversee the Town's sewer system to this day.

On or about February 10, 2004 – before the audit report was even issued – PSG received

a letter from the Town stating that the 1998 Contract was terminated by operation of law because

the actions of Thomson and Sausé violated Chapter 30B.  PSG denied this claim and entered into

negotiations with the Town to resolve the matter.  PSG's efforts to resolve the matter were

unsuccessful.  On April 12, 2004, the Town directed PSG to turn over operation of the

Wastewater Treatment Plant to an interim operator.  Subsequently the contract was rebid and

awarded to Aquarion.

On March 30, 2004, after The Town terminated the 1998 Contract, Robert Corvi, the

Chairman of the Sewer Commission, wrote to PSG:

> It is unfortunate that our contract had to end and will need to be rebid due to the
> actions of two former employees.  You have been an excellent and dependable
> partner for wastewater treatment services for more than 20 years.

> Be assured that in no way did the actions of our two former employees impugn
> the integrity of your company's management of our wastewater treatment
> operations.  Since 1982, your company has performed stellar operations,
> maintaining an excellent safety and compliance record.  Your team has been a
> valuable partner.

The evidence will show that the Defendants repudiated the 1998 Contract without

right or justification and that PSG is entitled to its lost profits for the remaining four years

of its ten-year contract with the Sewer Commission.  The evidence also will show that (1)

the 1998 Contract was not procured in violation of state law, and (2) Thomson and

Sausé's scheme to steal the Sewer Commission's rebate funds was motivated by their

desire for personal benefit and thus PSG is not liable for Sausé's conduct.

### B.    Defendants' Summary

This dispute arises out of a procurement conducted in 1997 that resulted in the award of

a 10-year contract, with a 10-year renewal,  to US Filter (then PSG) to operate the Wastewater

Treatment Plant and the illegal and improper activities that occurred in relation to that contract.

Although other companies expressed interest in winning the 10-year contract, with a 10-year renewal offered by the Town in 1997, PSG was the sole bidder and was awarded the contract. The Massachusetts Inspector General's office, after conducting an investigation, directed the Town to cancel the contract and conduct a new procurement. As a result, the Town canceled the contract with PSG in 2004, and issued a new Request for Proposals. PSG did not bid in that new procurement, and the contract was awarded to another wastewater treatment plant operator.

The former Vice President and Area Manager of PSG Michael Sausé and the former Rockland Sewer Superintendent Gregory Thomson have pleaded guilty to embezzlement of Town funds. Both now express remorse and admit that the procurement was tainted, and describe how PSG processed thousands of dollars in specious check requests to keep Thomson – PSG's main contact in the Town – content.

In 1996, the Wastewater Treatment Plant was being operated by PSG, which had taken over Metcalf and Eddy Services. Metcalf and Eddy had a three-year contract to operate the plant from 1994 to 1997. Michael Sausé was a Vice President and area manager of PSG who had worked for Metcalf and Eddy services and continued to work for PSG in interacting with the Town. A new bidding process was coming up in 1997.

In late 1996, before the procurement process was underway for the 1997 procurement, Sausé took steps to help Thomson obtain what was to be a newly created position as Sewer Superintendent for the Town. Thomson, then Chairman of the part-time Sewer Commission, and other members of the Sewer Commission, were talking about creating a full-time position of superintendent. Thomson expressed interest in the position. Sausé contacted the law firm used by PSG – Mintz Levin – and asked the firm to do research to determine the procedures that had

to be followed so that Thomson could apply for and obtain the position. This was important to Sausé because he had a strong relationship with Thomson and he wanted to be able to retain his influence by helping Thomson become superintendent.

Typically, municipalities hire an engineering firm to prepare a Request for Proposals to launch competitive bidding for a technical activity such as operation of a wastewater treatment plant. But Michael Sausé, the former Vice President and Area Manager of PSG, has acknowledged during this litigation that he conspired with the then-Sewer Superintendent Gregory Thomson to write the Request for Proposals in 1997, in an effort to give PSG a clear advantage in the bidding. Sausé has testified that he prepared the RFP, and every addendum that was issued to address matters raised by prospective bidders, in an effort to direct the contract to PSG. Sausé has also acknowledged that he pushed to have the contract term switch from a short three-year term, which was the term of the then-existing contract, to a 10-year contract with a 10-year renewal, a total of 20 years.

Because of Sausé's efforts, there were, at minimum, two provisions of the Request for Proposals that gave PSG a distinct advantage and deterred prospective bidders. One was a minimum labor cost. In other words, the request for proposal required competitors to bid a minimum of $400,000 for labor costs. Since labor costs were the single largest expense in the contract, this provision prevented prospective bidders from offering a lower price for labor, and eliminated one chief way for prospective competitors to come in at a lower bid than PSG. The evidence shows that the idea of a minimum labor cost to help deter competitors was Sausé's. He was concerned that this provision might be challenged by prospective bidders, so he engineered a way to get the approval of the provision from the Massachusetts Office of the Inspector General. He wrote a letter from Thomson to the Inspector General, purporting to justify the minimum

labor requirement. Thomson signed the letter, and the Inspector General's office bought the articulated justification. Thomson and Sausé then had the blessing of the Inspector General's office to include the minimum labor cost in the RFP.

Another device that Sausé used in the RFP, with Thomson's assistance, to deter prospective bidders was a requirement that any bids include a particular type of equipment known as a "belt filter press" to handle sludge dewatering. The plant, in 1997, was equipped with a belt filter press that was being leased by PSG with a purchase option at the end of the lease. The RFP required any proposal to include a belt filter press "equal to or better in quality, age and hours run." This gave PSG a competitive advantage because it already had a contract for the equipment, it was already a few years into the lease, and it precluded bidders from coming up with alternative, potentially more cost-effective, proposals.

The evidence will also show other anticompetitive provisions of the RFP, including that that a copy of the RFP could only be obtained for an extremely short period of time, and a requirement of interim sludge dewatering while a belt filter press was installed, which would be costly for all bidders other than PSG, because PSG would not have to install a new belt filter press.

The evidence shows that two prospective bidders voiced criticism of the RFP because it prevented bidders from coming up with alternatives to what was being done by PSG. Woodard & Curran, a competing company, specifically sought to have the belt filter press removed as a requirement in the RFP so that it could propose alternatives. Woodard & Curran requested the option to submit an "alternate" proposal that it believed would result in savings, which was denied. When the approach was rejected, Woodard & Curran informed the Town that it would not submit a bid, complaining that the RFP "seems to be heavily weighted in favor of your

incumbent operator," PSG. Another prospective bidder, American Anglian, also said that it would not submit a proposal in response to the RFP, but would be interested "if the RFP is reissued in a form which allows us to be innovative in the operation of the plant." Thomson has admitted during this litigation that he and Sausé conspired to have PSG, primarily through Michael Sausé as the lead preparer but also with input from others at PSG, write the RFP.

Sausé was a salaried employee for PSG, and he did not receive any Sewer Commission or bonus upon landing a contract. The prospective bidders were not told that PSG's Michael Sausé prepared the RFP and the addenda addressing their questions.

Not surprisingly, only PSG put in a bid for the contract. In submitting the bid, PSG represented falsely, under penalties of perjury, that its bid was not the result of any collusion. During this litigation, Sausé has admitted traveling with Thomson and wining and dining Thomson in an effort to curry favor with him and influence his decisionmaking. During the course of this litigation, Thomson, too, has admitted being wined and dined by Sausé, and traveling with Sausé and the manager of the Wastewater Treatment Plant – who was a PSG employee. He has admitted traveling to such places as Las Vegas, Cancun, Montreal, and to the Houston office of PSG as arranged by PSG. This was all done as PSG attempted to curry favor with Thomson and maintain a positive relationship with him, since he could stand in the way of approval of PSG's annual fees (which were subject to adjustment), expenditures, and variations in the scope of the contract.

The evidence will also show PSG's misconduct with respect to the handling of funds under the contract. Under PSG's contract with the Town resulting from the 1997 RFP contract, certain funds were earmarked for specific categories of expenses: maintenance and repair; capital

expenses; utility expenses and labor. If funds earmarked for those purposes were left over at the end of the contract year, the excess was supposed to be rebated to the Town <u>at the end of the contract year</u>. As it turns out, however, PSG improperly issued checks amounting to thousands and thousands of dollars during the course of the contract years out of those accounts. The check requests typically were typed by Sausé or PSG plant manager Aram Varjabedian for Gregory Thomson to sign, which he did, and then approved by PSG through Sausé, Plant Manager Aram Varjabedian, Area Manager Frank Cavalieri, or PSG Vice President Steven Kruger.

