UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PROFESSIONAL SERVICES GROUP, INC.,<br>    Plaintiff,<br><br>    v.<br><br>TOWN OF ROCKLAND, et al.,<br>        Defendants | )<br>)<br>)<br>)<br>)<br>)   Civil No. 04-11131-PBS<br>)<br>)<br>)<br>)<br>) |

OPPOSITION OF TOWN OF ROCKLAND AND ROCKLAND SEWER COMMISSION TO PLAINTIFF PROFESSIONAL SERVICE GROUP, INC.'S MOTION TO COMPEL DISCOVERY OF CERTAIN DOCUMENTS FROM DEFENDANT TOWN OF ROCKLAND

### I. Introduction

The Defendants/Counterclaimants Town of Rockland and Rockland Sewer Commission (collectively referred to herein as "Town" or "Town of Rockland") hereby oppose Plaintiff Professional Service's Group, Inc.'s motion to compel discovery of certain documents. In support of their position, the Town relies on the attached affidavits of Michael Sausé and Joanne D'Alcomo, at Tab A and B, which demonstrate that the documents were shared as part of a joint litigation agreement and are not subject to discovery, and, furthermore, do not lose the protection of the attorney-client privilege and work product doctrine.

### II. Background of the Case

This dispute arises out of a procurement conducted in 1997 that resulted in the award of a 10-year contract, with a 10-year renewal, to Professional Services Group, Inc. or "PSG" to operate the Town of Rockland's wastewater treatment plant, and the illegal and improper

JS\127513.1

activities that occurred in relation to that contract. Although other companies expressed interest, PSG was the sole bidder and was awarded the contract. The Massachusetts Office of Inspector General's office, after conducting an investigation, directed the Town to cancel the contract and conduct a new procurement. As a result, the Town canceled the contract with PSG in 2004, and issued a new Request for Proposals. PSG did not bid in that new procurement, and the contract was awarded to another wastewater treatment plant operator.

In 1996, the Wastewater Treatment Plant was being operated by PSG, which had taken over Metcalf and Eddy Services, Inc. Metcalf and Eddy had a three-year contract to operate the plant from 1994 to 1997. Michael Sausé was a Vice President and area manager of PSG who had worked for Metcalf and Eddy Services and continued to work for PSG in interacting with the Town. A new bidding process was coming up in 1997.

There is evidence that in late 1996, before the procurement process was underway for the 1997 procurement, Sausé took steps to help Sewer Commissioner Gregory Thomson obtain what was to be a newly created position as Sewer Superintendent for the Town. This was important to Sausé because he had a strong relationship with Thomson and he wanted to be able to retain his influence by helping Thomson become superintendent.

Typically, municipalities hire an engineering firm to prepare a Request for Proposals to launch competitive bidding for a technical activity such as operation of a wastewater treatment plant. But, in the Town of Rockland procurement, Sausé, a PSG manager, conspired with then-Sewer Superintendent Thomson to write the Request for Proposals in 1997, in an effort to give PSG an advantage in the bidding. Sausé has testified at deposition as to his involvement in writing the RFP, and the subsequent addenda to that RFP, and deliberately influencing the process to aid PSG in getting the contract. Not surprisingly, only PSG put in a bid for the

2

contract. In submitting the bid, PSG falsely represented that its bid was not the result of any collusion.

Under PSG's contract with the Town resulting from the 1997 RFP contract, certain funds were earmarked for specific categories of expenses: maintenance and repair; capital expenses; utility expenses and labor. If funds earmarked for those purposes were left over at the end of the contract year, the excess was supposed to be rebated to the Town at the end of the contract year. As it turns out, however, PSG improperly issued checks to the Sewer Superintendent Gregory Thomson amounting to thousands and thousands of dollars during the course of the contract years out of those accounts. The check requests were for specious purposes. For the most part, no invoice or other back-up documentation of any kind was submitted in connection with the check requests that Thomson submitted and were processed by PSG. The Town's money was thereby diverted into, first, a bank account that Thomson and Sausé controlled, and then, an account that only Thomson controlled. Both Thomson and Sausé have pleaded guilty to embezzlement of Town funds. Both now express remorse and admit that the procurement was tainted, and describe how PSG processed thousands of dollars in specious check requests to keep Thomson – PSG's main contact in the Town – content.

After conducting an investigation, the Massachusetts Inspector General's office directed the Town to cancel the contract and conduct a new procurement. As a result, the Town canceled the contract with PSG in 2004, and conducted a new procurement. PSG then brought this suit against the Town, the Sewer Commission, Michael Sausé and Gregory Thomson. The Town brought counterclaims against PSG, and cross-claimed against Sausé.

