TOWN OF ROCKLAND
ROCKLAND SEWER COMMISSION

Forensic Investigation

February 25, 2004

*Exemption $D + F$*

*Policy Exempt*

*NO letter + 1+2*
*ok 3-23*
*No 24, 25, 26, 27 (Recount*
*ok Last Two*

Board of Selectmen
Town of Rockland
24 Union Street
Rockland, MA 02370-1897

Dear Board Members:

We have performed a forensic investigation of the Rockland Sewer Commission
as described in the letter of engagement dated October 19, 2002 and expanded
through an additional engagement letter dated May 2, 2003. The investigation
was based on discovery that certain checks issued to the Town of Rockland had
been deposited into a personal account of the Superintendent of the Sewer
Commission.

Our procedures consisted of reviewing; records and documentation retained by
the Town, documentation provided by the Sewer Commission, documentation and
records provided by U. S. Filter and information acquired from banks. We inter-
viewed various individuals at Town Hall, the Administrative Assistant at the Sewer
Commission, the three current Sewer Commissioners, a representative from U. S.
Filter and a representative from one of the competing management companies
who participated in the bid for the February 1998 contract.

Our scope was limited in two aspects, which may impact our ability to reach
conclusions in certain areas.

1.  The investigation spanned three companies, Metcalf and Eddy Services,
    Inc., PSG and U. S. Filter. The former two companies merged into U. S.
    Filter and we did not have access to some of the records supporting
    transactions prior to the February 1998 contract.

2.  We were not allowed to interview a key employee of U. S. Filter involved
    in the management and administration of the Rockland contract.

At the time this report is finalized, the Town is in negotiations for recovery of funds
through the Town's insurance carrier, U.S. Filter, potential restitution from criminal
cases pending and through potential litigation with financial institutions. The Town is
also proceeding with voiding the U. S. Filter contract and placing the Sewer Contract
Operations out to bid in order to obtain a more equitable contract. We will continue
to work with the Town to achieve these ends.

I look forward to meeting with the Board to discuss this report and the course of actions in progress by the Town of Rockland.

Sincerely,

Melanson Heath and Company, P.C.
Certified Public Accountants
February 25, 2004

# TABLE OF CONTENTS

PAGE

LETTER OF TRANSMITTAL                                                        1

BACKGROUND INFORMATION                                                      3

COSTS QUESTIONED PRIOR TO 1998 CONTRACT                                     5

    Reconciliation of 1994 Contract                      5

    Sludge Collection Equipment                          5

    Consent Order Engineering                            6

PROCUREMENT OF 1998 OPERATIONS CONTRACT                                     7

CONTRACT                                                                    11

YEAR 1 - MARCH 1, 1998 THROUGH FEBRUARY 28 1999                             13

    Wages and Salaries $ 513,162 Limit                   13

    Equipment/Capital Replacement and Repair $ 100,000 Limit    13

    Repair and Maintenance Limit  $ 75,000               15

    Electricity at New Pump Stations $ 15,000            15

    Belt Filter Press                                    15

    Conclusion                                           16

YEAR 2 - MARCH 1, 1999 THROUGH FEBRUARY 28, 2000                            17

    Wages and Salaries $ 556,328.50 Limit                17

    Equipment/Capital Replacement and Repair $ 100,493 Limit    17

    Repair and Maintenance Limit $ 75,370                18

    Electricity at New Pump Stations $ 15,073.95         19

    Conclusion                                           19

YEAR 3 - MARCH 1, 2000 THROUGH FEBRUARY 28, 2001                    20

    Wages and Salaries $ 575,820.76 Limit                          20

    Equipment/Capital Replacement and Repair $ 103,386.1Limit       20

    Repair and Maintenance Limit $ 75,539.65                        21

    Electricity at New Pump Stations $ 15,507.93                    21

    Conclusion                                                      22

YEAR 4 - MARCH 1, 2001 THROUGH FEBRUARY 28, 2002                    23

    Wages and Salaries $ 565,757.01 Limit                          23

    Equipment/Capital Replacement and Repair $ 108,358.04 Limit     23

    Repair and Maintenance Limit $ 75,539.65                        21

SUMMARY CONCLUSION AND RECOMMENDATIONS                              24

    Recommendations                                                 25

**Background Information**

The Rockland Sewer Commission is governed by an elected three member Board of Commissioners. In late fiscal 1997 the Board hired a Superintendent on a sub-contract basis and the Superintendent became a full time salaried position in the fiscal 1998 budget.

The Sewer Department budget covers the staffing of the Superintendent and Administrative Assistant with related benefits, sludge removal, industrial pre-treatment and various other costs. The major category within the Sewer Commission budget is for the Contract Operations of the sewer treatment facility.

The same company has been contracted to operate the plant for as far back as records were available to review, although the company has twice been acquired by larger companies.

Metcalf and Eddy Services, Inc. was the Contract Operator prior to the three year contract spanning fiscal 1994 through 1997. Metcalf and Eddy Services, Inc. was also the company of record for the 1994 contract dated July 25, 1994. The Company became PSG sometime during that three-year contract. The contract expired in June of 1997 and PSG continued as Contract Operators until the new contract was executed in February of 1998. The 1998 contract provided for ten years with a ten-year renewal. The contract term was duly voted at Town meeting. PSG was awarded the contract and notified the Sewer Commission that it was part of the U. S. Filter group in September of 1999. U. S. Filter has been the company of record since that time.

There are several provisions in the 1994 contract that are noteworthy in examining the 1998 contract.

1. The 1994 contract was signed by both the Rockland Sewer Commission and the Board of Selectmen. The 1998 contract was only signed by the Sewer Commission.

2. At the time of the 1994 contract the Sewer Commission disposed of sludge at the Rockland landfill. The contract did not require the Contract Operator to pick up the cost of disposal at an alternative site. The Contract Operator was required to provide sludge de-watering equipment within the cost of the contract which would meet the 21% solids requirement for landfill disposal. (Belt Filter Press)

3. The contract provided a $ 100,000 allowance for Equipment Replacement/ Facility Maintenance. All unexpended funds from the allowance were to be retained by the Sewer Commission. The $ 100,000 allowance continued in the 1998 contract.

4. The 1994 contract provided for a $ 50,000 Preventative Maintenance/Repair provision. The 1998 contract increased the amount to $ 75,000 and added wording regarding the return of unexpended funds to the Commission.

5. There is no requirement in the 1994 contract for minimum staffing or costs associated with staffing. The 1998 contract contained an allowance for 10 employees at a minimum amount of $ 400,000 with provision that unexpended amounts would be returned to the Commission.

We did not have access to year-end reports and reconciliations for the three years covered by the 1994 contract or the interim period from July 1, 1997 through February 28, 1998 when the new contract took effect. The Contract Operator asserts that they provided yearly reconciliations to the Sewer Commission for all years subsequent to the 1998 contract. The Sewer Commissioners claim that they requested annual reconciliations but never received them. We have examined all of the reconciliations provided and have presented the information in this report.

