UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PROFESSIONAL SERVICES GROUP, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| TOWN OF ROCKLAND, ROCKLAND SEWER COMMISSION, GREGORY THOMSON and MICHAEL SAUSÉ, | ) ) ) ) ) |
| . | ) ) |
| TOWN OF ROCKLAND, ROCKLAND SEWER COMMISSION, | ) ) ) ) |
| Plaintiffs-in-Counterclaim and Crossclaim | ) ) ) |
| v. | ) ) |
| PROFESSIONAL SERVICES GROUP, INC., | ) ) ) |
| Defendant-in-Counterclaim, | ) ) |
| and | ) ) |
| MICHAEL SAUSÉ, | ) ) |
| Crossclaim Defendant | ) ) |

Civil No. 04-11131-PBS

**TOWN OF ROCKLAND'S AND ROCKLAND SEWER COMMISSION'S MOTION IN LIMINE TO PRECLUDE PROFESSIONAL SERVICES GROUP, INC. FROM OFFERING TESTIMONY OF LOST PROFITS**

JS#129078v1

The Defendants/Counterclaimants Town of Rockland and Rockland Sewer Commission (collectively referred to herein as "Town" or "Town of Rockland") hereby move to preclude evidence proffered by Plaintiff Professional Services Group, Inc. of profits lost as a result of the Town's termination of its contract.  The contract was terminated in April 2004, was scheduled to terminate at the end of February 2008.

Testimony about future profits in a case such as this which involves a complex contract, is by its very nature opinion testimony rather than "fact" testimony.  PSG was ordered by Magistrate Judge Collings to produce any documents that projected what profits what profits would have been from April 2004, when the contract was terminated, through February 2008, when the first term of the contract was to expire – but the Town has seen none.  Any opinions that would be offered by any PSG witness would therefore be expert opinions generated solely for the purposes of litigation. There have been no disclosures of such opinions or experts.

**I.    The Federal Rules Require The Disclosure Of The Identity of All Experts Who Will Be Relied Upon At Trial**

Federal Rule of Civil Procedure 26(a)(2) requires that parties disclose the identity of any experts who may be used to present evidence at trial. Fed. R. Civ. P. 26(a)(2)(A).  The difference between expert testimony and fact testimony is explained by the Federal Rules of Evidence. Rule 701(a) limits opinion testimony by fact witnesses to testimony that is "rationally based on the perception of the witness."  By contrast, expert testimony can be based on facts "perceived by or made known to the expert at or before the hearing."  Fed. R. Evid. 703.  Rule 701(c) precludes fact witnesses from giving any testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.  The Advisory Committee's comments to the 2000 Amendments of Rule 701 make clear that section 701(c) was

added "to eliminate the risk that the reliability requirements set forth in 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee's notes, 2000 amendments ("there is no good reason to allow what is essentially surprise expert testimony" . . . "the Court should be vigilant to preclude manipulative conduct designed to thwart the expert disclosure and discovery process."). (Emphasis added).

Failure to comply with the requirement to disclose experts precludes a party from using "as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1).

## II.     The Calculation of Lost Profits Is A Complex One Typically Requiring Expert Testimony

Although Massachusetts courts, and Massachusetts law is the applicable law in this case, have never imposed a strict requirement that lost profit damages must be calculated by an expert, they have expressed that doing so is beneficial to the claim. See Giuliano, 2004 Mass.App.Div. 154, 2004 WL 2163422 at *5 ("the likelihood of those profits must be proven by an 'established earnings record' preferably supported by expert opinion"). Massachusetts courts routinely cite the testimony of experts to justify the award of lost profits. See Matsushita Elec. Corp. of America v. Sonus Corp., 284 N.E.2d 880, 890, 362 Mass. 246, 263 (Mass. 1972) ("the prospective profits were determined on the basis of a combination of past earnings records and in part on the expert testimony of the president of [the defendant]."); Graves v. R.M. Packer Co., Inc., 702 N.E.2d 21, 28, 45 Mass.App.Ct. 760, 770 (Mass.App.Ct. 1998) (affirming lost profits award in part because "[t]here was expert testimony that the clean-up costs were estimated to be between $260,000 and $275,000."); City Welding and Mfg. Co. v. Gidley-Eschenheimer Corp., 451 N.E.2d 734, 736, 16 Mass.App.Ct. 372, 374, (Mass.App.Ct. 1983) (affirming award of lost

profits on counterclaim because "[the expert and president of the defendant relied upon his] experience in sales and repairs, his membership and holding office in several trailer organizations, his experience as an appraiser of trailers and dump bodies, his awareness of the general level of sales of dump equipment in Massachusetts, and his knowledge of the share of the market held by GE [in testifying as an expert concerning] lost profits.")

