UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                      )
PROFESSIONAL SERVICES                   )
GROUP, INC.,                                        )
                                                      )
                    Plaintiff,                        )
                                                      )
          v.                                          )
                                                      )
TOWN OF ROCKLAND, ROCKLAND       )
SEWER COMMISSION, GREGORY         )
THOMSON and MICHAEL SAUSÉ,        )
                                                      )
                    .                                 )
_____)
                                                      )
TOWN OF ROCKLAND, ROCKLAND       )
SEWER COMMISSION,                         )
                                                      )
          Plaintiffs-in-Counterclaim        )          Civil No. 04-11131-PBS
             and Crossclaim                    )
                                                      )
v.                                                    )
                                                      )
PROFESSIONAL SERVICES                   )
GROUP, INC.,                                        )
                                                      )
          Defendant-in-Counterclaim,      )
                                                      )
and                                                   )
                                                      )
MICHAEL SAUSÉ,                               )
                                                      )
          Crossclaim Defendant               )
_____)

## JOINT FINAL PRETRIAL MEMORANDUM

Plaintiff Professional Services Group, Inc. ("PSG"), Defendant Town of Rockland

("Rockland") and Defendant Rockland Sewer Commission (the "Sewer Commission") submit

this joint final pretrial memorandum pursuant to Rule 26(a)(3) of the Federal Rules of Civil

Procedure, Local Rule 16.5(D) and the Amended Pretrial Order.[1]

## I.     SUMMARY OF THE EVIDENCE

### A.     Plaintiff's Summary

PSG expects that the evidence at trial will be as follows.

At all relevant times, PSG[2] provided operations, maintenance and management services

for water and wastewater systems in cities and towns throughout Massachusetts, including the

wastewater system for Rockland.  Between 1982 and 2004, PSG operated and maintained

Rockland's wastewater treatment facility (the "Sewer Plant") pursuant to a series of four

contracts.  From 1990 to 1999, Sausé was employed by PSG to manage the Rockland project as

well as many other wastewater treatment projects throughout New England and New York.

The Sewer Commission, a three-member elected board, was responsible for overseeing

the Sewer Plant on behalf of Rockland.  In the mid-1990's, Rockland's sewer system

experienced significant growth, with the addition of new pumping stations and sewer lines.  The

Sewer Commission was a part-time board with only a single secretary to provide administrative

support, and thus it lacked the internal resources to handle many of the Sewer Department's day-

to-day functions, including operations, billing and customer issues.  The Sewer Department's

poor fiscal oversight practices was the subject of criticism in annual audit reports.

 By 1996, the Sewer Commission decided that it needed a full-time superintendent, a

position it had authority to create under Massachusetts law.  At a public meeting in December

---

[1] In January 2006, Defendant Michael Sausé ("Sausé") filed for bankruptcy protection in Delaware.  In April 2006 he received a discharge of debts.  Defendant Gregory Thomson ("Thomson") failed to answer the claims against him and has not appeared in this matter.

[2] As used in this memorandum, PSG refers to the Plaintiff and its corporate predecessors and successors, including Metcalf & Eddy Services, Inc., U.S. Filter and Veolia Water North America.

1996, the Sewer Commission voted to accept applications for the position. A job description was reviewed and approved by Rockland's legal counsel, the law firm of Kopelman & Paige. After consulting with the Board of Selectmen and the Town Administrator, the Sewer Commission sought and obtained a recommendation for funding from Rockland's Finance Committee, and that funding request was approved by Town Meeting in May 1997.

Thomson, a member of the Sewer Commission since 1994, was interested in the superintendent's position. At least as early as July 1996, Thomson obtained advice from Town Counsel Anne-Marie Hyland ("Attorney Hyland") about the steps he would need to take to apply. When the Sewer Commission created the superintendent's position five months later, Thomson announced that he intended to apply for the job and resigned his membership on the Sewer Commission. As he had been advised by Attorney Hyland, Thomson submitted his application after a thirty day "cooling off" period and entered into an interim contract to provide consulting services to the Sewer Commission pending funding of the Superintendent's position by Town Meeting.

During this period, PSG was operating the Sewer Plant under a three-year contract (the "1994 Contract"). Under the 1994 Contract, two categories of expenses were budgeted at a fixed amount (the "Allowance Accounts"). If PSG spent less than those amounts, the Sewer Commission was entitled to a rebate of the difference. In 1995, the Sewer Commission signed an agreement directing PSG to hold rebate monies from the Allowance Accounts in a new allowance account earmarked for professional development and miscellaneous expenses. The Sewer Commission spent some of its rebate monies on conferences and similar expenses, but by the end of the 1994 Contract term there was a significant balance of rebate funds being held by PSG on account for the Sewer Commission.

3

The 1994 Contract was due to expire in mid-1997.  One of Thomson's duties as superintendent, as stated in the job description approved by Kopelman & Paige, was to manage the municipal procurement process for the Sewer Commission.  In July 1997 the Sewer Commission issued a Request For Proposals ("RFP") for a new contract (the "1997 RFP") pursuant to the Uniform Procurement Act.  Unlike a competitive bidding procedure, a procurement initiated by an RFP permits a municipality to award a contract based on subjective evaluative criteria as well as cost, and the municipality is not required to accept the proposal with the lowest cost.

