UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PROFESSIONAL SERVICES GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> TOWN OF ROCKLAND, ROCKLAND SEWER COMMISSION, GREGORY THOMSON and MICHAEL SAUSÉ, <br><br> Defendants. <br><br> TOWN OF ROCKLAND, ROCKLAND SEWER COMMISSION, <br><br> Plaintiffs-in-Counterclaim and Crossclaim <br><br> v. <br><br> PROFESSIONAL SERVICES GROUP, INC., <br><br> Defendant-in-Counterclaim, <br><br> and <br><br> MICHAEL SAUSÉ, <br><br> Crossclaim Defendant | Civil No. 04-11131-PBS |

**STATEMENT OF TOWN OF ROCKLAND AND ROCKLAND
SEWER COMMISSION IDENTIFYING THE FACTUAL BASIS FOR EACH
<u>INDIVIDUAL CLAIM</u>**

As stated at sidebar on August 4, 2006, Defendants and Plaintiffs-in-Counterclaim Town

of Rockland and Rockland Sewer Commission (collectively "The Town") hereby submit this

JS#150875v1                                                                 1

statement to clarify and streamline the various counterclaims brought by the Town. Some of the damages asserted for various claims are overlapping, and the Town recognizes the difficulties in drafting an appropriate verdict form. This memorandum is intended to provide a factual basis for each of the Town's claims so that the Court can provide proper questions for the jury.

The Town recognizes that the damages sought on claims are overlapping, but seeks to have all claims submitted so that the Town may make an election after the verdict. In this manner, the issues are fully litigated, and duplication is avoided.

The Town will not pursue its claim for Conversion (Count IX). Furthermore Counts XI and XII (Respondeat Superior) are merely theories of recovery, not underlying claims. The following are the claims the Town wishes to be decided by the jury and Court:

**I.  Violation of G.L. c.30B – as affirmative claim and as defense to breach of contract**

The Town maintains that the PSG, primarily through Michael Sause, "cause[d] or conspire[d] with another to cause a contract to be solicited or awarded in violation of" Act. G. L. c. 30B § 17(c). PSG caused the violation of the Uniform Procurement Act in several ways.

First, PSG caused, primarily through Michael Sause, the procurement to be conducted in bad faith and for the contract to be awarded to PSG as a result of such bad faith. The premise of the procurements conducted under the Uniform Procurement Act, as well as other competitive bidding statutes of the Commonwealth, is that the procurement process is conducted in good faith and is not a sham. "[T]he the design of the competitive bidding statutes .. is 'to establish genuine and open competition after due public advertisement in the letting of contracts . . . to prevent favoritism in awarding such contracts and to secure honest methods of letting contracts in the public interests.". Com. v. Gill  363 N.E.2d 267, 272 (Mass.App.Ct. 1977). In other cases involving the state's statutory bidding laws, courts have identified "bad faith" as a violation of the law, without necessarily identifying a specific provision that was violated.  See Bradford &

Bigelow, Inc. v. Commonwealth, 24 Mass.App.Ct. 349, 355 509 N.E.2d 30, 34 (Mass. App. Ct. 1987) (in case brought under bidding statute, "the issues really contested were . . . whether B & B had been deprived in bad faith by Commonwealth officers"); Amanti & Sons, Inc. v. R.C. Griffin, Inc., 53 Mass.App.Ct. 245, 758 N.E.2d 153, 162 (Mass. App. Ct. 2001) (while affirming judgment on alternate grounds, holding that trial judge's grant of damages for "bad faith" under bidding statute was improper due to lack of subsidiary findings, not because "bad faith" was an improper basis to award damages for violation of bidding law").

