UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| PROFESSIONAL SERVICES GROUP, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| TOWN OF ROCKLAND, ROCKLAND SEWER COMMISSION, GREGORY THOMSON and MICHAEL SAUSÉ, | ) | |
| TOWN OF ROCKLAND, ROCKLAND SEWER COMMISSION, | ) | |
| Plaintiffs-in-Counterclaim and Crossclaim | ) | Civil No. 04-11131-PBS |
| v. | ) | |
| PROFESSIONAL SERVICES GROUP, INC., | ) | |
| Defendant-in-Counterclaim, | ) | |
| and | ) | |
| MICHAEL SAUSÉ, | ) | |
| Crossclaim Defendant | ) | |

_____

**PLAINTIFF'S MEMORANDUM OF LAW REGARDING LIABILITY
& DAMAGES ISSUES**

Plaintiff Professional Services Group, Inc. ("PSG") submits this memorandum of law

regarding various liability and damages issues discussed with the Court at trial.

I.      **Liability Under § 17(c) of the Uniform Procurement Act Requires Proof of a Violation of a Specific Provision of the Act**

To prove PSG liable under § 17(c) of the Uniform Procurement Act, Mass. Gen. L. c. 30B, Defendants Town of Rockland and Rockland Sewer Commission must prove a violation of a specific provision of c. 30B.  Section 17(c) plainly and explicitly states that "[a] person who causes or conspires with another to cause a contract to be solicited or awarded *in violation of a provision of this chapter*" shall be liable for damages.  c. 30B, § 17(c) (emphasis added). Proving that Michael Sause and Gregory Thomson "caused the procurement to be conducted in bad faith," as Defendants assert, is insufficient to establish § 17(c) liability.  See Statement of Town of Rockland and Rockland Sewer Commission Identifying the Factual Basis for Each Individual Claim ("Defendants' Memo.") (8/8/06) at 3.

In their argument to the contrary, Defendants have once again distorted the Procurement Act to fit their claim in this case.  See Memorandum of Law in Support of Plaintiff's Rule 12(b)(6) Motion to Dismiss Defendants' Counterclaim Under the Uniform Procurement Act (7/10/06) (discussing Defendants' distortion of Act in bringing their claim under § 17(c)).  Just as Defendants' tortured interpretation of the Procurement Act expands the Act to include a right of action for Defendants under § 17(c) where they have none, Defendants now ignore the plain language of § 17(c) because they cannot prove a violation of that provision.  See id.  Defendants cite caselaw concerning distinct provisions of other statutes applied in very different factual circumstances than those of this case in support of their assertion that general "bad faith" is sufficient to prove liability under § 17(c).  See Defendants' Memo. at 2-3; cf. Bradford & Bigelow, Inc. v. Commonwealth, 24 Mass. App. Ct. 349, 354 (1987) (claim by contractor against state agencies for being "deprived … of its interest in being approved as the low bidder" for a contract under public bidding statute, Mass. Gen. L. c. 149, §§ 44A-44J); E. Amanti & Sons, Inc.

v. R.C. Griffin, Inc., 53 Mass. App. Ct. 245 (2001) (suit by subcontractor against contractor and town under c. 149, § 29 for additional costs of fire station exhaust system based on failure of specification to identify system required).  Neither these cases nor the statutory provisions at issue address the specific express requirement in § 17(c) that Defendants prove "a violation of a provision of" c. 30B.  See § 17(c).[1]

Defendants also err in asserting that they may prove PSG liable under § 17(c) based on the requirement that a chief procurement officer must award a contract to a "responsible offeror." Section 6 of c. 30B states that "[t]he chief procurement officer shall determine the most advantageous proposal from a *responsible* and responsive *offeror* taking into consideration price and the evaluation criteria set forth in the request for proposals."  c. 30B, § 6 (emphasis added). Chapter 30B defines a "responsible offeror" as "a person who has the capability to perform fully the contract requirements, and the integrity and reliability which assures good faith performance."  c. 30B, § 2.  Taken together, these provisions require that, at the time a contract is awarded, a chief procurement officer determine that the offeror bears characteristics that "assure[] good faith performance" of its obligations under the contract.  In other words, these provisions impose an obligation on the awarding authority not to award a contract to an offeror that, at the time of the award, does not "assure[] good faith performance" of its obligations under the contract.