The check requests were for specious purposes. For the most part, no invoice or other back-up documentation of any kind was submitted in connection with the check requests processed by PSG.

In addition to processing the check requests, PSG facilitated Thomson's (and, for a time, both Thomson's and Sausé's) embezzlement of Town funds by having the checks made out in an improper manner. The checks were often made out to:

> Town of Rockland
> Rockland Sewer Commission
> Gregory Thomson, Superintendent

Under the applicable Uniform Commercial Code provisions governing interpretation of checks, this choice of wording by PSG in making out the checks meant that <u>any</u> of the three parties to whom the checks were made out would be able to endorse them and cash them. As a result, initially a series of checks were deposited in a bank account opened up by Sausé and Thomson in Boston, in the name of Town of Rockland d.b.a. The Rockland Sewer Commission. From late 1997 to early 1999, a series of checks issued by PSG were deposited into that Boston bank account and the proceeds were used by Sausé and Thomson for a variety of purposes. Both of them were signatories on the account. The Boston bank account, for example, was used to pay

12

PSG's Wastewater Treatment Plant manager, Aram Varjabedian, for certain expenses. Some of the purposes for which Sausé used the money were to pay for the wining and dining of Thomson.

During 1999, 2000, 2001 and 2002, Thomson stopped using the Boston account with Sausé, and deposited the checks issued by PSG into a new account he opened at a bank on the South Shore. He also endorsed two of the checks over to another party in another bank. In 2002, a teller at one bank raised a question about a check seemingly for the Town being deposited by Thomson into a personal account, and the embezzlement became public.

Another aspect of PSG's conduct at issue in this lawsuit was its deliberate holding of Town funds in accounts that were "off the books" and not able to be tracked by Town finance officers. These accounts were maintained by PSG, and PSG did not pay any interest on the funds in the accounts. These accounts were not set up as a result of any contract between PSG and the Town. According to PSG in this lawsuit, the funds were held by PSG at the request of either Thomson or the Sewer Commission because – so PSG claims – they did not want the funds reverting to the Town for general use and instead wanted those funds available for discretionary purposes. If PSG's contention is correct, (or even if it is not correct), PSG's holding of the Town's funds in a manner to help keep the funds "off the books" and out of sight from the Town's finance officers was improper.

Another category of activity at issue in this lawsuit concerns PSG's use of money earmarked for various purposes under its contract with PSG for purposes unrelated to those contract-designated purposes. These include expenses for such items as T-Shirts, Christmas Trees, and the thousands of dollars in checks issued for the specious purposes described by Thomson in the check requests submitted to PSG.

When PSG's contract was terminated, PSG refused to rebate to Town monies owed under the contract. The Town quickly hired an engineering firm to step in and run the plant on an interim basis and prepare a new Request for Proposals. The new bidding was held in 2004. A new operator was chosen from among the bidders.

The Town has brought claims for fraud and misrepresentation; violations of the State Procurement Act, Massachusetts General Laws, Chapter 30B; violations of the state's Conflict of Interest Law, Mass. General Laws, Chapter 268A; breach of contract, including breach of the implied covenant of good faith and fair dealing; conversion; and civil conspiracy.

## Overview of Defenses for PSG's Claims
## Against the Town and the Sewer Commission

PSG claims that the Town breached the contract by terminating it. However, under Massachusetts General Laws Chapter 30B, Section 17, the competitive bidding statute, "[A] contract made in violation of [Mass Gen. Laws Chapter 30B] shall not be valid, and the governmental body shall make no payment under such contract." Because the procurement in 1997 was clearly in violation of Chapter 30B, as more fully described above, the contract was not valid. The evidence shows that the Town cancelled the contract because of concerns by the State Inspector General that the procurement process was corrupt. The evidence establishes clearly that the procurement process *was* corrupt.

Furthermore, as discussed below, the contract to PSG resulted from a violation of the state's Conflict of Interest Statute, Chapter 268A. A violation of Section 2 of Chapter 268A "which has substantially influenced the action taken by a municipal agency in any particular matter shall be grounds for avoiding, rescinding or canceling the action on such terms as the interest of the municipality and innocent third persons require." Mass. Gen. Laws ch. 268A § 21(a). The Town legitimately cancelled the contract on that basis.

Moreover, by its conduct, PSG was in material breach of its contract. Because it materially breached the contract, PSG cannot recover any damages for termination.

## II.  FACTS ESTABLISHED BY PLEADINGS, STIPULATIONS AND ADMISSIONS

None at this time.

## III.  CONTESTED ISSUES OF FACT

A.  Whether the Town or the Sewer Commission breached the 1998 Contract.

B.  Whether any breach by the Town or the Sewer Commission of the 1998 Contract was material.

C.  The extent of PSG's alleged damages.

D.  Whether the 1998 Contract was procured in violation of any state laws.

E.  Whether Sausé's alleged conduct was within the scope of his employment.

F.  Whether Thomson's alleged conduct was within the scope of his employment.

G.  Whether PSG owed a duty to the Town and/or the Sewer Commission to supervise Sausé.

H.  Whether PSG breached a duty that it owed to the Town and/or the Sewer Commission to supervise Sausé.

I.  Whether PSG made any negligent misrepresentation of fact to the Town and/or the Sewer Commission.

J.  Whether PSG made any knowing misrepresentation of fact to the Town and/or the Sewer Commission.

K.  Whether the Town and/or the Sewer Commission relied on any misrepresentation of fact by PSG.

L.  Whether PSG engaged in any unfair or deceptive acts.

M.  Whether PSG engaged in any unfair or deceptive acts willfully and knowingly.

N.  Whether PSG gave or promised a thing of value to Thomson.

O.  Whether PSG gave or promised a thing of value to Thomson for or because of an official act by Thomson.

P.    Whether PSG gave or promised a thing of value to Thomson to influence an official act by Thomson.

Q.    Whether PSG gave or promised a thing of value to Thomson with the intent to influence Thomson to commit, aid in committing, collude in or allow fraud.

R.    Whether PSG gave or promised a thing of value to Thomson with the intent to induce Thomson to do or omit an act in violation of his lawful duties.

S.    Whether PSG absconded with the property of the Town and/or the Sewer Commission upon vacating the Wastewater Treatment Plant.

T.    Whether PSG refused to rebate monies due and owing to the Town and/or the Sewer Commission under the 1998 Contract.

U.    Whether PSG established any unauthorized bank accounts and deposited public funds in those accounts.

V.    Whether PSG made unauthorized expenditures with public funds.

W.    Whether PSG converted public property.

X.    The extent of the Town and/or the Sewer Commission's alleged damages.

Y.    The extent to which the Town and/or the Sewer Commission are liable for any damages and costs that may be awarded against PSG at trial.

Z.    Whether the Town and/or the Sewer Commission were on notice of their alleged claims outside of the applicable statute of limitations period(s).

AA.    Whether PSG breached the 1998 Contract.

BB.    Whether any breach by PSG of the 1998 Contract was material.

CC.    Whether PSG breached the covenant of good faith and fair dealing in its performance of the 1998 Contract.

DD.    Whether the Town was justified in terminating the 1998 Contract.

**ADDITIONAL PLAINTIFF'S DISPUTED ISSUES OF FACT**

EE.    Whether the Town and/or the Sewer Commission were on notice of any claims against PSG outside of the statute of limitations period.

## ADDITIONAL DEFENDANTS' DISPUTED ISSUES OF FACT

FF.    Whether PSG is liable, under principles of agency, for the conduct of its Vice President and Area Manager Michael Sausé.

GG.    Whether PSG conspired with Gregory Thomson to prepare an RFP in 1997 that would favor PSG.

HH.    Whether PSG conspired with Gregory Thomson to give PSG the lead in managing and running the procurement process in 1997.

II.    Whether PSG conspired with Gregory Thomson and others to keep public funds of the Town of Rockland "off the books" and out of sight of Rockland finance officers.

JJ.    Whether PSG conspired with Gregory Thomson to have monies withdrawn improperly from accounts designated for specific contractual purposes, such as maintenance and repair and capital expenditures.

KK.    Whether PSG is liable, under principles of agency, for the conduct of its managers and employees in connection with the conduct of the procurement in 1997 and the handling of funds in its control.

LL.    Whether the Town of Rockland was justified in terminating its contract with PSG after being directed to do so by the Inspector General of Massachusetts.

MM.    Whether there was collusion between PSG and the Rockland Sewer Superintendent in the 1997 procurement that resulted in the award of the contract to PSG.