### III. Background Regarding the "Sausé Documents"

In the fall of 2004, Stephen CampoBasso, the attorney for Sausé, and Joanne D'Alcomo, the attorney for the Town, entered into an agreement to share information relating to the claims

3

in this lawsuit. See Affidavit of Michael Sausé ("Sausé Aff."), [1]Tab A, at ¶ 4; Affidavit of Joanne D'Alcomo ("D'Alcomo Aff."), [2] Tab B at ¶ 3.  The common-interest agreement was intended to allow Attorney D'Alcomo and Sausé and his attorney to share information and, in particular, for Attorney D'Alcomo to review information provided by Sausé and his attorney without Sausé losing any protections of the attorney-client privilege or disclosure of any confidential materials.  Sausé Aff., Tab A, at ¶ 5; see generally D'Alcomo Aff..  Attorney D'Alcomo was provided with some documents, held onto privileged documents or work product documents only at the discretion of Sausé and CampoBasso, was not permitted by the agreement to disclose them to any other parties, and was required to return them at the request of Sausé or CampoBasso.  Sausé Aff. at ¶ 5; D'Alcomo Aff. at ¶ 6.  Attorney D'Alcomo continued to discuss common litigation strategies with both CampoBasso and Sausé until February 2005, when CampoBasso unexpectedly died.  Sausé Aff. at ¶ 6; D'Alcomo Aff. at ¶ 10.  The joint litigation agreement remained in effect after CampoBasso's sudden death; Sausé continued to share information and work jointly with counsel for the Town.  Sausé Aff. at ¶ 9; . D'Alcomo Aff. at ¶ 12

Some time thereafter, in the spring of 2006, Sausé instructed Stephen CampoBasso's law firm to forward all his files from this case and the related criminal case to Attorney D'Alcomo, as part of the ongoing common interest litigation strategy.  Sausé Aff. at ¶ 14; . D'Alcomo Aff. at ¶ 13.  On June 13, 2006, when Sausé was deposed, and PSG learned about the location of his legal files.  PSG demanded that the Town produce the files that had been sent to the Town's

---

[1] References to the Sausé affidavit are to the affidavit at Tab A to this opposition.
[2] References to the D'Alcomo affidavit are to the affidavit at Tab B to this opposition.

JS\127513.1

attorney in the Spring of 2006. The Town refused to turn over the documents, explaining that the files were Sausé's, were only being held subject to a joint litigation agreement, and that, in any case, they had not even been received at the time PSG made its document request. PSG then filed this motion to compel.

### IV. Argument

PSG argues that that the Sausé documents must be turned over by the Town if they are responsive to their document requests. This argument ignores the fact that the documents are not now, nor have they ever been, in the control of the Town. They have merely been held by the Town as part of a joint litigation agreement. It also ignores the fact that, with respect to the full case file, the documents were only held by the Town after PSG's request for production had already been answered, and that the Town has not had an opportunity to assert objections.

**A. PSG Never Pursued Any Discovery From Michael Sausé And Should Not Be Permitted To Circumvent The Automatic Bankruptcy Stay in Effect as to Sausé, as well as the Normal Discovery Process, By Obtaining Sausé's Documents Through The Town Of Rockland**

Michael Sausé has been a party to this litigation since it was filed in 2004, yet to the best of the Town's knowledge, PSG never made any attempt to pursue discovery from him. He was apparently never served with any interrogatories or document requests, and, if he was, he never responded and PSG never pursued a response. PSG never even noticed a deposition of Mr. Sausé, although it did cross-examine him when the Town took his deposition this month.

Furthermore, Sausé declared bankruptcy in January of this year, and PSG never made any effort to obtain relief from the bankruptcy court's automatic stay to obtain discovery from Sausé, unlike the Town, which specifically waived its claim against Sausé as part of an agreement for relief from the automatic stay. Section 362(a)(1) of Title 11 of the United States Code states, in relevant part, that the filing of a voluntary bankruptcy petition "operates as a stay,

applicable to all entities, of . . . the . . . continuation, including the issuance or employment of process, of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case  . . . , or to recover a claim against the debtor that arose before the commencement of the case under this title." PSG appears to be trying to do an end-run around that stay using this judicial process – namely a motion -- to try to obtain access to his records.  This circumvention of the stay should not be permitted, particularly where PSG made no meaningful attempt to obtain discovery from Sausé  since the outset of this case in 2004. In short, PSG should not be permitted to obtain discovery from Sausé by chasing documents that the Town has only by virtue of the joint litigation agreement..