On June 1, 2002 a check made out to the Town of Rockland , Rockland Sewer Commission, Gregory Thomson, Superintendent, by U. S. Filter in the amount of $ 5,744.48 was presented for deposit into an account in the name of the Superintendent. The bank notified the Rockland Police Department and an investigation was launched leading to an indictment of the Superintendent. As a result of the first phase of this investigation, an additional account was found maintained jointly by the Superintendent of the Sewer Commission and the Regional Sales Manager of U. S. Filter. The discovery of that account led to an additional indictment of the U. S. Filter employee.

The Town has reported continuing difficulties in distinguishing bills presented for payment by U. S. Filter as to the inclusion of such bills within the contract or outside of the contract. The relationship between the Town and the Commission has been adversarial and has made the administration of a normal fiscal control structure difficult.

## Costs Questioned Prior to 1998 Contract

We were unable to perform comprehensive procedures for all costs prior to the 1998 contract as records going back were not available. However, the following items related to PSG payments were identified by us.

### Reconciliation of 1994 Contract

We were not provided reconciliations of each year of the 1994 contract. However, in a letter dated November 21, 1997 from the Superintendent to Michael Sause of Professional Services Group, Inc., a request for $ 50,000 was made for remains of the 1994 contract which expires in 1997. This letter referenced establishing an account in the name of the Rockland Sewer Commission. Such an account was established at the Wainwright Bank in Boston listing as the address the employee of PSG. The Rockland Sewer Commission Superintendent and the PSG employee were the sole signers on that account. The $ 50,000 was deposited into that account and the proceeds were soon dispersed for the personal benefit of the two individuals.

Attachment A provides copies of the letter and bank account activity for the first $ 50,000 deposit.

### Sludge Collection Equipment

At the close-out of fiscal 1996 the Sewer Commission encumbered $ 70,000 out of the budget account for sludge removal. At an Executive Emergency Meeting held by the Sewer Commission on August 1, 1996 a vote was taken to authorize PSG to purchase new sludge collection equipment under the emergency procurement provisions of Chapter 30B. The reason stated was to acquire the equipment before the winter season to prevent equipment breakdowns. An Emergency Procurement Declaration was issued and signed by the Commissioners on August 2, 1996.

PSG issued an invoice for the $ 70,000 allocated for Sludge Collection Equipment & Installation and an additional $ 5,250 administrative fee. A Rockland purchase order was issued on November 21, 1996 to PSG and the $ 70,000 payment to PSG was submitted to the Town Hall by the Commissioners on the same date.

PSG has provided us with an accounting of the disposition of the $ 70,000 which was paid out in several invoices ranging from December 27, 1996 to February 26, 1997.

Although I was unable to determine the necessity of the equipment purchased, it is clear that the period of time between the identification of need in early August to the intended installation before winter makes the emergency nature of the purchase contradictory. In our opinion the payment was an attempt to expend budget, which would have lapsed at the close of the fiscal year, and to circumvent the 30B bid process.

The documents supporting this transaction are included as Attachment B.

**Consent Order Engineering**

On June 28, 1996 The Rockland Sewer Commission paid $ 100,686 to PSG under an agreement that PSG procure and pay for the services of an engineering firm to assist with pending consent order requirements. Documentation includes a purchase order, agreement, invoice and bills payable schedule. It is clear that the date and Gregory Thomson's name are of type font different from the rest of the PSG invoice.

The payment was charged to account #14492-13450 which is the sludge removal account. This payment and the $ 70,000 item listed above depleted the remaining balance in the sludge removal appropriation at the closing of that fiscal year.

The Sewer Commissioner's were unable to recall any engineering project under-taken through PSG at that time period. U. S. Filter has been unable to provide us with any documentation of the disposition of the $ 100,686 payment. However, a check request form from Michael Sause initiated a $ 78,139.56 refund to "close Rockland Engineering Project per client". The check was subsequently deposited into the unauthorized Wainwright bank account and dispersed for personal use to the Rockland Sewer Superintendent and PSG employee.

The documents supporting this transaction are included as Attachment C.

**Other PSG Purchases**

We found numerous payments to PSG outside of the contract and for which there was no evidence of applying procurement procedures.

| | | |
|---|---|---|
| Instrumentation and Electrical Services for dechlorination system | 05/20/97 | $ 3,790 |
| Instrumentation and Electrical Services for dechlorination system | 05/21/97 | $ 758 |
| Reimbursable Chemical Costs | 10/31/97 | $ 4,472 |
| Reimbursable Chemical Costs | 12/17/97 | $ 6,934 |
| Reimbursable Chemical Costs | 01/19/98 | $ 2,412 |
| Reimbursable Chemical Costs | 02/10/98 | $ 1,595 |
| Reimbursable Chemical Costs | 03/05/98 | $ 6,263 |

## Procurement of 1998 Operations Contract

We found that the proper notifications and advertisements required by Chapter 30B were made. The request for proposal was prepared by Gregory Thomson and by the Regional Sales Manager for U. S. Filter, then PSG, Michael Sause. The involvement of the Sewer Commissioners in unknown. We reviewed the minutes to all meetings and only found one reference to the proposal and contract which simply indicated that the RFP was nearing completion. In a February 1998 meeting, the Commissioners accepted the PSG contract. There is no evidence that the Town's Chief Procurement Officer participated in the bid process. There was no reference to him at the bid opening or at any other time. There is no delegation on file authorizing the Sewer Superintendent to act as Chief Procurement Officer as required by 30B.

It is noted that there was a gap of eight months between the expiration of the 1994 contract (June 30, 1997) and the execution of the 1998 contract (February 24, 1998). Attachment C is an Emergency Declaration seeking renewal of the 1994 contract from July 1, 1996 through September 30, 1997. We see no documentation that any action was taken for renewals after that date through February 24th of 1998 when the new contract was signed.

There were only two qualified companies that participated in the proposal process. PSG and Woodard & Curran. The competition for this contract was intensive as several prior employees, who previously worked at the Rockland Sewer Plant during the Metcalf & Eddy Services, Inc. days, had joined the Woodard & Curran group.

The Request For Proposal (RFP) was issued July 21, 1997 with a due date of September 2, 1997. The due date was extended several times due to the issues raised in the proposal process.

The request was a proposal rather than a bid as set forth in the requirements of MGL Chapter 30B. The RFP contained clear Minimum Submission Requirements but did not contain the comparative evaluation criteria required by Chapter 30B. Paragraph 2. of the instructions states "All proposals meeting the Minimum Submission Requirements will be initially evaluated based on the specific information presented in the RFP. Proposals will be rated Highly Advantageous, Advantageous, Acceptable and Unacceptable." The specific criteria used in the evaluation process is outlined on page twenty four, Section VII. The evaluation criteria does not tell the vendors what conditions exists to achieve the Highly Advantageous, Advantageous, Acceptable and Unacceptable rankings and therefore is unusable as evaluative criteria.