The use of experts in cases involving lost profits is both frequent and longstanding. See, e.g., E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc., 40 F.3d 492, 503 (1st Cir. 1994) (affirming award of lost profits based on expert testimony); In re Ward, 194 B.R. 703, 712 (D. Mass. 1996) ("The perceived difficulty in proving lost profits is less present today because of the receptive attitude of modern courts toward proof of sophisticated financial data through expert testimony."); Rombola v. Cosindas, 351 Mass. 382, 385-86, 220 N.E.2d 919 (1966) (Applying Massachusetts law, which is applicable here; using expert to assess lost profits from race horse); Neal v. Jefferson, 212 Mass. 517, 524, 99 N.E. 334 (1912) (Applying Massachusetts law, using expert to assess lost profit from rental space); Nelson Theatre Co. v. Nelson, 216 Mass. 30, 35-36, 102 N.E. 926 (1913) (same).

    **III.**    **PSG has never disclosed the basis for its calculation of its lost profits, even after being ordered to produce all documents on June 28, 2006 by Magistrate Judge Collings, and any such testimony would necessarily be based on complex calculations and documentary evidence which has not been disclosed or produced**

Federal Rule of Civil Procedure 26(C) states that parties are to make automatic disclosures of

> [A] computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such

computation is based, including materials bearing on the nature and extent of injuries suffered.

PSG asserted in its automatic disclosures that "it is owed compensatory damages totaling $1,048,000.00." See Initial Disclosures of Professional Services Group, Exhibit 1 at 6. Despite the requirement to provide a computation of damages, PSG's figure was presented without any explanation as to how it was calculated. Id. PSG has indicated that the number is intended to quantify the profits that it purportedly lost when its contract with the Town was terminated. The Town therefore made the following requests for production of documents to PSG to obtain documents supporting the asserted figure:

> Request No. 39 -- All documentary materials reports, pro formas, spread sheets, budgets, etc., describing, calculating, analyzing, assessing, commenting upon, or referring to any revenues, earnings and or profit earned, or projected to be earned, by Metcalf & Eddy, PSG, and/or U.S. Filter as a result of the 1994 or 1998 Contract.
>
> Request No. 40 -- All documentary materials containing or referring to any projections or forecasts of revenue, earnings, and/or profits from the operation of the plant at any time.
>
> Request No. 41 -- All documentary materials including but not limited to, emails, reports, memoranda, emails, spread sheets, etc., analyzing, commenting upon, projecting, or concerning the profitability of any actual or proposed contract to operate the plant.

See PSG's Responses to Town's Requests for Production, Exhibit 2. No documents were produced in response to these requests, and on June 28, 2006, the production of these documents was ordered Magistrate Judge Collings. See Unnumbered Docket Entry of June 28, 2006. Despite the Court's order, PSG has never produced any documents that could be used to calculate what its profits would have been between 2004 and 2008.

PSG has informally indicated that it intends to introduce evidence about future profits through a fact witness, Gerrell Eichman, who has worked as a controller.[1]  The calculation of future profits involves estimations about both costs and revenues in the future.  It is impossible for any witness to testify about perceptions of events that take place in the future.  Furthermore, Mr. Eichman works at Veolia Water North America's offices in Texas, and to the best of the Town's knowledge, has no personal knowledge at all with respect to the operation of the Rockland wastewater treatment plant.  The fact that profit projection documents were never produced, even under court order, makes clear that Mr. Eichman also was not making such projections as part of his regular employment.  Any testimony Mr. Eichman or other fact witnesses could give would be based purely upon facts learned in anticipation of this litigation, and not on his perceptions as required by Fed. R. Evid. 701(a).