The 1994 Contract was procured through an RFP that had been prepared  by the engineering firm of Tighe & Bond (the "1994 RFP").  Because the Sewer Commission in 1997 (unlike in 1994) had a full-time superintendent who could supervise the procurement process, it did not need to hire Tighe & Bond (at significant expense) to prepare the 1997 RFP.  The 1994 RFP could – and did – serve as a template for the 1997 RFP.  Indeed, the 1997 RFP was largely identical to the 1994 RFP, except in two respects.  First, the 1997 RFP required all firms submitting a proposal to budget $400,000 for direct labor costs.  This provision had been approved by the Massachusetts Office of the Inspector General ("OIG") and was motivated by the Sewer Commission's desire to ensure that workers at the Sewer Plant would not lose their jobs or receive a cut in wages.  Second, the 1997 RFP provided that the contract would have a ten-year term.  Contract terms of ten years or even longer were not uncommon in the wastewater industry after 1996 due to changes in tax regulation, and in May 1997 Town Meeting approved a term of up to ten years for the next contract to operate the Sewer Plant.

Other than PSG, the only firm that showed serious interest in the 1997 RFP was Woodard & Curran.  Woodard & Curran lacked the five years of experience needed to meet the

1997 RFP's minimum requirements.  Nevertheless, the firm informed the Sewer Commission that it was interested in submitting a proposal that would deviate from the 1997 RFP in a number of material respects, including the staffing level approved by the Department of Environmental Protection.  Thomson and Attorney Hyland discussed this "alternate proposal" with the OIG, which advised them that the Sewer Commission could not award the contract to a firm whose proposal did not conform to the 1997 RFP's minimum requirements.  Woodard & Curran opted not to submit a proposal, citing their inability to meet the RFP's minimum criteria.

Two other firms that decided not to submit proposals in response to the 1997 RFP explained their reasons in writing.  American Commonwealth Management Services Co., Inc., wrote that its decision was due to a "heavier than normal bidding schedule in the New England area" and Rockland's satisfaction with the incumbent operator's services.  American Anglian expressed interest only in pursuing an "innovative" proposal to jointly operate Rockland's water and wastewater systems, even though such a proposal was not feasible because the Sewer Commission did not run Rockland's water system.

PSG was the only firm to submit a proposal in response to the 1997 RFP.  Thomson contacted the OIG to inquire whether the contract could be awarded even though only one proposal had been received and, if so, whether the Sewer Commission could negotiate a lower price.  After the OIG responded in the affirmative, PSG was notified that it would be awarded the contract.

PSG had priced its proposal at $1.269 million for the first year of the ten-year contract, with annual adjustments based on an inflation formula.  Even though PSG was the only firm to submit a proposal in response to the 1997 RFP, Thomson negotiated PSG's price down to $1.2 million.  In February 1998, PSG and the Sewer Commission entered into a new contract (the

"1998 Contract") for a ten-year term commencing March 1, 1998.  Attorney Hyland was

involved in the contract negotiations and approved the final document.

 The 1998 Contract – like the 1994 Contract – included certain Allowance Accounts.  As

with the 1994 Contract, any unspent funds from these Allowance Accounts were to be rebated

back to the Sewer Commission, but the Sewer Commission continued the practice it began in

1995 of having PSG hold the rebate monies and drawing on those monies to pay Sewer

Commission expenses from time to time as instructed by Thomson.

 Around the time that PSG was awarded the 1998 Contract, Sausé and Thomson devised a

plan to divert rebate monies from the Sewer Commission to use as their personal "slush fund."

Sausé opened an account in the Sewer Commission's name at Wainwright Bank (the

"Wainwright Account"), with Thomson and Sausé as joint signatories.  In November 1997,

Thomson sent a letter to Sausé requesting that PSG release $50,000 in rebatable funds under the

1994 Contract by issuing a check for that amount payable to the "Town of Rockland, d/b/a

Rockland Sewer Commission."  Sausé caused this request to be processed in accordance with

PSG's standard check-issuance procedures.  Because Thomson was the authorized agent of a

client seeking rebate money to which the client was entitled, PSG issued the check as requested.

Thomson endorsed the check by stamping the Sewer Commission's name on the back and

writing his own name and position below, and he then deposited the check into the Wainwright

Account.

 Over the next several months, Thomson sent more written check requests to PSG.  PSG

continued to process these requests as a matter of course with the understanding that the rebate

monies were the Sewer Commission's funds and that the Sewer Commission could use those

funds however it wished.  After Thomson deposited the rebate checks into the Wainwright

Account, he and Sause withdrew funds to pay for their personal expenses, including meals, trips and illegal drugs.  PSG did not know – and could not have known – what happened to the rebate checks after they were delivered to the Sewer Commission's superintendent.

In 1999 Sausé lost responsibility for the Rockland project after he was transferred to PSG's Mid-Coast region.  Thomson closed the Wainwright Account and opened a new account in his own name at North Abington Co-Op Bank.  He continued his rebate check diversion scheme for the next three years, apparently without further participation by Sausé.