PSG, primarily through Michael Sause, conspired with Gregory Thomson, and caused the procurement to be conducted in bad faith. The good faith appearance of the procurement process was a sham, because of PSG's behind-the-scenes manipulation and involvement. Sause was the dominant author of the RFP, and steered its provisions to give PSG an unfair advantage in the bidding . Unbeknownst to prospective bidders, PSG, through Sause, worked to try to stifle, or at least minimize, competition for the contract, and to gain for itself an advantage in obtaining what Sause helped make a 10 year contract. Sause was the orchestrator of the RFP, so much so that he wrote a letter for Thomson to send to the Inspector General's office in an effort to make an argument to support a key anticompetitive provision he (Sause) wanted to include, and thus diminish the chances of controversy. Sause set the qualifications for the bidders. Even after the RFP was issued, PSG, through Sause, manipulated the procurement process. Although Thomson took the position with other bidders that the only substantive communication could be in writing, Sause and Thomson had direct communications, and it was Sause – representing PSG, the incumbent and also a prospective bidder – who crafted the responses to the prospective bidders and who worked with Thomson behind the scenes on how to field the inquiries.

PSG also violated specific provisions of the statute. Specifically, G. L. c. 30B § 6 requires that the chief procurement officer award a contract only to "a responsible and responsive offeror," which means that the winning bidder must have the "integrity and reliability which assures good faith performance." G. L. c. 30B § 2. PSG caused the Town of Rockland to award its wastewater contract to an operator, namely PSG, that did not satisfy the requirements of "integrity and reliability." A bidder that engaged in the type of behavior at issue in this case – bad faith manipulation of the bidding process and intentional conduct that causes a governmental body to conduct a procurement in bad faith -- does not have the necessary "integrity and to be considered a "responsible and responsive offeror."

In addition, the Uniform Procurement Act requires that "a person submitting a bid or a proposal for the procurement…of…services to any governmental body shall certify…that [the] bid or proposal has been made or submitted in good faith and without collusion or fraud with any other person." G. L. c. 30B § 10. Although PSG ostensibly provided such a certification, the certification was false since PSG's bid was not submitted in good faith, and since PSG bid was the result of collusion and fraud with Thomson. Furthermore, a bidder who submits a false certification of such significance does not have the "integrity and reliability" that would enable it to qualify as a responsible and responsive offeror."

Damages for the violation of 30B are "not more than two thousand dollars for each violation" and "double the amount of damages sustained by the governmental body by reason of the violation, together with the costs of any action." G. L. c. 30B § 17(c). Therefore, the Town seeks the damages it sustained by reason of the violation: (a) the difference between what it paid PSG and what it likely would have paid an operator in a fair bidding process (testimony to come from then Woodard & Curran executive Jack Bonomo); (b) the cost of conducting a new

procurement in 2004 after it cancelled the invalid contract.  The Town also seeks its attorneys fees in bringing this action as provided by the statute.

In addition, because a contract awarded in violation of the Uniform Procurement Act is invalid, rather and cannot logically form the basis of a breach of contract claim if found invalid, the Town is entitled to receive damages incurred as a result of PSG's conduct in managing the plant.  These damages include: (a) the money improperly withheld by PSG in the form of an unpaid rebate for the 2003-2004 contract year; (b) damages  for PSG's diversion of Town funds (compensation for loss of use of the diverted funds and attorney's fees for action taken to recover diverted funds);  (b) cost of the forensic audit conducted to determine the extent of the PSG's mismanagement of Town's funds and losses; (c) damages for improper expenditures made by PSG while managing the plant, such as T-shirts, Christmas trees, and other improper charges identified by the forensic auditor.

## II. Fraud – as affirmative claim and as defense to breach of contract

The Town's fraud claim is based on several factual bases.  Fraud can be established upon proof "(1) that a misrepresentation was as to a matter of fact, which may include a belief or an intention, made by the defendant or his agent, (2) that it was made with the intention to induce another to act upon it, (3) that it was made with knowledge of its untruth or was made of a fact susceptible of actual knowledge with recklessness as to its truth or falsehood, or was the utterance of a half truth which is in effect a lie, or was the failure to disclose known facts when there was a duty, original or supervening, to disclose, (4) that it was intended that it should be acted upon, as it was, and (5) that damage directly resulted therefrom." Bishop, Prima Facie Case – Proof and Defense, 17A Massachusetts Practice § 29.1, at 309 (West 2005); See also  Graphic

Arts Finishers, Inc. v. Boston Redevelopment Authority, 357 Mass. 40 (1970), quoting Restatement: Torts § 525.