In this case, PSG does not allege that, and there is no evidence that, the Town failed to meet its obligation under § 6.  Similarly, there is no allegation or evidence that, at the time the

---

[1]  Defendants also attempt to extend their nebulous "bad faith" theory to their fraud claim.  See Defendants' Memo. at 7.  Yet Defendants provide no support, nor much of an explanation, for how "bad faith" can be the basis of a fraudulent misrepresentation or, more importantly, how they could have suffered damages in reliance on a false representation that PSG would act in "good faith."

contract was awarded, PSG failed to display characteristics that "assure[d] good faith performance" of its obligations under the contract.  As the evidence has established, at the time that the 1998 Contract was awarded, PSG and its predecessor had been operating the Town's wastewater treatment facilities in good faith since 1982.  Of course, given Defendants' allegations in this case, Defendants are eager to put before the jury any statutory provision that contains the term "integrity," regardless of its applicability or relevance to proof of PSG's liability.  However, Defendants may not prove PSG liable under § 17(c) on that basis.

Finally, in addition to those damages provided for expressly in § 17(c), Defendants contend that § 17(c) entitles them "to receive damages incurred as a result of PSG's conduct in managing the plant" because proof of a violation of § 17(c) renders the contract invalid.  <u>See</u> Defendants' Memo. at 5.  There is no legal basis for such damages.  Section 17(c) only allows recovery of "the amount of damages sustained by the governmental body *by reason of the violation*" of § 17(c).  <u>See</u> § 17(c) (emphasis added).

## II.    <u>Defendants Are Limited to "Reliance Damages" on Their Fraud Claim</u>

Contrary to Defendants' assertion, they are not entitled to "disgorgement" of PSG's profit if PSG is proven liable for fraud. For a fraud claim under Massachusetts law, "the usual rule, at least in appropriate cases, is that the injured party receives benefit of the bargain damages." <u>Twin Fires Invest., LLC v. Morgan Stanley Dean Witter & Co.</u>, 445 Mass. 411, 425 (2005). "Benefit of the bargain" does <u>not</u> constitute disgorgement.  "Benefit of the bargain damages refers to the difference between what a plaintiff has received and the actual value of what he would have received if the representations had been true." <u>Id.</u> at 424 n.24 (quotation omitted); <u>see also</u> <u>Anzalone</u>, 14 Mass. App. Ct. at 47-48.  In other words, the "benefit of the bargain" is determined from the perspective of the party bringing the claim.

Moreover, this general rule "may be modified or supplemented" where its application is inappropriate. Twin Fires Invest., 445 Mass. at 425 (citation omitted); see also Anzalone, 14 Mass. App. Ct. at 48 n.2 ("even in cases of deceit, the 'benefit of the bargain' rule is not rigidly followed"). "Generally, benefit of the bargain damages are awarded in business transactions only where proved with reasonable certainty and where out-of-pocket damages would not afford just and satisfactory compensation because one party is 'left with something acquired under the transaction which, because of the matter misrepresented, he does not want and cannot use.'" Twin Fires Invest., 445 Mass. at 424 n.24  (quoting Restatement (Second) Torts § 549(2), cmt. g).[2]

Consequently, the "benefit of the bargain" standard plainly does not apply in this case. Defendants are not alleging a stereotypical fraud case, in which, based on PSG's misrepresentation, they bought something that was worth less than it was represented to be worth. Defendants also do not allege that they acquired a defective product from PSG, as a result of a misrepresentation, that they could not use. See Restatement (Second) Torts § 549(2), cmt. d (discussing the "usual form of financial loss" suffered from a misrepresentation).[3]  In the

---

[2]  "Our courts have consistently limited the award of benefit of the bargain damages to cases of intentional misrepresentation where the person who was the target of the misrepresentation has actually acquired something in a transaction that is of less value than he was led to believe it was worth when he bargained for it." Id. at 425; see also id. (equating benefit of the bargain damages to breach of warranty damages).