NN.    Whether any of PSG's activities, such as its obtaining legal counsel to provide advice to then Rockland Sewer Commissioner Gregory Thomson; travel with the Rockland Sewer Superintendent; or entertainment of the Rockland Sewer Superintendent, iolated the state's Conflict of Interest Law.

OO.    Whether PSG committed misrepresentation when it stated, in submitting its bid to the Town of Rockland in 1997, that it had not "participated in any collusion, or otherwise taken any action in restraint of free competitive bidding in connection with this proposal."

PP.    Whether PSG held public funds of the Town of Rockland to prevent finance officers from the Town of Rockland from knowing about the existence of the funds and from keeping track of such funds.

QQ.    Whether PSG, deceptively and in violation of contract, caused expenditures to be made for improper purposes.

JS\127498.1

## IV.    JURISDICTIONAL QUESTIONS

### A.    Plaintiff's Jurisdictional Questions

Among other affirmative defenses, PSG alleges that the Town and the Sewer Commission lack standing to bring certain claims. To simplify the trial of this matter, PSG intends to file a motion for judgment on the pleadings arguing that the The Town ' claim under Chapter 30B must be dismissed. <u>See</u> Fed. R. Civ. P. 12(c) (motion for judgment on pleadings may be brought after pleadings are closed); <u>see also</u> Fed. R. Civ. P. 12(h)(3) ("Whether it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). A summary of the grounds for this motion is set forth below.

PSG notes that, because these grounds are essentially matters of first impression regarding the interpretation of state law, it may be necessary to certify one or more questions to the Massachusetts Supreme Judicial Court (the "SJC"). Certification of a question by this Court to the SJC is within the discretion of this Court and is appropriate where there is "no controlling Massachusetts precedent" on an issue and when the "course that the state courts would take" on the issue is not "reasonably clear." <u>See</u> <u>Kansallis Finance Ltd. v. Fern</u>, 40 F.3d 476, 481 (1st Cir. 1994); <u>Stewart v. Milford-Whitinsville Hosp.</u>, 349 F. Supp. 2d 68, 70 (D. Mass. 2004) (Gorton, J.). Therefore, the Court or the parties may seek to certify a question or questions to the SJC regarding the appropriate interpretation of § 17(c). <u>See</u> SJC Rule 1:03 (procedure for certifying questions).

1.    **The Town and the Sewer Commission have no right of action under Mass. Gen. L. ch. 30B, § 17.**

Section 17(c) of the Uniform Procurement Act provides no right of action to the The Town for their counterclaim in this case. <u>See</u> Mass. Gen. L. ch. 30B, § 17. When a right of enforcement "is expressly conferred upon specified public officers, we may assume that the Legislature did not intend to create the private attorney general rights" which the The Town purport to exercise. <u>Local 1445, UFCW v. Police Chief of Natick</u>, 29 Mass. App. Ct. 554, 558, (1990); <u>see id.</u> (discussing authority to seek injunctive relief to enforce the Sunday "Common Day of Rest Law," Mass. Gen. L. ch. 136, § 10); <u>see also</u> <u>Loffredo v. Ctr. for Addictive Behaviors</u>, 426 Mass. 541, 544 (1998) (Courts are "reluctant to infer a private cause of action from a statute in the absence of some indication from the Legislature supporting such an inference.").

Here, § 17(d), unlike other provisions of Chapter 30B, specifically assigns enforcement authority for the penalty provisions of § 17(c) without including parties such as the Town and the Sewer Commission. In doing so, § 17(d) makes clear the "intent of the Legislature" in establishing who may bring an action to enforce § 17(c). <u>See</u> <u>Beard Motors, Inc. v. Toyota Motor Distributors, Inc.</u>, 395 Mass. 428, 431 (1985) (intent of Legislature is controlling in determining whether party has right of action under statute). Thus, § 17(d), "rather than more general ideas about standing, governs who may initiate legal action in relation to the subject matter" of the provision. <u>Local 1445, UFCW</u>, 29 Mass. App. Ct. at 558; <u>cf.</u> <u>Town of Lunenburg v. Carlson</u>, 2005 WL 937730, at *3 (Mass. Super. Ct. 2005) (Superior Court case applying standard incorrectly in holding "no express prohibition against private actions" under § 17(c)).

### 2.     The Town has no standing for its counterclaim under Mass. Gen. L. ch. 30B, § 17.

Even if § 17(c) contains a right of action for municipal entities, the Sewer Commission –

not the Town – is "the appropriate governmental body" to bring such an action. See Mass. Gen.

L. ch. 30B, § 17(c). As the SJC has explained:

> [N]ot every party who can claim injury as a result of violations of a statute or regulation has standing to bring an action thereunder. This is true even where a literal reading of the statute … would appear to provide a broader grant of standing.

Beard Motors, Inc., 395 Mass. at 431.

In this case, § 17(c) awards a penalty for violation of its provisions only to the

"appropriate governmental body." Although Chapter 30B defines "governmental body" broadly

to include both a "town" and a municipal "commission," see Mass. Gen. L. ch. 30B, § 2, the

"governmental body" referred to throughout § 17 is the governmental body with whom a

contractor contracts. See Mass. Gen. L. ch. 30B, § 17(a) ("the governmental body shall make

no payment … prior to the execution of such contract" and "the governmental body shall make

no payment under such contract"). In this case, PSG entered into the 1998 Contract with the

Sewer Commission, invoiced the Sewer Commission for monies owned under the 1998 contract,

and received payments from the sewer assessments of the Sewer Commission.

Moreover, the only harm for which § 17(c) provides a remedy in this case is harm to the

Sewer Commission. Any harm that the Town may have suffered is outside the scope of this

provision. See Policastro v. City of Boston, 2005 WL 3669755, at * 1 (Mass. Super. Ct. 2005)

("Generally, … harm must fall within the area of concern of the relevant statute or constitutional

guarantee. '[S]tanding is not measured by the intensity of the litigant's interest or the fervor of

his advocacy.'" (quoting Pratt v. Boston, 396 Mass. 37, 42 (1985)). The Sewer Commission is

the only "appropriate governmental body" under § 17(c) and, therefore, is the only entity with potential standing to bring a claim under § 17(c).

**B.     Response of Town of Rockland, Rockland Sewer Commission's to Plaintiff's Asserted Jurisdictional Questions**

Defendants Town of Rockland and Rockland Sewer Commission disagree that there are any "jurisdictional" questions in this case. To the extent the issue of whether a private right of action under the State's Procurement Act exists can be fairly characterized as a "jurisdictional" question, Defendants disagree that the issue is beyond the province of this Court. First, a Superior Court judge addressed the issue last year, concluding that a town *did* have a private right of action under the State Procurement Act. Town of Lunenburg v. Carlson, 2005 WL 937730 (Mass.Super. March 31, 2005) (Agnes, J.). Moreover, the issue of whether a state statute in Massachusetts creates a private right of action is an analysis that can be readily conducted by this Court using well-established principles of Massachusetts law. See, e.g., All Brands Container Recovery, Inc., v. Merrimack Valley Distributing Co., Inc., 54 Mass. App. Ct. 297, 764 N.E.2d 931 (2002) (analyzing question of existence of private right of action under bottle bill).

This Court need not delay this case by certifying questions to the Massachusetts Supreme Judicial Court or by engaging in motion practice on this issue. Moreover, the deadline for filing dispositive motions has passed.

**V.     QUESTIONS RAISED BY PENDING MOTIONS**

**A.     Plaintiff's Motions**

PSG has filed a motion to compel the production of certain documents from the files of Sausé's former attorney – including the grand jury testimony of witnesses in this case – that Sausé voluntarily turned over to the Town and the Sewer Commission two months ago and that

PSG learned of for the first time at Sausé's deposition on June 13, 2006. That motion has been referred to Magistrate Judge Collings and is pending. Depending on the ruling of Magistrate Judge Collings, the parties may be required to supplement their exhibit lists.

The day after PSG filed this motion, counsel for the Town and the Sewer Commission sent an email to PSG's counsel indicating that the files produced by Sausé were being returned to him. PSG objected, and after discussions by telephone and email counsel for the Town and the Sewer Commission informed PSG's counsel that Sausé agreed to allow the counsel for the Town and the Sewer Commission to retain possession of the files pending a resolution of PSG's motion to compel. Because the Town and the Sewer Commission apparently take the position that they must obey the directives of Sausé, at the pretrial conference PSG will request that the Town and the Sewer Commission be instructed to retain possession of the files or a complete copy thereof pending a resolution of PSG's motion to compel.