> **B. The Sausé Documents Are Not In The Possession, Custody or Control of the Town of Rockland And Have Never Been In The Possession, Custody or Control of the Town within the meaning of Rule 34**

Under Rule 34 of the Federal Rules of Civil Procedure, a party is required to produce requested documents only if they are within his "possession, custody or control."  In construing the rule, courts have rejected a narrow physical-possession test, focusing instead on whether the party has a "legal right" to obtain the documents. <u>See, e.g.,</u> <u>Calzaturficio v. Fabiano Shoe Co</u>., 201 F.R.D. 33, 38-39 (D.Mass.2001). In this case, the Town of Rockland has no legal right, and never has had a legal right, to show Sausé's documents to any other party.  By the express agreement initially made with Sausé's attorney, that continued after his attorney's death, the requested documents were to be treated confidentially and were kept in the physical possession of Attorney D'Alcomo subject entirely to the control of Sausé and his attorney.  Attorney D'Alcomo never had any legal right to turn the documents over to PSG.  Had Sausé or his attorney asked for them to be returned, Attorney D'Alcomo was contractually obligated to return them.

**C. The Sausé Documents Were Turned Over As Part of A Joint Litigation Strategy, And Are Therefore Protected With Respect To Any Attorney-Client Privileged Communications**

The documents sought by PSG were held by counsel for the Town by virtue of a joint defense agreement. They are therefore subject to the "common-interest exception" to the rule that normally waives the attorney client privilege with respect to communications shared with a third party. See Mass. Eye & Ear Infirmary v. QLT, 412 F.3d 215, 225 (1st Cir. 2005); The joint defense privilege "is an extension of the attorney client privilege." United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 28 (1st Cir. 1989). ("In order to establish the existence of a joint defense privilege, the party asserting the privilege must show that (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived.") To qualify for the privilege, the communication must have been made in confidence. Id. In addressing whether a given communication was meant to be confidential, what "the client reasonably understood" is "the key question." Kevlik v. Goldstein, 724 F.2d 844, 849 (1st Cir.1984).

In this case, there is abundant evidence that the client, in this case, Sausé, had a reasonable belief that his attorney's files would be kept confidential and not put in the hands of PSG. See D'Alcomo Aff. at ¶¶ 5,6, 7, 8, 12, 13, 16; Sausé Aff. at ¶¶ 4, 5, 6, 7, 8, 9, 10, 11, 12, 14. There was clearly a common litigation agreement, as is evident in the affidavits of Sausé and D'Alcomo. See generally D'Alcomo Aff., Sausé Aff. The fact that the parties may appear adverse on the case caption of the complaint is irrelevant, because Sausé and the Town's interests are not truly adverse. "Communications to an attorney to establish a common defense strategy are privileged even though the attorney represents another client with some adverse interests." Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d at 28 (quoting Eisenberg v. Gagnon, 766 F.2d 770, 787-88 (3d Cir.); see also Prevue Pet Prods., Inc. v. Avian Adventures,

JS\127513.1

Inc., 200 F.R.D. 413, 417-18 (N.D. Ill. 2001) (holding that common interest rule applied to parties with cross-claims against each other because there was no claim for relief and their interests were aligned);. In re LTV Sec. Lit., 89 F.R.D. 595, 604 (N.D. Tex. 1981) ("The Court finds little merit in the class' contention that the joint defense privilege does not extend to civil defendants whose liability may arise from different acts or omissions, or who may assert cross-claims against each other.")

The fact that the Town has a cross-claim against Sausé in the caption of the complaint is unimportant. Each has a common interest in disproving PSG's contentions that the 1997 procurement was not tainted, and in proving the activities that had occurred that caused the Town and the Rockland Sewer Commission harm, such as the procurement process and the handling of funds. See D'Alcomo Aff. at ¶ 4; Sausé Aff. at ¶ 13.. Furthermore, the Town of Rockland has expressly waived any claims it has against Michael Sausé. The parties are aligned for purposes of this litigation and it is therefore wholly proper that they would be engaged in a joint litigation strategy.

> **D. The Town Has Never Reviewed The Documents For Responsiveness And Therefore Any Production Would Require A Review of Such Documents Before They Could Be Turned Over, and Possibly Additional Objections**

In the event the Court agrees with PSG that the documents are in the control of the Town of Rockland and are not all privileged or protected by virtue of its joint litigation agreement with Michael Sausé, the production of the documents may not be an easy chore. At the time the Town of Rockland responded to the document requests of PSG, it did not have the vast majority of what now comprise the "Sausé Documents" in its physical possession and did not anticipate obtaining the documents. As a result, the Town may have failed to make objections that would apply to the production of the "Sausé documents."

8

JS\127513.1

        Respectfully submitted,

        TOWN OF ROCKLAND and
        THE ROCKLAND SEWER COMMISSION,
        By their attorneys,

        /s/Joanne D'Alcomo_____
        Joanne D'Alcomo (BBO # 544177)
        Seth Nesin (BBO # #650739)
        JAGER SMITH P.C.
        One Financial Center
        Boston, MA 02111
        (617) 951-0500

DATED: June 26, 2006