The proposal goes on to discuss interviews with firms and "A final rating of the proposals will be determined based on the initial evaluations of qualifications, responsiveness to the scope of services requested in this RFP, interviews and reference/follow-up review work on the firms." The final rating process does not meet the process set forth in 30B.

7

The final awarding of the contract was to be based on "the most qualified firm offering a plan of service with a reasonable cost that is in the best interest of the Rockland Sewer Commission".

A proposal review committee was suppose to review the proposals and make a recommendation to Rockland's Chief Procurement Officer. We were unable to find any documentation that the Town's Chief Procurement Officer participated in the process in any way.

In our opinion, the process described for selection does not meet the 30B requirements in that it does not give the vendors proposing on the project an understanding of the criteria to be used for selection and assurance that selection process that is fair and equitable. It is too subject to the discretion of the individuals doing the review.

The Minimum Submission Requirements are set forth on page seven. There is a requirement stated in paragraph d that "At a minimum, contract operators shall demonstrate that they have provided successful contract operations at a minimum of five water pollution control facilities similar in size and complexity to the Rockland facility for at least five years." In our opinion this requirement is reasonable due to the technical nature and regulatory complexities of operating the plant.

Paragraph e deals with staffing and indicates that "With the expansion of the collection system and addition of pumping stations, the staffing plan for this contract must be ten persons." This topic is discussed further in the proposal starting on page 10. "The minimum on-site qualified staff that shall be assigned for the operations and maintenance of the WPCF shall be ten (10)."

The section goes on to state "a minimum dollar value of $ 400,000 be included for wages only. The proposer will be required to verify to the Rockland Sewer Commission the wages incurred for the ten positions required. Wages shall be defined as gross dollars paid to each employee including base annual salary, overtime and bonus amounts. Wages cannot include fringe benefits or other associated labor costs." Further, "any unused funds will be rebated to the Rockland Sewer Commission to include **the actual wage, fringe benefits, tax expense, overhead and profit.**" (Bold face not in RFP. Added here for emphasis.) And, "Costs for all employee benefits, health insurances, 401K, pension, all payroll taxes, and overhead shall be included as a separate line item in the cost proposal."

Woodard & Curran met with the Superintendent to discuss this requirement. They felt strongly that the WPCF could be managed with less staff and for a substantially reduced price than the $ 400,000 required by the RFP. In response the Superintendent wrote back to all vendors that the Rockland Sewer Commission would not allow changes in the requirements but that they would look at the operating plan after the contract was awarded. (Attachment D)

The staffing levels required in this contract are significant in evaluating both the fair and open competition in the proposal, in the execution of the contract and in contract performance. The Rockland WPCF has never been staffed with ten (10) positions either before or after the RFP. In correspondence to the Department of Environmental Protection (DEP) dated February 10, 1998, PSG submits a staffing plan which indicates a staffing level of eight (8) and adding one position to bring the level to nine (9) (Attachment E). On May 8, 1998 an update is submitted listing a staffing level of eight (8) (Attachment F). In March of 1999 the staffing level was reported back at nine (9) although the actual payroll records show only eight (8) working most of the 99/00 contract year.

Based on the documentation submitted to DEP and the actual staffing of the plant prior to and after the proposal and contract, it is our opinion that the requirement for ten (10) staff and the fixed allowance of $ 400,000 listed in the proposal did not reflect reality. The refusal to recognize Woodard & Curran's proposal of an operating plan at a reduced staffing level is considered unreasonable. The misuse of surplus balances created in the salary allowance is discussed later in this report.

The RFP required vendors submitting proposals to include the cost of a belt filter press similar in quality and condition to one owned and installed by PSG in 1994. The contract executed with PSG in 1994 required them to provide equipment that would de-water sludge to a level acceptable for disposal in a landfill. At the time the sludge was being disposed of at the Rockland landfill. PSG executed a seven year lease for a belt filter press and related equipment with an original cost of $ 174,000. Based on discussions with U. S. Filter the cost of the lease payments were factored into the contract cost in the 1994 contract.

Woodard & Curran in their meeting with the Superintendent proposed an alternative to the belt filter press that would save the WPCF money. Again the Superintendent in Attachment D indicates that the WPCF will consider other alternatives after the contract is executed. The pricing schedule required the vendors proposing to separately list the cost of the belt filter press in their price proposal.

The unwillingness of the Superintendent to consider cost saving alternatives resulted in Woodard & Currans decision not to submit a proposal. They expressed their opinion that the RFP and further clarifications were heavily weighted in favor of the incumbent contract operator. Their letter of September 22, 1997 outlines their position. (Attachment G)

Other provisions of the proposal are important to note.

Section V, A. outlines the Preventative Maintenance & Repair requirement and the related $ 75,000 allowance. Section B. outlines the Equipment Replacement/ Facilities maintenance account for items exceeding $ 3,000. The section provides for a $ 100,000 allowance and requires Sewer Commission prior approval before expending out of the allowance. At the end of the section stated in bold lettering **"For emphasis purposes, the Rockland Sewer Commission must authorize the expenditure of funds from the $ 100,000 allowance."**

The RFP included a cost proposal page with pricing broken down into several line items. The line items for Labor ($ 400,000), Preventative Maintenance ($ 75,000), New Pump Station Electricity ($ 15,000) and Equipment Replacement/Facility Maintenance ($ 100,000) were already filled in. (Attachment H)

The Rockland Sewer Commission only received one proposal which was from PSG. Their price proposal was for $ 1,269,704 (Attachment I). There were several items removed from the cost proposal to bring the cost down to the $ 1,200,000 amount which was included in the Rockland Sewer Commission budget. These were $ 35,600 for the belt filter press, $ 17,000 for Industrial Pre Treatment, $ 8,400 for the Performance Bond and $ 8,704 for profit and overhead.

## Contract

There are several sections of the contract important in evaluating the propriety of the contract and in evaluating contract compliance issues.

Section 1.7

"In the event of an inconsistency or conflict between the provisions of this Agreement and the provisions of Section IV of the RFP, Scope of Services, which are incorporated herein by reference, the provisions of this agreement shall prevail and take precedence."

Section 2.2

"PSG will staff the Project with a minimum of ten employees who have met the appropriate licensing and certification requirements of the Commonwealth of Massachusetts to satisfy an approved staffing plan by the Massachusetts DEP."

"Any deviations from this staffing plan must be approved in advance by the Rockland Sewer Commission and the Massachusetts DEP."

Section 2.10

"PSG may modify the process and/or facilities to achieve the objectives of this agreement and Charge the Cost to the Maintenance and Repair limit; provided, however, no modification shall be without the Commission's prior written approval if the complete modification Cost shall be in excess of Three Thousand Dollars ($ 3,000)."