The contract at issue in this case is not a simple one with fixed costs and revenues.  It is unquestionable that the question of what the profits would have been in the future is one that requires "scientific, technical, or other specialized knowledge."  Under the terms of the contract, the annual fee paid by the Town of Rockland to PSG varied each year depending upon a wide variety of factors.  The following is the formula from the contract under which payments were determined:

> 6.1 PSG's compensation under this Agreement shall consist of an Annual Fee.  For the first year of this agreement, PSG's Annual Fee is $1,200,000.  The Maintenance and Repair Limit included in the Annual Fee is $75,000.  The Equipment/Capital Replacement and Repair Limit is $100,000.  The New Pump Station Electricity Limit is $15,000.  For the first year of the agreement the Wages and Salaries Limit is $513, 162, which includes benefits.

---

[1] The sole document that PSG's counsel informally has indicated relates to projected profits is a complicated document that PSG's counsel maintains refers to overhead expenses.  See Exhibit 4 and discussion on page 7, infra.

> 6.2 If the actual Maintenance and Repair, Equipment/Capital Replacement and Repair, New Pump Station Electricity Limit and/or Wages and Salaries/Benefits Limit expenditures are less than $75,000, $100,000, $15,000 and $513,162 respectively for any agreement year, PSG will rebate the entire difference to COMMISSION in accordance with section 3.4 and 2.1. If actual expenses for any of the limits for the cost categories identified herein exceed the respective limits, COMMISSION will pay the excess to PSG in accordance with section 8.3. . . . . The Wages and Salaries/Benefits limit will be reviewed and based upon CPI-U and the costs for benefits annually.
>
> The Annual fee adjustment shall be calculated at least two [2] months prior to the anniversary of the Agreement's commencement date. This adjustment shall be based upon the Consumer Price Index [CPI-U Boston Area] and Net Power Cost. Weighing for these adjustment factors shall be 80% and 20% respectively. The Maintenance and Repair Limit, Equipment/Capital Replacement and Repair Limit, and New Pump Station Electricity Limit shall increase or decrease by a percentage equal to the change in the annual fee. . . .

<u>See</u> Amendment to the Agreement for Operation, Maintenance and Management Services, Exhibit 3. To make an informed estimate of the revenues that PSG would have received for each year of the contract, Mr. Eichman would need to calculate those revenues using the cumbersome formula above, with estimates as to many of the categories. It would be grossly unfair for Mr. Eichman or any other witness to testify as to these estimates without having been disclosed as experts by PSG.

Another factor in an award of lost profits is the cost of generating those profits. <u>Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc.</u>, 14 Mass. App. Ct. 396, 430-431 (1982) ("Damages for such profits must be reduced by any direct expenses that would have been incurred") The calculation of PSG's costs and overhead from running the wastewater treatment plant is similarly complex. PSG has produced a single three-page document, attached as Exhibit 4, which purports to show what the overhead from running the plant in 2005 would have been. There are 43 different line items representing the costs of various categories and 16 different

columns of information. PSG has not provided any explanation of how the numbers on these documents were calculated, nor how they change from year to year. The contract would have run until mid 2008 had it not been terminated, but there is no record evidence of these costs during that time period. PSG cannot use a fact witness to opine about these subjects.

### IV.     Conclusion

For the reasons stated above, PSG's fact witnesses should be prevented from testifying as experts with respect to lost profits.

<u>Certificate and Statement Pursuant to Local Rules 7.1(A)(2) and 37.1(B)</u>

The undersigned certifies that counsel have conferred by both phone and email and have attempted in good faith to resolve or narrow the issues, and further that the provisions of Local Rule 37.1 have been complied with. The issue not resolved is the subject of this motion.

/s/ Joanne D'Alcomo
_____

TOWN OF ROCKLAND ,
By its attorneys,

/s/ Seth Nesin
_____
Joanne D'Alcomo
BBO #544177
Howard P. Blatchford, Jr.
BBO #045580
Seth Nesin
BBO #650739
JAGER SMITH P.C.
One Financial Center
Boston, MA 02111
(617) 951-0500

DATED: July 13, 2006