Rockland's public officials failed to discover that Thomson was stealing the rebate funds after PSG sent the funds back to the Sewer Commission.  The Sewer Commission failed to provide the oversight of Thomson that would have prevented his theft of public funds or to audit the accounts under the 1998 Contract that would have detected Thomson's personal use of public funds.  Finally, in 2002 the North Abington Co-Op Bank informed the Rockland Police Department that Thomson had attempted to deposit a check payable to the Rockland Sewer Commission into his personal account.  Thomson confessed to stealing the Sewer Commission's rebate money and resigned as Superintendent, but he did not immediately reveal Sause's participation.  PSG fully cooperated in Rockland's ensuing investigation.

In 2003, PSG learned that Sause had written two large checks to Thomson and asked him for an explanation.  He refused to answer PSG's questions about these checks and was forced to resign.  Thomson and Sause subsequently were convicted of larceny in Plymouth Superior Court.  No other individuals or entities were charged in connection with Sausé and Thomson's scheme to embezzle public funds.

On February 10, 2004, PSG received a letter from Rockland stating that the 1998 Contract was terminated by operation of law because the actions of Thomson and Sausé violated

the Uniform Procurement Act (Chapter 30B). PSG denied this claim and entered into

negotiations to resolve the matter. PSG's efforts were unsuccessful, and on April 12, 2004,

Rockland ordered PSG to vacate the Sewer Plant and turn over its operation to an interim

operator. After the Sewer Commission issued a new RFP, the contract was awarded to another

company, Aquarion.

Because Rockland terminated the 1998 Contract just six years into its ten-year

term, PSG suffered damages amounting to its lost profits for the last four years of the

contract term.

### B.    Defendants' Summary

This dispute arises out of a procurement conducted in 1997 that resulted in the award of

a 10-year contract, with a 10-year renewal, to US Filter (then PSG) to operate the Wastewater

Treatment Plant and the illegal and improper activities that occurred in relation to that contract.

Although other companies expressed interest in winning the 10-year contract, with a 10-

year renewal offered by the Town in 1997, PSG was the sole bidder and was awarded the

contract. The Massachusetts Inspector General's office, after conducting an investigation,

directed the Town to cancel the contract and conduct a new procurement. As a result, the Town

canceled the contract with PSG in 2004, and issued a new Request for Proposals. PSG did not

bid in that new procurement, and the contract was awarded to another wastewater treatment plant

operator.

The former Vice President and Area Manager of PSG Michael Sausé and the former

Rockland Sewer Superintendent Gregory Thomson have pleaded guilty to embezzlement of

Town funds. Both now express remorse and admit that the procurement was tainted, and describe

how PSG processed thousands of dollars in specious check requests to keep Thomson – PSG's

main contact in the Town – content.

In 1996, the Wastewater Treatment Plant was being operated by PSG, which had taken over Metcalf and Eddy Services. Metcalf and Eddy had a three-year contract to operate the plant from 1994 to 1997. Michael Sausé was a Vice President and area manager of PSG who had worked for Metcalf and Eddy services and continued to work for PSG in interacting with the Town. A new bidding process was coming up in 1997.

In late 1996, before the procurement process was underway for the 1997 procurement, Sausé took steps to help Thomson obtain what was to be a newly created position as Sewer Superintendent for the Town. Thomson, then Chairman of the part-time Sewer Commission, and other members of the Sewer Commission, were talking about creating a full-time position of superintendent. Thomson expressed interest in the position. Sausé contacted the law firm used by PSG – Mintz Levin – and asked the firm to do research to determine the procedures that had to be followed so that Thomson could apply for and obtain the position. This was important to Sausé because he had a strong relationship with Thomson and he wanted to be able to retain his influence by helping Thomson become superintendent.

Typically, municipalities hire an engineering firm to prepare a Request for Proposals to launch competitive bidding for a technical activity such as operation of a wastewater treatment plant. But Michael Sausé, the former Vice President and Area Manager of PSG, has acknowledged during this litigation that he conspired with the then-Sewer Superintendent Gregory Thomson to write the Request for Proposals in 1997, in an effort to give PSG a clear advantage in the bidding. Sausé has testified that he prepared the RFP, and every addendum that was issued to address matters raised by prospective bidders, in an effort to direct the contract to PSG. Sausé has also acknowledged that he pushed to have the contract term switch from a short

9

three-year term, which was the term of the then-existing contract, to a 10-year contract with a 10-year renewal, a total of 20 years.

Because of Sausé's efforts, there were, at minimum, two provisions of the Request for Proposals that gave PSG a distinct advantage and deterred prospective bidders. One was a minimum labor cost. In other words, the request for proposal required competitors to bid a minimum of $400,000 for labor costs. Since labor costs were the single largest expense in the contract, this provision prevented prospective bidders from offering a lower price for labor, and eliminated one chief way for prospective competitors to come in at a lower bid than PSG. The evidence shows that the idea of a minimum labor cost to help deter competitors was Sausé's. He was concerned that this provision might be challenged by prospective bidders, so he engineered a way to get the approval of the provision from the Massachusetts Office of the Inspector General. He wrote a letter from Thomson to the Inspector General, purporting to justify the minimum labor requirement. Thomson signed the letter, and the Inspector General's office bought the articulated justification. Thomson and Sausé then had the blessing of the Inspector General's office to include the minimum labor cost in the RFP.