Fraud or deceit may be perpetrated "by an implied as well as by an expressed representation." Nota Constr. Corp. v. Keys Associates, Inc., 45 Mass.App.Ct. 15, 17 (1998), citing Briggs v.. Carol Cars, Inc., 407 Mass. 391, 396 (1990) (further citations omitted)). A statement that, in form, is one of opinion, in some circumstances may reasonably be interpreted by the recipient to imply that the maker of the statement knows facts that justify the opinion. *Briggs,* 407 Mass. at 396, citing Restatement (Second) of Torts § 539 (1977). Also, a defendant can be held responsible not only for intentional or reckless misrepresentations about an existing fact, but also for giving misleading partial information or for telling half-truths. Golber v. BayBank Valley Trust Co., 46 Mass.App.Ct. 256, 258 (1999), citing Kannavos v. Annino, 356 Mass. 42, 48 (1969). Massachusetts has long recognized that both "[d]eclarations *and conduct* calculated to mislead and which in fact do mislead one who is acting reasonably are enough to constitute fraud." Boston Five Cents Sav. Bank v. Brooks, 309 Mass. 52, 55-56, 34 N.E.2d 435, 437 (1941) (emphasis added); Kannavos v. Annino, 247 N.E.2d 708, 712, 356 Mass. 42, 48 (Mass. 1969) (same).  This is consistent with the Restatement (Second) of Torts, which uses "misrepresentation" to mean "not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth." Restatement: Torts § 525.

The Town asserts that PSG committed fraud by submitting a bid and falsely representing in the anti-collusion affidavit that its bid or proposal has been made or submitted in good faith and without collusion or fraud with any other person. See G. L. c. 30B § 10.

The assertions that there was no collusion and that the bid was made in bad faith were false, or were made with reckless with reckless disregard of whether they were true. The truth of

such statements was able to be determined by PSG. . The evidence at trial shows that PSG's own area vice president Michael Sause prepared the RFP, others at PSG participated, and that Sause led the effort in plain view at the Norwell office of PSG and at the Rockland Sewer Department office in plain view of PSG plant manager Aram Varjabedian.

The Town's Administrator, Kevin Donovan, who received PSG's bid and, was misled to believe that PSG's proposal was in good faith and allowed the award to be made to PSG. If he had known the true state of affairs, he would have disqualified PSG, and blocked any award to PSG.

Similarly, PSG committed fraud by its conduct in misleading the Town that the procurement in which it participated was conducted in good faith. PSG participated in the perpetuation of the fraud on the Town, as well as the prospective bidders, that the procurement process was being conducted in good faith and in compliance with the Uniform Procurement Act. In fact, PSG, through Sause, secretly drafted the Request for Proposals in an attempt to steer the contract to itself. If the Town, in particular its administrator Kevin Donovan, had known the true state of affairs when he opened PSG's bid, he would have disqualified PSG and prevented any award to PSG.

As damages for fraud, the Town seeks disgorgement of PSG's profits – its enrichment from the fraud -- from March 1, 1998 when the contract at issue began, until mid-April 2004, when canceled. "[I]t is simple equity that a wrongdoer should disgorge his fraudulent enrichment." Janigan v. Taylor, 344 F.2d 781, 786 -87 (1st Cir.), cert. denied, 1965), 382 U.S. 879 (1965). PSG would not have been paid by the Town Treasurer and the Town if it had not been for its fraud. The Town seeks the damages necessary to prevent PSG's unjust enrichment. Therefore, it seeks the profits that PSG realized for each of the years that PSG had the contract as

a result of its fraud. The Town also seeks prejudgment interest representing PSG's enjoyment of such funds, running from each of the years in which the profit was earned.