[3]  Notably, Defendants' "theory" of PSG's liability for fraud is completely different now than when the case began. Compare Counterclaim ¶ 53 ("In furtherance of its effort to defraud the Town, PSG established unauthorized bank accounts and deposited public funds therein; knowingly failed and refused to rebate to the Town monies due and owing to the Town under Contract No. 2; absconded with Town property upon vacating the Sewer Plant; made unauthorized expenses with public funds; and converted public funds to personal use (collectively the 'Fraudulent Activity').") with Defendants' Memo. at 6 ("The Town asserts that PSG committed fraud by submitting a bid and falsely representing in the anti-collusion affidavit that its bid or proposal had been made in good faith ….").

circumstances of this case, "the proper measure of recovery is the pecuniary loss actually

suffered as a result of the misrepresentation, rather than the 'loss' claimed from disappointed

expectation." <u>Twin Fires Invest.</u>, 445 Mass. at 426  (citing Restatement (Second) Torts § 549);

<u>see</u> <u>id.</u> (limiting recovery to "reliance damages").  "Limiting recovery to reliance damages … is

consistent with the purpose of tort law 'to compensate for loss sustained and to restore the

plaintiff to his former position.'" <u>Id.</u>  (quoting Restatement (Second) Torts § 549(2), cmt. g).

### III.    <u>Any Conflict of Interest Statute Violations Must Have Occurred *Before* the Request for Proposals Was Written in July 1997</u>

Defendants' proof of any violation of c. 268A in this case is limited to conduct that

occurred before the request for proposals was written in July 1997.  Defendants themselves state

that "the official act that PSG attempted to influence and reward [in violation of c. 268A] was the

drafting and acceptance of the 1997 request for proposals." <u>See</u> Defendants' Memo. at 10.

Although some violations of c. 268A may, as a matter of law, be "backward-looking" or

constitute rewards for past conduct, <u>see</u> c. 268A, §§ 3(a), 17(b), both the assertion of c. 268A as

an affirmative defense to PSG's breach of contract claim and the damages sought by Defendants

under c. 268A require that any violation of c. 268A in this case occurred <u>before</u> July 1997.

First, Defendants' assertion of c. 268A as an affirmative defense to breach of contract

limits potential c. 268A violations to pre-July 1997 conduct.  Section 21(a) of c. 268A provides

that "any violation … *which has substantially influenced* the action taken by any municipal

agency in any particular matter shall be grounds for avoiding, rescinding, or canceling the

action." § 21(a) (emphasis added).  To avoid the 1998 Contract under c. 268A, therefore,

Defendants must prove a violation of c. 268A that *substantially influenced* the Defendants'

"acceptance of the 1997 request for proposals."  A violation of c. 268A that occurred after that

date could not have *substantially influenced* acceptance of the 1997 request for proposals, and therefore is irrelevant to this issue.

Similarly, Defendants seek as damages under c. 268A "the profits [PSG] earned from the start of the contract in 1998 until its termination in mid-April 2004." <u>See</u> Defendants' Memo. at 11. Section 21(b) of c. 268A provides that a city or town may recover damages "in the amount of such economic advantage" that a person has received from a violation of c. 268A. § 21(b). If the "economic advantage" that Defendants seek in this case is all of the profit that PSG received for its performance under the 1998 Contract, then the c. 268A violation that caused those damages must have occurred prior to the award of the 1998 Contract.