### B.    Defendants' Motions

The Town and the Sewer Commission have filed a motion to compel the production of documents, which is now pending before Magistrate Judge Collings. This motion is opposed by PSG, and a hearing is motion is scheduled for June 28, 2005. Depending on the ruling of Magistrate Judge Collings, the parties may be required to supplement their exhibit lists.

## VI.    ISSUES OF LAW

### A.    Plaintiff's Issues of Law

In addition to the issues identified in Section IV(A) above, the following issues of law may arise at trial. As with the issues identified in Section IV (A), the issue in Section VI(A)(2) may require certification to the SJC.

### 1.    Statute of Limitations

In the last three weeks, PSG learned information in the course of discovery that the Town

and the Sewer Commission were on notice of some of their counterclaims as early as 1997, and

thus those counterclaims are barred by all applicable statutes of limitations.  In Section VII, PSG

requests leave to amend its answer by adding an affirmative defense of statute of limitations.

With regard to the Defendants' claims under Chapter 30B and Chapter 268A, the Court

will have to determine what the applicable limitations period.  If the Court determines that

Chapter 30B and Chapter 268A are penal in nature, the applicable limitations period would be

one year after the offense was committed.  See Mass. Gen. L. ch. 260, § 5; see also Lynch v.

Signal Finance Co. of Quincy, 367 Mass. 503 (1975).  If Section 5 does not apply, however, the

Court must determine the applicable limitations period based on the nature of the claim.  See

Flynn v. Associated Press, 401 Mass. 776, 782 (1988) ( where statutes do not expressly state a

limitations period, courts should look to the "'gist of the action' or the essential nature of the

plaintiff's claim, because limitations statutes should apply equally to similar facts regardless of

the form of [the] proceeding").  Because the ' statutory claims sound in tort, the period of

limitations should be three years.  Even if the Court determines that these statutory claims are

contractual in nature and thus are subject to a six-year limitations period, the evidence at trial

will show that the ' claims are time-barred.

### 2.    Apportionment of Damages and Costs

Section 17(c) provides that "[i]f one or more person participates in [a violation of §

17(c)], the damages and costs may be apportioned among them."  If PSG establishes at trial that

the Town and/or the Sewer Commission participated in a violation of § 17(c) through the

conduct of Thomson, any damages and costs that may be awarded in this case against PSG

should be apportioned. However, there is no apparent authority that would aid the Court in determining (1) whether the decision to apportion, under the discretion provided by this provision, is a question of law or a question of fact; (2) what should guide the exercise of that discretion; (3) whether apportionment itself is a question of law or a question of fact; (4) how, if "damages and costs" are apportioned, they should be apportioned; and (5) whether the involvement of the Town  or their agent in any violation of § 17(c) precludes the Town  from recovering damages under § 17(c).

### 3.    Amount of Damages

The Defendants contend that they are entitled to various damages, including but not limited to their out-of-pocket costs under Chapter 30B (representing the difference between the annual fee in the 1998 Contract and the unqualified Woodard & Curran bid that the Defendants claim would have won without so-called "bid manipulation") and "economic advantage" damages under Chapter 268A (representing PSG's profit under the 1998 Contract). Because PSG's profit is built into the alleged out-of-pocket costs to the Defendants, the same damages are accounted for under both Chapter 30B and Chapter 268A. The Defendants cannot recover for the same harm under separate theories of recovery. See, e.g., Flesner v. Technical Communications Corp., 410 Mass. 805, 814 (1991). The Court will need to determine the extent to which damages under Chapter 30B are precluded by damages under Chapter 268A.

### 4.    *Respondeat Superior* Principles

Under principles of *respondeat superior*, "an employer cannot be held liable for the intentional conduct of an employee acting outside the scope of his employment." Int'l Brotherhood of Police Officers, Local 433 v. Memorial Press, Inc., 31 Mass. App. Ct. 138, 140 (1991). To find that conduct is within the scope of employment, a finder of fact must "consider

whether the conduct complained of is of the kind the employee is hired to perform, whether it occurs within authorized time and space limits, and whether it is motivated, at least in part, by a purpose to serve the employer." Id. (citation omitted).

**B.    Defendants' Issues of Law**

### 1. Response to Plaintiff's Statute of Limitations Issues

Defendants' response to Plaintiff's statute of limitations argument is straightforward: the defense was never pled and has been waived.  Under Rule 8(c) of the Federal Rules of Civil Procedure, statute of limitations is an affirmative defense that must be set forth in a responsive pleading.  PSG did not raise the statute of limitations defense in its answer to the counterclaims brought by the Town of Rockland and the Rockland Sewer Commission. As a result, the defense has been waived. See, e.g., International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers-Local 1603 v. Transue & Williams Corp., 879 F.2d 1388, 1396 n. 3 (6th Cir.1989)

### 2. Response to Plaintiff's Issue Concerning Duplication of Damages

The damages sought by the Defendants under the State Procurement Act and the Conflict of Interest Statute are, as explained below,  analytically distinct. To the extent any damages sought on other claims overlap or duplicate the damages sought on these causes of action, such an issue can readily be addressed by special questions to the jury.  While it is true that the Town and the Sewer Commission cannot receive duplicate damages, it is also true that they need not decide in advance to eliminate damages that they are seeking in order to avoid duplication. That is an issue that be addressed through special questions to the jury.

### a. Damages for Violation of the State Procurement Act

Chapter 30B provides: "A person who causes or conspires with another to cause a contract to be solicited or awarded in violation of [the Uniform Procurement Act] shall forfeit and pay to the appropriate governmental body a sum of not more than two thousand dollars for each violation ...[and] "In addition, the person shall pay double the amount of damages sustained by the governmental body by reason of the violation, together with the costs of any action." ....
30B § 17(c).

The Defendants contend that as a result of PSG's violation of the Uniform Procurement Act, the Town did not receive the lowest price for the work. A prospective bidder that was ready and willing to perform the work at a lower cost per year than the PSG annual contract price declined to submit a proposal because of the exclusionary nature of the RFP. In addition, because the Town had to conduct another procurement, the Town hired a firm to handle the re-bid. Each of these circumstances gives rise to a measure of damages.

### b. Damages for Violation of Conflict of Interest Statute, Chapter 268A

The Defendants contend that PSG's conduct also violates the Conflict of Interest Law, Chapter 268A. PSG's conduct violates Sections 2(a), 3(a) and 17(b) of that law. Section 2(a) imposes liability on any person who:

> (a) ...directly or indirectly, corruptly gives, offers or promises anything of any value to any...municipal employee...or who offers or promises any such employee...to give anything of value to any other person or entity with intent
>
> (1) to influence any official act or any act within the official responsibility of such employee..., or
>
> (2) to influence such an employee...to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud on...a...municipal agency, or

(3) to induce such an employee...to do or omit to do any act in violation of his lawful duty;

Section 3(a), in turn, imposes liability on any person who "directly or indirectly, gives, offers or promises anything of substantial value to any present or former...municipal employee...for or because of any official act performed or to be performed by such an employee..." See G.L. c.268A, §3(a).

Further, Section 17(b) provides that "[n]o person shall knowingly...directly or indirectly give, promise or offer [compensation to a municipal employee in relation to any particular matter in which the town has a direct and substantial interest.]" See G.L. c.268A, §17(b).

The Defendants maintain that PSG violated the above provisions of the Conflict of Interest Law by giving monetary value to Gregory Thomson (1) knowingly and in relation to the operation of the Sewer Plant; (2) with the intent to influence Thomson's official acts; (3) with the intent to influence Thomson to commit, aid in committing, collude in and allow fraud by Thomson in the conduct of the RFP, and the diversion of Town funds to himself by fraudulent means; and (4) with the intent to induce Thomson to do and omit to do acts contrary to his lawful duties.

Section 21(b) provides that a town may bring a civil action "against any person who has acted to his economic advantage in violation of" Sections 2, 3, 8 and 15-20, and may recover damages "in the amount of such economic damages or five hundred dollars, whichever is greater." G. L. c. 268A § 21(b). (Emphasis added).  Furthermore, "[i]f there has *been no final* criminal judgment of conviction or acquittal of the same violation, ... the [municipality] may in the discretion of the court recover additional damages...in an amount not exceeding twice the amount of economic recovery or five hundred dollars, whichever is greater..." Id. (Emphasis added).

PSG acted to its "economic advantage" by violating the Conflict of Interest statute through its employee, Sausé, and other managers. Its "economic advantage" can be measured by the profits that it earned on the contract from the commencement of the contract in March 1998, to the termination of the contract in April 2004. Such profits are analytically distinct from the damages that the Town and Sewer Commission seek to recover under the State Procurement Act.