Section 6.1

"For the first year of this Agreement, PSG's Annual Fee is $ 1,200,000. The Maintenance and Repair Limit included in the annual fee is $ 75,000. The Equipment/Capital Replacement and Repair Limit is $ 100,000. The New Pump Station Electricity Limit is $ 15,000. The Wages and Salaries Limit is $ 400,000 exclusive of benefits."

Section 6.2

"If actual Maintenance and Repair, Equipment/Capital Replacement and Repair, New Pump Station Electricity Limit and/or Wages and Salaries Limit expenditures are less than $ 75,000, $ 100,000, $ 15,000 and $ 400,000 respectively for any Agreement year, PSG will rebate the entire difference to COMMISSION in accordance with Section 3.4 and 2.1."

Thee are several differences between the original RFP and the contract which place the Commission at a disadvantage. The requirement for Commission approval of

Capital purchases seems to have been omitted from the contract. Although there is some mention in Section 2.10 described above about charges to the Maintenance and Repair Limit, there is no mention of Commission approval for charges to the Equipment/Capital Replacement and Repair Limit.

During our review of the Rockland Sewer Commission minutes we did not see reference to any of the capital purchases charges against the $ 100,000 Equipment/Capital Replacement and Repair Limit. We also did not see any discussion in the Commission minutes about charges to the Maintenance and Repair limit either. This seems contrary to the bold emphasis placed on the Commission approval provision detailed in the RFP.

We did find that there were frequent letters from the Superintendent to the Project Manager or notification from the Project Manager to the Superintendent regarding Capital and Maintenance costs in excess of $ 3,000 which indicates that authorization was being sought. In our opinion the Superintendent would not have the authority to replace the Commissioners approval in such matters. This issue becomes increasingly important in the misuse and theft that resulted from expenditures charged against these accounts described later in this report.

The second material difference between the RFP and the Agreement is in the Salary and Wage Limit. Section IV, F. 2. states that any rebate of the salary and wage limit is to include the actual wage, fringe benefits, tax expense, overhead and profit. The Agreement makes no mention of the rebate including these items.

Section 6.2 of the Agreement deals with the Salary and Wage limit exclusive of benefits.

There is a contract amendment dated August 24, 1998 that changes the salary and wage limit to $ 513,162 including benefits. The salary and wage limit including benefits based on the Cost Proposal would equal $ 577,756 plus a provision for overhead and profit. This amendment then appears to be a detriment to Rockland based on the RFP and Cost Proposal but not based on the Agreement.

The following sections of the report go through each year of the contract and evaluate contract compliance and compliance with other municipal laws and requirements. The focus of the next sections is on costs charged to the four accounts subject to allowances, the reconciliation of costs at the end of each year and the disposition of any resulting surplus balances in those accounts.

**Year 1**
**March 1, 1998 through February 28, 1999**

The Contract for Year 1 was $ 1,200,000. The Allowance accounts changed due to the previously mentioned contract amendment.

**Wages and Salaries $ 513,162 Limit**

The actual wages paid for Year 1 were $ 359,80 resulting in a $ 40,200 surplus compared to the original agreement $ 400,00 limit. The primary surplus results from one less employee (9 instead of 10). The fringe benefit limit was $ 113,162 compared to the $ 177, 756 included in the original cost proposal. The fringe benefit surplus was $ 18,744 based on the contract amendment. The total surplus in the Wages account was reduced by $ 4,491 in temporary help and a $ 9,000 charge to an account called Professional Development.

On further discovery, the $ 9,000 charge turned out to be a check written out to the Town of Rockland dated July 28, 1998. This check date is prior to the account opened by the Superintendent used to deposit checks written by PSG/U. S. Filter to the Town of Rockland et al. This check was not on the list of checks identified in either the criminal case or the insurance audit. U. S. Filter was unable to provide us with a copy of this check to determine its disposition.

The total credit for Wages and Benefits after deductions for temporary help and the check to Rockland amounts to $ 45,554.64. PSG added 10% for overhead and profit for a total credit of $ 50,110.1.

**Equipment/Capital Replacement and Repair $ 100,000 Limit**

There are numerous problems identified in the Equipment/Capital account for this year and all of the years going forward.

The first purchase to Associate Measurement Co. is for $ 7,414 dated July 7, 1998. We have not seen documentation that the purchase was approved by the Board of Commissioners or that competitive bid procedures were followed in accordance with Chapter 30B.

The next purchase was to Baker Tractor Corp. for $ 6,798 dated 11/23/98. Notation in the records indicate that it was a Vac Unit purchased for the Park Department. We have not seen documentation that the purchase was approved by the Board of Commissioners or that competitive bid procedures were followed in accordance with Chapter 30B.

There was a payment to Bay State Business Products for $ 8,000 for a copier in the office. The RFP required the Contract Operator to provide a copier. PSG did provide a credit of $ 250 per month as a result of this purchase.

Payments were made to D'Andrea Food for $ 410, William Donovan for $ 500 and John Dibeneditto for $ 275 for a staff Christmas party. Since the staff are employees PSG and the cost has nothing to do with Equipment/Capital Replacement it does not appear to be an appropriate charge to this account.

$ 1,119.94 and $ 129.99 was paid to Hanlon Shoes for work boots. This does not appear to be a charge that would qualify as Equipment/Capital Replacement.

Two checks were written to KET-Tree Farms for the purchase of Christmas Trees for a total of $ 7,259. The WPTF ran a fund raiser and donated the proceeds to various organizations in Town. The total donations were reported to the Board of Selectmen at a meeting to be $ 11,500. It is my understanding that the Town did not know that they were paying for the cost of the Trees through the Equipment/Capital Replacement allowance. The cost would not be an eligible municipal expense nor is it appropriate to charge the cost against a capital account.

A check for $ 7,484.99 dated January 27, 1999, one for $ 1,863.59 dated March 19, 199 and a check for $ 608.96 of the same date were all made out to Best Buy. We did not see all of the receipts related to these purchases but did see that the Superintendent had a Best Buy charge card in the name of the Rockland Sewer Commission. We also know that three computers were purchased, one for the Superintendent, one for the Assistant and one that allegedly went home with the Superintendent. We also saw the purchase of a computer software game named DeerHunter.

There was a check to Themis Pizza for $ 420.76 dated February 24, 1999. Although we have not seen any information on this item it would not seem to qualify as an Equipment/Capital purchase.

A check for $ 8,245 was paid to a company called B.L. Makepeace Inc. dated March 19, 1999. We have not received any information on this expenditure.

There were three additional checks made out to the Town of Rockland. One dated April 20, 1999 for $ 5,000 and one for $ 4,300 dated August 3, 1999 and one dated December 10, 1998 for $ 10,000. The first two checks were endorsed over to an account believed to be Roadmaster Corporation. We were never able to verify the disposition. The third check for $ 10,000 was deposited into the Wainwright bank account. All checks are listed on the schedule of checks converted to Unauthorized Accounts.