Another device that Sausé used in the RFP, with Thomson's assistance, to deter prospective bidders was a requirement that any bids include a particular type of equipment known as a "belt filter press" to handle sludge dewatering. The plant, in 1997, was equipped with a belt filter press that was being leased by PSG with a purchase option at the end of the lease. The RFP required any proposal to include a belt filter press "equal to or better in quality, age and hours run." This gave PSG a competitive advantage because it already had a contract for the equipment, it was already a few years into the lease, and it precluded bidders from coming up with alternative, potentially more cost-effective, proposals.

The evidence will also show other anticompetitive provisions of the RFP, including that that a copy of the RFP could only be obtained for an extremely short period of time, and a requirement of interim sludge dewatering while a belt filter press was installed, which would be costly for all bidders other than PSG, because PSG would not have to install a new belt filter press.

The evidence shows that two prospective bidders voiced criticism of the RFP because it prevented bidders from coming up with alternatives to what was being done by PSG. Woodard & Curran, a competing company, specifically sought to have the belt filter press removed as a requirement in the RFP so that it could propose alternatives. Woodard & Curran requested the option to submit an "alternate" proposal that it believed would result in savings, which was denied. When the approach was rejected, Woodard & Curran informed the Town that it would not submit a bid, complaining that the RFP "seems to be heavily weighted in favor of your incumbent operator," PSG. Another prospective bidder, American Anglian, also said that it would not submit a proposal in response to the RFP, but would be interested "if the RFP is reissued in a form which allows us to be innovative in the operation of the plant." Thomson has admitted during this litigation that he and Sausé conspired to have PSG, primarily through Michael Sausé as the lead preparer but also with input from others at PSG, write the RFP.

Sausé was a salaried employee for PSG, and he did not receive any Sewer Commission or bonus upon landing a contract. The prospective bidders were not told that PSG's Michael Sausé prepared the RFP and the addenda addressing their questions.

Not surprisingly, only PSG put in a bid for the contract. In submitting the bid, PSG represented falsely, under penalties of perjury, that its bid was not the result of any collusion.

During this litigation, Sausé has admitted traveling with Thomson and wining and dining Thomson in an effort to curry favor with him and influence his decision making. During the course of this litigation, Thomson, too, has admitted being wined and dined by Sausé, and traveling with Sausé and the manager of the Wastewater Treatment Plant – who was a PSG employee. He has admitted traveling to such places as Las Vegas, Cancun, Montreal, and to the Houston office of PSG as arranged by PSG. This was all done as PSG attempted to curry favor with Thomson and maintain a positive relationship with him, since he could stand in the way of approval of PSG's annual fees (which were subject to adjustment), expenditures, and variations in the scope of the contract.

The evidence will also show PSG's misconduct with respect to the handling of funds under the contract. Under PSG's contract with the Town resulting from the 1997 RFP contract, certain funds were earmarked for specific categories of expenses: maintenance and repair; capital expenses; utility expenses and labor. If funds earmarked for those purposes were left over at the end of the contract year, the excess was supposed to be rebated to the Town <u>at the end of the contract year</u>. As it turns out, however, PSG improperly issued checks amounting to thousands and thousands of dollars during the course of the contract years out of those accounts. The check requests typically were typed by Sausé or PSG plant manager Aram Varjabedian for Gregory Thomson to sign, which he did, and then approved by PSG through Sausé, Plant Manager Aram Varjabedian, Area Manager Frank Cavaleri, or PSG Vice President Steven Kruger. The check requests were for specious purposes. For the most part, no invoice or other back-up documentation of any kind was submitted in connection with the check requests processed by PSG.

12

In addition to processing the check requests, PSG facilitated Thomson's (and, for a time, both Thomson's and Sausé's) embezzlement of Town funds by having the checks made out in an improper manner. The checks were often made out to:

    Town of Rockland
    Rockland Sewer Commission
    Gregory Thomson, Superintendent

Under the applicable Uniform Commercial Code provisions governing interpretation of checks, this choice of wording by PSG in making out the checks meant that <u>any</u> of the three parties to whom the checks were made out would be able to endorse them and cash them. As a result, initially a series of checks were deposited in a bank account opened up by Sausé and Thomson in Boston, in the name of Town of Rockland d.b.a. The Rockland Sewer Commission. From late 1997 to early 1999, a series of checks issued by PSG were deposited into that Boston bank account and the proceeds were used by Sausé and Thomson for a variety of purposes. Both of them were signatories on the account. The Boston bank account, for example, was used to pay PSG's Wastewater Treatment Plant manager, Aram Varjabedian, for certain expenses. Some of the purposes for which Sausé used the money were to pay for the wining and dining of Thomson.

During 1999, 2000, 2001 and 2002, Thomson stopped using the Boston account with Sausé, and deposited the checks issued by PSG into a new account he opened at a bank on the South Shore. He also endorsed two of the checks over to another party in another bank. In 2002, a teller at one bank raised a question about a check seemingly for the Town being deposited by Thomson into a personal account, and the embezzlement became public.