In addition, the Town is seeking damages that occurred as a result of the Town's reliance on PSG's fraudulent representations and conduct. Where a plaintiff suffers pecuniary injury by the fraud of the defendant, the damages recoverable are those which "naturally flow from the fraud." Reisman v. KPMG Peat Marwick LLP, 787 N.E.2d 1060, 1068-69 (Mass.App.Ct. 2003). PSG would not have received the contract if the Town administrator had known of PSG's fraudulent conduct. Therefore, the Town is entitled to receive damages incurred as a result of PSG's conduct in acquiring a contract it should not have been allowed to receive, and also damages from PSG's improper retention of, diversion of, and mismanagement of, the Town's money that PSG had obtained by virtue of its position as winner of the contract. These damages include: (a) the money improperly withheld by PSG in the form of an unpaid rebate for the 2003-2004 contract year; (b) damages for PSG's diversion of Town funds (compensation for loss of use of the diverted funds and attorney's fees for action taken to recover diverted funds); (b) cost of the forensic audit conducted to determine the extent of the PSG's mismanagement and losses; (c) damages for improper expenditures made by PSG while managing the plant, such as T-shirts, Christmas trees, and other improper charges identified by the forensic auditor; (d) cost of the new procurement in 2004.

### III. Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing – as affirmative claim and as defense to breach of contract

The Town has an alternative theory based on breach of contract. If there is a violation of the Uniform Procurement Act, then the contract awarded in violation of the Uniform Procurement Act is invalid and unenforceable, and the Town may obtain a remedy under the Uniform Procurement Act. Similarly, if the contract was the result of fraudulent inducement, the

remedy would not breach of contract. If the jury finds that the contract is valid, and not obtained by fraud, then the Town's alternative remedy is breach of contract.

Furthermore, under Massachusetts law, "[e]very contract implies good faith and fair dealing between the parties to it." Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471 (1991), quoting Warner Insurance Co. v. Commissioner of Insurance, 406 Mass. 354, 362 n.9 (1990) (citations omitted). "Good faith and fair dealing is the understanding between the parties 'that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " Tufankjian v. Rockland Trust Co., 57 Mass. App. Ct. 173, 177 (2003), quoting Anthony's Pier Four, 411 Mass., at 471 (citations omitted). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Cadle Co. v. Vargas, 55 Mass. App. Ct. 361, 366 (2002) (citations omitted). "[T]he implied covenant exists so that the objectives of the contract may be realized." Ayash v. Dana-Farber Cancer Institute, 443 Mass. 367, 385 (2005). A party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract. See Fortune v. National Cash Register Co., 373 Mass. 96, 101 (1977).

The Town asserts that PSG breached either the express terms of the contract or the implied covenant of good faith, and express provisions of the contract governing the maintenance of accounts for specific purposes such as equipment and maintenance, by, among other things: diverting the Town's funds to Superintendent Thomson and to Sause and helping to conceal Town funds from the Town Accountant and Town Treasurer; by making improper expenditures with the Town's money; and by failing to reimburse the Town's money that was held by PSG after termination.

As to the measure of damages, "[t]he general rule is that in an action of contract the damages must be the direct, natural result of the breach, and to have been in the contemplation of the parties when the contract was made as the probable result of the breach." Weeks v. Calnan, 39 Mass. App. Ct. 933 (1995), quoting Greany v. McCormick, 273 Mass. 250 (1930). The damages sought for breach of contract therefore are: the costs associated with the diverted funds, specifically the costs of recovering such funds and the loss of use of such funds; damages for the improper expenditures; and the amount of money PSG is still holding from the Town that was supposed to be rebated in 2004; and the cost of the forensic audit.

**IV. Violations of G.L. c.268A §2(a), §3(a) and §17(b) – as affirmative claim and as defense to breach of contract**

The Town also asserts claims under the Massachusetts Conflict of Interest Law, G. L. c. 268A. That law, specifically the three provisions identified above, imposes liability for various conduct that influences, or is intended to influence, public officials. It also encompasses conduct that rewards public officials for their official acts. See G. L. c. 268A § 3(a) (provision is violated by gifts and promises "for *or because of* any official act *performed* or to be performed." (emphasis added)); see also Scaccia v. State Ethics Commission, 431 Mass. 351, 356, 727 N.E.2d 824, 829 (Mass. 2000) (it is a violation of law if gifts "constitute a reward for official acts already undertaken"). The scope of activities encompassed under the law was clarified by the First Circuit in United States v. Sawyer, 85 F.3d 713, 741 (1st Cir. 1996) and cases following that decision. In Scaccia, 431 Mass. at 356, 727 N.E.2d at 829, the Supreme Judicial Court clarified that the statutory violations must be linked to a particular official act. The statute does not require that the violator use its own money to give something of "value" to a public official.