Notably, in their memorandum to the Court, Defendants identify only three activities that occurred prior to July 1997. <u>See</u> Defendants' Memo. at 10-11. First, Defendants state that "the company provided [Mr. Thomson] with free legal services in his attempt to become Sewer Superintendent." At trial on August 8, 2006, Mr. Thomson testified that he never asked for such assistance, did not rely on it, and did not use it in his efforts to get that position. Defendants also assert that PSG "hosted him at the Inspector General's procurement seminar," although the evidence at trial was that the Rockland Sewer Commission paid for his attendance at the seminar and that he simply stayed in a room in which a PSG employee was already staying. Likewise, while Defendants contend that PSG "wined and dined" Mr. Thomson, the only evidence concerning pre-July 1997 conduct related to Mr. Thomson's attendance at an industry conference in Miami Beach two years earlier in 1995.

Defendants also contend that PSG "paid for [Mr. Thomson's] travel expenses." <u>See</u> Defendants' Memo. at 11. However, the only evidence of pre-contract travel expenses was a trip to Miami Beach in 1995 paid for with the Town's professional development account—<u>not</u> by

PSG.  Therefore, as with Defendants' other c. 268A theories, the "travel expenses" theory

provides no basis for a c. 268A claim.  In contrast to the unsupported assertions in Defendants'

memorandum, the actual evidence at trial has been insufficient to prove any of the c. 268A

violations alleged.  See c. 268A, §§ 2(a), 3(a), 17(b); see also Scaccia v. State Ethics Comm'n,

431 Mass. 351, 355-56 (2000) (requiring a "two-way nexus" for a § 2(a) violation and a link to a

specific official act for a § 3(a) violation).

## IV.    Defendants Are Limited to Foreseeable Out-of-Pocket Losses on Their Negligent Misrepresentation Claim

For negligent misrepresentation under Massachusetts law, a party may recover "damages

equal to the difference between the value of what they received and the purchase price plus any

other pecuniary loss suffered as a consequence of their reliance on the misrepresentation."

Danca v. Taunton Sav. Bank, 385 Mass. 1, 9 (1982) (citing Restatement (Second) Torts §

552B(1)).  "Consequential damages include those that might reasonably be expected to result

from reliance upon the misrepresentation."  Id.; see also Gagnon Welding & Contracting Corp. v.

Town of Lynnfield, 2002 WL 31698148 (Mass. App. 2002), at *2 (denying alleged damages that

were not the "foreseeable consequence" of reasonable reliance on the misrepresentation).

"This rule essentially restates the traditional 'out of pocket' measure of damages ...."

Anzalone v. Strand, 14 Mass. App. Ct. 45, 49 (1982); see also Zimmerman v. Kent, 31 Mass.

App. Ct. 72, 82 (1991) (holding "out of pocket" damages appropriate measure of negligent

misrepresentation damages); Gagnon Welding, 2002 WL 31698148, at *2 (same); Ross v.

Raytheon Co., 2001 WL 1455863 (Mass. Super. 2001), at *5 (same).  "The purpose of this

remedy is to restore the status quo as if the transaction had never occurred."  Zimmerman, 31

Mass. App. Ct. at 82.  "[T]he considerations of policy that have led courts to compensate the

plaintiff for the loss of his bargain ... *do not apply* when the defendant has had honest intentions

but has merely failed to exercise reasonable care in what he says or does." Anzalone, 14 Mass. App. Ct. at 48 n.2 (quoting Restatement (Second) Torts § 552B, cmt. b  (emphasis added)).  In this case, therefore, if PSG is proven liable on Defendants' negligent misrepresentation claim, Defendants may recover only their foreseeable out-of-pocket damages.