### 3.    Principles of Agency

A major issue in this case will be principles of agency. The Defendants expect PSG to claim that Sausé was a rogue employee. But, Sausé's involvement in the procurement process implicates agency principles and the extent to which PSG is directly liable for his conduct. To prove the liability of a principal for the acts of an agent, the party seeking to establish the agency must prove "(1) the relationship of principal and agent, (2) that the servant or agent was acting within the express or implied authority conferred upon him by his appointment, and (3) that at the time of committing the tortious act, he was acting upon or within the employer's business or affairs." Bishop, Prima Facie Case – Proof and Defense, 17 Massachusetts Practice § 17.8, at 524 (West 2005) and authorities cited. A principal will even be liable for the acts of an agent even where the agent's acts are expressly forbidden. Id.

The issue of the extent to which PSG is liable for the conduct of other managerial employees will also be an issue in the trial. For example, in addition to Sausé, other PSG managers approved specious check requests from Thomson and facilitated the diversion of funds. Also, at least one manager in addition to Sausé participated in the efforts to keep public funds "off the books" and beyond the view of Town of Rockland finance officials.

## VII.    REQUESTED AMENDMENTS TO PLEADINGS

### A.    Plaintiff's Requested Amendments to Pleading

PSG requests leave under Fed. R. Civ. P. 15(a) to amend their answer by adding an affirmative defense of statute of limitations.  During depositions conducted in the last three weeks, PSG learned information from former Town Administrator Kevin Donovan and Sewer Commission Member William Stewart that the Town and the Sewer Commission were on notice of some of their counterclaims as early as 1997.  Leave to amend a pleading "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  Leave to amend is appropriate when information obtained during discovery indicates the existence of an affirmative defense.  See Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc., 418 F.3d 1326 (2d Cir. 2005) (noting that district court allowed additional affirmative defenses after discovery).  No party will be prejudiced if leave to add a statute of limitations affirmative defense is granted because all of the witnesses and documents tending to support or refute such a defense are in the actual or effective control of the Defendants.

### B.    Defendants' Requested Amendments to Pleading

Defendants oppose such a motion.

## VIII.    ADDITIONAL MATTERS TO AID IN DISPOSITION OF ACTION

None at this time.

## IX.    PROBABLE LENGTH OF TRIAL

The parties estimate that it will require fifteen half days to complete this trial.

## X.    NAMES, ADDRESSES AND TELEPHONE NUMBERS OF WITNESSES

### A.    Plaintiff's Witnesses

Cindy Solomon
2144 Pleasant St
Dighton, MA 02715

Aram Varjabedian
20 Homestead Road
Middleboro, MA 02346

Frank Cavaleri
39 Scotland Street
Hingham, MA 02043

Susan Keenan
3 Field Street
Taunton, MA 02780

Michael Sausé
103 Par Haven Drive, Apt. K-11
Dover, Delaware 19904

Gregory Thomson
90 Liberty Street
Rockland, MA 02370

Anne-Marie Hyland
Kopelman and Paige, P.C.
101 Arch Street
Boston, MA 02110

John Kenney
FormaTech, Inc.
200 Bulfinch Drive
Andover, MA 01810

Kevin Donovan
Town of Kingston
26 Evergreen Street
Kingston, MA 02364

William Stewart
40 Summit Street
Rockland, MA 02370

Robert Corvi
63 Concord Street
Rockland, MA 02370

Walter Byrne
1 Kris Roy Drive
Rockland, MA 02370

Bradley Plante
Town of Rockland
242 Union Street
Rockland, MA 02370

June P. Donnelly
Town of Rockland
242 Union Street
Rockland, MA 02370

Michael McDonald
379 Hingham Street
Rockland, MA 02370

Walter Simmons
97 Division Street
Rockland, MA 02370

Steven Kruger
Veolia Water North America - South LLC
14950 Heathrow Forest Parkway, Suite 200
Houston, Texas 77032

Robert Arendell
Veolia Water North America
14950 Heathrow Forest Parkway, Suite 200
Houston, Texas 77032

Gregory Sullivan
Massachusetts Office of the Inspector General
McCormack Building
Room 1311
Boston, MA 02108

Jack McCarthy
Massachusetts Office of the Inspector General
McCormack Building
Room 1311
Boston, MA 02108

John Sullivan
Melanson, Heath & Co.
11 Trafalgar Square
Nashua, NH 03063

John Franey
37 Forest St
Carver, MA 02330

Robert Eiben
Dedham-Westwood Water District
50 Elm Street, P.O. Box 9137
Dedham, MA 02027

Det. Sgt. John Wentworth
Rockland Police Department
490 Market Street
Rockland, MA 02370

Keeper of Records of PSG
Veolia Water North America - South LLC
14950 Heathrow Forest Parkway, Suite 200
Houston, Texas 77032

Keeper of Records of the Town Clerk
Town of Rockland
242 Union Street
Rockland, MA 02370

Keeper of Records of the Sewer Commission
587 Rear Summer Street
Rockland, MA 02370

Keeper of Records of Woodard & Curran
980 Washington Street
Suite 325N
Dedham, MA 02026

Keeper of Records of Mass. Inspector General's Office
Massachusetts Office of the Inspector General
McCormack Building
Room 1311
Boston, MA 02108

Keeper of Records
North Abington Co-Op Bank
6 Harrison Avenue
Abington, MA 02351

Keeper of the Records
Wainwright Bank & Trust Company
63 Franklin Street
Boston, MA 02110

Keeper of Records of American Commonwealth Management Services

Keeper of Records of American Anglian Environmental Technologies

All persons on the witness list of the Defendants

PSG reserves the right to supplement this list for the reasons for the reasons set forth in Section XII below and to call additional witnesses to rebut any testimony at trial.

In addition, PSG objects to the Defendants' designation of three expert witness, John Sullivan, Ronald A. Michalski and Eric Hart. The Defendants made their expert disclosures on June 14, 2006 for Mr. Sullivan, on June 15, 2006 for Mr. Michalski and on June 20, 2006 for Mr. Hart. Prior to these dates, PSG received no notice that these – or any – individuals would be called to testify as experts in this case. Because these disclosures were not made in a timely manner, see Local Rule 26.4(A), these two witnesses should not be permitted to testify as experts at trial.

### B.   Defendants' Response to Plaintiff's Attempt to Bar Expert Witnesses

Defendants respond to Plaintiff's position that Defendants' experts should be barred as untimely as follows:

1. Plaintiffs' position is directly contrary to the agreement under which the parties have been operating in order to work cooperatively and complete discovery. The rule on which Plaintiff relies requires experts to be disclosed 90 days in advance of the pretrial conference. By agreement between the parties, it is only within the last month that the Defendants have been able to depose *any* of Plaintiff's past or present employees. Moreover, although PSG discovered approximately 14 boxes of materials taken from the Rockland Wastewater Treatment plant in mid-April, Defendants were denied all access to the documents until a few days ago. Expert disclosures typically follow fact discovery – but in this case, the Defendants sped up the process and made disclosures as soon as they reasonably could do so given the number of depositions yet to be taken and documents yet to be reviewed. A 30(b)(6) witness of PSG has been unavailable for months, and is only now being made available on June 30. In addition, PSG has been continuing to notice new depositions as recently as the past two weeks. In the past two weeks, for example, PSG first noticed the deposition of a key witness, Gregory Thomson, and a former assistant at the Sewer Department.   To penalize the Defendants for not having engaged in expert discovery three months ago – when the parties cooperatively continued to engage in discovery – would be manifestly unfair and would give PSG an unfair advantage.

2. If PSG is permitted to preclude expert discovery from this point on, then Defendants see no point in continuing to cooperate with PSG and enabling it to conduct other discovery; under such circumstances, leave to conduct such discovery should be barred.   PSG has scheduled a number of depositions to which the Defendants had not objected, with the understanding that the Defendants would not be prejudiced by untimely discovery.  For Defendants to sit back and allow PSG to take such untimely depositions, while PSG objects to Defendants' expert disclosures as untimely, would be unfair to Defendants.

3. PSG suffers no prejudice by the designation of Defendants' experts at this time. The Defendants have no objection to PSG disclosing a rebuttal expert or other experts, and PSG is free, as far as Defendants are concerned, to conduct discovery of the Defendants' designated experts. If anything, it is Defendants who have been prejudiced by the unavailability of PSG's witnesses and, in particular, PSG's 30(b)(6) witness. Defendants have made their expert disclosures without the advantage of knowing what PSG's 30(b)(6) witness is going to say.