There are two additional checks charged to this account that we have no documentation on. One to Aram Varjebedian for $ 1,661.62 dated July 22, 19999 (way after contract year end) and one to Greg Thomson dated March 15, 1999 for $ 558.34 also after year end.

Finally, there are two checks written out to Roadmaster Corporation, each for $ 10,000 dated June 9, 1999 and August 3, 1999. (Again after the end of the contract year.) These are two of several checks paid out over a period of time and

charged to multiple allowance accounts including the Salaries and Wages account. The purchase is for a Mobile Vac Unit which cost a total of $ 180,151. The details of this purchase will be discussed later in the report.

### Repair and Maintenance Limit $ 75,000

Charges to the Maintenance and Repair account are mostly small amounts to numerous vendors over the year. The vendors appear to be the normal ones expected for this type of work. In subsequent years there are problems that arise with Home Depot bills and other bills. In the first year we do not see that same kind of activity. There are two charges to the Repairs and Maintenance account that are questioned.

The Rockland Sewer Commission through their Superintendent contracted with a Company by the name of Hi-Voltage Associates for Electrical Maintenance at their Plant and Stations. There was an initial contract dated October 6, 1977 (before the PSG contract) typed by the vendor with no signature space for anyone from Rockland. PSG was told to continue using this vendor rather than their own after the new contract was signed. We were not supplied with any documentation of competitive procedures under 30B for this contractor. The total amount paid by PSG and charged to the first contract year was $ 6,902.97.

One check was paid to Lurie & Krupp, LLP in the amount of $ 1,054.50 for legal fees related to the Town of Abington. We question the relevance to Repairs and Maintenance.

### Electricity at New Pump Stations $ 15,000

The total for electricity was $ 6,223 including $ 1,250 for telemetering and $ 1,574 for telephone. A credit of $ 8,777 was issued for the surplus balance.

### Belt Filter Press

At the end of the Town's 1998 fiscal year, July 1, 1997 to June 30, 1998, there was a significant surplus in the Sewer Commissions Contract Operations budget account. This happened because the Sewer Commission budgeted the account at $ 1.2 million, the amount that the contract turned out to be. However, the original due date of the RFP was September, 1997 but the contract was not issued until February, 1998. As a result, the old contract price remained in effect for the first eight months of the budget year. The result was a substantial surplus in the account at the end of the year.

The Sewer Commission encumbered $ 115,000 for a capital purchase of the belt filter press which had been supplied by PSG starting in 1994 and by agreement during the new contract.

PSG had negotiated a seven-year lease purchase for the belt filter press. PSG had the option to purchase the equipment at the end of the lease period for fair market

value of ten percent of the original cost whichever is more. The Rockland Sewer Commission bought out the lease in July 1999, fifty-eight months into the 84 month lease for $ 115,000. At the time of the purchase the remaining payments would have amounted to $ 73,560. It appears that a substantial premium was paid for the early buy-out of the lease.

In exchange for the purchase of the lease by the Rockland Sewer Commission, PSG agreed to credit the amount of the lease payments to the Town of Rockland. As we know, the Town was not getting the credit checks being written to them so there was no benefit to Rockland other than to the Superintendent.

## Conclusion

Year one of the contract is actually the cleanest of the ones investigated. The reconciliation resulted in a net credit balance of $ 69,528.56 even after $ 28,300 paid to the Town of Rockland and converted to unauthorized use, $ 20,000 to Roadmaster paid well after the contract year, Christmas and pizza parties, Christmas Trees, new computers, a tractor for the Park Department and a new copier. The credit balance was paid by the application of $ 50,000 to one of the invoices in year two. The remaining $ 19,528 balance was to be applied to one of the next year's allowance accounts although we have not been able to verify that it really happened.

**Year 2**
**March 1, 1999 through February 28, 2000**

The contract amount increased in the second contract year by $ 50,000 to
$ 1,250,000. The allowance accounts increased by $ 44,000 while the remainder
of the contract increased some $ 6,000. We were unable to determine justification
for the increases except to note that they were insignificant in accounts other than
the Wages and Salaries account.

### Wages and Salaries $ 556,328.50 Limit

The wages and salary account including benefits increased by $ 43,167 in the
second contract year despite the fact that there was a surplus in the limit in the first
contract year of $ 54,554. In addition, the staffing plan, and actual staffing, was
reduced in the second contract year from nine (9) to eight (8).

The actual expenditures charged to the salary account limit was $ 542,325, resulting
in a surplus of $ 14,002. However, two checks were written for the Vactor truck in
the total amount of $ 71,864,94 and charged to the wages allowance.

The first check was to Roadmaster dated March 13, 2000 in the amount of $ 30,000.
The next check was for $ 41,864.94 dated March 1, 2000. Both were charges to the
wages account as of February 28, 2000. The complete details of this purchase are
discussed later in this report as the purchase spans three fiscal years and several
allowance accounts.

It appears that the wages and salary allowance account was increased intentionally
in year two to accommodate the Vactor truck purchase.

### Equipment/Capital Replacement and Repair $ 100,493 Limit

The actual expenditures charged to this account for the contract year ended
February 28, 2000 amounted to $ 109,589.99. However, there are several problems
related to the charges in this account.

We found two checks in the total amount of $ 140 made out to the Town of Rockland
and Rockland Sewer Commission deposited into the accounts of PSG/U.S. Filter.
Credit was given to the Equipment/Capital account in the total amount. Although
these checks are not large, one check in contract year 3 is substantial, the
depositing of checks made out to Rockland into any account other than the Town
Treasury is in violation of municipal statutes and possibly other statutes.

There were several donations made by PSG/U.S. Filter check that were charged to
the Equipment/Capital account. A check for $ 200 was made out to the Rockland
Police Association. A check to the Rockland Golf Course for $ 175 was paid for a
fundraising tournament.

The Christmas "Trees for Kids" program was expanded in this contract year and a total of $ 9,495 was paid out of the Equipment/Capital allowance for wreaths and trees. There were additional supplies purchased at Home Depot through the Repairs and Maintenance account that added to the total cost. Minutes to Selectmen's meetings report that total sales of $ 11,500 were made. That amount appears low based on the mark-up and cost of trees and wreaths. We are concerned that not all of the proceeds were accounted for.

We do not question the authority of PSG or U. S. Filter to make donations and contributions out of their corporate accounts. We do question the legality of making such donations out of the allowance account for Equipment/Capital.

In addition to the contributions, there were several promotional expenditures made out of the Equipment/Capital allowance. A check for $ 2,597.25 was paid to Eastern Design Co. for tee-shirts with PSG and Rockland Sewer Commission logo on them. These were given away at an open house. A check to The Stitchery was paid in the amount of $ 902 for shirts with the U. S. Filter logo.

Checks to Roadmaster made out of this year's Equipment/Capital account include $ 10,000 dated August 23, 1999, $ 30,000 dated March 13, 2000 and $ 12,050 dated March 13, 2000.