Another aspect of PSG's conduct at issue in this lawsuit was its deliberate holding of Town funds in accounts that were "off the books" and not able to be tracked by Town finance officers. These accounts were maintained by PSG, and PSG did not pay any interest on the

funds in the accounts. These accounts were not set up as a result of any contract between PSG and the Town. According to PSG in this lawsuit, the funds were held by PSG at the request of either Thomson or the Sewer Commission because – so PSG claims – they did not want the funds reverting to the Town for general use and instead wanted those funds available for discretionary purposes. If PSG's contention is correct, (or even if it is not correct), PSG's holding of the Town's funds in a manner to help keep the funds "off the books" and out of sight from the Town's finance officers was improper.

Another category of activity at issue in this lawsuit concerns PSG's use of money earmarked for various purposes under its contract with PSG for purposes unrelated to those contract-designated purposes. These include expenses for such items as T-Shirts, Christmas Trees, and the thousands of dollars in checks issued for the specious purposes described by Thomson in the check requests submitted to PSG.

When PSG's contract was terminated, PSG refused to rebate to Town monies owed under the contract. The Town quickly hired an engineering firm to step in and run the plant on an interim basis and prepare a new Request for Proposals. The new bidding was held in 2004. A new operator was chosen from among the bidders.

The Town has brought claims for fraud and misrepresentation; violations of the State Procurement Act, Massachusetts General Laws, Chapter 30B; violations of the state's Conflict of Interest Law, Mass. General Laws, Chapter 268A; breach of contract, including breach of the implied covenant of good faith and fair dealing; conversion; and civil conspiracy.

**Overview of Defenses for PSG's Claims
<u>Against the Town and the Sewer Commission</u>**

PSG claims that the Town breached the contract by terminating it. However, under Massachusetts General Laws Chapter 30B, Section 17, the competitive bidding statute, "[A]

14

contract made in violation of [Mass Gen. Laws Chapter 30B] shall not be valid, and the governmental body shall make no payment under such contract." Because the procurement in 1997 was clearly in violation of Chapter 30B, as more fully described above, the contract was not valid. The evidence shows that the Town cancelled the contract because of concerns by the State Inspector General that the procurement process was corrupt. The evidence establishes clearly that the procurement process *was* corrupt.

Furthermore, as discussed below, the contract to PSG resulted from a violation of the state's Conflict of Interest Statute, Chapter 268A. A violation of Section 2 of Chapter 268A "which has substantially influenced the action taken by a municipal agency in any particular matter shall be grounds for avoiding, rescinding or canceling the action on such terms as the interest of the municipality and innocent third persons require." Mass. Gen. Laws ch. 268A § 21(a). The Town legitimately cancelled the contract on that basis.

Moreover, by its conduct, PSG was in material breach of its contract. Because it materially breached the contract, PSG cannot recover any damages for termination.

## II.    FACTS ESTABLISHED BY PLEADINGS, STIPULATIONS AND ADMISSIONS

None at this time.

## III.    CONTESTED ISSUES OF FACT

A.    Whether Rockland or the Sewer Commission breached the 1998 Contract.

B.    Whether any breach by Rockland or the Sewer Commission of the 1998 Contract was material.

C.    The extent of PSG's alleged damages.

D.    Whether the 1998 Contract was procured in violation of any state laws.

E.    Whether Sausé's alleged conduct was within the scope of his employment.

F.    Whether Thomson's alleged conduct was within the scope of his employment.

G.     Whether PSG owed a duty to Rockland and/or the Sewer Commission to supervise Sausé.

H.     Whether PSG breached a duty that it owed to Rockland and/or the Sewer Commission to supervise Sausé.

I.     Whether PSG made any negligent misrepresentation of fact to Rockland and/or the Sewer Commission.

J.     Whether PSG made any knowing misrepresentation of fact to Rockland and/or the Sewer Commission.

K.     Whether Rockland and/or the Sewer Commission relied on any misrepresentation of fact by PSG.

L.     Whether PSG engaged in any unfair or deceptive acts.

M.     Whether PSG engaged in any unfair or deceptive acts willfully and knowingly.

N.     Whether PSG gave or promised a thing of value to Thomson.

O.     Whether PSG gave or promised a thing of value to Thomson for or because of an official act by Thomson.

P.     Whether PSG gave or promised a thing of value to Thomson to influence an official act by Thomson.

Q.     Whether PSG gave or promised a thing of value to Thomson with the intent to influence Thomson to commit, aid in committing, collude in or allow fraud.

R.     Whether PSG gave or promised a thing of value to Thomson with the intent to induce Thomson to do or omit an act in violation of his lawful duties.

S.     Whether PSG absconded with the property of Rockland and/or the Sewer Commission upon vacating the Wastewater Treatment Plant.

T.     Whether PSG refused to rebate monies due and owing to Rockland and/or the Sewer Commission under the 1998 Contract.

U.     Whether PSG established any unauthorized bank accounts and deposited public funds in those accounts.

V.     Whether PSG made unauthorized expenditures with public funds.

W.     Whether PSG converted public property.

X.      The extent of Rockland and/or the Sewer Commission's alleged damages.

Y.      The extent to which Rockland and/or the Sewer Commission are liable for any damages and costs that may be awarded against PSG at trial.