The Town asserts that the official act that PSG attempted to influence and reward was the drafting and acceptance of the 1997 request for proposals. In an attempt to influence Greg

Thomson so that he would act favorably towards PSG, the company provided him with free legal services in his attempt to become Sewer Superintendent, hosted him at the Inspector General's procurement seminar, wined and dined him and paid for his travel expenses (sometimes using funds that properly belonged to the Town of Rockland), and, as a reward after PSG was the only bidder on the RFP, taking him to the Foxy Lady for an expensive night in a limousine.

Section 21(b) of Chapter 268A provides that the Town may bring a civil action "against any person who has acted to his economic advantage in violation of" Sections 2, 3, 8 and 15-20, and may recover damages "in the amount of *such economic damages* or five hundred dollars, whichever is greater." G. L. c. 268A § 21(b). Under Chapter 268A the Town may "in the discretion of the court recover additional damages…in an amount not exceeding twice the amount of economic recovery or five hundred dollars, whichever is greater… ." Id.

For the violation of Chapter 268A, the Town seeks the economic advantage that PSG enjoyed as a result of its conduct, specifically, the profits it earned from the start of the contract in 1998 until its termination in mid-April 2004. The Town also seeks prejudgment interest representing PSG's enjoyment of such funds, running from each of the years in which the profit was earned.

If PSG is found to have violated 268A, the Town asks for damages equaling twice the amount of profits that PSG earned in the six years it operated the Rockland wastewater treatment plant.

## V. Civil Conspiracy

The Town also asserts a claim of conspiracy between PSG and Gregory Thomson. In the civil context in Massachusetts, the word conspiracy is used to denote vicarious liability in tort for "concerted action." See W. Page Keeton, Prosser and Keeton on Torts 322 (5th ed. 1984); Restatement (Second) of Torts § 876 cmt. b (1977). For liability to attach on this basis, there

must be, first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement. The Town asserts that all of its other tortious claims in this lawsuit were the result of a conspiracy between PSG (through Michael Sausé) and Gregory Thomson.

The Town is asserting the conspiracy claim because it would make PSG jointly and severally liable for any tort committed as part of the conspiracy. See New England Foundation Co. v. Reed, 209 Mass. 556, 95 N.E. 935, 935 (1911) ("The gist of a civil action of this sort is not the conspiracy, but the deceit or fraud causing damage to the plaintiff, the combination being charged merely for the purpose of fixing joint liability on the defendants."). This form of civil conspiracy is explicitly recognized in Massachusetts law. See Gurney v. Tenney, 197 Mass. 457, 84 N.E. 428, 430 (1908); see also Phelan v. Atlantic Nat'l Bank, 301 Mass. 463, 17 N.E.2d 697, 700 (1938) ("[A]verment of conspiracy does not ordinarily change nature of cause of action [sounding in tort] nor add to its legal force.").

Consequently, to the extent that both Thomson and PSG (through Sause or otherwise) acted to defraud the Town, PSG would be liable under principles of civil conspiracy for Thomson's fraudulent conduct as well as Sause's..

## VI. Violation of G.L. c.93A

. The Town asserts that PSG acted "unfairly" and "deceptively" in violation of 93A by engaging in all of the activity above, with the sole exception of any breaches of contract found not have been committed in bad faith.

The Town therefore seeks to recover the difference between what the Town paid under the contract and what it would have paid in a fair procurement, as well as the costs of the procurement that took place in 2004.

Therefore, the Town to recovery: (a) the difference between what it paid PSG and what it likely would have paid an operator in a fair bidding process (testimony to come from then Woodard & Curran executive Jack Bonomo); (b) the cost of conducting a new procurement in 2004 after the Town cancelled the contract; (a) the money improperly withheld by PSG in the form of an unpaid rebate for the 2003-2004 contract year; (b) damages for PSG's diversion of Town funds (compensation for loss of use of the diverted funds and attorney's fees for action taken to recover diverted funds); (b) cost of the forensic audit conducted to determine the extent of the PSG's mismanagement of Town's funds and losses; (c) damages for improper expenditures made by PSG while managing the plant, such as T-shirts, Christmas trees, and other improper charges identified by the forensic auditor.