## V.    Defendants May Not Recover For Misuse of Rebate Funds Already Recovered

In their memorandum to the Court, Defendants suggest that they may be able to recover for misuse of rebate funds under their fraud, negligence, breach of contract, and/or civil conspiracy claims.  See Defendants' Memo. at 8, 10, 13.  However, Defendants may not recover any amount of damages for misuse of rebate funds that they have already recovered.

 "Recovery of duplicative damages under multiple counts of a complaint is not permissible."  Szalla v. Locke, 421 Mass. 448, 453 (1995).  A party may recover under each of multiple claims or theories only if "the claims and injuries are 'factually separable and distinguishable.'"  Charles River Constr. Co., Inc. v. Kirksey, 20 Mass. App. Ct. 333, 344 (1985) (quoting Calimlim v. Foreign Car Ctr., Inc., 392 Mass. 228, 236 (1984)); see also Bruce Campbell & Assoc., Inc. v. Carpionato Corp., 2001 WL 1153507 (Mass. App. Ct. 2001), at *1 (party may not recover duplicative damages "arising from the same wrong"); Fox v. F & J Gattozzi Corp., 41 Mass. App. Ct. 581, 588-89 (1996) ("plaintiff must present evidence of distinct, separate losses").  Awards of damages under different claims or theories are duplicative unless they are "based on separate facts."  See Charles River Constr., 20 Mass. App. Ct. at 344; see also Szalla, 421 Mass. at 454 (damages duplicative if based on "the same conduct"); Locke v. Austin, 1999 WL 1034758 (Mass. App. Ct. 1999), at *2 (damages duplicative where "the same acts cause the same injury").  Where a party proves duplicative damages under multiple claims or theories, that party must elect one recovery from the alternative theories, or the Court

may enter judgment as a matter of law on alternative claims.  See Szalla, 421 Mass. at 454; see also Fox, 41 Mass. App. Ct. at 589 (affirming judgment notwithstanding the verdict on claims with duplicative damages).

In this case, Defendants' allegations support only two potentially distinct bases for damages: (1) Defendants' entry into the 1998 Contract and (2) the alleged misuse of rebate funds by Gregory Thomson and Michael Sause.  However, Defendants may not recover any amount for alleged misuse of rebate funds that they have already recovered.[4]  See Nota Constr. Corp. v. Keyes Assoc., Inc., 45 Mass. App. Ct. 15, 20 n.1 (1998) (If a party "has recouped those same losses from others, those sums would be deducted because it cannot recover twice."); accord Welch v. Kosasky, 24 Mass. App. Ct. 402, 404-05 (1987) (conversion damages deducted by amount already recovered).  Therefore, if Defendants prove PSG's underlying liability under multiple claims or theories, Defendants may be awarded damages under, at most, one theory of recovery for its losses based on the 1998 Contract, and one theory of recovery for the amount of rebate fund damages that it has not already recovered.  See, e.g., Szalla, 421 Mass. at 453-54 (plaintiff's claims for fraud and quantum meruit related to his services in remodeling a greenhouse were based on the "same conduct" and, therefore, plaintiff could not be awarded "double recovery" on both claims); Fox, 41 Mass. App. Ct. at 589 (holding that unjust enrichment damages would be duplicative of breach of contract and negligent misrepresentation damages regarding oral contract for retirement benefits).

---

[4]  This reality may explain the "transformation" of Defendants' fraud claim.  See supra n.2.

Respectfully submitted,

PROFESSIONAL SERVICES GROUP, INC.,
By its attorneys,

_____/s/ David M. Osborne_____
Maria R. Durant (BBO # 558906)
David M. Osborne  (BBO # 564840)
Sara E. Noonan (BBO # 645293)
DWYER & COLLORA, LLP
Federal Reserve Plaza
600 Atlantic Avenue, 12th Floor
Boston, MA  02210
(617) 371-1000

Dated:  August 10, 2006

## CERTIFICATE OF SERVICE

I, David M. Osborne, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on August 10, 2006.

_____/s/ David M. Osborne_____
David M. Osborne