4. PSG suffers no prejudice by the designation of Defendants' three experts since these experts are all individuals who are fact witnesses in the case. One witness is the forensic accountant who prepared a detailed report for the Town of Rockland prior to the initiation of this litigation, and who relied in part on documents supplied by PSG, and whose report was made available to PSG two years ago. Another witness prepared the RFP for the Town of Rockland which resulted in the contract that was in place with PSG at the time of the 1997 procurement. The witness is from the engineering firm whose name has come up several times in discovery as having prepared the RFP for the contract award that preceded the 1997 procurement. The third witness is simply the Rockland Town Accountant, who has a role as a financial officer in the Town, and is knowledgeable about the town's financial affairs.

5. The fairest course is for this Court not to bar the experts, but for a timetable to be established to complete expert discovery.

## C.     Defendants' Witnesses

The Town and the Sewer Commission expect to present the following witnesses, although new witnesses may need to be named after completion some outstanding discovery. A large volume of documents were located by PSG in April 2006 and were recently made available to  for viewing. The Town and the Sewer Commission also have a motion to compel pending

with respect to other documents, and PSG has a motion to compel pending as well. Furthermore,

there are few outstanding depositions due to problems in scheduling witnesses, and PSG, the

Town and the Sewer Commission have been cooperating with respect to the scheduling of those

depositions.

Robert Arendell
Veolia Water North America
1115 W.Chestnut Street
Brockton, MA

Jack Bonomo
Aquarian Operating Services
15 Dartmouth Drive
Auburn, NH.

Walter Byrne III
1 Kris Roy Drive
Rockland, MA.

Frank Cavalieri
39 Scotland St,
Hingham, MA 02043-3932

Lawrence Chaffee
Rockland Town Hall
246 Union Street
Rockland, MA

Robert Corvi (although health may affect availability as a witness)
63 Concord Street
Rockland, MA 02370

Pat Donnelly
Town of Rockland
242 Union Street
Rockland, MA 02370-1897

Kevin Donovan
Town of Kingston
26 Evergreen Street
Kingston, MA 02364

Robert Eiben
Dedham-Westwood Water District
50 Elm Street, P.O. Box 9137
Dedham, MA 02027-9137

Georgine Grissop
Camp Dresser & McKee
One Cambridge Place
50 Hampshire Street
Cambridge, MA 02139

Eric Hart
Rockland Town Hall
246 Union Street
Rockland, MA

Bruce Haskell
Camp Dresser & McKee
One Cambridge Place
50 Hampshire Street
Cambridge, MA 02139

Anne-Marie M. Hyland
Kopelman and Paige, P.C.
101 Arch Street
12th Floor
Boston , MA 02110

Susan M. Keenan
3 Field Street
Taunton, MA 02780-1029

Steve Kruger
Veolia Water North America
14950 Heathrow Forest Parkway, Suite 200
Houston, Texas 77032

John Llewelyn
Rockland Police Department
490 Market Street
Rockland, MA 02370

John Loughlin
Rockland Sewer Commission
587 Rear Summer Street
Rockland MA 02370

David Lurie
Lurie & Krupp
One McKinley Square
Boston , MA  02109

Christine McGuiness
587 Rear Summer Street
Rockland, MA 02370

Ronald Michalski, PE
Tighe &Bond, Inc.
53 Southampton Road
Westfield, Massachusetts 01805

Bruce Miller,
Town Accountant
Plymouth Town Hall
11 Lincoln Street
Plymouth, MA 02360

Ed Maccaferri
Treasurer/Collector
Town of Plymouth
Plymouth Town Hall
11 Lincoln Street
Plymouth, MA 02360

Mary Parsons
Rockland Town Hall
246 Union Street
Rockland, MA

Winfield A. Peterson
Aquarian Operating Services
15 Dartmouth Drive
Auburn, NH

Bradley A. Plante
Rockland Town Hall
242 Union Street
Rockland, MA 02370-1897

Joseph Ridge
Camp Dresser & McKee
One Cambridge Place
50 Hampshire Street
Cambridge, MA 02139

Michael Sausé
103 Par Haven Drive, Apt. K-11
Dover, Delaware 19904

Karen Sepeck
Town Treasurer
Rockland Town Hall
246 Union Street
Rockland, MA

Cynthia Solomon
2144 Pleasant St
Dighton, MA 02715-1502

William Stewart,
40 Summit Street
Rockland, MA

John Sullivan, CPA
Melanson, Heath & Co.
11 Trafalgar Square
Nashua, NH 03063-1974

Gregory W. Sullivan
Massachusetts Office of the Inspector General
John W. McCormack State office Building
Room 1311
Boston, MA 02108

Terrance J. Sullivan
Director of Public Works
1 Government Center -5th Floor
Fall River, MA 02722

Gregory Thomson
790 Liberty Street
Rockland, MA 02370

Lou Valanzola
Rockland Town Hall
246 Union Street
Rockland, MA

Aram Varjabedian
20 Homestead Road
Middleboro, MA 02346

Jack Wentworth
Rockland Police Department
490 Market Street
Rockland, MA 02370

Keeper of the Records
North Abington Co-Operative Bank
6 Harrison Avenue
Abington, MA 02351

Keeper of the Records
Wainwright Bank & Trust Company
63 Franklin Street
Boston, MA 02110

Keeper of the Records
Rockland Federal Credit Union
241 Union Street
Rockland, MA

All persons on the witness list of the Defendants

## XI.   **PROPOSED EXHIBITS**

Although the parties have not been able to agree on exhibits at this time for the reasons

discussed in Section XII, counsel expect to be able to reach agreement on a large number of

exhibits.

### A.      **Plaintiff's Exhibits**

1994 Contract

1998 Contract and amendment

1994 RFP and addenda

1997 RFP and addenda

PSG Price Proposal to Rockland 10/97

PSG Qualifications and Plan of Service to Rockland 10/97

2004 RFP

2004 Aquarion proposal in response to RFP

2004 Contract

Invoices to Rockland pursuant to 1998 Contract

Forensic Investigation Report

Weekly Operating Reports 1995-2004

Monthly Operating Reports to Sewer Commission 1995-2004

Letter from Lurie to Sausé of 11/8/96

Letter from Hyland to Sewer Commission of 1/8/97

Acknowledgement of bid receipt 10/3/97

Fax from Hyland to Sausé of 2/26/98

Letter from Thomson to Sausé of 7/23/98

Letter from Thomson to Sausé of 8/23/98

Fax from Hyland to Thomson of 7/11/96

Letter from Hyland to Sewer Commission of 1/14/97

Sewer Commission meeting minutes and agendas 1995-2004

Board of Selectmen meeting minutes and agendas 1995-2004

Fax from Kenney to Donnelly of 1/2/97

Letter from Thomson to OIG Legal Staff of 5/30/97

Preproposal Briefing of 8/6/97

Letter from Bonomo to Thomson of 8/14/97

Letter from Bonomo to Thomson of 9/22/97

Letter from Eiben to Thomson of 9/5/97

Letter from Joyner to Thomson of 9/23/97

Letter from Thomson to Sausé of 10/10/97

Letter from Thomson to Sausé of 11/21/97

Letter from Thomson to Sausé of 3/13/98

Memorandum from Franey to Sewer Commission of 2/2/00

Letter from Sullivan to Plante of 11/5/03

Letter from Plante to Cruz of 12/4/03

Letter from Sullivan to Plante & Corvi of 1/30/04

Letter from Plante to Stark of 2/10/04

Letter from Corvi to Hodgkins of 3/30/04

Letter from Bowen to Kruger of 4/9/04

Belt Filter Press lease documents

Title documents for OPS Win-32 software, Data Stream MP2 maintenance software, Microsoft office software

Title documents for tripod & winch

Title documents for F-350 Ford Pickups 1 Ton 4x4

Letter from Ross to Monty of 8/7/30 re:  Kady Mill setup

Title documents for DBI Tripod & Winch

Title documents for Air Blower

Title documents for Sharp photo copier

Notes re:  "Why do we need full time superintendent"

Woodard & Curran pricing materials

2004 Proposal of Aquarion

Municipal, County, District and Local Authority Procurement Manual for 1995, 1997, 2000