Checks made out to the Town of Rockland that are included on the list of funds converted to unauthorized use that were charged to the Equipment/Capital allow this contract year include: $ 4,090 dated October 6, 1999, $ 5,000 dated November 19, 1999, $ 4,000 dated December 10, 1999, and $ 976 dated January 24, 2000.

### Repair and Maintenance Limit $ 75,370

The actual amount charged to the Repair and Maintenance allowance during the second contract year amounted to $ 75,365.84 leaving a small credit.

Included in the Repair and Maintenance allowance were two invoices to Eastern Design Co. for $ 320 and $ 672 for sweatshirts with the PSG logo on them.

A payment was made to American Canvas Co., Inc. in May of 1999 in the amount of $ 1,285.74 for a canopy tent used for the open house in June and at several events since that time.

Again, we question the propriety of costs promoting the contract operator being charged to allowance accounts such as repairs and maintenance.

We found that charge cards had been established at Home Depot. During the second contract year there were $ 9,896.41 charges made for which documentation was provided that tied out to amounts paid. (The total Home Depot charges were substantially more than that amount.). Although there were several PSG employees ·ing the charge cards, the Superintendent of the Sewer Commission was by far the ·t frequent user accounting for $ 7,125.90 of the charges documented.

Included in the Home Depot charges was the purchase of gift cards for a total of $ 1,350.  $ 1,000 of cards were purchased by the Superintendent and $ 350 by the Plant Manager.  Gifts and gratuities are not an allowable municipal expenditure.

We were unable to determine based on the information provided whether all purchases made by the Superintendent benefited the WPCF.  If the purchases are repair and maintenance items for the facility, we question why the Superintendent was performing tasks that were the responsibility of the contract operator.

### Electricity at New Pump Stations $ 15,073.95

Actual costs charged against this allowance for the second contract year was $ 15,132.44, resulting in a small balance due.  However, the charges included a check to Roadmaster for $ 10,000 dated March 13, 2000.

### Conclusion

There was only a small balance left in the allowance accounts after all of the items noted above were applied to the accounts.  There was a credit for profit and overhead on the wages surplus including on the Vactor truck costs charges to the wages account.  There was a $ 23,731 credit for the belt filter press and another $ 3,000 for the copier.  Total credits amounted to $ 40,090.52.  $ 16,666.72 was applied to the June 2000 invoice and the balance of $ 23,423.80 was to be credited but we were not able to verify the application.

## Year 3
## March 1, 2000 through February 28, 2001

The total contract for year three increased by $ 39,463.07 most of which was accounted for in the wages and benefits account. The U. S. Filter share of the increase amounted to $ 14,473.74. We were unable to follow the rationale for the increases.

### Wages and Salaries $ 575,820.76 Limit

Again it is hard to understand any increase in the wages and salaries account when there was a surplus in the previous two years and $ 71,000 spent on the Vactor truck. There is evidence that staffing stayed around eight full time with a ninth person added seasonally and part time.

The actual wages including benefits amounted to $ 505,125.38 after a check to Rockland included on the list of checks converted to unauthorized use for $ 15,000. The result is a credit of $ 70,695.38 that is accounted for as additional checks to Rockland included on the list of checks converted to unauthorized use.

### Equipment/Capital Replacement and Repair $ 103,386.19 Limit

Actual charges to the Equipment/Capital allowances in the third year were $ 87,417.83.

A check for $ 12,500 was paid to a vendor, Gary Cook, for tree cutting, stumping, sub-grade and fill. We did not find evidence of competitive bid procedures or any mention of the item in the Commissioner's minutes.

There were two checks to Roadmaster. One for $ 11,616 dated November 10, 2000 and one for $ 14,620 dated August 17, 2000.

Invoices for $ 414, $ 678.50 and $ 1,201 were paid to Eastern Design Co. for sweatshirts with U. S. Filter logo on them. A payment was made to The Stitchery in the amount of $ 1,798 for Jackets with the U. S. Filter logo on them.

A check made out to Town of Rockland Wastewater, US Filter Operating Services in the amount of $ 6,559.43 was deposited into the U. S. Filter accounts with credit to the Equipment/Capital account. This check was an insurance reimbursement. There was an additional receipt from the Town of Hull in the amount of $ 8,474 for sludge disposal deposited into U. S. Filter accounts and credited to the Equipment/ Capital account. We did not see the check to see whom it was made out to.

The Christmas tree check amounted to $ 9,630.85. We do not have information regarding the amount collected or donated for that year.

A check was made out to the Rockland High School Superbowl Champs 2000 in the amount of $ 1,000. $ 1,500 was paid to the Rockland Sons of Italy for a Christmas party.

A check was made out to Hanlon Shoes for $ 1,906.84 for ten pair of workboots.

Checks made out to the Town of Rockland on the list of checks converted to unauthorized use include: $ 8,200 dated April 16, 2001, $ 1,800 dated February 1, 2001, $ 2,442.23 dated January 9, 2001, $ 3,800 December 8, 2000, $ 2,300 dated October 16, 2000, $ 5,000 dated August 8, 2000, $ 908.73 dated June 27, 2000, $ 2,100 dated May 2, 2000 and $ 2,499.96 dated March 24, 2000.

### Repair and Maintenance Limit $ 75,539.65

Actual charges against the repairs and maintenance account for this year were $ 90,003.15.

Home Depot charges increased to $ 17,945.83 of which $ 16,640.64 were made by the Superintendent. Gift cards amounted to $ 3,575 purchased by the Superintendent. Gift cards purchased by the Plant Manager were not charged against the allowance account.

### Electricity at New Pump Stations $ 15,507.93

Charges against this account amounted $ 5,008.55 and a credit of $ 10,499.38 was given in the year-end reconciliation.

### Conclusion

The credits from the allowance accounts amounted to $ 84,699.62 even with the checks described above. An additional credit of $ 35,597.28 was given for the belt filter press, a 10% credit for profit and overhead on the wages limit and a $ 3,000 copier credit were also applied.

The total year three credit amounted to $ 124,890.79. This credit was disposed of as follows:

Checks to Town of Rockland (All on list):

| | |
|---|---|
| September 24, 2001 | $15,000.00 |
| November 1, 2001 | $ 8,928.98 |
| December 1, 2001 | $ 8,000.00 |
| December 12, 2001 | $ 7,000.00 |
| January 22, 2002 | $ 6,983.00 |
| February 11, 2002 | $ 5,873.22 |
| March 12, 2002 | $ 6,804.03 |
| April 3, 2002 | $ 1,625.62 |

A check was paid to Gibson Associates, Inc. dated February 11, 2002 in the amount of $ 68,368.50. We do not have any information regarding the transaction. There is also a credit of $ 3,692.26 said to clear out the 99/00 rebate.

## Year 4
## March 1, 2001 through February 28, 2002

We did not obtain year 4 records to identify supporting documentation from U. S. Filter.  Based on the records that were provided to us and on the knowledge gain from examining documentation in prior years we are able to identify the following issues.