Z.      Whether PSG breached the 1998 Contract.

AA.     Whether any breach by PSG of the 1998 Contract was material.

BB.     Whether PSG breached the covenant of good faith and fair dealing in its performance of the 1998 Contract.

CC.     Whether the Defendants mitigated their alleged damages.

### ADDITIONAL DEFENDANTS' DISPUTED ISSUES OF FACT

DD.     Whether PSG is liable, under principles of agency, for the conduct of its Vice President and Area Manager Michael Sausé.

EE.     Whether PSG conspired with Gregory Thomson to prepare an RFP in 1997 that would favor PSG.

FF.     Whether PSG conspired with Gregory Thomson to give PSG the lead in managing and running the procurement process in 1997.

GG.     Whether PSG conspired with Gregory Thomson and others to keep public funds of the Town of Rockland "off the books" and out of sight of Rockland finance officers.

HH.     Whether PSG conspired with Gregory Thomson to have monies withdrawn improperly from accounts designated for specific contractual purposes, such as maintenance and repair and capital expenditures.

II.     Whether PSG is liable, under principles of agency, for the conduct of its managers and employees in connection with the conduct of the procurement in 1997 and the handling of funds in its control.

JJ.     Whether the Town of Rockland was justified in terminating its contract with PSG after being directed to do so by the Inspector General of Massachusetts.

KK.     Whether there was collusion between PSG and the Rockland Sewer Superintendent in the 1997 procurement that resulted in the award of the contract to PSG.

LL.   Whether any of PSG's activities, such as its obtaining legal counsel to provide advice to then Rockland Sewer Commissioner Gregory Thomson; travel with the Rockland Sewer Superintendent; or entertainment of the Rockland Sewer Superintendent,  violated the state's Conflict of Interest Law.

MM.   Whether PSG committed misrepresentation when it stated, in submitting its bid to the Town of Rockland in 1997, that it had not "participated in any collusion, or otherwise taken any action in restraint of free competitive bidding in connection with this proposal."

NN.   Whether PSG held public funds of the Town of Rockland to prevent finance officers from the Town of Rockland from knowing about the existence of the funds and from keeping track of such funds.

OO.   Whether PSG, deceptively and in violation of contract, caused expenditures to be made for improper purposes.

## IV.   <u>JURISDICTIONAL QUESTIONS</u>

### A.   <u>Plaintiff's Jurisdictional Questions</u>

PSG has filed a motion to dismiss the Defendants' claim under the Uniform Procurement Act on the grounds that the Defendants lack standing to raise such a claim (see Section V(A) below).

### B.   <u>Response of Town of Rockland, Rockland Sewer Commission's to  Plaintiff's Asserted  Jurisdictional Questions</u>

Defendants Town of Rockland and Rockland Sewer Commission disagree that there are any "jurisdictional" questions in this case. To the extent the issue of whether a private right of action under the State's Procurement Act exists can be fairly characterized as a "jurisdictional" question, Defendants disagree that the issue is beyond the province of this Court. First, a Superior Court judge addressed the issue last year, concluding that a town *did* have a private right of action under the State Procurement Act. <u>Town of Lunenburg</u> v. <u>Carlson</u>, 2005 WL 937730 (Mass.Super. March 31, 2005) (Agnes, J.). Moreover, the issue of whether a state statute in Massachusetts creates a private right of action is an analysis that can be readily conducted by this Court using well-established principles of Massachusetts law.  See, e.g., <u>All Brands</u>

Container Recovery, Inc., v. Merrimack Valley Distributing Co., Inc., 54 Mass. App. Ct. 297, 764 N.E.2d 931 (2002) (analyzing question of existence of private right of action under bottle bill).

## V.     QUESTIONS RAISED BY PENDING MOTIONS

### A.     Plaintiff's Motions

PSG has filed the following motions that seek to exclude expert testimony to be offered by the Defendants:

1.     Motion to Exclude Expert Testimony of John J. Sullivan

2.     Motion to Exclude Expert Testimony of Ronald A. Michalski

3.     Motion to Exclude Expert Testimony of Stephen Gunzburger

PSG has filed the following *in limine* motions to exclude certain evidence at trial:

1.     Motion *In Limine* to Exclude Unrelated Prior Bad Acts Evidence

2.     Motion *In Limine* to Exclude Argument and Evidence of Draft Proposals as a Proper Measure of Damages

PSG has filed the following motions to dismiss the Defendants' Uniform Procurement Act claim and to strike certain claims for a jury trial:

1.     Rule 12(b)(6) Motion to Dismiss Defendants' Counterclaim Under the Uniform Procurement Act

2.     Motion to Strike Defendants' Jury Trial Demand as to Conflict of Interest and Procurement Act Counts

### B.     Defendants' Motions

Rockland and the Sewer Commission have filed the following motions that are pending before the Court:

1.     Motion In Limine To  Preclude Professional Services Group, Inc. From Offering Testimony Of  Lost Profits

2.    Motion In Limine To Preclude "Apportionment" Argument, Comment or Inquiry under the Uniform Procurement Act;

3.    Motion in Limine to Preclude PSG from offering evidence of Michael Sause Personnel Issues that it failed to produce in response to a specific request for his personnel records and in response to the recent order for production by Magistrate Judge Collings