Because of the willful behavior at issue, the Town seeks multiple damages.

**VII.** **Negligence**

The Town also asserts a claim of negligence. To establish a claim for negligence, the Town must prove "(1) facts indicating that he defendant owed him the duty of care, (2) facts establishing that the defendant was negligent in the discharge of that duty, (3) that the defendant's negligence was the cause of damage to the plaintiff, and (4) actual, and if any, special damage." Bishop, Prima Facie Case – Proof and Defense, 17 Massachusetts Practice § 18.1, at 582 (West 2005), and authorities cited. The economic loss doctrine does not preclude recovery of damages in this case because of the duty that PSG had to the Town, in particular the duty of the handling of the funds. In cases even without the existence of a duty, Massachusetts courts have recognized recovery of economic losses for negligent behavior in the absence of personal injury or property damages. For example, in Rae v. Air-Speed, Inc. 386 Mass. 187, 192, 435 N.E.2d 628, 631 (1982), the Supreme Judicial Court held that Massachusetts law

"clearly permits a potential insured …to recovery in tort for the failure of an insurance agent to perform his duty to obtain an insurance policy." In this case, the Town should be able to recover economic losses for the failure of PSG, as a professional manager, to manage the Town's money properly, thus leading to diversion of funds and improper expenditures.  See also  Peerless Insurance Co. v. Cerny & Associates, 199 F.Supp. 951 (D.Minn.1961) (holding architect liable to a surety for the negligent release of retainage funds).

The measure of damages on a negligence claim is "fair compensation for the injury sustained." Bishop, Prima Facie Case – Proof and Defense, 17 Massachusetts Practice § 18.14, at 623 (West 2005), citing Rodgers v. Boynton, 315 Mass. 279 (1943). On its negligence claim, the Town seeks: the costs associated with the diverted funds, specifically the costs of recovering such funds and the loss of use of such funds;  damages for the improper expenditures.

## VIII. Negligent Misrepresentation

Lastly, the Town asserts a claim of negligent misrepresentation.  Massachusetts has adopted the test for negligent misrepresentation taken from the Restatement (Second) of Torts:

> One who, [1] in the course of his business, profession or employment or in any other transaction in which he has a pecuniary interest, [2] supplies false information for the guidance of others in their business transactions, [3] is subject to liability for pecuniary loss caused to them, [4] by their justifiable reliance upon the information, [5] if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. 491, 495-496 (1998), quoting Restatement (Second) of Torts  § 552 (1977); see also Sampson v. MacDougall, 60 Mass. App. Ct. 394, 400 (2004); Kitner v. CTW Transport, Inc., 53 Mass. App. Ct. 741, 749 (2002); Cole v. New England Life Insurance Co., 49 Mass. App. Ct. 296, 323 (2000).  Negligent misrepresentation differs

from an action for fraud because liability for negligent misrepresentation does not require a showing that the defendant even knew that the statements made were false or that the defendant actually intended to deceive the plaintiff. <u>Marram v. Kobrick Offshore Fund, Ltd.</u>, 442 Mass. 43, 59 n. 25 (2004). In this case, the Town asserts that PSG made a negligent misrepresentations by submitting a false non-collusion affidavit with its proposal.

The Restatement provides that damages for negligent misrepresentation are "those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause", including

> (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
>
> (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

Therefore, as damages for negligent misrepresentation, the Town asks for the difference between the cost of PSG's contract and what the Town would have received in a fair bidding process, as well as the costs associated with the 2004 procurement that would not have needed to take place.

TOWN OF ROCKLAND AND
ROCKLAND SEWER COMMISSION,
By their attorneys:

/s/ Seth Nesin
Joanne D'Alcomo (BBO # 544177)
Howard P. Blatchford, Jr. (BBO #045580)
Seth Nesin (BBO # #650739)
JAGER SMITH P.C.
One Financial Center
Boston, Massachusetts 02111
617-951-0500

Dated: August 8, 2006