Business Practices Compliance Manual 1999

AWT Business Integrity Compliance Program 1998

PSG Employee Handbook

PSG Policies and Procedures 1994-95

PSG Project Manager's Guide

Town Annual Reports for 1996, 1997, 1998

Certified conviction of Sausé

Certified conviction of Thomson

Transcript of Sausé plea colloquy

Transcript of Thomson plea colloquy

Press release from OIG re:  MCPPOP of 5/8/97

Letter from Ahern to Thomson of 5/8/97

Reports of Det. Sgt. Wentworth re: investigation

Sausé memo of 1/7/04 re:  Grand Jury Minutes

Narratives re:  Sausé Proffer

Invoices from Kopelman & Paige to Sewer Commission from 1/24/97-3/25/98

Bank statements from North Abington Co-Op Bank 1999-2002

Bank statements from Wainwright Bank 1997-1999

Monthly financial printouts for Rockland project 1995-2003

Check request forms for payments from rebate account

Letters from Thomson to PSG re: requests for checks

Cancelled rebate checks issued to Sewer Commission

Rockland Final Reconciliations 1998-2004

Promotional materials for open houses at Wastewater Treatment Facility

Promotional materials for Christmas tree sales

Transcript from Massasoit Community College for Thomson

Application for Employment by Thomson to Board of Selection of 1/18/97

Fax from Kenney to Donnelly of 1/2/97 with superintendent job description

Job Description for Rockland Sewer Superintendent

Notice of posting for position of Rockland Sewer Superintendent

Letter from Thomson to Varjabedian of 9/14/99 re: technical evaluation

Email from Kiani to Cavaleri of 9/13/99 re: technical evaluation

Fax from Hyland to Thomson of 2/23/98 with attachment

RFP Request

Letter from Thomson to Varjabedian of 2/13/01

Rockland Payback Summaries for Contract Years 1-6

Cost Detail Reports 1997-2004

Letter from Thomson to Cavaleri of 1/15/02 re: current wage/salary structures

All deposition exhibits

All exhibits identified by the Defendants

The Plaintiff reserves the right to supplement this list for the reasons set forth in Section

XII below and to introduce additional exhibits for impeachment purposes and to rebut any

testimony at trial.

B.    **Defendants' Exhibits**

July 21, 1997 Request for Proposals

Contract between Town of Rockland and Metcalf & Eddy Services July 25, 1994

1998 Contract between Rockland Sewer Commission and Professional Services Group, Inc. 02/24/1998

Amendments to 1998 Contract Rockland Sewer Commission and Professional Services Group, Inc.

Mintz Levin Billing Memorandum (Depo Ex. Lurie 1)

Mintz Levin Letter to Michael Sausé (Depo Ex. Lurie 2) 11/08/1996

Town of Rockland By-Laws June 1993 (Depo Ex. Lurie 3)

Kopelman and Paige Fax to Thomson (Depo Ex. Lurie 4) 07/11/1996

Town of Rockland --Rockland Town Charter—
Amended Through 1993 (Depo Ex. Lurie 5)

Fax from Aram Varjabedian to David Lurie re: Sewer Act attachments (Depo Ex. Lurie 6) 10/10/1996

Status of Rockland Accounts--
Current Balances Left as of September 1, 1996 (Depo Ex. Lurie 7)

Agreement for the Operation, Maintenance, and Management Services for the Wastewater Treatment Facilities— The City of Fall River, Massachusetts (Agreement between Fall River Sewer Commission and PSG) (Depo Ex. Lurie 8) 09/5/1996

Letter Re: Rockland Budget Reconciliation for Contract Year 4 – 3/01-2/28/02 (Depo Ex. Cavaleri 17) 01/21/2003

One page fax re: Addendum 4 sent to Frank Cavaleri (Depo Ex. Cavaleri 18) 01/21/2003

Memo re: Accounts Reconciliation Contract Year Ending 2-28-00 (Depo Ex. Cavaleri 19) 12/6/2000

Letter Re: Contract Fee for March 1, 2001 – February 28, 2002 (Depo Ex. Cavaleri 20) 04/01/2001

Rockland Project Status by Fiscal Year (Depo Ex. Cavaleri 21)

Handwritten notes (Depo Ex. Cavaleri 22)

Hand drawn office layout diagram of Rockland Sewer Department (Depo Ex. Varjabedian 23)

1997 hand drawn office diagram of Rockland Sewer Department office (Depo Ex. Varjabedian 24)

Town of Rockland Addendum #1 to the Request for Proposals 8/13/1997

Town of Rockland RFP Addendum #2 to the Request for Proposals 8/19/1997

Town of Rockland RFP Addendum #3 to the Request for Proposals 8/25/1997

Town of Rockland RFP Addendum 4 with handwritten notes (Dep. Ex. 18)

Town of Rockland Addendum #1 to the Request for Proposals 8/13/1997 (Dep. Ex. 25)

Town of Rockland RFP Addendum #2 to the Request for Proposals 8/19/1997 (Dep.Ex. 26)

Town of Rockland RFP Addendum #3 to the Request for Proposals 8/25/1997 (Dep.Ex. 27)

Town of Rockland RFP Addendum #4 to the Request for Proposals 9/10/1997 (Dep. Ex. 28)

Town of Rockland RFPAddendum #5 to the Request for Proposals 9/25/1997 (Dep. Ex. 29)

Fax to Anne-Marie Hyland from Michael Sausé 2/24/98

Fax to Anne-Marie Hyland from Michael Sausé 2/26/98

Letter from Gregory Thomson to Michael Sausé re Transfer of Funds 11/21/1997

Letter from Gregory Thomson to Michael Sausé 3/13/98 (Sausé Dep. Ex. 77)

Letter from Gregory Thomson to Michael Sausé 7/23/98 (PSG 1000)

Letter from Aram Varjabedian to Kevin R. Donovan 12/30/99

Memo to Rockland Sewer Commission from Aram Varjabedian re Millbrook Pump Station 4/6/00

Letter dated June 28, 1996 from Michael Sausé to Gregory Thomson re subcontracting of Engineering Services (Depo Ex. Sausé 69)

PSG Invoice No. 50112 dated June 28, 1996 to Town of Rockland $100,686 (Sausé Dep. Ex. 70)

Draft letter to Office of the Inspector General dated May 30, 1997 (Sausé Ex. 65)

Fax letter to Office of the Inspector General from Gregory Thomson (Sausé Sep. Ex. 66)

PSG technical proposal to Town of Rockland Oct. 1997

PSG Price proposal to Town of Rockland Oct. 1997

Non-collusion affidavit submitted by PSG to Town of Rockland 10/1/97Oc

Receipts and charge records (Sausé Dep. Ex. 71)

Hotel bill (Sausé Dep. Ex. 76)

Receipts (Sausé Dep. Ex. 78)

Receipts (Sausé Dep.Ex. 80)

Wainwright Bank Final Statement and Check withdrawal (Sausé Dep.Ex. 81)

PSG Check Request 9/25/1997 for $3,000 re Water Environment Conference

PSG Check Request 10/30/97 $6,000

PSG expense report form (Sausé Dep. Ex. 74)

Rockland Final Reconciliation Summary Contract Year 3/1/03 through 02/29/04 & [3/1/04-4/11/04] (PSG 1284-1297)

Photo (Depo Ex. Varjabedian 41)

Photo  2 people (Depo Ex. Varjabedian 42)

Photo  – Cancun Mexico (Depo Ex. Varjabedian 43)

Photo  (Depo Ex. Varjabedian 44)

Photo  (Depo Ex. Varjabedian 45)

Photo  (Depo Ex. Varjabedian 46)

Photo of dinner

Hand drawn office diagram (Depo Ex. Keenan 47)

Hand Drawn Diagram of Norwell office of PSG (Depo Ex. Solomon 51)

Videotape of excerpt of Board of Selectmen's meeting 1/22/02

Videotape of excerpt of Board of Selectmen's meeting 12/22/98 re Christmas trees

Rockland Reconciliation Contract Year 3/1/01 though 2/28/02 (Depo Ex. Solomon 54)

Wainwright Bank Account Statements and checks of account of Town of Rockland d/b/a Rockland Sewer Commission

North Abington Cooperative Bank statements of Gregory Thomson

Rockland MA Reconciliations (Depo Ex. Solomon 53)

Letter and Bill of Sale from Lease Options & Terms, Inc. Equipment Leasing Advisors (Depo Ex. Solomon 56) 08/09/1999

PSG, Inc. Cost Detail Report from 01/01/95 thru 10/27/00 (Depo Ex. Solomon 58) 10/24/2000

United States Attorney's Office District of Connecticut Press Release (Depo Ex. Solomon 59) 07/01/2003

Accounting Policies & Procedures Manual form  (Depo Ex. Solomon 60) 08/17/1994

Excerpts from Michael Sausé Personnel File

Notice of Taking Deposition of Professional Services Group Inc. Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure (Depo Ex. Solomon 61) 04/19/2006

Memorandum from Mike Stump to All PSG employees July 31, 1996

Massachusetts Certified Public Purchasing Official Program certificate to Michael Sausé