The contract price increased to $ 1.3 million.  The total increase amounted to $ 10,537 but a decrease in the wages category offset increases in the other allowance accounts and a $ 20,154 increase in the U. S. Filter share of the contract.

**Wages and Salaries $ 565,757.01 Limit**

Actual salaries and benefits amounted to $ 505,499 but checks to the Town of Rockland charged to the wages account brought the total up to $ 538,030.98. Checks made out to the Town of Rockland included in the list of checks converted to unauthorized use included:  $ 7,049.63 dated April 3, 2002, $ 14,309.00 dated April 23, 2002, $ 5,428.50 dated May 13, 2002 and $ 5,744.48 dated June 6, 2002.  The last check was never cashed but U. S. Filter has included the payment in their reconciliation.

**Equipment/Capital Replacement and Repair $ 108,358.04 Limit**

Again, we have no supporting documentation for the $ 85,756.43 charged to this account but can identify the following:

Town of Rockland checks included on the list of checks converted to unauthorized use include:  $ 3,197.50 dated February 1, 2002, $ 5,354.34 dated September 4, 2001, $ 4,492 dated July 26, 2001, $ 2,700 dated July 1, 2001, $ 4,020 dated June 1, 2001.

Checks to Eastern Design for clothing with U. S. Filter logo included $ 857 and $ 2,620.

The Christmas trees cost was $ 9,127.21.

The maintenance and repair and electricity accounts do not have sufficient information to report on.  The allowance credits amount to $ 37,317 and with the belt filter press credit of $ 35,597, shared savings credit of $ 20,919 and other credits the total amounts to $ 102,883.02.  The balance has been remitted to the Town of Rockland.

## Summary Conclusion and Recommendations

From the period that the contract began, March 1, 1998 through June of 2002, U. S. Filter (PSG) wrote $ 198,927 of checks to the Town of Rockland which were either deposited into the Superintendent's private bank account or to the account established by the Superintendent and a U. S. Filter employee for their personal use. An additional $ 73,138 of surplus funds from the 1994 through 1997 contract, and $ 78,139 from the advance to U. S. Filter (PSG) for engineering services were deposited into the account held by the Superintendent and the U. S. Filter employee. The total amount converted to personal use amounted to $ 350,204. The supporting documentation for most of these checks was based on letters written to the Project Manager by the Superintendent of the Rockland Sewer Commission. As we were not allowed to talk to the U. S. Filter Project Manager, we do not know what understanding he had regarding what these funds were used for. The letters state that they are for "project related expenses" without explanation as to the purpose. The checks were written against the four allowance accounts as instructed in each of the letters.

The Rockland Sewer Commission purchased a Vactor truck through the four allowance accounts and over a period of three years. The supporting documentation mentions a second bid but we did not see any documentation of that bid. The original price quote from Roadmaster was for $ 129,489. With changes, the total amount paid was $ 180,151. We did not see any mention in the Rockland Sewer Commission minutes that the Vactor truck was discussed or where and how it would be paid for.

There were amounts paid out of the various allowance accounts but primarily out of the Equipment/Capital allowance that promoted U. S. Filter (PSG) and their partnership with the Rockland Sewer Commission. These promotions and contributions add up to $ 25,055.

Additional gifts to individuals and related parties amounted to $ 9,266.77.

Receipts were deposited into the U. S. Filter bank accounts adding credit to the allowance accounts including substantial credits for the belt filter press and copier buy-out. These receipts and credits added up to $ 119,599.55. Rockland has yet to see rebates for any of the credits as of this date.

The Commission also spent substantial amounts out of their own budget account surplus balance by the encumbrance and subsequent expenditure on capital items through PSG. These amounts total $ 285,686.

There are other costs questioned in this report due to lack of documentation supporting compliance with competitive bid laws and lack of documented approval by the Board of Sewer Commissioners.

In our opinion the original RFP does not meet 30B standards and the procurement process was not in the best interest of the Town of Rockland. The contention by a competitive firm that the plant can be operated at a significantly lower cost is more than supported by the theft and misuse of allowance accounts reported here.

## Recommendations

Our highest concern is to stop the wasteful spending caused by the excessive allowances and credits outside of the control of normal municipal authority. By spending municipal resources through a private vendor there is not assurance that the municipal purpose set forth in the statutes is protected.

The control over allowances and credits has clearly been with the former Super-intendent. Documentation supports that the Rockland Superintendent and the PSG Regional Sales Manager conspired to convert funds to their own personal use. However, the control structure of both the Board of Commissioners and the private vendor were not adequate to prevent the loss and waste.

The contract operator provided annual reconciliation reports to the Commissioners along with supporting documentation as required by the contract. A review of that documentation by the Commissioners would have detected the theft and other amounts expended that are questioned in this report. The Commissioners were to have approved expenditures in excess of $ 3,000 from the Equipment/Capital account which is the account most abused by the Superintendent. We saw very little discussion in the minutes related to any of the capital purchases or even the RFP and contract with the contract operator.

The contract for managing the operations of the WPCF should be terminated and a competitive procedure used to produce a new contract which will substantially reduce the cost of operating the facility in future years. Consideration should be given to recovery of all funds misspent under the contract. There are also substan-tial funds to be recovered from contract years 2003 and 2004. The basis for voiding the current contract include:

1.  The 1997 request for proposal for contract operations, was prepared by the Superintendent, together with the Regional Sales Manager of U. S. Filter (then PSG). This creates a conflict of interest as the contract operator benefits from the outcome of the RFP.

2.  The Sewer Commission did not include the Town's Chief Procurement Officer in the proposal and contract process. Chapter 30B requires com-petitive purchases to be carried out by the Chief Procurement Officer and any delegation of those duties must be made in writing to the Inspector General's Office. No such delegation was made.

3.  The request for proposal includes provisions which reduce the competi-tive nature of the proposal. The fixed price of $ 400,000 for ten full-time employees reduces the ability of a competitor to price compete for a

material part of the contract. Compounded is the fact that there was never an intention of using ten employees in the administration of the contract. In addition, the requirement of the vendor to provide a belt filter press when there existed cost efficient alternative methods for sludge disposal is restrictive.

4. The comparative criteria contained in the request for proposals did not contain the methodology by which the highly advantageous, advantageous, acceptable and unacceptable designations would be determined. In addition, the request for proposal does not provide the criteria for determining the successful bidder. A proposal review committee was to be established to review the proposals and a recommendation was to be made to Rockland's Chief Procurement Officer. That process never happened. The fact that only one proposal was submitted does not eliminate the need to review the proposal fairly or to use the Town's Chief Procurement Officer.

5. As evidenced by the misuse of surplus balances in the allowance accounts, the contract is substantially in excess of fair market value. Even if the use of such surplus balances were according to permitted use of municipal funds, and they were not, the process circumvents the appropriation and authorization process inherent in Massachusetts Municipal Finance statutes.