## VI.    ISSUES OF LAW

### A.    Plaintiff's Issues of Law

#### 1.    *Respondeat Superior* Principles and Defendants' Waiver of Claims Against PSG

Most of the counts in the Defendants' counterclaim are based on PSG's alleged vicarious liability for the acts of Sause.  Under principles of *respondeat superior*, "an employer cannot be held liable for the intentional conduct of an employee acting outside the scope of his employment."  Int'l Brotherhood of Police Officers, Local 433 v. Memorial Press, Inc., 31 Mass. App. Ct. 138, 140 (1991).  To find that conduct is within the scope of employment, a finder of fact must "consider whether the conduct complained of is of the kind the employee is hired to perform, whether it occurs within authorized time and space limits, and whether it is motivated, at least in part, by a purpose to serve the employer."  Id. (citation omitted).

#### 2.    Apportionment of Damages and Costs

Section 17(c) provides that "[i]f one or more person participates in [a violation of § 17(c)], the damages and costs may be apportioned among them."  If PSG establishes at trial that Rockland and/or the Sewer Commission participated in a violation of § 17(c) through the conduct of Thomson, any damages and costs that may be awarded in this case against PSG should be apportioned.  However, there is no apparent authority that would aid the Court in determining (1) whether the decision to apportion, under the discretion provided by this

provision, is a question of law or a question of fact; (2) what should guide the exercise of that

discretion; (3) whether apportionment itself is a question of law or a question of fact; (4) how, if

"damages and costs" are apportioned, they should be apportioned; and (5) whether the

involvement of the Defendants or their agent in any violation of § 17(c) precludes the

Defendants from recovering damages under § 17(c).

B.    **Defendants' Issues of Law**

**Professional Services Group, Inc.'s liability for the acts of**
**Michael Sause and other employees**

Although the Defendants  plan a more comprehensive discussion of these issues in their

Trial Memorandum that is due to be filed on July 24, 2006,  the Defendants include in this joint

pretrial an overview of the issues of vicarious liability that are implicated in this case.

**1. General Principles**

"A corporation is a creature of law, a 'separate and distinct legal entity…that can only act

through its agents.' " *Sarvis v. Boston Safe Deposit & Trust Co*., 47 Mass. App. Ct. 86, 96

(1999), quoting *Sunrise Properties, Inc. v. Bacon, Wilson, Ratner, Salvage, Fialky & Fitzgerald,*

*P.C*., 425 Mass. 63, 66 (1997). "[A corporation's] liability is 'necessarily vicarious.' That

corporations may be vicariously liable for the acts of their agents is axiomatic." *Id*., quoting

*Commonwealth v. L.A.L. Corp.,* 400 Mass. 737, 743 (1987) (internal citation omitted).

The law allows for vicarious liability because "as between two innocent parties—the

principal-master and the third party—the principal-master who for his own purposes places

another in a position to do harm to a third party should bear the loss." *Kansallis Finance Ltd., v.*

*Fern*, 421 Mass. 659, 664 (1996). "A principal who requires an agent to transact his business,

and can only get that business done if third parties deal with the agent as if with the principal,

cannot complain if the innocent third party suffers loss by reason of the agent's act." Id. "[T]he

master who must put an instrument into his servant's hands in order to get his business done, must also bear the loss if the servant causes harm to a stranger in the use of that instrument as the business is transacted." Id.

## 2.  Respondeat Superior

An employee is an agent of his employer. *See Kansallis Finance Ltd., v. Fern*, 421 Mass. 659, 662 (1996) ("servants…are categorized as agents of their principals"), citing *Restatement (Second) of Agency* § 218 Title B, Torts of Servants, introductory note, fourth par. (1957) (servants are agents of their master); W.A. Seavey, *Agency* § 2(B) (1964) (master and servant included in agency relation). A principal may be held vicariously liable for the acts of its agent if those acts were committed within the scope of the agent's employment. *Worcester Insurance Co. v. Fells Acre Day School, Inc.,* 408 Mass. 393, 404 (1990). "[C]onduct of an agent is within the scope of employment if [1] it is of the kind he is employed to perform…; [2] if it occurs substantially within the authorized time and space limits…; and [3] if it is motivated, at least in part, by a purpose to serve the principal… ." *Id*., quoting *Wang Laboratories, Inc. v. Business Incentives, Inc*., 398 Mass. 854, 859 (1986).

A corporation may be held vicarious liable under the doctrine of respondeat superior for intentional misconduct as well negligence. *See*, *id.* ("An employer may be held vicariously liable for the intentional tort of an agent if the tortious act or acts were committed within the scope of employment.").