Letter dated May 8, 1997 from Office of the Inspector General to Gregory Thomson

Inspector General Seminar Attendance sheet May 1997

US Filter Operating Services Detail Income Statement for period ending January 24, 2003 (PSG1074-76)

Letter from Anne-Marie Hyland to Rockland Sewer Commission 1/14/97 (PSG 0641)

Letter from Anne-Marie Hyland to Rockland Sewer Commission 1/8/1997 (PSG 0643-047)

Letter from Anne-Marie Hyland to Rockland Sewer Commission 1/14/97 (PSG0641-42)

Typed notes (PSG 0639-40)

Water Engineering & Management January 1998

Excerpts from Town Annual Report for the year 1997

Email from Aram Varjabedian to Frank Cavalieri with notes 12/1/2000 (PSG1095)

Letter from American Anglian to Greg Thomson 9/23/97 (PSGS 0924)

Letter from Woodard& Curran to Gregory Thomson 8/14/97 (PSG 922)

Letter from Woodard& Curran to Gregory Thomson 9/22/97 (PSG 918-19)

Letter from Woodard & Curran to Gregory Thomson 9/22/97  (PSG 20-21)

Acknowledgment of bids (PSG942)

Rockland Wastewater Treatment Plant Staffing plans in 1998, 1999, 2000, 2001, 2002

Inspector General Letter to Town of Rockland  11/5/03

Inspector General Letter to Town of Rockland 11/19/03

Inspector General Letter to Town of Rockland 1/30/04

Kopelman & Paige Letter to PSG  4/9/2004

Kopelman & Paige Letter to PSG  5/14/2004

Contract Copy Distribution 1/5/98 with Amendment Two to Emergency Declaration(PSG 945-47)

Letter from PSG to Gregory Thomson 9/15/99

Letter from Theirry M. Mallet to "My Fellow Employees" 10/13/98

Fax from Gregory Thomson to Steve Kruger (10/29/98) with letter  from Kruger to Thomson (10/26/98)

Fax to "Frank" from "Aram"  (PSG 1062-1065)

Agreement between Camp Dresser & McKee and Town of Rockland (CDM674-684)

Exhibit A to Agreement between Town of Rockland and Camp Dresser & McKee, Inc. (CDM 0683-84)

Emergency Declaration by Rockland Sewer Commission 6/12/97

Amendment One to Emergency Declaration 9/25/1997 (PSGS 926-27)

Letter from A. Varjabedian to G. Thomson requesting permission to lease F-350pick up (w/attachments) 8/22/96

Check  or check stub dated 11/25/97  $50,000

Check dated 3/24/98 $ 9,964.05

Check request dated 3/16/98 and related documents

Check dated 3/24/98 $78,139.56

Check dated 3/27/98 check $ 193.97

Check request dated 3/26/98 and related documents

Check dated 12/11/98 $10,000

Check request dated 12/10/98 and related documents

Check dated 3/99 $558.34

Check request dated 3/8/99 and related documents

Check dated 4/20/99 $5,000.00

Check request dated 4/16/99 and related documents

Check dated 7/20/99 check $ 4,300.00

Check dated 7/19/99 and related documents

Check dated 10/05/99 $4,090.00

Check request dated 10/5/99 and related documents

Check dated 11/22/99 $5,000.00

Check request dated 11/18/99 and related documents

Check dated 12/13/99  $4,000

Check request dated 12/9/99 and related documents

Check dated 1/27/00 $976.00

Check request dated 1/19/00 and related documents

Check dated 3/30/00 $2,499.96

Request for check dated 3/30/00 and related documents

Check dated 5/05/00 $2,100

Check request dated 5/1/00 and related documents

Check dated 6/28/00 $908.73

Check request dated 6/26/00 and related documents

Check dated 8/11/00 $5,000

Check request dated 8/7/00 and related documents

Check dated 10/19/00 $2,300

Check request dated 10/13/00 and related documents

Check dated 12/12/00 $3,800

 Check request dated 12/5/00 and related documents

Check dated 1/12/01 $2,442.23

Check request dated 1/8/01 and related documents

Check dated 1/29/01 $1,800

Chck request dated 1/22/01 and related documents

Check dated 2/21/01 $15,000

Check request dated 2/14/01 and related documents

Check dated 4/18/01 $8,200

Check request dated 4/6/01 and related documents

Check dated 5/30/01 $4,020

Check request dated 5/24/01 and related documents

Check dated 7/03/01 $2,700

Check request dated 6/21/01 and related documents

Check dated 7/27/01 $4,492

Check request dated 7/24/01 and related documents

Check dated 9/05/01 $5,354.34

 Check request for check dated 9/5/01 and related documents

Check request dated 9/24/01 and related documents

Check dated 9/25/01 $15,000

Check request dated 9/24/01 and related documents

Check dated 10/29/01 $8,928.98

Check request dated 10/25/01 and related documents

Check dated 11/28/01 $8,000

Check request dated 11/26/01 and related documents

Check dated 12/13/01 $7,000.00

Check request dated 12/12/01 and related documents

Check dated 1/03/02 $6,893.00

Check request dated 12/28/02 and related documents

Check dated 1/30/02 $3,197.50

Check request dated 1/28/02 and related documents

Check dated 2/12/02 $5,873.22

Check request dated 2/8/02 and related documents

Check dated 3/14/02 $6,804.03

Check request dated 3/11/02 and related documents

Check dated 4/04/02 $8,675.25

Check request dated 4/02/02 and related documents

Check dated 4/25/02 $14,309.00

Check request dated 4/18/02 and related documents

Check dated 5/14/02 check $5,428.50

Check request dated 5/10/02 and related documents

Check dated 5/29/02 $5,744.48

Check request dated 5/23/02 and related documents

Wainwright Bank account check made out to Aram Varjabedian and signed by Gregory Thomson

Wainwright Bank Account Statements and checks for account in name of Town of Rockland, d/b/a Rockland Sewer Commission

North Abington Cooperative Bank Account Statements and checks for account of Gregory Thomson

Check deposited in Rockland Federal Credit Union

Check Deposited in Rockland Federal Credit Union

US Filter Checks made out to Town of Rockland, Rockland Sewer Commission, Gregory Thomson, Superintendent

Minutes of 12/12/96 Rockland Sewer Commission meeting (Stewart Depo. Ex. K)

Forensic Investigation (February 25, 2004)

DOJ Press Release (5/31/01)

American Commonwealth Management Services Co., Inc. letter to Gregory Thomson (9/5/97) (PSG 0925)

Fax from Bradley A. Plante to US Filter dated 2/10/04

The Town and the Sewer Commission reserve the right to designate additional exhibits following the submission of this pre-trial memorandum for the reasons described in Section XII. The Town and the Sewer Commission reserve the right to designate additional exhibits after having the opportunity to review all of the Plaintiff's exhibits. The Town of Rockland and the

Commission also reserve the right to introduce exhibits for rebuttal. The Town of Rockland and the Commission also reserve the right to introduce any exhibits identified by Plaintiff.

## XII.    POSITIONS ON OBJECTIONS TO EVIDENCE

The parties state that they have been unable to exchange objections to exhibits at this time. Last month a large quantity of documents that had been removed from the Wastewater Treatment Plant in 2004 were unexpectedly delivered to PSG's offices by a former PSG employee. PSG did not know of the existence of these documents until that time. After reviewing these documents, PSG agreed to make them available to the Town and the Sewer Commission, but the Town and the Sewer Commission have not had an opportunity to review them as of the date of this memorandum. In addition, the parties are in the process of completing a number of depositions that were delayed for scheduling reasons. For these reasons, the parties request leave to supplement this memorandum by filing their objections at a later date agreeable to the parties that will not interfere with trial of this matter.

Respectfully submitted,

PROFESSIONAL SERVICES GROUP, INC.,
By its attorneys,


/s/David M. Osborne
Maria R. Durant (BBO # 558906)
David M. Osborne  (BBO # 564840)
DWYER & COLLORA, LLP
Federal Reserve Plaza
600 Atlantic Avenue, 12th Floor
Boston, MA  02210
(617) 371-1000

TOWN OF ROCKLAND and
THE ROCKLAND SEWER COMMISSION,
By their attorneys,


/s/Joanne D'Alcomo
Joanne D'Alcomo (BBO # 544177)
Seth Nesin (BBO # #650739)
JAGER SMITH P.C.
One Financial Center
Boston, MA 02111
(617) 951-0500


DATED: June 21, 2006

## CERTIFICATE OF SERVICE

I, David M. Osborne, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on June 20, 2006.

/s/David M. Osborne
David M. Osborne

JS\127498.1                                                        56