6. The Contract Operator did not comply with key provisions of the contract leading to the unauthorized conversions going undetected. The proposal and contract called for Commissioner's approval of all expenditures of capital purchases. There were numerous checks written to the Town of Rockland related to purported purchases that never were known to the Commissioners. In addition, despite requests by the Commissioners for an accounting of the allowances, the Contract Operator never provided the Commissioners with reconciliation information clearly indicating the numerous checks written out to the Town of Rockland.

7. The Contract Operator participated in unlawful municipal spending by paying bills out of allowance accounts that were unrelated to the allowances for which they were created, contrary to bid laws, contrary to statutes such as prohibition over gifts and gratuities and benefited the Contract Operator.

The Town of Rockland should consider restructuring the governance of the Sewer Department. There has been little interest in the last several years for bringing candidates forward for public office. The Board of Commissioners have not provided oversight of the Sewer Commission adequate to protect the Town from fraud and abuse of public funds. The Board hired a full time Superintendent and then did not provide the supervision to prevent him from opening unauthorized accounts and converting money for personal use that was due back to the Town. The Commissioners state that they asked for an accounting from the contract operator of amounts spent and due under the allowance accounts but allowed several years to go by without following up on the requirement. They even allowed amounts due under the 1994 through 1997 contract to go unaccounted for.

26

The Commissioners have participated in unusual transactions such as the advance for engineering services made to PSG in 1997 which resulted in a unauthorized conversion of Town funds, a purported emergency purchase as part of the 1997 close-out and the buy-out of the belt filter press at higher than fair market value. (All transacted to keep from allowing unused appropriation balances to close out at year-end.) They had knowledge of the excessive amount spent on the vactor truck even though the purchase was never taken up at a public meeting. They knew of purchases that promoted the contract operator such as the Christmas Tree program and the purchase of logo clothing promoting the contract operator.

Throughout the negotiation process for recovery of misspent and diverted money, the Commissioners have sought to retain the existing contract and preserve the relationship with the current contract operator.

The Town should consider the abolition of the Sewer Commission and a restructuring which would create a full time position managing the Sewer Facility under the direction and supervision of the Board of Selectmen. The Town should look at the Sewer Facility in conjunction with management of the Highway and Water facilities.

Town of Rockland
Checks Made out to Rockland Converted to Unauthorized Accounts

| | | | |
|---|---|---|---|
| Rockland | 11/25/1997 | $50,000.00 | Wainwright Bank |
| Rockland | 3/20/1998 | $78,139.56 | Wainwright Bank |
| Rockland | 3/24/1998 | $9,964.05 | Wainwright Bank |
| Rockland | 3/27/1998 | $193.97 | Wainwright Bank |
| Rockland | 7/31/1998 | $9,000.00 | No Copy Yet |
| Rockland | 10/13/1998 | $12,980.00 | Tutela Engineering - Wainwright Bank |
| Rockland | 12/25/1998 | $10,000.00 | Wainwright Bank |
| Rockland | 4/30/1999 | $5,000.00 | Pay to ? |
| Rockland | 7/30/1999 | $4,300.00 | Pay to ? |
| Rockland | 10/29/1999 | $4,090.00 | North Abington Coop |
| Rockland | 11/26/1999 | $5,000.00 | North Abington Coop |
| Rockland | 12/31/1999 | $4,000.00 | North Abington Coop |
| Rockland | 1/24/2000 | $976.00 | North Abington Coop |
| Rockland | 3/24/2000 | $2,499.96 | North Abington Coop |
| Rockland | 5/2/2000 | $2,100.00 | North Abington Coop |
| Rockland | 6/27/2000 | $908.73 | North Abington Coop |
| Rockland | 8/8/2000 | $5,000.00 | North Abington Coop |
| Rockland | 10/16/2000 | $2,300.00 | North Abington Coop |
| Rockland | 12/8/2000 | $3,800.00 | North Abington Coop |
| Rockland | 1/9/2001 | $2,442.23 | North Abington Coop |
| Rockland | 2/1/2001 | $1,800.00 | Looks like pg 2 of January statement missing. Check processed |
| Rockland | 2/16/2001 | $15,000.00 | North Abington Coop |
| Rockland | 4/16/2001 | $8,200.00 | North Abington Coop |
| Rockland | 6/1/2001 | $4,020.00 | North Abington Coop |
| Rockland | 7/1/2001 | $2,700.00 | North Abington Coop |
| Rockland | 7/26/2001 | $4,492.00 | North Abington Coop |
| Rockland | 9/4/2001 | $5,354.34 | North Abington Coop |
| Rockland | 9/24/2001 | $15,000.00 | North Abington Coop |
| Rockland | 11/1/2001 | $8,928.98 | North Abington Coop |
| Rockland | 12/1/2001 | $8,000.00 | North Abington Coop |
| Rockland | 12/12/2001 | $7,000.00 | North Abington Coop |
| Rockland | 1/2/2002 | $6,983.00 | North Abington Coop |
| Rockland | 2/1/2002 | $3,197.50 | North Abington Coop |
| Rockland | 2/11/2002 | $5,873.22 | North Abington Coop |
| Rockland | 3/12/2002 | $6,804.03 | North Abington Coop |
| Rockland | 4/3/2002 | $1,625.62 | North Abington Coop |
| Rockland | 4/3/2002 | $7,049.63 | North Abington Coop |
| Rockland | 4/23/2002 | $14,309.00 | North Abington Coop |
| Rockland | 5/13/2002 | $5,428.50 | North Abington Coop |
| Rockland | 6/1/2002 | $5,744.48 | Bank stopped payment and called police |
| | | $350,204.80 | |

Town of Rockland
Questioned Costs
U.S. Filter Contract

**Year 1**
Staff Christmas Party                    $1,185.00
Work Boots                               $1,249.93
Christmas Trees                          $7,259.00
Pizza                                      $420.76
                                        $10,114.69

**Year 2**
Rockland Police Assn                       $200.00
Rockland Golf Course                       $175.00
Checks to Rockland                         $140.00
Christmas trees                          $9,495.00
Tee Shirts                               $2,597.25
Logo                                       $902.00
Sweatshirts with Logo                      $992.00
Canopy Tent                              $1,285.74
Gift Cards                               $1,350.00
                                        $17,136.99

**Year 3**
Sweatshirts with Logo                    $2,293.50
Jackets with Logo                        $1,798.00
Christmas trees                          $9,630.85
Rockland High School                     $1,000.00
Sons of Italy                            $1,500.00
Checks to Rockland                      $15,033.43
Workboots                                $1,906.84
Gift Cards                               $3,575.00
                                        $36,737.62

**Year 4**
Logo Clothing                            $3,477.00
Christmas Trees                          $9,127.21
                                        $12,604.21

Total Documented                        $76,593.51

Note: Year 4 was not completed due to inadequate documentation.
Year 5 documentation has not been supplied.