## 3.  Vicarious Liability For Acts Outside Scope of Employment

In addition to imposing liability upon a principal for the acts of an agent committed within the scope of the agent's employment, liability may also be imposed upon a principal where the agent acted with the actual or apparent authority of the principal. This method of

determining vicarious liability is particularly appropriate where the harm to the victim resulted

from the voluntary transaction of business, as in the cases of contracts, of fraud and

misrepresentation. *Kansallis Finance Ltd., v. Fern*, 421 Mass. 659, 664 (1996)

Where an agent has "actual authority to transact the very business or to do the very act

that causes the harm, the agent acts as the extension of the will of his principal and the case for

vicarious liability is very clear." *Id*., at 665. Even where the agent's authority is apparent, but not

actual, the principal will still be vicariously liable because "vicarious liability recognizes that it is

the principal who for his own purposes found it useful to create the impression that the agent

[was] act[ing] with his authority." *Id.*

Although a principal ordinarily will not be held liable for the acts of an agent that exceed

the scope of the agent's authority, there are some circumstances where liability will nevertheless

be imposed vicariously upon a principal even where the agent has acted beyond the scope of his

employment. *Id*., at 665-666. For example, a principal will be vicariously liable without regard to

whether the agent acted within the scope of his employment where the principal took an

unreasonable risk that resulted in his agent misusing his authority—actual or apparent—to act on

the principal's behalf. *Id*., at 666 n6.

Principles of agency can be used to impose vicarious liability upon a corporate principal

for the fraud of an agent. *Makino, U.S.A., Inc. v. MetLife Capital Credit Corp.,*, 25 Mass. App.

Ct. 302, 313 (1988), quoting *Restatement (Second) of Agency* § 261 comment a (1958) (A

principal's liability for the fraud of an agent results if "the agent's position facilitates…the fraud,

in that from the point of view of the third person the transaction seems regular on its face and the

agent appears to be acting in the ordinary course of the business confided to him." ).  Those same

principles can impose vicarious liability upon a corporate principal for the deceptive acts of an

agent as well. Id., at 312 (A principal is liable for the deceptive acts of an agent if the deceptive acts "were within  the actual authority, implied authority or apparent authority, or, if not within {the agent's] authority were ratified by the principal.").

### 4.  Vicarious Liability for Criminal Conduct

A corporation can be held liable for the conduct of an employee that amounts to a criminal offense. *See Commonwealth v. Angelo Todesca Corp.*, 446 Mass. 128, 133-136 (2006). A corporation can be held liable for the criminal conduct of its employee where it is established that an individual "[1] was placed in a position by the corporation where he had enough power, duty, responsibility and authority to act for and in behalf of the corporation to handle the particular business or operation or project of the corporation in which he was engaged at the time that he committed the criminal act…and [2] that he was acting for an din behalf of the corporation in the accomplishment of that particular business or operation or project, and that he committed a criminal act while so acting." *Id.*, quoting *Commonwealth v. Beneficial Finance Co.*, 360 Mass. 188, 256 (1971), cert. denied sub. nom. *Farrell v. Massachusetts*, 407 U.S. 910 (1972, and sub nom. *Beneficial Finance Co. v. Massachusetts*, 407 U.S. 914 (1972).

For purposes of imposing liability upon a corporation for the criminal acts of an employee, "there is no requirement that corporate officials had knowledge of their employees' criminal acts.. ." *Id.*, citing *Commonwealth v. L.A.L. Corp.,* 400 Mass. 737, 743 (1987). Nor is there any requirement that such conduct be " 'performed, authorized, ratified, adopted or tolerated by' corporate officials or managers.' " *Id.*, quoting *Commonwealth v. Beneficial Finance Co.*, 360 Mass. 188, 254 (1971), cert. denied sub. nom. *Farrell v. Massachusetts*, 407 U.S. 910 (1972, and sub nom. *Beneficial Finance Co. v. Massachusetts*, 407 U.S. 914 (1972).

**VII.    REQUESTED AMENDMENTS TO PLEADINGS**

None at this time.

**VIII.    ADDITIONAL MATTERS TO AID IN DISPOSITION OF ACTION**

None at this time.

**IX.    PROBABLE LENGTH OF TRIAL**

The parties estimate that it will require fifteen half days to complete this trial.

**X.    NAMES, ADDRESSES AND TELEPHONE NUMBERS OF WITNESSES**

As instructed in the Court's Amended Pretrial Order, the parties have filed with the Court their witness lists in separate documents.

**XI.    PROPOSED EXHIBITS**

As instructed in the Court's Amended Pretrial Order, the parties have filed with the Court their exhibit lists in separate documents.

**XII.    POSITIONS ON OBJECTIONS TO EVIDENCE**

Pursuant to the Amended Pretrial Order, the parties will file objections on or before July 20, 2006.

Respectfully submitted,

PROFESSIONAL SERVICES GROUP, INC.,
By its attorneys,


/s/David M. Osborne_____
Maria R. Durant (BBO # 558906)
David M. Osborne  (BBO # 564840)
DWYER & COLLORA, LLP
Federal Reserve Plaza
600 Atlantic Avenue, 12th Floor
Boston, MA  02210
(617) 371-1000

TOWN OF ROCKLAND and
THE ROCKLAND SEWER COMMISSION,
By their attorneys,

/s/Joanne D'Alcomo_____
Joanne D'Alcomo (BBO # 544177)
Seth Nesin (BBO # #650739)
JAGER SMITH P.C.
One Financial Center
Boston, MA 02111
(617) 951-0500


DATED:  July 14, 2006


## CERTIFICATE OF SERVICE

I, David M. Osborne, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on July 14, 2006.

/s/David M. Osborne_____
David M. Osborne