UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

PROFESSIONAL SERVICES GROUP, INC.,
Plaintiff

v.

TOWN OF ROCKLAND, et al.
Defendants

---------------------------------------------------------

TOWN OF ROCKLAND, et al.
Plaintiffs-in-Counterclaim and Crossclaim

v.

PROFESSIONAL SERVICES GROUP, INC.,
Defendant-in-Counterclaim,

and

MICHAEL SAUSÉ,
Crossclaim Defendant

Civil Action
No. 04-11131-PBS

**TOWN OF ROCKLAND AND ROCKLAND SEWER COMMISSION'S PROPOSED
FINDINGS OF FACT, RULINGS OF LAW AND CONCLUSIONS**

Joanne D'Alcomo
BBO No.  544177
Seth Nesin
BBO No. 650739
JAGER SMITH  P.C.
One Financial Center
Boston, MA  02111
(617) 951-0500

i

TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ............................................................................1

I.      GENERAL BACKGROUND.............................................................................1

II.     THE SEWER COMMISSION AND GREGORY THOMSON, WHO
        WAS FIRST A COMMISSIONER AND THEN ITS FIRST
        SUPERINTENDENT ......................................................................................1

III.    MICHAEL SAUSÉ - PSG'S AREA VICE PRESIDENT ................................3

IV.     SAUSÉ'S INVOLVEMENT WITH ROCKLAND AND HIS EFFORTS
        TO HELP THOMSON BECOME SUPERINTENDENT..............................5

V.      PSG'S INFLUENCE IN THE PROCUREMENT PROCESS AND THE
        PREPARATION OF THE RFP.........................................................................7

VI.     SAUSÉ'S EFFORT TO STIFLE COMPETITION BY REQUIRING
        A MINIMUM BID FOR LABOR, THE SINGLE LARGEST COST OF OPERATING
        THE PLANT.....................................................................................................10

VII.    PSG'S SAUSÉ INSERTED A MINIMUM EXPERIENCE
        PROVISION THAT HE KNEW WOULD EXCLUDE AN
        AGGRESSIVE COMPETITOR .....................................................................13

VIII.   THE BELT FILTER PRESS REQUIREMENT ALSO
        STYMIED COMPETITION.............................................................................13

IX.     THE RELEASE  OF THE RFP .......................................................................15

X.      PSG'S SAUSÉ INFLUENCED THE ADDENDA TO THE RFP..................17

XI.     PROSPECTIVE COMPETITORS WERE DETERRED BY THE
        RFP, AND THE TOWN WAS DEPRIVED OF AT LEAST ONE
        ALTERNATIVE THAT WOULD HAVE LIKELY SAVED THE
        TOWN $250,000 ANNUALLY .......................................................................19

XII.    PSG WAS THE ONLY BIDDER, AND THE CHAIRMAN OF THE BOARD
        AND CEO OF PSG'S PARENT COMPANY THANKED SAUSÉ AND
        VARJABEDIAN FOR THE RESULTS...........................................................22

XIII.   PSG MADE A FALSE REPRESENTATION IN THE
        NON-COLLUSION AFFIDAVIT SUBMITTED TO
        THE TOWN IN CONNECTION WITH PSG'S BID ....................................24

XIV.   PSG RECEIVED THE CONTRACT BECAUSE THE TOWN
       WAS DECEIVED INTO BELIEVING THAT THE
       PROCUREMENT PROCESS HAD BEEN FAIR ........................................25

XV.    THE TOWN INCURRED THE COSTS OF A FORENSIC
       AUDIT, AND THE CONDUCTING OF A
       NEW PROCUREMENT BECAUSE OF PSG'S UNFAIR AND
       DECEPTIVE CONDUCT .................................................................25

XVI.   TESTIMONY FROM AN EXPERT BUTTRESSES THE
       FINDING THAT THE RFP INFLUENCED AND
       STEERED BY PSG'S SAUSÉ WAS ANTICOMPETITIVE.......................26

XVII.  SAUSÉ WAS NOT A "ROGUE EMPLOYEE" WORKING
       TO INFLUENCE THE RFP; THE EVIDENCE LEADS TO
       THE CONCLUSION THAT PSG HAD KNOWLEDGE
       OF SAUSÉ'S INVOLVEMENT IN THE RFP AND THE
       PROCUREMENT PROCESS ............................................................27

       A.   Sausé And Thomson Worked On The RFP And The Addenda
            In PSG'S Small Norwell Office, In Plain Sight Of PSG
            Employees And In Communication With PSG Employees..................27

       B.   PSG'S Plant Manager Varjabedian Was Involved In The
            Preparation Of The RFP And Witnessed Sausé And Thomson
            Working On It At The Plant Offices.........................................29

       C.   Kruger, Who Was Sausé's Supervisor And A PSG Regional
            Vice President, Admits He Knew Before The RFP Was Issued
            That Sausé Was Planning To Prepare The RFP With Thomson,
            And That They Were Attending The Inspector General's Seminar
            To "Make Sure They Did Everything Right" ...............................31

       D.   Kruger, Who Was Sausé's Supervisor And A PSG Regional
            Vice President, Admits He Discussed With Sausé – Before The
            RFP Was Issued -- Sausé's Idea Of Including A Minimum Labor
            Cost Requirement In The RFP...............................................32

       E.   Kruger, Who Was Sausé's Supervisor And A PSG Regional
            Vice President, Admitted That He Knew Before The RFP Was
            Issued That The Inspector General Had Signed Off On The Idea
            Of A Minimum Labor Requirement In The RFP............................33

       F.   Kruger, Who Was Sausé's Supervisor And A PSG Regional
            Vice President, Admits That He Knew Before Other Bidders
            That The RFP *Would In Fact* Contain A Minimum Bid
            Requirement For Labor.......................................................34

G.     PSG Wanted To Be The Only Bidder In Competitive Bidding
Processes Or To Avoid Competitive Bidding Altogether To
Secure A Contract ....................................................................................34

H.     Sausé's Ability To Position Himself To Work On The 1997
RFP And To Influence The Procurement To Help PSG Win
Was Consistent With The Political Skill And Ability To
Develop Client Relationships For Which He Was Known,
And For His Willingness To Look Out For His Employer's Interests ...............34

I.     PSG'S Behavior In Not Making Records Available To The Forensic
Auditor, And In Preventing The Forensic Auditor From Questioning
The Plant Manager, Aram Varjabedian, Whom The Forensic Auditor
Considered a Key Witness, Is Evidence That PSG Believed It Had
Something to Hide .....................................................................................36

XVIII.   PSG -- INTENTIONALLY, RECKLESSLY, UNFAIRLY OR
DECEPTIVELY -- MISHANDLED  FUNDS IN REBATE
ACCOUNTS EARMARKED FOR SPECIFIC PURPOSES, THUS
FACILITATING  MISUSE AND EMBEZZLEMENT OF THE FUNDS
BY GREGORY THOMSON (THROUGH CHECKS MADE OUT TO
THOMSON AS PAYEE) ............................................................................39

A.     The Checks Were Made Out In A Reckless, Unfair And
Deceptive Manner ....................................................................................42

B.     PSG Made No Effort To Ensure That The Monies It Was
Pulling Out Of The Earmarked Accounts In Response To
Check Requests Were Being Used For Purposes Consistent
With The Purposes Of The Accounts .........................................................45

C.     Based On Flimsy Or Non-Existent Documentation, PSG Readily
Issued Checks To Thomson As A Payee, Drawn From The Special
Accounts Of Town Money For Capital Expenditures, Repair And
Maintenance, Etc., Under The Contract ......................................................46

D.     Even If, By Tortuous Logic, The Checks Issued Could Be Called
"Rebate" Money, PSG Acted Improperly In Issuing The Checks
For Purposes Unrelated To The Accounts *During The Course Of
The Contract Year* ....................................................................................50

E.     PSG's Apparent Motive For Issuing The Checks Was Its Own
Self-Interest..............................................................................................52

XIX.    PSG -- INTENTIONALLY, RECKLESSLY, UNFAIRLY OR
        DECEPTIVELY --  MISHANDLED  FUNDS IN REBATE ACCOUNTS
        EARMARKED FOR SPECIFIC PURPOSES, THUS FACILITATING
        MISUSE, MISAPPROPRIATION AND DIVERSION OF FUNDS
        (THROUGH CHECKS MADE OUT TO THIRD PARTIES OR
        DIVERSION OF CHECKS RECEIVED FROM THIRD PARTIES) ..........................53

XX.     PSG  -- INTENTIONALLY, RECKLESSLY, UNFAIRLY
        OR DECEPTIVELY -- ESTABLISHED AND MAINTAINED
        A "PROFESSIONAL DEVELOPMENT ACCOUNT" TO CONCEAL
        MONIES FROM TOWN HALL, WHICH DEPRIVED THE TOWN
        OF USE OF THE FUNDS FOR THE TOWN TREASURY, AND WHICH
        FACILITATED MISUSE AND EMBEZZLEMENT OF TOWN FUNDS..................56

XXI.    PSG -- INTENTIONALLY, RECKLESSLY, UNFAIRLY OR
        DECEPTIVELY -- MISHANDLED TOWN FUNDS IN A WAY
        THAT LED TO MISUSE, MISAPPROPRIATION AND
        EMBEZZLEMENT THROUGH AN ACCOUNT AT
        WAINWRIGHT BANK ...................................................................59

XXII.   DAMAGES SUFFERED BY THE TOWN ...................................................65

        A.      Damages Suffered Because Of The Improper And Undue
                Influence That PSG Had In Influencing The Procurement Process
                And Steering The Contract to PSG..................................................65

                1.      The difference in what the Town paid PSG under the
                        1998 contract and what it likely would have paid a
                        competitor if had not been for the undue and improper
                        influence of PSG ..................................................................65

                2.      Cost of new procurement in 2004 ............................................65

        B.      Other Damages Suffered By The Town.................................................65

                1.      Cost of forensic audit .............................................................65

                2.      Cost to Town to recover funds misappropriated by
                        PSG'S issuance of checks to Thomson, which he
                        deposited into his personal account, and the deposits
                        of checks into an account at Wainwright Bank .........................66

                3.      Cost of improper transactions (other than checks
                        issued to Thomson as payee) in special rebate accounts
                        that were supposed to be for capital expenditures, repair and
                        maintenance ..........................................................................66

                4.      Improperly withheld rebate money from 1998 contract ............66

XXIII.   THE TOWN MADE DEMAND ON PSG .................................................................66

XXIV.   PSG'S DEFENSE – ASSERTED AT TRIAL – THAT
        MANIPULATION OF THE PROCUREMENT PROCESS IN 1997
        WAS A PERSONAL SCHEME HATCHED BY SAUSÉ AND
        THOMSON TO STEAL TOWN FUNDS  IS TOTALLY BELIED
        BY THE FACTS, THE TIMING OF EVENTS, AND THE
        APPLICATION OF COMMON SENSE TO THE FACTS ...........................................67

PROPOSED RULINGS OF LAW .......................................................................................70

XXV.    THE TOWN'S ACTION IS BROUGHT UNDER SECTION 9...................................70

XXVI.   NO DEMAND LETTER IS NECESSARY BECAUSE ACTION IS
        BROUGHT AS A COUNTERCLAIM ...........................................................70

XXVII.  A JUDGE AND JURY MAY REACH INCONSISTENT RESULTS .........................70

XXVIII. THE CONDUCT PROHIBITED BY CHAPTER 93A IS BROAD AND
        NOT BOUND BY CONVENTIONAL DEFINITIONS ................................................71

        A.   Conduct May Be "Unfair" Without Being "Deceptive";
             The Evidence Proves "Unfair" Conduct By PSG ...................................72

        B.   Negligent Or Reckless Deceptive Conduct May Be The Basis
             Of A Chapter 93A Violation; PSG's Deceptive Conduct Violated
             Chapter 93A .............................................................................73

        C.   Bad Faith Can Be Basis For Violation Of Chapter 93A; PSG's
             Bad Faith Conduct Violated Chapter 93A ..........................................75

        D.   Aiding And Abetting Can Be A Basis For Chapter 93A Liability:
             PSG's Aiding And Abetting Thomson's Breach Of His
             Responsibility As A Public Official To Conduct An Honest And
             Open Bidding Process Violated Chapter 93A ......................................75

XXIX.   THE CHECK PAYEE RULES DEMONSTRATE, AT THE VERY LEAST, THE
        RECKLESSNESS OF PSG'S CONDUCT IN HANDLING TOWN FUNDS .............76

XXX.    BY ITS CONDUCT, PSG SHOWED CONSCIOUSNESS OF LIABILITY ................76

XXXI.   PSG IS VICARIOUSLY LIABLE FOR ACTS OF SAUSÉ IN
        INFLUENCING THE PROCUREMENT PROCESS IN 1997,
        AND IN ITS EMPLOYEES' HANDLING OF TOWN FUNDS
        UNFAIRLY, DECEPTIVELY, AND RECKLESSLY ..................................................77

        A.   Vicarious Liability – Employees As Agents.........................................77

B.      Employer Liable For Employee's Conduct Even If Unaware Of It ....................77

C.      Scope of Employment ............................................................................................78

D.      Employer Liable Even If Conduct Is In Excess Of, Or
        Abuse Of Authority................................................................................................79

E.      Employer Vicariously Liable For Intentional Conduct
        Of Employees Within Scope Of Employment........................................................79

F.      An Employer Is Liable For Acts Of Employees With
        Actual Or Apparent Authority ...............................................................................79

G.      An Employer Is Liable For The Fraudulent Or
        Deceptive Acts Of Its Employees .........................................................................80

H.      An Employer Can Be Vicariously Liable Even
        For Criminal Acts Of An Employee ......................................................................81

I.      An Employer Is Liable For The Acts Of An Employee
        Outside The Scope Of Employment When There
        Is Ratification; At The Very Least, PSG Ratified
        Sausé's Efforts To Influence The RFP And
        Procurement Process ..............................................................................................81

J.      For Vicarious Liability, There Is Even No Requirement
        That Corporate Officials Had Knowledge ............................................................82

K.      A Principal Is Liable For An Employee's Conduct Regardless
        Of The Scope Of Employment When Principal Took Risk
        That Agent Would Misuse His Authority ..............................................................83

XXXII.  DAMAGES NEED NOT BE PROVEN WITH CERTAINTY.....................................83

XXXIII. MULTIPLE DAMAGES FOR "WILLFUL OR KNOWING CONDUCT".................83

CONCLUSIONS......................................................................................................................85

XXXIV. PSG VIOLATED CHAPTER 93A IN CONNECTION WITH THE RFP AND
        THE PROCUREMENT PROCESS .......................................................................85

XXXV.  PSG VIOLATED CHAPTER 93A IN CONCEALING TOWN FUNDS,
        IN IMPROPER USE OF TOWN FUNDS PLACED IN ACCOUNTS FOR
        SPECIFIC PURPOSES, AND IN FACILITATING AND AIDING
        MISAPPROPRIATION OF FUNDS.......................................................................86

XXXVI. PSG'S UNFAIR AND DECEPTIVE CONDUCT IN CONNECTION
     WITH THE RFP AND THE PROCUREMENT WAS
     "WILLFUL" OR "KNOWING" .......................................................................................87


XXXVII.    PSG'S UNFAIR AND DECEPTIVE CONDUCT IN CONNECTION
     WITH THE HANDLING OF TOWN FUNDS WAS
     "WILLFUL" OR "KNOWING" ...........................................................................88

XXXVIII.    ATTORNEYS' FEES IN THIS ACTION ...............................................................89

## PROPOSED FINDINGS OF FACT

Plaintiff Professional Services Group, Inc. "PSG", Defendant Town of Rockland the "Town" and Defendant Rockland Sewer Commission the "Commission" or "Sewer Commission" hereby submit their proposed findings of fact and rulings of law on their Counterclaim based on Massachusetts General Laws Chapter 93A:

### I.     GENERAL BACKGROUND

1.     The Town of Rockland is a small town south of Boston.

2.     Its form of government is that it has an open town meeting, which votes on appropriations, budgets, and its primary governing body is a Board of Selectmen made up of part-time members.

3.     Its central offices, which are at Town Hall, has a small core of full-time workers, including such positions as the Town Accountant, the Town Treasurer, and the Town Administrator.

4.     The Sewer Commission is a part-time body consisting of three elected members who oversee the operations of the Town's wastewater treatment plant.

5.     The wastewater treatment plant has been operated, for years, by private contract. The private contractor staffs the wastewater treatment plant and operates it on a day-to-day basis.

### II.     THE SEWER COMMISSION AND GREGORY THOMSON, WHO WAS FIRST A COMMISSIONER AND THEN ITS FIRST SUPERINTENDENT

6.      Gregory Thomson ("Thomson") is a high school graduate. Thomson direct, day 1, 8.

7.     He took some night courses in college and some trade schools. Thomson direct, day 1, 8.

8.     After he graduated from high school, he owned a hardware store and worked there approximately 18 years. Thomson direct, day 1, 8-9.

9.     At trade school, he concentrated in electrical wok. Thomson direct, 8. He works in that area currently. Thomson direct, day 1, 8, 9.

10.     Thomson became a member of the Rockland Sewer Commission in 1994. Thomson direct, day 1, 9. He was appointed initially, and then was elected in 1995. Thomson direct, day 1, 9-10.

11.     The job of Sewer Commissioner was a part-time position. Thomson direct, day 1, 10. The pay was approximately $600 per year. Thomson direct, day 1, 10.

12.     He became chairman of the Commission in approximately 1995 or 1996. Thomson direct, day 1, 10.  That was also a part-time position.

13.     The Sewer Commission decided to create a full-time position of Superintendent in December, 1996.

14.     Thomson resigned his part-time position as commissioner, and applied for the position. While his application was pending, he functioned as the full-time superintendent by working on a contract with the Commission. Thomson direct, day 1, 33, 34.

15.     Thomson was formally appointed Superintendent in June 1997. Thomson direct, day 1, 34.

16.     The Commission had an office at the wastewater treatment plant. Thomson direct, day 1, 11. The wastewater treatment plant is a building separate from the Town Hall, where the Town's main governmental offices are located.

17.     There were three commissioners, and they shared an office with the secretary of the commission at the plant. Thomson direct, day 1, 11.

18.     The Sewer Commission had only one full time employee when Thomson was a Sewer Commissioner. Thomson direct, day 1, 11. That full-time employee was a secretary. Thomson direct, day 1, 11-12.

19.     When Thomson first became a Sewer Commissioner in 1994, Metcalf & Eddy Services was operating the plant.  Thomson direct, day 1, 12. The company had seven or eight people operating the plant full time. Thomson direct, day 1, 12.

20.     Thomson first met Sausé at the meetings of the Sewer Commission.  Thomson direct, day 1, 12-13.

21.     The Sewer Commission would meet a couple of times a month to go over bills. Thomson direct, day 1, 10-11, 13-14.

22.     The Commission had to vote on bills in order for a bill to be paid.  The Commission would then sign the voucher and then the secretary would then send it to Town Hall for the town accountant.  Thomson direct, day 1, 14.

23.    The Town Accountant would review bills before they would be paid. Then, once the Town Accountant approved the bills, they would go to the Town Treasurer and she would make out the checks. Then, every Thursday, the secretary to the Commission would go up to Town Hall and pick up any checks that were being requested from the Sewer Commission and she would bring them back and then mail them. Thomson direct, day 1, 17; testimony of Karen Sepeck, town treasurer.

24.    That was the standard operating procedure at the Sewer Commission when he joined the Commission in 1994 and remained the standard operating procedure. Thomson direct, day 1, 17.

25.    The Sewer Commission did not have its own checkbook or account out of which bills could be paid. Thomson direct, day 1, 14-15.

26.    The Sewer Commission collects revenues. The Sewer Commission collects sewer use charges from every house that is connected to Town sewers. Each house that is connected would receive a quarterly bill. Thomson direct, day 1, 15.

27.    Bills Would go out on behalf of the sewer Commission and monies would be sent to a post office box. The secretary to the Commissioner would go up every day to collect the mail, and checks that were mailed to the Sewer Commission. Thomson direct, day 1, 15-16.

28.    The checks would be made out to the Rockland Sewer Department. Thomson direct, day 1, 16.

29.    After the checks were picked up at the post office box, the secretary would bring them back to the plant, open them all up, post them on the computer, put them all together, and then bring them to Town Hall. Thomson direct, day 1, 16.

30.    Then, officials at Town Hall, would take care of depositing the checks. Thomson direct, day 1, 16. The Sewer Department didn't deposit the checks anywhere. Thomson direct, day 1, 16.

### III.    MICHAEL SAUSÉ – PSG'S AREA VICE PRESIDENT

31.    Sausé has a Bachelor of Science degree in environmental health. He holds a Delaware Level 4 wastewater operator's license, which is the highest in Delaware. Sausé direct, 10.

32.    The license enables him to be the chief operator, or the person directly responsible, of a wastewater treatment facility. Sausé direct, 10.

33.    After Sausé graduated from college, he went to work for Envirotech Operating Services in 1997. He held a variety of positions at Envirotech. He was a lab technical and also a process control director. Sausé direct, 18.

34.    As a lab technician he performed required laboratory tests as required by permits.   As process control director, he oversaw what is called the "activated sludge process," which is a biological treatment system for wastewater. He also oversaw the solids handling. Sausé direct, 19.

35.    He worked at Envirotech until January of 1990. Thereafter, he went to work for Metcalf & Eddy Services, then in Wakefield, Mass.   He held the title of area manager for Metcalf & Eddy Services.   As Area Manager, he oversaw several different treatment facilities thorough New England, for treatment of sewage, water treatment and groundwater remediation.   The plant managers of those facilities would report to him. Sausé direct, 19-20.

36.    As Area Manager for Metcalf & Eddy, he was also responsible for assisting with "business development," specifically the acquiring of new contracts through bidding and the renewal of existing contracts. Sausé direct, 20.

37.    Sausé's primary focus in business development was the municipal sector, because that was Metcalf & Eddy Services' focus.  Sausé direct, 21.

38.    While working as Area Manager for Metcalf & Eddy Services, Sausé entertained clients from time to time as part of his job, taking them out for meals, sporting events, and entertaining them at meetings outside of Massachusetts.  Sausé direct, 22-23.

39.    While Sausé was an Area Manager at Metcalf & Eddy Services, one of the plants over which he had responsibility was the Rockland plant. Sausé direct, 21, 30, 23-24.

40.    Sausé first became an employee of PSG in July 1994. See Ex. 585 at 1.

41.    His supervisor when he first worked for PSG was Steven Kruger. Sausé direct, 24.

42.    As an employee of PSG, Sausé continued to have responsibility for the Rockland plant. Sausé direct, 24.

43.    Sausé's title when he worked for PSG Area Vice President.  See Ex. 585 at 1, Ex. 603.

44.    Some time after PSG merged with Metcalf & Eddy Services, Kruger assigned Sausé to look for a new office on Boston's South Shore. Sausé direct, 24.

45.    Sausé found an office in Norwell, and PSG opened an office in Norwell. Sausé direct, 25.

46.    When he became an employee of PSG, Sausé assumed management responsibility of several of the PSG contracts in addition to the contracts that he had been managing while an employee of Metcalf & Eddy. Sausé direct, 25-26.

47. Sausé continued to have management responsibility for the Rockland plant until September 1999 when there was another corporate change at PSG.   At that time, PSG merged with a company called US Filter.  Sausé direct, 26-27.

48. The area that was Sausé's region at the time, called the northeast region, which included New York, was being divided up. He was given a choice, either be assigned to the New York area, or stay in the Northeast.  He decided to go to New York. Sausé direct, 26-27.

49. Consequently, in September 1999, Sausé moved his office out of the Norwell office of PSG and no longer maintained an office there. He worked out of his condo, which was in Provincetown, and he no longer reported to Kruger.  He reported to a supervisor in Pittsburgh. Sausé direct, 26.

50. Sausé continued to work for U.S. Filter until 2002, when he resigned for a few months. Sausé direct, 27-28

51. Then, he was rehired in October 2002, and then finally resigned in 2003.  Sausé direct, 28.

## IV.    SAUSÉ'S INVOLVEMENT WITH ROCKLAND AND HIS EFFORTS TO HELP THOMSON BECOME SUPERINTENDENT

52. Metcalf & Eddy Services, where Sausé began working in 1990, had a contract renewed to operate the Rockland wastewater treatment plant within months after Sausé began working for Metcalf & Eddy Services. See Ex. 4.

53. Sausé, as part of his job as area manager, entertained members of the Rockland Sewer Commission from the "from the very beginning" of his interactions with the Commission in 1990.  Sausé direct, 30, 34, 35, 36, 37.

54. He would take them to restaurants and sporting events.  He would pay for the expenses on his corporate American Express Card. Sausé direct, 30-31.

55. While working for PSG and Metcalf & Eddy services, he had a company car to travel to different projects. Sausé direct, 37.

56. Sausé met Greg Thomson when he first was named to the Sewer Commission in 1994. Sausé direct, 37.

57. Thomson was named to the Commission some time after an RFP had been issued in 1994.  Sausé direct, 38.

58. In 1996, Sausé learned  from the Sewer Commission that it was interested in creating the position of Sewer superintendent and interested in hiring Greg Thomson for the position, and wanted some assistance in knowing how that could be done. The Sewer Commission expressed concern about using the lawyer who advised the Attorney Anne

Hyland, an outside counsel because she also represented the Board of Selectmen, and they were concerned about attorney-client privilege. Sausé direct, 39, 40, 41.

59. Thomson had confided in Sausé that he was interested in the position. Sausé direct, 40. Thomson direct, day 1, 30. Members of the Sewer Commission also told Sausé that they wanted Thomson to get the job. Sausé direct, 40.

60. Sausé hired David Lurie, who had been the lawyer for Metcalf & Eddy and later PSG. Sausé had used him on a previous matter relating to his work so he was familiar with David Lurie. Sausé direct, 41-43.

61. Lurie testified that he understood at all times that his client was PSG, not Sausé personally. David Lurie direct, 5.

62. Sausé had Aram Varjabedian, PSG's Plant Manager in Rockland, fax information to Lurie for his use, Ex. 515.

63. Sausé gave Lurie "assignment of looking into what it would take to create the position of superintendent in the town of Rockland and advise on how Greg could apply for the job, what would be required if he were going to." Sausé direct, 42.

64. According to Lurie's billing records, Sausé gave Lurie that assignment in September 1996. Ex. 510; see Lurie Direct.

65. Sausé wanted Greg Thomson to become superintendent rather than to have a newcomer become Superintendent. Sausé direct, 45.

66. Sausé wanted Thomson to become Superintendent because the existing contract which PSG had by merging with Metcalf & Eddy was soon to expire, and "[t]here was going to be a new RFP," and he "knew that if Greg was superintendent, my chances of getting that contract would be significantly greater." Sausé direct, 45.

67. Attorney Lurie prepares a letter giving advice about what an existing sewer commission member should do if he wanted to become Superintendent. Ex. 511

68. Thomson received a copy of Lurie's letter dated November 8, 1996 shortly after it was dated. Thomson direct, day 1, 32.

69. Thomson used the advice in the letter from Attorney Lurie in proceeding with his interest in the Sewer Superintendent's position. Thomson direct, day 1, 32.

70. In December, 1996, the Commission decided to create the Superintendent's position. Ex. 10.

71. Thomson stepped down from being a Sewer Commission once there was a decision made by the Commission to create the position of Sewer Superintendent. Thomson

direct, 33. And that was some of the advice that was contained in the letter from Attorney Lurie.  Ex. 511.

72.    The Commission hired Thomson as a private contractor while the position was being advertised, and Thomson functioned as the superintendent, working full-time. Thomson direct, day 1, 33, 34.

73.    Thomson, in fact, later hired Attorney Lurie to perform some work for the Sewer Commission.  Thomson direct, day 1, 33.

74.    The invoice for Lurie's services was made out to PSG, and Sausé signed off on it and had it processed by PSG for payment. Sausé direct, 46-47.

75.    In May 1997, the Town Meeting approved creation of the Superintendent's position. Ex, 116.

## V.    PSG'S INFLUENCE IN THE PROCUREMENT PROCESS AND THE PREPARATION OF THE RFP

76.    Sausé interacted with his supervisor Kruger on a "frequent, regular basis." Sausé direct, 47. They had "many conversations."  Sausé direct, 47. There as a "very active interaction between the two of us." Sausé direct, 47.

77.    In 1996, Sausé worked out of the Norwell office of PSG several days a week. Sausé direct, 47. He had a computer docking station there, and used a laptop. Sausé direct, 47.

78.    The Norwell office was Sausé's main base in 1996 and 1997. Sausé, 48. He also worked out of the Boston condo where he lived.  Sausé direct, 48.

79.    Sausé was in the Norwell office so regularly that he had a dry cleaner in Norwell do all of his dry cleaning.  Sausé, 48-49. He would spend at least three partial days at the Norwell office in 1996 and 1997, sometimes more sometimes less, depending on the needs of all the projects that he was supervising. Sausé direct, 49.

80.    Sausé wanted to find a way to ensure that PSG landed the contract with the Town of Rockland. He worked on ways to help ensure that PSG would win the bidding, by deterring prospective competitors and stifling competition.

81.    In 1997, PSG was working under a contract that had been put out for bid in a RFP process in 1994. Sausé direct, 49.

82.    The contract was scheduled to expire in 1997. Sausé direct, 49.

83.    PSG was the incumbent operator, because it had merged with Metcalf & Eddy Services in 1994 and had taken over the contract. See, e.g., Ex. 236.

84. The process for putting such a contract out to bid is that a Request for Proposal is developed, bidders submit proposals, and a bidder is selected. Mass. Gen. Laws ch. 30B.

85. At the beginning of 1997, Thomson was aware that the Sewer Department's wastewater treatment plan was being operated under a contract that had been put out to bid in 1994. Thomson direct, day 1, 35.

86. He was aware that it was a three-year contract and that it was coming up to be put out to bid in 1997. Thomson direct, day 1, 35.

87. In 1997, Thomson knew that the Engineering firm Tighe & Bond was involved in preparing the request for proposal that was used in the 1994 procurement. Thomson direct, day 1, 35, 36.

88. In the spring of 1997, Sausé learned that the Inspector General's office was conducting a seminar on procurement. Sausé direct, 54.

89. He was not aware of anyone at PSG who had ever attended a seminar sponsored by the Inspector General's office on procurement. Sausé direct, 54.

90. Sausé contacted the Inspector General's office to see if he was able to attend since he was a representative of a contractor.  Sausé direct, 54.

91. Sausé recommended to Thomson that Thomson attend the seminar with Sausé.  Sausé direct, 54. He told Thomson that "it would help us in the RFP process, that we would understand the laws of RFPs and the bid procedures and what was allowed, not allowed." Sausé direct, 54-55.

92. He referred to "us" in the plural when he recommended to Thomson that Thomson attend the seminar with him because he was planning to write the RFP working with Thomson. Sausé direct, 55.

93. Sausé and Thomson went to the two-day seminar sponsored by the Inspector General on procurement.  It was held at the University of Massachusetts Amherst campus.  Sausé direct, 55.

94.  PSG paid for their meals. Sausé direct, 56.

95. Both Sausé and Thomson received certificates from the Inspector General's office for attending the seminar. Exs.605, 114, 604.

96. The Inspector General's seminar on procurement procedures was in May 1997. Ex. 605, 604, 114.

97.  Sausé's attendance at the seminar as a representative of a private contractor was unusual; the attendance sheet for the seminar reveals that Sausé was the only attendee who was not a representative of a public entity. Ex. 606.

98.  Sausé acknowledges that he had the "lead role" in preparing the RFP that was issued on July 21, 1997 to run the Rockland wastewater treatment plant. Sausé direct, 56.

99.  Thomson acknowledges that Sausé wrote the RFP, with some input from him. Thomson direct, day 1, 43.

100.  Thomson had never prepared an RFP before. He was new to the position. Nothing in his background prepared him for the task of preparing an RFP to operate a wastewater treatment plant. See Ex. 88.

101.  The contract under which PSG was operating had been the subject of a procurement in 1994. Ex. 3; Varjabedian direct, 17.

102.  An engineering firm, Tighe & Bond, had prepared the RFP used by the Town of Rockland in 1994. Varjabedian direct, 17.

103.  Sausé had never prepared an RFP before but he had seen many, so he had the skills and expertise to prepare such a document.   Sausé direct, 56-57. Also, he had written proposals to submit in response to an RFP. Sausé direct, 57.

104.  Thomson relied on Sausé 's expertise in the drafting of the RFP. Thomson direct, day 1, 95.

105.  Sausé wanted PSG to have its contract renewed. Sausé direct, 57.

106.  Sausé told Thomson to give him the lead in writing the RFP because Sausé wanted PSG to have an advantage in winning the job. Sausé direct, 57.

107.  Sausé's motivation in seeking to write the RFP was "[t]o win the job." Sausé direct, 57.

108.  Sausé was a salaried employee of PSG. Sausé direct, 57. He received no commission of any kind if he won a bid. Sausé direct, 57-58.

109.  Sausé and Thomson worked on the RFP at the wastewater treatment plant offices in Rockland and at PSG's corporate offices in Norwell. Thomson direct, day 1, 53.

110.  In writing the RFP for the 1997 procurement process, Sausé used as a core the RFP that had been prepared for the Town by the engineering firm Tighe & Bond in 1994.  Sausé direct, 59-60.  He also drew from a generic RFP that PSG's business development people had put together. Sausé direct, 58.

111.    In the Spring of 1997, Sausé talked with Thomson about the duration of the upcoming contract. Sausé direct, 49-50.

112.    Sausé told Thomson that he was interested in a longer term contract than the allowable three-year contract that was required under [Mass. Gen. Laws] 30B" the competitive bidding statute. Sausé direct, 50.

113.    In 1997, Sausé had an understanding based on work that he did, that there was three year limitation on contract duration, unless the governmental body approved a longer period. Sausé direct, 51-52.

114.    In advance of the RFP being issued, Sausé urged Thomson to seek Town Meeting approval for a long-term contract of ten years, with the option of a ten-year renewal. Sausé direct, 52.

115.    Sausé wanted a 10-year contract for PSG as opposed to a three-year contract "it was better for the company." Sausé, 52.  "[y]ou didn't have the risk of losing it every three years when it would go back out to bid….[T]o have a ten-year contract versus a three-year contract is clearly more advantageous to the company."  Sausé direct, 52.

116.    Sausé sold Thomson on the idea.  Thomson "wasn't looking forward to the bid to begin with, and so Sausé, capitalizing on that, said, "If we're going to do this, let's do it with the ten-year contract. When we're not going to be rebidding again in three years." Sausé direct, 52-53.

117.    As a result of Sausé's urgings, Thomson had an article put in at the Rockland Town Meeting, and the Town Meeting on May 19, 1007, authorized the Town to enter into a contract with a duration of 10 years. Ex. 117; Sausé direct, 53; Thomson direct, day 1, 37, 38.

## VI.    SAUSÉ'S EFFORT TO STIFLE COMPETITION BY REQUIRING A MINIMUM BID FOR LABOR, THE SINGLE LARGEST COST OF OPERATING THE PLANT

118.    In the RFP process for the operation of a sewage treatment plant, there are two parts of any bidder's proposal.  One part is the technical proposal – the part that  that proposes to the Town the technical aspects of the bidder's proposal.  The other part is the cost proposal – the economic side of the proposal. In the cost proposal, the bidder proposes the amount that the bidder will charge to perform the contract.

119.    To prevent competitors from outbidding PSG, Sausé thought of the idea of including a provision in the contract that would require all firms to bid a minimum of $400,000 for the labor component of the contract. Sausé direct, 70-71.

120.    Sausé had never seen such a provision in an RFP.  Sausé direct, 70-71.

121.  Usually, labor would be a line item that competitors would openly bid on. Sausé direct, 71.

122.  Labor was the largest single expenditure in operating the Rockland plant.  Kruger cross, Day 1, 37; Sausé direct, 112. See, e.g., PSG Cost Proposal in 1997, Ex. 239.

123.  Competitors could reduce the price of labor and undercut, in its bidding another competitor's proposed cost.  Sausé direct, 71.  A $400,000 minimum requirement for labor would give "assurance" that "the job was not going to be undercut on labor costs." Sausé direct, 71.

124.  Sausé was worried about competitors "submitting a lower labor bid," and that he "thought this would be a very good way to prevent that from happening." Sausé direct, 71.

125.  Sausé was concerned that competitors "wouldn't like" such a provision, so he decided to try a tactic to obtain clearance from the Inspector General's office to shield the provision from criticisms.   Sausé direct, 71, 72.

126.  Sausé told Thomson that the way "to make sure that this would fly and that the competition wouldn't have a problem with it would be to get the blessing of the Inspector General in advance." Sausé direct, 72.

127.  Sausé discussed the minimum labor bid idea with Thomson.  Thomson agreed. Sausé direct, 71-72.  Sausé told his boss, Steven Kruger about his idea before it was put into the RFP, Sausé told him he as worried about competitors and he thought it was a good was to prevent it from happening.  Sausé direct, 70, 71.

128.  In an attempt to immunize the provision from challenge, Sausé devised the idea of trying to come up with a way to obtain the Inspector General's approval in advance. Sausé direct, 71-73.

129.  Thomson had developed a relationship with people at the at the Inspector General's office, in particular a woman named Heidi Zimmerman.  Sausé direct, 73.  Sausé told Thomson, "you should talk to Heidi and get the Inspector General's office to buy off on the concept of having a fixed labor amount."  Sausé direct, 73.

130.  To facilitate the approval, Sausé drafted a letter in Thomson's name seeking clearance for the minimum labor bid. Sausé came up with a way to justify the need for the minimum labor bid. He claimed, in an attachment, the plant needed 10 workers. There is no dispute that the plant did not have 10 workers at the time of the RFP in July 1997, nor at any later time, up to and including the date that PSG was terminated was terminated as the operator. See, e.g., Ex. 155 (PSG submitted staffing plans to the state Department of Environmental Protection, showing fewer than 10 workers)..

131.  The letter was put on Sewer Commission stationery, Thomson signed it and it was sent off to the Inspector General's office. Sausé direct, 74-75; Ex. 542.  Thomson used the letter that had drafted to communicate with the Inspector General about the provision that Sausé wanted to include in the RFP.  Thomson direct, day 1, 48-49, 50; Compare Ex. 541 letter prepared by Michael Sausé with Ex. 542 letter faxed on letterhead to Inspector General's office with Thomson signature.

132.  Exhibit 541 is the letter that Sausé prepared to be sent to the Inspector General's office. Exhibit 542 is the text of the letter put on Sewer Commission stationery, with Thomson's signature, which was sent to the Inspector General's office. Thomson direct, day 1, 48-49, 50, 51.  The letter sent to the Inspector General's office is identical to the letter that Sausé prepared for Thomson's signature. Thomson direct, day 1, 51.

133.  Thomson followed up with a phone call to the Inspector General's office. Thomson direct, day 1, 52.

134.  Thomson did not tell the Inspector General's office that a PSG employee – that is, an employee of the incumbent plant operator who planned to bid on the contract in the upcoming RFP – had written the letter.  Thomson direct, day 1, 52.

135.  As a result of the phone call Thomson had with the Inspector General's office, Sausé and Thomson were both satisfied that they had some protection if the minimum bid requirement were questioned.   Sausé direct, 74-75.

136.  Thomson believed that what Sausé had written succeeded in convincing the Inspector General's office that the idea of the minimum labor bid was acceptable. Thomson direct, day 1, 52.

137.  Sausé was "very pleased" once he learned that the Inspector General's office thought that the $400,000 minimum labor amount was acceptable because "he "knew that that would give me an advantage in winning this job." Sausé direct, 76.

138.  Thomson acknowledges that the $400,000 minimum labor bid was Sausé's idea. Thomson direct, day 1, 44.

139.  Thomson acknowledges that Sausé expressed concern to him about the inclusion of the provision in the RFP, and he wanted to make sure it was "blessed".  Thomson direct, day 1, 44.  Thomson acknowledges that Sausé suggested to him that a person named Heidi Zimmerman from the Inspector General's office be contacted to see if the idea could be blessed. Thomson direct, day 1, 44.

140.  Sausé considered Woodard & Curran an "aggressive" competitor because it was a young company and he believed that because it was "trying to build their [its] client base," it would  "be inclined to take a job at a much lower profit margin than probably what PSG would have."  Sausé direct, 82.

141.  Sausé brought up to Thomson specifically Woodard & Curran in discussing his idea of a minimum labor bid. Thomson direct, day 1, 46.   Sausé made Thomson become concerned about losing a certain caliber of help, because he said that Woodard & Curran had in other situations brought in "less qualified help." Thomson direct, day 1, 46.

### VII.   PSG'S SAUSÉ INSERTED A MINIMUM EXPERIENCE PROVISION THAT HE KNEW WOULD EXCLUDE AN  AGGRESSIVE COMPETITOR

142.  Sausé also included a provision in the RFP that was a minimum experience requirement that he knew would exclude Woodard & Curran.  Sausé considered Woodard & Curran an "aggressive competitor" of PSG at the time, Woodard & Curran. Sausé direct, 85, 82.

143.  The language in the RFP that he included provided:

> "At minimum, contract operators shall demonstrate that they have provided successful contract operations at a minimum of five water pollution control facilities similar in size and complexity to the Rockland facility for at least *five years*."

 Sausé direct, 85, RFP, Ex. 500, at 7 (Emphasis added).

144.  Sausé was responsible for writing the language requiring a certain number of years' experience at certain types of plants. Thomson direct, day 1, 82.

145.  The 1994 RFP written by the engineering firm Tighe & Bond required only successful contract operations on water pollution control facilities similar in size and complexity for only a *three year* minimum. Ex. 3; Sausé direct, 86-87.

146.  There was no requirement in the 1994 RFP as to the even the number of facilities that a prospective bidder have experience with.  See 1994 RFP, Ex. 3.

147.   Sausé wanted the bidding qualifications in the 1997 RFP "toughened" from the 1994 RFP written by the engineering firm Tighe & Bond because he wanted "[t]o narrow the competition." Sausé direct, 88.

### VIII.   THE BELT FILTER PRESS REQUIREMENT ALSO STYMIED COMPETITION

148.  The major piece of equipment used at the Rockland wastewater plant for the dewatering of sludge was the belt filter press. It was the single largest piece of equipment at the plant.

149.  The belt filter press had been a requirement in the 1994 RFP. Ex. 3.

150.  The winning bidder had been required to supply it.  Ex. 3.

151.    PSG had leased the belt filter press that it was providing the under the 1994 contract, and the Town was paying for all the lease payments. Thomson direct, day 1,  2, 73.

152.    If the Town continued to require use of a belt filter press to operate the plant, PSG would have an advantage because it already had a belt filter press on site and under lease at the rates for the lease that it had entered a few years earlier when it won the 1994 bid.

153.    With Sausé influencing the RFP, and no independent consultant involved, there was no one to suggest or recommend to Thomson or the Commission that the Town consider alternate ways, potentially more economical, of operating the plant, and, in particular of dewatering the sludge.

154.    Thomson did think of, at least, trying to prevent PSG from having such an edge with its control of the belt filter press by trying to have the Town take over the belt filter press – since the Town was paying for it anyway – or having the Town buy it outright. Thomson direct, day 1; 71-74. The town was making all the payments on the belt filter press lease.  Thomson direct, day 1, 72-73

155.    While working on the RFP at PSG's Norwell office, Thomson had a discussion with Kruger about the belt filter press, which was the equipment used at the plant for sludge dewatering. Thomson talked to Kruger, Sausé's boss about having the Town take over the lease payments, or just buy the belt filter press outright so that the Town would own it. Thomson direct, day 1, 71-72.

156.    Thomson had a vivid memory of Kruger's office. His office had a fish tank, and books of various plants that PSG operated. He recalled Kruger's office as being fairly clean, in contrast to Sausé's, which he described as a "mess." Thomson direct, day 1, 62.

157.    Kruger refused Thomson. He said that the lease was under PSG's name, and if they lost the contract, PSG was going to pull out the belt filter press. Thomson direct, day 1, 72.

158.    Thomson said he argued with Kruger. He said he argued that the belt filter press was a huge piece of equipment "four stories high," and he told Kruger that a concrete wall would have to be ripped down, steel would have to be burned and a crane would have to be used to lift the belt filter press out. Thomson direct, day 1, 72. He argued to Kruger that it was not worth it to PSG. Thomson direct, day 1, 72.

159.    Thomson said Kruger warned him: "[I]f we don't get the contract, that's coming out the plant." Thomson direct, day 1, 72.

160.    Because Thomson could not arrange for the Town to take over the lease from PSG – even though the Town had actually been paying for the lease -- and could not arrange to buy the belt filter press directly, Thomson felt the RFP had to specify that any contractor bidding would have to provide a belt filter press.  Thomson direct, day 1, 73.

161.    The RFP drafted by Sausé required any proposal to include a belt filter press "equal to or better in quality, age and hours run" the belt filter press that PSG had leased and had at the plant. Ex. 500. This gave PSG a competitive advantage because it already had a contract for the equipment, it was already a few years into the lease, and it precluded bidders from coming up with alternative, potentially more cost-effective, proposals.

162.    The RFP also required, because of PSG's position, any prospective bidder to take on the additional burden of providing "interim sludge dewatering while the belt filter press installation [that it was required to provide] is being installed." RFP, Ex. 500 at 15.

163.    After PSG won the contract, PSG changed its position on whether the Town could buy the belt filter press on which the Town was making all the payments.  When its position as contractor was secure, PSG eventually allowed the  Town to buy the belt filter press that Kruger had told Thomson – before the PSG won the contract – PSG would <u>not</u> permit the Town to buy or take over the lease. Thomson direct, day 1 73.  The Town bought the belt filter press in 1999. Ex. 574 (bill of sale).

164.    John Sullivan, the forensic auditor hired by the Town to examine the procurement and the financial dealings with PSG, concluded that when the Town eventually was given the opportunity to buy the belt filter press, it paid more than fair market value. Sullivan direct, 48.

### IX.    THE RELEASE OF THE RFP

165.    When the RFP went out to bidders, Thomson realized that PSG had the "upper hand". Thomson direct, day 1, 84.

166.    Thomson did not tell any of the prospective bidders that Sausé had written the RFP. Thomson direct, day 1, 84.  He didn't tell them "[b]ecause he shouldn't have taken part in it." Thomson direct, day 1, 85.

167.    When he first started working on the RFP,  Thomson said he was getting Sausé's input because he needed input from PSG because of various information he needed to put into the RFP for prospective bidders.  Thomson direct, day 1, 85.

168.    But, the time it was finished, Thomson said, "it went amok." "It was crazy." Thomson direct, day 1, 85.

169.    At the time RFP went out, Thomson believed that Sausé had had so much input into the RFP that Thomson believed he had done "something wrong." Thomson direct, 85.  At the time the RFP went out, he knew that what he had done "in letting Michael Sausé participate in writing the RFP was unfair to prospective bidders." Thomson direct, day 1, 85.

170.    Thomson did not tell anyone what he had done. Thomson direct, day 1, 85.

171.    An RFP was made available to prospective bidders on July 21, 1997. Ex. 500.

172.    After the RFP was released, there was what is called a "pre-proposal briefing." Sausé direct, 78.

173.    The pre-proposal briefing is standard in connection with the release of RFPs. Sausé direct. 78. Its purpose is to bring all of the potential bidders together in a meeting where the incumbent operator and the Town could present some records that would be needed for the bidders to look at, to arrange tours of the plant. Sausé, 78. It was required that all bidders attend; a firm could not bid the job if it didn't send a representative. Sausé direct, 78.

174.    PSG was required to present information at the pre-proposal briefing because of its role as the incumbent operator. Sausé direct, 78.

175.    Thomson had never conducted a pre-proposal briefing before. Sausé direct, 79; Thomson direct, day 1, 83.

176.    Sausé gave Thomson advice in advance of the pre-proposal briefing. Sausé direct, 79; Thomson direct, day 1, 83.

177.    Sausé told Thomson to "come across" with "impartiality" and as if it was "an open playing field" and as if "this job was not sewn up for PSG." Sausé direct, 79.

178.    Sausé gave Thomson such advice even though, at the time, he admits, "I knew it was set up for PSG." Sausé direct, 79-80.

179.    Sausé and Varjabedian and attended the pre-proposal briefing in August, 1997 on behalf of PSG. Sausé direct, 80.

180.    After the pre-proposal briefing, Sausé also had behind-the-scenes involvement in, and influence, over the procurement process. He responded to all questions and letters that the competitors would submit by preparing the written responses and then having Thomson mail them out to all the prospective bidders. Sausé direct, 91.

181.    It was the requirement after the pre-proposal briefing that questions from prospective bidders should have been submitted to the Thomson, and Thomson should have prepared a written response and distributed the response to all prospective bidders so that all prospective bidders would be able to see the response. Sausé direct, 91.

182.    Thomson understood that there was a rule that every time a question was raised by a prospective bidder, he had to answer that in writing and provide all the other prospective bidders with the answer. Thomson direct, day1, 96-97; Sausé direct, 91.

183.    Sausé, however, a representative of one of the competitors, prepared the responses to the prospective bidders' questions and had Thomson mail them out. Sausé direct, 91.

184.    PSG, through Sausé, did not have to adhere to that rule. Thomson direct, day 1, 97.  If another prospective bidder contacted him with a question, Thomson did not give the prospective bidder a substantive answer, but said, "We have to give it you in writing." Thomson direct, 97.  Thomson only answered orally for PSG.  Thomson direct, day 1, 97.

185.    Thomson knew at the time that the other prospective bidders were not being treated fairly because of this access that PSG had to him. Thomson direct, day 1, 97-98.

186.    Sausé's involvement in preparing the answers to prospective bidders' questions was not disclosed to other bidders.  Sausé direct, day 1, 92.

187.    Sausé did not want any of the competitors to know that he was handling the answers. Sausé direct, 92. He knew they would have objected because it was not a proper role as a representative of a vendor that was going to be submitting a bid. Sausé direct, 93.

188.    Sausé prepared the addenda to the RFP that contained the answers to the bidders' questions "[t]o control the RFP process."  Sausé direct, 93.

189.    Sausé and Thomson wanted it to be controlled by Sausé "[t]o give PSG an advantage." Sausé direct, 93.

190.    When Sausé saw representatives of Woodard & Curran at the proposal briefing, including Jack Bonomo, he was not surprised. He expected them. Sausé direct, 94.

191.    Sausé told Thomson that Woodard & Curran would be the competitor that would "put out a strong effort to win this job, and they were the vendor of concern to me." Sausé direct, 95.

192.    Sausé believed "that they [Woodard & Curran} would come in with a significantly lower price. " Sausé direct, 95.

## X.    PSG'S SAUSÉ INFLUENCED THE ADDENDA TO THE RFP

193.    Following the pre-proposal briefing, Sausé prepared documents to be distributed to prospective bidders as an "Addenda" to the RFP. They reflected his views of how questions raised at the conference should be handled. Sausé direct, 91, 92. The documents were printed out on Sewer Commission stationery.  Thomson signed them and sent them in the name of the Sewer Commission to the prospective bidders. The first document was called "Addendum 1" to the RFP, since others were to follow. Ex. 526.

194.  Sausé had so much influence over Thomson's work as superintendent that he convinced Thomson to leave Sewer Commission stationery at PSG's Norwell office so that he could print out the addenda to the RFP easily.  Thomson direct, day 1, 87, 88.  Thomson quoted Sausé as saying: "Why don't you just leave some stationery here. I can use when I print them up, instead of you bringing another piece of paper every time we need one." Thomson direct, day 1, 87. Thomson agreed.

195.  Thomson said it got to the point where he pre-signed blank pieces of Sewer Commission stationery in the bottom right corner so that Sausé would have it available to print out documents in his name for the RFP process. It was Sausé's idea, and Thomson agreed. Thomson direct, day1, 86, 87, 88.

196.  By letter to Thomson  dated August 14, 1997, Woodard & Curran asked that be consideration to it even though the firm did not meet the minimum criteria that Sausé had included in the RFP. Ex. 615; Sausé direct 96-97.

197.  The minimum criteria that Woodard & Curran sought a waiver of was the requirement that any prospective bidder have a history of operating five facilities of equal complexity and size and five years of operating experience.   RFP, Ex. 500; Sausé direct, 97.

198.  Woodard & Curran said its senior management team had averaged more than 20 years of experience and had direct operations experience at the Rockland wastewater treatment plant. The letter said members of management were responsible for operations and maintenance of Rockland for the time of the plant's introduction until 1993, approximately 10 years. Ex. 615.

199.  Sausé gave the advice to Thomson that the requirement "not be relaxed." Sausé direct, 97. Thomson agreed. Sausé direct, 98.

200.  Sausé prepared another an "Addendum 2" for Thomson to sign, reflecting his view that the criteria would not be waived.   Ex. 527.  Addendum 2 to the RFP was printed out on Sewer Commission stationery, and distributed to prospective bidders in the name of the Rockland Sewer Commission on or about August 13, 1997. Sausé direct, Ex. 96.

201.  Sausé prepared another addendum to the RFP, "Addendum 3," addressing other issues raised by prospective bidders.   The response was printed out on Rockland Sewer Commission stationery and signed by Thomson. Thomson then sent the "Addendum 3" Sausé had prepared to prospective bidders in the name of the Rockland Sewer Commission or about August 25, 1997. Ex. 528.

202.  Sausé prepared another addendum to the RFP, "Addendum 4," addressing other issues raised by prospective bidders.   The response was printed out on Rockland Sewer Commission stationery and signed by Thomson. Thomson then sent the "Addendum 4" Sausé had prepared to prospective bidders in the name of the Rockland Sewer Commission or about September 10, 1997. Ex 529.

203. Sausé and Thomson decided that they did not want any more questions to answer, and they wanted to get on with the bidding process, so Sausé prepared an "Addendum 5" to the RFP dated September 25, 1997. That addendum announced that there would be no more questions.  The addendum was printed out on Sewer Commission stationery, Thomson signed it and distributed it to prospective bidders on or about September 25, 1997. Ex 530.

## XI. PROSPECTIVE COMPETITORS WERE DETERRED BY THE RFP, AND THE TOWN WAS DEPRIVED OF AT LEAST ONE ALTERNATIVE BID THAT WOULD HAVE LIKELY SAVED THE TOWN $250,000 ANNUALLY

204. In 1997, John Bonomo was a partner at Woodard & Curran, and responsible for the operations and maintenance of some of the firm's wastewater plants as well as business development in Massachusetts in Southern New England. Bonomo, 6.

205. John Bonomo has a bachelor's of science in chemistry from Clarkson University and a variety of technical courses in wastewater treatment. Bonomo, 5.

206. 1n 1997, at the time of the RFP, although Woodard & Curran had been in existence since 1983, the section of Woodard & Curran that operated wastewater treatment plants had been in existence for four-and-a-half years. Bonomo, 6.

207. Before joining Woodard & Curran, Bonomo had worked for Metcalf & Eddy Services for 12 years. Bonomo, 7.

208. He performed a variety of jobs at Metcalf & Eddy Services, and his last assignment was president. Bonomo, 7.

209. He had general responsibilities for the Rockland wastewater treatment plant while at Metcalf & Eddy, and relied on staff to operate the plant. Bonomo. 7.

210. In July 1997, Bonomo learned about the RFP being issued in connection with the operation of the Rockland wastewater treatment plant. Bonomo, 7. He was interested in the prospect of having Woodard & Curran win the bid and operate the plant. Bonomo, 8.

211. Bonomo led the team that pursued the possibility of winning the bid. Bonomo, 8.

212. Bonomo attended the pre-proposal briefing, Bonomo, 7, and visited the plant after the pre-proposal meeting. Bonomo, 8.

213. Bonomo was concerned about several aspects of the July 1997 RFP. Bonomo, 9. One of the chief aspects of the RFP that concerned Woodard & Curran was the requirement to include in any bid a specified minimum of $400,000.  Bonomo said: "That made it more difficult to come up with a price that would be lower than the incumbent operator

because the staffing and benefits represented approximately 50 percent of the operating cost of the plant, so it only left the remaining 50 percent to try to find economies." Bonomo, 8-9.

214. Another provision of the RFP that concerned Woodard & Curran was the provision that provided: At a minimum, contractor operators shall demonstrate that they have provided successful contract operations at a minimum of five water pollution control facilities similar in size and complexity to the Rockland facilities for at least five years. Bonomo, 10.

215. Woodard & Curran was concerned about that provision because, by the summer of 1997 when the RFP was issued, Woodard & Curran had only four-and-a-half years experience in the operation of water pollution control facilities. Bonomo, 11. Although Woodard & Curran had ample experience operating water pollution control facilities – it operated more than 20 facilities, and those facilities were similar in size and needs to Rockland's – the company was six months short of the experience that was the minimum in the RFP. Bonomo, 11.

216. In addition, the management team at Woodard & Curran was the same management team that had been at Metcalf & Eddy Services and who had successfully operated the Rockland plant since it was constructed in the early 1980s, and they were very familiar with the plant. Bonomo, 12.

217. Woodard & Curran wrote a letter to Thomson and asked the Rockland Sewer Commission to exercise its discretion to waive what he considered to be a "minor" variation of the RFP. Bonomo, 12.

218. By letter dated August 15, 1997, Woodard & Curran asked Thomson to change in the five year requirement, pointing out that the senior management ream averaged over 20 years experience and had direct operations experience in Rockland. Ex. 615. The letter pointed out that members of Woodard & Curran's management were responsible for operations and of Rockland from the time that the plant began operations until 1993, approximately 10 years. Ex. 615.

219. Woodard & Curran's request that the five year requirement be waived was rejected. Addendum 2, Ex. 527.

220. Nevertheless, Woodard & Curran still continued to be interested in the contract for the wastewater treatment because they believed they could offer Rockland a "very competitive and high quality solution "for the operation and maintenance of the plant. Bonomo, 13.

221. Bonomo developed a proposal that was an alterative to the use of the belt filter press and the minimum labor requirements that were contained in the RFP. Bonomo, 14-18.

Instead of the 10 personnel required in the RFP, Bonomo had calculated that Woodard & Curran would only need 7 employees. Bonomo, 16-17.

222.    The proposal that Woodard & Curran prepared to handle sludge at the Rockland plant and in effort to save the Town money was not a wild approach. In fact, it was virtually the same approach that an internal memo reveals PSG's plant manager, Aram Varjabedian was recommending <u>at the very same time</u> to save PSG money in its operations of the Rockland plant. Ex. 774; Bonomo 14-15. The approach that Woodard & Curran wanted to take relied on use of a sludge thickener instead of a belt filter press. Bonomo, 14-16. A sludge thickener is a piece of equipment which removes water from the sludge at the plant to make it more amenable to dispose of. Bonomo, 15. A sludge thickener leaves sludge less thick than a belt filter press, but the internal memo from Varjabedian reveals that Varjabedian was recommending that the belt filter press be *converted* to a sludge thickener, resulting in the same approach that Woodard & Curran wanted to take. Bonomo, 15, 16; Ex. 774. Varjabedian's memo recommending conversion of the belt filter press to a sludge thickener was dated September 4, 1997 – the very same time that Woodard & Curran was working on a potential proposal for the Town. Bonomo, 15; Ex. 774.

223.    Varjabedian acknowledged during his testimony at trial, that during the procurement process, Varjabedian was trying to think of ways to come up with a more economical way to operate the wastewater treatment plant. Varjabedian direct, 30-31. During a proposal process, Varjabedian said, "[Y]ou do a lot of brainstorming and trying to think of ways to run your facility." Varjabedian direct, 31. Varjabedian acknowledged that the brainstorming is done to look at ways to try to come up with economical ways, or the most economical way, to operate the plant. Varjabedian direct, 31. In September 1997, PSG was working on its proposal to submit to the Town in connection with the RFP that was issued in July 1997. PSG's proposal to the town in response to the RFP was not submitted until October 1997. Ex. 137, 239. In a memo dated September 4, 1997 that specifically referred to "cost savers" at the top, Varjabedian proposed to Sausé that PSG convert the belt filter press so that it would operate as a sludge thickener. Varjabedian direct, 31; Ex. 774.

224.    Woodard & Curran was so confident about its cost-savings approach that it was willing to commit to staff the plant at a higher level than seven employees – or whatever would meet the state Department of Environment approval at no additional cost to the town if the DEP did not accept its seven-person staffing.. Bonomo, 23, 24. At the time of the RFP, the DEP had approved a staff of eight, and the Woodard & Curran proposal called for eight persons initially with a transition to seven. Bonomo 51. Woodard & Curran was willing to take the risk that its staffing proposal would meet any issues with the state Department of Environmental Protection, and under the proposal was committed to staff the plant with additional employees if required under an existing consent decree without additional cost to the town. Bonomo, 22-23, 51

225.    Representatives of Woodard & Curran met with Thomson to discuss the viability of an alternative proposal and the benefits to the town. Bonomo, 22. Bonomo told Thomson that the benefits were lower costs and high quality.

226.    Woodard & Curran specifically sought to have the belt filter press removed as a requirement in the RFP so that it could propose alternatives.  Woodard & Curran requested the option to submit an "alternate" proposal that it believed would result, in savings, which was denied.  Ex. 529.

227.    The cost to the town that Woodard & Curran was prepared to bid if it had been able to submit its alternative proposal the town would have been a little less than $950,000 annually.  Bonomo, 17-18. That was approximately $250,000 less than the price charged the Town under the contract with PSG. Bonomo, 18.

228.    Bonomo estimated that the difference between what the Town paid PSG, and what Woodard & Curran would have charged using the alternative proposal would have been approximately $250,000 annually.  Bonomo, 19.

229.    If the Town had been interested in using an approach other than the belt filter press and other than the minimum labor bid, Woodard & Curran would have submitted its alternative proposal at the price that would have been approximately $250,000 less annually than what PSG charged.  Bonomo, 19, 23.

230.    In an addendum, Woodard & Curran was advised that the Sewer Commission was not interested.  Addendum 4, Ex. 529.

231.    In a letter to Thomson, dated September 22, 1997, Woodard & Curran informed the Town that it would not submit a bid, complaining that the RFP "seems to be heavily weighted in favor of your incumbent operator," PSG.  Ex. 182. Bonomo, 22.

232.    Another prospective bidder, American Anglian, also informed the Town by letter dated September 23, 1997 that it would not submit a proposal in response to the RFP, but would be interested "if the RFP is reissued in a form which allows us to be innovative in the operation of the plant." Ex. 131.

233.    At trial, Bonomo was able to rely on his contemporaneous notes from the time of the procurement because Woodard & Curran had kept his notes. Bonomo, 13.

## XII.    PSG WAS THE ONLY BIDDER, AND THE CHAIRMAN OF THE BOARD AND CEO OF PSG'S PARENT COMPANY THANKED SAUSÉ AND VARJABEDIAN FOR THE RESULTS

234.    Sausé worked on PSG's proposal in response to the very RFP that he had worked on with Thomson.  Sausé direct, 105,106, 107-108.

235. There were two parts to PSG's bid: the technical proposal and the price proposal. Ex. 137 (technical proposal); Ex. 239(price proposal).

236. Sausé and his boss Kruger agreed that he would take the lead along with a person from PSG's headquarters in Houston to prepare the proposal in response to the RFP. Sausé direct, 105.

237. Sausé had such a key role in the preparation of PSG's proposal that PSG submitted the proposal with a letter from him. See Ex. 543.

238. PSG submitted the proposals by letter dated October 3, 1997. Ex. 543; Ex. 239.

239. Because of the volume of work involved in working on PSG's proposal, and because of the work that Sausé did in preparing the addenda to the RFP for the Town, it is clear from the timing that Sausé was in the position of working on preparing addenda to the RFP that Thomson would be distributing to bidders (including to PSG) at the very same time that Sausé was working on PSG's proposal.

240. The last addendum that Sausé wrote for Thomson was dated September 25, 1997. Ex. 530.

241. PSG's voluminous technical proposal, and its price proposal, are dated only eight days later. Exs 543, 239.

242. Thomson knew even before the deadline for bids to be submitted that it was likely that no one else but PSG would be submitting. Thomson direct, day 1, 99.

243. At the time that PSG submitted the price proposal, Woodard & Curran, the competitor about whom Sausé was most concerned, had already informed Thomson that it would not be submitting a bid. Bonomo had told Thomson by telephone and followed up with a fax letter on September 23, 1997. Ex. 782

244. At the time that PSG submitted the price proposal, another prospective bidder American Anglian, had already notified Thomson that it would not be submitting a proposal. See letter dated September 23, 1997 (Ex. 131).

245. Kruger, Sausé's boss, was involved in the preparation of PSG's proposal in response to the RFP. Kruger approved the price proposal before it was submitted. Ex.724; Sausé direct, 110.

246. In submitting the price proposal, PSG deliberately – "for appearance" -- understated the amount of the contract price that amounted to profit. Sausé direct, 109; See Ex. 239.

247. Because there were so few attendees at the pre-proposal briefing, and a bidder had to attend the pre-proposal briefing in order to submit a bid, it evident by the time of the deadline for submitting bids that PSG had no meaningful competition.

248.    The Chairman of the Board and CEO of PSG's parent company at the time, Air & Water Technologies Corporation, expressed delight with PSG being the only bidder and winning the contract in Rockland. He wasted no time congratulating Sausé and Varjabedian. In a letter to Sausé dated Oct. 9, 1997, he wrote:

> You and Aram are due a full round of applause for your successful efforts in winning the en-year contract renewal at Rockland. Understand that this represents a contract value of $9 million over the full term, and it's a great piece of work.

> My congratulations and best wishes to both of you for your continued success. Ex.505.

### XIII.    PSG MADE A FALSE REPRESENTATION IN THE NON-COLLUSION AFFIDAVIT SUBMITTED TO THE TOWN IN CONNECTION WITH PSG'S BID

249.    At the time PSG submitted its technical proposal to the Town, it included within it a "certificate of non-collusion." Ex. 545.

250.    Sausé worked on preparing the proposal that PSG submitted to the Town in response to the July 1997 RFP he had drafted for the Town.

251.    In the certificate of non-collusion, a representative of PSG certified under penalties of perjury that PSG has "directly or indirectly entered into any agreement, participated in any collusion, or otherwise taken any action in restraint of free competitive bidding in connection with this proposal." Ex. 545.

252.    Sausé believed that the representation by PSG's representative that PSG had not "participated in any collusion" was untrue at the time it was submitted to the Town October of 1997. Sausé direct, 115.

253.    Sausé believed that the representation by PSG's representative in the proposal that no action had been taken in restraint of free competitive bidding in connection that proposal was untrue. Sausé believed that there had been such action taken. Sausé direct, 116.

254.    Sausé believed that the fact he prepared the RFP to favor PSG had restrained free competitive bidding in connection with the procurement process. Sausé direct, 116.

255.    Sausé believed that the fact that he wrote the RFP with Thomson amounted to collusion. Sausé direct, 116.

256.    PSG's representation to the Town in the Affidavit that no collusion had taken place and that PSG had engaged in no activity that restrained free competitive bidding was unfair

and deceptive because it was either intentionally false, or made with reckless disregard of its truth or falsity. Based on the facts recited thus far, and those in Section XVII infra, it is a fair conclusion that PSG *had* engaged in collusion and *had* engaged in activity that restrained free competitive bidding in the procurement.

### XIV.   PSG RECEIVED THE CONTRACT BECAUSE THE TOWN WAS DECEIVED INTO BELIEVING THAT THE PROCUREMENT PROCESS HAD BEEN FAIR

257.   The sole bid in response to the RFP was submitted by PSG, and it was submitted to the Town Administrator, Kevin Donovan, who in that role was the Town's chief procurement officer at the time. Testimony of former Town Administrator Kevin Donovan; Hyland direct, 16.

258.   Kevin Donovan was the Town Administrator at the time. He testified that if he had known of PSG's involvement in writing the RFP, and its influence during the procurement, he would have thrown out its bid and had a new procurement conducted. Donovan testimony.

259.   The Town had an outside lawyer, Anne Marie Hyland of Kopelman and Paige, who worked on certain of the wording of the contract with PSG's representative, Sausé, following the bidding in which PSG emerged as the only bidder. Hyland direct, 10-11.

260.   Hyland performed legal work for the Town on an as-needed basis.  Hyland direct, 6-7.

261.    After the PSG was determined to be the only bidder, Hyland's role was to negotiate with Sausé over some language in the contract with PSG and "approve it as to form." Hyland direct, 15-16. By "form" is meant that it conforms to certain technical requirements. Hyland direct, 15-16.

262.   If Hyland had believed that there had been collusion on the part of any employee of PSG and Thomson, the superintendent, in the conducting of the procurement process, she "would have immediately contacted the Town Administrator, who is the chief procurement officer for the town, and advised him of it because that would be a clear violation of Chapter 30B [the procurement statute]." Hyland direct, 16.

263.   If Hyland, the Town's counsel, had known that an employee of PSG had prepared the RFP, Hyland testified, she would have advised the Town "to have canceled the procurement."  Hyland direct, 16.

### XV.   THE TOWN INCURRED THE COSTS OF A FORENSIC AUDIT, AND THE CONDUCTING OF A NEW PROCUREMENT BECAUSE OF PSG'S UNFAIR AN DECEPTIVE CONDUCT

264.   Thomson's depositing of checks issued by PSG into his own personal bank surfaced in late May 2002.

265.    As a result of the information about the PSG checks that had surfaced, the Board of Selectmen hired a forensic accountant to look into the Sewer Department and its financial dealings with PSG.  The Town hired John Sullivan. Ex. 716; Testimony of Lawrence Chaffee, selectman.

266.    Sullivan began his investigation in October 2002 and completed it with a reported dated February 25, 2004.  Sullivan direct, 9; Ex. 716. At the time Sullivan started his investigation, he knew that Thomson had been charged with taking money.  Sullivan direct, 9.

267.    The forensic audit cost the town $36,250. Sullivan direct, 48.

268.    By letter dated January 30, 2004, the Inspector General's office recommended to the Town that the contract with PSG be terminated and that a new procurement process be conducted.  The Inspector General wrote that it is "sound public policy and fiscally prudent to exercise your legal rights to abandon a contract you have determined as tainted by scandalous activity, poorly serves the financial interests of your community and is given rise to an appearance of misfeasance in the use of public funds". Ex. 627.

269.    The Inspector General's office further wrote: "It is the expectation and recommendation of this office that, consistent with the opinion of your counsel and the advice of your forensic auditor, you will now act to establish a new contract for sewer operations services that is properly procured, consistent with the best interest of your citizens, and untainted by its association with allegation to criminal wrong doing that have engulfed the relationship between Rockland and US Filter."Ex. 627.

270.    As a result of the Inspector General's recommendation, and what the forensic accountant had reported to it, the Town had no choice but to terminate the contract with PSG, which it did by letter dated April 9, 2004. Ex. 192.

271.    An engineering firm, Camp Dresser & McKee, was hired to conduct a new procurement in place of the 1997 procurement. The new procurement cost the town $80,000. Testimony of Eric Hart, Town Accountant.

### XVI.    TESTIMONY FROM AN EXPERT BUTTRESSES THE FINDING THAT THE RFP INFLUENCED AND STEERED BY PSG'S SAUSÉ WAS ANTICOMPETITIVE

272.    John Sullivan is a forensic accountant who has was hired by the Town to investigate the RFP process and expenditures connected to PSG's contract with the Town. Sullivan direct, 4-5.

273.    Sullivan is an accountant who primarily services cities and towns. Sullivan direct, 5.

274.   Sullivan has extensive experience lecturing about the procurement process and Massachusetts General Laws Chapter 30B, the competitive bidding statute. Sullivan direct, 7-8.

275.   After his investigation, Sullivan concluded that the RFP was flawed and the process was flawed. Sullivan direct, 39.

276.   He believed that the RFP was structured "to suppress competition." Sullivan direct, 39. He concluded that the way the RFP was structured made it difficult for any firm other than PSG to submit a competitive proposal. Sullivan direct, 40.

277.   Sullivan opined that the minimum labor bid requirement was one of the provisions that made it difficult for any firm to submit a proposal that would compete with PSG. Sullivan direct, 40.

278.   Sullivan pointed out that the minimum labor requirement called for $400,000 and 10 employees, even though the operations had never had 10 employees, and even after that time, had not had 10 employees. Sullivan direct, 40.  Sullivan said that he found that sometimes nine employees staffed the plant, but "most normally eight employees." Sullivan direct, 40.

279.   As a result, Sullivan concluded that what the minimum labor bid requirement did was to "inflate the amount of money that was being allocated for salaries, but yet not allowing firms to compete." Sullivan direct, 40.

280.   Sullivan viewed the belt filter press requirement as another anticompetitive provision. Sullivan direct, 39-40.Sullivan was concerned that by the RFP requiring a belt filter press of similar specification and age as the one that was currently being provided by PSG be provided by any firm that sought to submit a bid, the Town had not explored alternatives may be available. Sullivan direct, 46, 47. He considered the belt filter press requirement as restrictive." Sullivan direct, 46.


### XVII.  SAUSÉ WAS NOT A "ROGUE EMPLOYEE" WORKING TO INFLUENCE THE RFP; THE EVIDENCE LEADS TO THE CONCLUSION THAT PSG HAD KNOWLEDGE  OF SAUSÉ'S INVOLVEMENT IN THE RFP AND THE PROCUREMENT PROCESS


#### A.    Sausé And Thomson Worked On The RFP And The Addenda In PSG'S Small Norwell Office, In Plain Sight of PSG Employees And In Communication With PSG Employees

281.   During May, June and July 1997, Sausé was working on the RFP regularly.  The RFP was extremely important to the company. Rockland was a longtime client and PSG wanted to keep Rockland as a client. Sausé direct, 63.

282.    Sausé worked on preparing the RFP on his laptop computer, "primarily" in the Norwell office of PSG, "oftentimes" at the Rockland Sewer Commission conference room, and "quite even possibly" at his office in his condo on Sleeper Street in Boston. Sausé direct, 60-61.

283.    Thomson spent an estimated 40 to 50 hours at PSG's Norwell office working on the RFP with Sausé before the RFP was issued. Thomson direct, 56. Thomson was at PSG's offices an estimated 12 to 15 days, and in some cases on more than one occasion during the same day, while working on the RFP with Sausé. Thomson direct, day1, 56.

284.    When he was at the PSG office while working on the RFP, he would see everyone who worked there, specifically, Kruger, Sausé's supervisor and a PSG vice president; Cindy Solomon, the business manager; Frank Cavaleri, another area manager; and the receptionist, Susan Keenan. Thomson direct, day 1, 57.

285.    Thomson saw Kruger eight to ten times at PSG's offices while working on the RFP. Thomson direct, 57. Although Cindy Solomon "stayed in her office lot," she came out once in a while and he saw her four or five or five times at PSG's offices while working on the RFP with Sausé. Thomson direct, day 1, 57.  He saw Susan Keenan, the receptionist, every day that he went to PSG's offices to work on the RFP.  Thomson direct, day 1, 57. He saw Cavalieri approximately three times at PSG's offices while working on the RFP with Sausé. Thomson direct, day 1, 57.

286.    While working on the RFP at the Norwell office of PSG, Thomson and Sausé would go out and grab a sandwich around the corner, but at other times, others in the PSG office would go to a Chinese restaurant called Beijing House around the corner from the office. Thomson direct, day 1, 59.

287.    Thomson would work on the RFP with Sausé in Sausé's office at PSG's offices in Norwell. The door to Sausé's office was kept open.  Thomson direct, 61. Sometimes they would call back to the plant to ask Aram Varjabedian for information to include. Thomson direct, 60. On other occasions, they needed technical help from Cavalieri. Thomson direct, 60. He and Sausé talked to Kruger "often" about some of the issues in the RFP. Thomson direct, day 1, 60.

288.    PSG's Norwell office was a small office. See Ex. 862. Sausé direct, 48.

289.    Sausé would print out drafts of the RFP in PSG's Norwell office. Sausé, 61-62.

290.    Sausé printed out the documents, including the addenda, by using a common printer in the PSG office that shared by the entire office. He would print the document out by using the "print" command on his laptop computer and then going into the common area and picking up the document from the printer. Sausé direct, 100.

291.    Sausé would work on the RFP in his office at PSG in Norwell, sitting at his desk. Sausé direct, 63. Typically, he would be there daily. Sausé direct, 63.

292.    Sausé could type. Sausé direct, 60.  Thomason could not type. Thomson direct, day 1, 40.

293.    Sausé considered it "common knowledge" at PSG's Norwell office that he was working on the RFP.  Sausé direct, 69. Sausé made no attempt to conceal from anyone at PSG that he was working on the RFP.  Sausé direct, 67.

294.    When Sausé was working on the RFP at PSG's Norwell office, Kruger, Sausé's supervisor, was "frequently" around.  Sausé direct, 67. PSG's office business manager, Cindy Solomon, was also "frequently" in the office when Sausé was working on the RFP in PSG's Norwell office. Solomon was there on a "daily" basis. Sausé direct, 68.

295.    There were many drafts of the RFP. Thomson direct, day 1, 79.

296.    Sausé would print out a draft from his computer and they would make a few copies so they could go over it and pencil in on the side remarks and changes or questions. Thomson direct, day 1, 79-80. The drafts would typically be printed out at PSG's Norwell office. Thomson direct, day 1, 80.

297.    Sausé and Thomson brought Kruger drafts of the RFP "a couple of times" at PSG's Norwell office. Thomson direct, day 1, 80.

298.    Exhibit 501, which bears a date of June, 1997, is an example of a draft of the 1997 RFP. Thomson direct, day 1, 81. Most of the handwriting on the draft is Thomson's. Thomson direct, day 1, 81.

299.    According to the layout of PSG's Norwell office, the office was so small, and there were so few people working there,  that PSG employees must have been aware that Sausé  and Thomson working there on the RFP, printing out drafts of the RFP and must have seen Sausé  working on the addenda and printing out addenda to the RFP. Ex. 862.

>    **B.    PSG'S Plant Manager Varjabedian Was Involved In The Preparation Of The RFP And Witnessed Sausé And Thomson Working On It At The Plant Offices**

300.    Aram Varjabedian worked for Metcalf & Eddy Services, and then PSG. Varjabedian direct, 4-5.

301.    Varjabedian started working as project manager of the Rockland plant in 1983. Varjabedian direct, 4.

302.    Varjabedian became an employee of PSG in August 1994. Varjabedian direct, 4-5.

303.    Varjabedian primarily worked in his office at the Rockland wastewater treatment plant, or somewhere in the plant.  Varjabedian direct, 7-8.

304.    Varjabedian knew that an engineering firm had prepared the RFP for the Town in 1994. Varjabedian direct, 17.

305.    Varjabedian knew that no engineering firm had been hired to prepare the RFP in 1997. Varjabedian direct, 17.

306.    He claimed at trial that he believed Thomson wrote the RFP. "I still think Gregory Thomson wrote the proposal." Varjabedian direct, 18. Varjabedian, however, was forced to acknowledge that he could not give a single example in the years that he worked the plant while Thomson was a commissioner (beginning in 1994) until Thomson's departure in 2002 in which he saw Thomson type a single sentence even though their offices were close. Varjabedian direct,  19. Varjabedian admitted that he typed many letters for Thomson to sign. Varjabedian direct, 19.

307.    Varjabedian admitted that Sausé working on the RFP would be improper. Varjabedian direct, 26. He would consider it improper because it's supposed to be a document that is issued by the town and prepared by the town. Varjabedian direct, 25-26.

308.    Varjabedian acknowledged that that Thomson asked him for information to put into the RFP. Varjabedian direct, 24-25.

309.    Sausé testified he kept Varjabedian, PSG's plant manager, "apprised of what I was doing" when he was working on the RFP. Sausé direct, 66. Sausé kept Varjabedian apprised because "it was important to him. He [Varjabedian] was the plant manager … he had a very vested interest in seeing that the job was renewed." Sausé direct, 66.

310.    Sausé told Varjabedian he was working on the RFP. Sausé direct, 67.

311.    Sausé asked Varjabedian for various technical information that had to be included in the RFP, and Varjabedian would supply by bringing the information into the conference room where Sausé was working at the Sewer Commission office.  Sausé direct, 67.

312.    Sausé also worked on the RFP in the conference room at the Sewer plant offices. Sausé direct, 64.

313.    PSG's plant manager Varjabedian was in the conference room at the Sewer Commission offices from time to time when he was working on the RFP. Sausé direct, 65.

314.    Thomson and Sausé talked to Aram Varjabedian "a lot" about the RFP during its preparation. Thomson direct, 79.

315.    The offices at the plant were so small, based on the layout, and Varjabedian's office so close to the conference room, that Varjabedian must have seen Thomson and Sausé working on the RFP and seen drafts of the RFP. Ex. 863.

> ### C.    Kruger, Who Was Sausé's Supervisor and A PSG Regional Vice President, Admits He Knew Before The RFP Was Issued That Sausé Was Planning To Prepare The RFP With Thomson, And That They Were Attending The Inspector General's Seminar To "Make Sure They Did Everything Right"

316.    In 1997, Kruger was Sausé's supervisor, and a Vice President of Client Services of PSG covering the region that included New England and elsewhere in the Northeast. See Kruger Direct, 16-17, 23; PSG Proposal, 3-1.

317.    Even before Sausé started working on the RFP, Sausé's supervisor, Kruger, knew that Sausé was planning on working with Thomson to prepare the RFP. Kruger, cross, Day 1, 32. Kruger admitted that he knew that Sausé and Thomson were going to a course on procurement sponsored by the Inspector General "so that *they* would understand the process and make sure *they* did everything right."  Kruger cross, Day 1, 32.  Kruger testified:

> "Michael explained to me that they were taking a course on 30b [sic] procurement so that they would make – so that they would understand the process and make sure that they did everything right."

> Kruger Cross, Day 1, 32.

> QUESTION:  Michael Sausé told you in advance of going to a seminar at the Inspector General's office that Greg Thomson and he were taking a course so they'd make sure they were doing it all right; it that right?

> KRUGER: Yes.
>  *   *   *
> Q. And did you know that Michael Sausé and Greg Thomson *did* go to this two-day seminar sponsored by the Inspector General about how procurements are to be prepared?

> Kruger: Yes.

> Kruger, Cross, Day 1, 32. Emphasis added

318.    Kruger admitted that, when Sausé told him that he and Thomson were   going   to   the seminar "to make sure they were doing it right," he understood that they were referring to preparing the RFP:

QUESTION:  Now, when Michael Sausé told you that he and Greg Thomson were going to the Inspector General's office to make sure they were doing it right, didn't you understand it to mean that were talking about preparing the RFP?

KRUGER: Yes.

Kruger Cross, Day 1, 33.

> **D.    Kruger, Who Was Sausé's Supervisor and A PSG Regional Vice President, Admits He Discussed With Sausé – Before The RFP Was Issued – Sausé's Idea Of Including A Minimum Labor Cost Requirement In The RFP**

319.    Sausé had a discussion with Kruger about a provision in the RFP that he wanted to include that would require all bidders to submit a minimum dollar figure for labor of $400,000. Sausé direct, 69-71.

320.    Sausé had never seen such a provision in an RFP. Sausé direct, 70-71.

321.    Usually, labor would be a line item that competitors would openly bid on. Sausé direct, 71.

322.    Labor, for example, was the largest single expenditure in operating the Rockland plant. Kruger cross, Day 1, 37.

323.    Competitors could reduce the price of labor and undercut, in its bidding another competitor's proposed cost.  Sausé direct, 71.  A $400,000 minimum requirement for labor would give "assurance" that "the job was not going to be undercut on labor costs." Sausé direct, 71.

324.    Sausé told Kruger he was worried about competitors "submitting a lower labor bid," and that he, Sausé, "thought this would be a very good way to prevent that from happening." Sausé direct, 71.

325.    Kruger admitted at trial that Sausé discussed with him language to be included in the RFP, before the RFP was issued. Kruger cross, Day 1, 34-35.

326.    Kruger admitted that Sausé discussed with him, in advance of the RFP being issued, Sausé's idea of "putting a minimum labor amount in the costs section of the RFP." Kruger cross, day 1, 34-35, 36. .

327.    Sausé testified that Kruger told him that he "thought it was a good idea." Sausé direct, 71.

> **E.** **Kruger, Who Was Sausé's Supervisor And A PSG Regional Vice President, Admitted That He Knew Before The RFP Was Issued That The Inspector General Had Signed Off On The Idea Of A Minimum Labor Requirement In The RFP**

328.    Sausé discussed the minimum labor bid requirement bid idea with Thomson. Thomson agreed.

329.    Sausé was concerned that competitors would be disgruntled if they saw a minimum labor bid requirement if he included it in the RFP. Sausé direct, 71-72.

330.    In an attempt to protect such a provision from challenge, Sausé devised the idea of trying to come up with a way to obtain clearance from the Inspector General's office for such a provision. Sausé direct, 71-72.

331.    Sausé drafted a letter in Thomson's name seeking clearance for the minimum labor bid, and purporting to justify the need for such a minimum bid requirement. Sausé direct, 72-73; Ex. 541.

332.    The letter was put on Sewer Commission stationery, Thomson signed it and it was sent off to the Inspector General's office. Thomson used the letter that Sausé had drafted to communicate with the Inspector General about the provision that Sausé wanted to include in the RFP. Thomson direct, day 1; 50-52. Exs. 542,541.

333.    Thomson followed up with a phone call to the Inspector General's office. As a result of the phone call Thomson had with the Inspector General's office, Sausé and Thomson were both satisfied that they had some protection if the minimum bid requirement were questioned. Thomson direct, day 1; 50-53.

334.    Sausé testified that he informed Kruger once he learned that the Inspector General's office had given "its blessing" to the concept. Sausé direct, 76.

335.    Kruger "thinks" Sausé told him, even before the Inspector General had approved the concept, that he Sausé was *attempting* to arrange for the Inspector General's office to sign off on the idea of the minimum labor bid requirement. Kruger cross, day 1.

336.    Kruger admitted that he *knew* before the RFP was issued that the Inspector General had approved the concept of the minimum labor requirement for inclusion in the RFP. Kruger cross, day 1, 37.

**F.**  **Kruger, Who Was Sausé's Supervisor And A PSG Regional Vice President, Admits That He Knew Before Other Bidders That The RFP *Would In Fact* Contain A Minimum Bid Requirement For Labor**

337.  Kruger admitted at trial that he learned before other bidders that a minimum labor bid requirement was going to be included in the RFP.  Kruger cross, Day 1, 37.

**G.**  **PSG Wanted To Be The Only Bidder In Competitive Bidding Processes Or To Avoid Competitive Bidding Altogether To Secure A Contract**

338.  PSG wanted to be the only bidder in competitive bidding situations. For example, Kruger unabashedly praised Sausé's role in making PSG the sole bidder in a procurement process in Southbridge, Massachusetts, and credited his ability to develop "client relationships." Kruger wrote on Sausé's personnel evaluation for 1998:

> "Mike excels in developing client relationships.  **Was a key to being the only bidder in Southbridge.**

Kruger cross, day 2, 27; Ex. 585. (Emphasis added).

339.  PSG considered a "good thing" that Sausé was a key to having PSG being the only bidder in Southbridge. Kruger cross, day 2, 28.

340.  PSG also hoped while Sausé worked for PSG that Sausé would be able to achieve PSG obtaining a contract in Fall River without competitive bidding.  PSG was the incumbent operator of Fall River's plant in 1998, and Kruger was hopeful that Sausé would be able to use his skills with client relationship to prevent the contract from going out to bid. Kruger was so pleased about the prospect that Sausé might have been able to able to avoid competitive bidding for PSG that he put "WON'T HIT THE STREET' in bold letters in Sausé's evaluation, referring to the prospect that Fall River would not put the contract out to bid but would simply, if Sausé was successful, renew PSG's contract. Kruger cross, day 2, 29-30; Ex. 585.

**H.**  **Sausé's Ability To Position Himself To Work On The 1997 RFP And To Influence The Procurement To Help PSG Win Was Consistent With The Political Skill And Ability To Develop Client Relationships For Which He Was Known, And For His Willingness To Look Out For His Employer's Interests.**

341.  PSG's evaluation of Sausé for the year 1994 was that he exceeded expectations. Ex. 577.

342.  One of the reasons that Sausé was deemed by his supervisor to exceed expectations in terms of performance was in the area of "client satisfaction". Ex. 577.

343.  The year 1994 was the year that Metcalf & Eddy Services had been awarded a contract, a three-year contract with Rockland.  Kruger, Cross, day 2, 20. Sausé's supervisor at the time wrote that the Rockland renewal was a good example of client satisfaction.   Ex. 577; Kruger cross, day 2, 20.

344.  Sausé was evaluated in 1994 as being "very strong with clients", and praised as "manages proposals well." Ex. 577; Kruger cross, day 2, 21. The word "proposals" refers to "proposals" to get business. Id.

345.  Kruger knew when he became Sausé's supervisor that his ability to deal with clients was strong. Kruger cross, day 2, 21.

346.  For the year 1995, Sausé also received a high evaluation, "exceeding expectations." Ex. 578. In the area of business development, his performance was so highly rated that he received nearly a 95% rating out of 100 percent.  Ex. 578; Kruger cross, day 2, 21,-22.

347.  In 1995, he was praised as being "very effective in meeting his client's [sic] needs" and has having "an excellent relationship with all, including the politicians." Ex. 578; Kruger cross, day 2, 22 (emphasis added).

348.  Kruger knew when he became Sausé's supervisor that Sausé was known for being able to get along with the political types in the towns that he was servicing.  Kruger cross, day 2, 23.

349.  Kruger, at the end of 1996, praised Sausé as for his performance in 1996 as "excellent at developing client relationship." Kruger cross, day 2, 23; Ex. 582.

350.  Kruger assessed Sausé, in his evaluation in 1996, as "always ready to help," Ex. 582, Kruger cross, Day 2, 24, and he considered Sausé always reading to help in 1997 and 1998 as well. Kruger Cross, day 2, 24.

351.  Kruger praised Sausé in his evaluation for 1996 as "very good with the political side." Kruger cross, day 2, 25; ex. 582.

352.  In 1998, the year that PSG signed its contract with Rockland after the 1997 procurement process, Kruger rated Sausé overall as "proficient," which meant, in terms of PSG's evaluation process that his "performance generally exceeds most of the requirements of the position." Kruger cross, day 2, 27; Ex. 585.

353.  In 2001, once again, Sausé was recognized for having strong and effective client relationships. Ex. 585. In his 2001 personnel evaluation, Sausé's supervisor recognized that he had done such an effective job with client relations in Poughkeepsie that "The

project is now used as a reference for our services under difficult circumstances." Ex. 585; Kruger cross, day 2, 32.

354.    PSG, which by 2001 operated as US Filter, continued to view Sausé as "a team individual that looks out for all U.S. Filter interests." Ex. 585; Kruger cross, day 2, 32. Kruger agreed with that assessment. Id.

355.    Kruger also described Sausé as follows: "Never refused a mission." Ex. 585, at 2.

356.    Kruger also noted that Sausé "works successfully at developing client relationships….Has renewed two projects into twenty year long term deals." Ex. 585, at 4. Kruger wrote: "coordinates very well on business development issues." Ex. 585 at 3.

357.    Sausé, Kruger said in an evaluation of him, "has a great talent for gaining client's trust." Ex. 600.

358.    Kruger observed in 2003: "All his clients and project managers respect and want him, we confirmed that when Mike took a leave from the company." Ex. 600. He commented that for 2003, "Mike's area exceeded plans financially." Ex. 600.

359.    In commenting on Sausé's willingness to help the company, Kruger said: "He never refuses an assignment [,] often volunteering." Ex. 600.

360.    Sausé was an employee known for looking out for his employer's interests and trying to advance those interests.

> I.    **PSG'S BEHAVIOR IN NOT MAKING RECORDS AVAILABLE TO THE FORENSIC AUDITOR, AND IN PREVENTING THE FORENSIC AUDITOR FROM QUESTIONING THE PLANT MANAGER, ARAM VARJABEDIAN, WHOM THE FORENSIC AUDITOR CONSIDERED A KEY WITNESS, IS EVIDENCE THAT PSG BELIEVED IT HAD SOMETHING TO HIDE**

361.    John Sullivan was the forensic auditor who was hired by the Town to investigate financial dealings by PSG in connection with the Town. Sullivan direct.; Testimony of Lawrence Chaffee, Selectman.

362.    Sullivan specifically asked the in-house lawyer at PSG, Rob Arendell, for various information. Sullivan direct, 12.

363.    Sullivan started his forensic investigation in October 2002. Sullivan direct, 9. He did not issue a final report until early 2004. Sullivan direct, 31.

364.    The contract that was signed as a result of the 1997 RFP took effect on March 1, 1998. 2002. Ex. 160. 1998. The finances of the contract were maintained by  PSG on a contract year basis, that is,  March 1 through February 28.

365.  Year 4 of the 1998 contract ended on February 28, 2002. Sullivan direct, 30.

366.  Year 4 ended months before Sullivan even started his forensic investigation. Sullivan direct, 30.

367.  Although Year 4 ended months before Sullivan even started his forensic investigation, and even though Sullivan did not produce his final report until 2004, PSG did not provide any records of any kind relating to transactions that had occurred in the rebate accounts – the specific accounts for capital improvements, repair and maintenance, etc. – until late in Sullivan's investigation.  Sullivan direct, 30. And, at that late date, all PSG provided was a "computer printout of transactions." Sullivan direct, 30.

368.  PSG never provided Sullivan with the "backup documentation" for the transactions that had occurred in the rebate accounts for Year 4 of the contract, that is, the contract year ending February 28, 2002. Sullivan direct, 30-31.

369.  Year 5 of the contract was March 1, 2002 through February 28, 2003. Sullivan direct, 31.

370.  Sullivan tried to obtain from PSG's in-house attorney, Arendell, records relating to the transactions in the capital account and other rebate accounts for Year 5 of the contract. Sullivan direct, 31.

371.  Year 5 of the contract – the year ending March 1, 2003 – was over almost a year before Sullivan completed his forensic report to the Town, dated in February 25, 2004. Sullivan direct, 31.

372.  PSG did not provide to Sullivan records of any kind relating to transactions in the rebate accounts, such as capital, etc., for Year 5 ending March 1, 2003.

373.  PSG's conduct in failing to provide records documenting expenditures out of the accounts is significant because, in its proposal to the Town in response to the July 1997 RFP, PSG made a point of stating that "Detailed breakdowns of all repair and maintenance expenditures will be provided." Ex. 543 at 4-2.  PSG's failure to provide the Town's forensic accountant with the information when pointedly asked leads to the to the conclusion that PSG did not want the forensic accountant to see the records because their content would be harmful to PSG.  It shows consciousness of liability.

374.  At the time Sullivan began his investigation, Thomson had been charged in connection with theft of funds resulting from the issuance of checks by PSG, so Sullivan knew that Thomson had been involved in receiving Town funds from PSG.  Sullivan direct, 10.

375.  The employee at PSG who Sullivan was "absolutely" interested in interviewing was Aram Varjabedian, who was the plant manager.  Sullivan direct, 20-21.

376. Varjabedian's name appears on paperwork associated with the issuance of the bulk of the checks issued by PSG that include "Gregory Thomson, Superintendent" as a payee. He had a pivotal role in the issuance of checks at issue. See infra Section XVIII.

377. Sullivan made the initial request to PSG to interview Varjabedian in early 2003. Sullivan direct, 21. Varjabedian had been plant manager in Rockland since 1988. See Ex. 543, PSG proposal (bio at 3-2). Varjabedian was the plant manager all during Sullivan's investigation. Sullivan direct, 21.

378. Sullivan asked PSG's attorney Arendell to interview Varjabedian. Sullivan direct, 22.

379. Sullivan considered it important for him to interview Varjabedian. Sullivan direct, 22.

380. As project manager, Varjabedian was in charge of day-to-day operations of the wastewater treatment plant, interaction with the Sewer Commission, budgeting, preparation of monthly reports. Varjabedian direct, 5-6.

381. Each month, Varjabedian received financial reports from PSG's headquarters in Houston about how the plant was performing financially and he would review those reports and make any adjustments that he believed were appropriate. Varjabedian direct, 6. As part of his job, Varjabedian prepared budgets each year for the plant. Varjabedian direct, 6. Thus, Varjabedian was in a position to have considerable information about the plant's finances.

382. Sullivan did not issue his final report until 2004. Sullivan direct, 21.

383. From the time of his first request in early 2003 until the time he finished his report in early 2004, Sullivan was unable to interview Varjabedian, even though he had asked PSG's attorney, Rob Arendell. Sullivan direct, 21, 22.

384. Varjabedian has been represented by PSG's counsel, Dwyer & Collora, since approximately the middle of 2002. Varjabedian direct, 9. PSG's in-house, Mr. Arendell, recommended the law firm Dwyer & Collora to Varjabedian. Varjabedian direct, 10. Dwyer & Collora represented him when he testified to the grand jury in this matter, and gave him advice concerning his testimony. Varjabedian direct, 12-13. Dwyer & Collora prepared him for his testimony before he was deposed, and prepared him for his testimony for trial. Varjabedian direct, 12-13.

385. Varjabedian claims he was totally unaware that Sullivan had made efforts to speak with him. Varjabedian direct, 12.

386.    The only reason that Varjabedian claims he did not speak with the forensic auditor is the fact Mr. Sullivan never contacted him. Varjabedian direct, 11.

387.    The PSG lawyer whom Sullivan contacted in his futile efforts to speak with Varjabedian, Arendell, was acknowledged by Sullivan to be in the courtroom. Sullivan direct, 12.

388.    It is a fair inference from the facts that PSG intentionally did not relay to Varjabedian the request from forensic accountant Sullivan to interview him.

389.    It is a fair inference from the facts that PSG intentionally did not relay Sullivan's request to interview Varjabedian because PSG did not want its employee Varjabedian to be interviewed by Sullivan.

390.    It is a fair inference from the facts that PSG intentionally did not relay Sullivan's request to interview Varjabedian because PSG did not want Sullivan to learn the facts that Varjabedian knew because PSG believed those facts would be harmful to PSG.

### XVIII. PSG -- INTENTIONALLY, RECKLESSLY, UNFAIRLY OR DECEPTIVELY -- MISHANDLED FUNDS IN REBATE ACCOUNTS EARMARKED FOR SPECIFIC PURPOSES, THUS FACILITATING MISUSE AND EMBEZZLEMENT OF THE FUNDS BY GREGORY THOMSON (THROUGH CHECKS MADE OUT TO THOMSON AS PAYEE)

391.    Under its contracts to operate the wastewater treatment plant with the Town, PSG was supposed to hold monies that were earmarked for specific purposes.   These were called rebate accounts because, at the end of the year if there were monies left over, the funds were supposed to be returned, or "rebated" to the town. 1994, Contract, Ex. 7, 1998 Contract, 160;  Sullivan direct, 33.

392.    The accounts were sometimes referred to at trial as "rebate accounts," "allowance accounts," "limit accounts."

393.    Under PSG's contract with the Town that was in effect from 1994 until the new contract was signed in February 1998, funds were earmarked for certain categories of expenses: Equipment replacement/facility maintenance [capital account]; $100,000; "preventative maintenance/repairs – a minimum of $50,000; Pump Station electricity and dechlorination chemicals $20,000.  1994 RFP, Ex. 3 at 22;  1994 Contract, 13, 15.

394.    The 1994 contract specifically provided :

> Except in an amergency, equipment Maintenance/Facility Maintenance items [capital account] that exceed $3,000.00 in cost must receive prior approval of the

Board before the work proceeds. To receive prior approval, the Operator must provide the Board [Sewer Commission] with comparative cost estimates for the work. Payment for the work will be processed by the Board as the work proceeds.

1994 Contract, Ex. 7 at 13.

395. The 1994 contract under which PSG operated until March 1, 1998 further provided that "all expenditures from the $100,000.00 annual Equipment Replacement/Facility Maintenance Allowance [capital account] shall be made pursuant to a plan submitted by the Operator and approved by the Sewer Commission (exceprt for emergency expenditures).

Contract, Ex. 7 at 16.

396. PSG was supposed to, under the 1994 Contract, give the Town a monthly report which was to include "an update" on costs charged to the $50,000 Preventative Maintenance/repair account, and an "update" on costs charged to the $100,00 Equipment epalcement/Facility Maintenance account [capital account]. Ex. 7 at 15.

397. Under the 1994 contract, PSG was also to notify the Town in writing each year "if and when expenses reach 75 % of the annual allowance for each category of expenditure," and PSG was required "not to incur" in any year costs in either the preventative maintenance and repair account or the capital account which exceeded 90% of the designated amount "without first obtaining  the approval of the Town for such expenditure." Ex. 7 at 15.

398. Under PSG's contract with the Town resulting from the 1997 RFP, which was dated in February 1998, certain funds were earmarked for specific categories of expenses: "Maintenance and Repair" - $75,000; "Equipment/ Capital Replacement and Repair" [capital account] - $100,000; pump station electricity -- $15,000; Labor - $400,000. Contract, Ex. 160 at 7; Varjabedian direct, 80; 1997; RFP, Ex. 500.

399. The 1998 contract contained definitions for analyzing the type of expenditures that were appropriate for the "Maintenance and Repair" account, and the ""Equipment/Capital Replacement and Repair" Account. Contract, Ex. 160 at 13.

400. "Maintenance" was  defined as "those routine and/or repetitive activities required or recommended by the equipment or facility manufacturer or by PSG to maximumize the service life of the equipment, sewer, vehicles and facilities." Contract, Ex. 160 at 13.

401. "Repairs" were defined as "those non-routine/non-repetitive activities required for operational continuity, safety and performance generally due to failure or to avert a failure of the equipment, sewer, vehicles or facilities or some component thereof." 1998 Contract, Ex. 160 at 13.

402.    "Capital Expenditures" were also defined in the 1998 Contract:

> Any expenditures for (1) the purchase of new equipment or facility items that cost more than Three Thousand Dollars ($3,000); or (2) major repairs which significant extend equipment or facility service life and cost more than three Thousand dollars ($3,000) or (3) expenditures that are planned, non-routine and budged by [Sewer] COMMISSION.

> 1998 Contract, Ex. 160 at 12. (Emphasis added).

403.    The monies were set aside in the specialized accounts through the monthly compensation that the Town gave to PSG under the contract. See, e.g. 199 Contract, Ex. 160 at 7 (Section 6.2). Each month, PSG billed the Town for a monthly fee under the contract. Examples of the monthly invoices sent by PSG to the Town are at Exhibit 777. The Town paid PSG a monthly fee under that contract, based on a check issued out of Town Hall, by the Town Treasurer. Testimony of Karen Sepeck. Out of that monthly fee, funds were to be set aside for these specific accounts. Testimony of Karen Sepeck, Town treasurer; see 1998 Contract, Ex. 160 at 7..

404.    If funds earmarked for the purposes in the rebate accounts were unused, or left over, at the end of the contract year, PSG was supposed to rebate the surplus to the Town at the end of the contract year. Contract, Ex. 160 at 7.; Varjabedian direct, 81, Testimony of Francis Cavalieri. If there was a deficiency, the Town was supposed to pay PSG the difference, with interest. Varjabedian direct, 81. Contract, Ex. 160 at 7.

405.    PSG, however, handled these funds improperly, or at the very least recklessly, in several significant ways.

406.    The ways in which PSG handled these funds improperly, unfairly and deceptively are described below. PSG improperly issued checks amounting to thousands and thousands of dollars.

407.    In order to grasp the magnitude and gravity of the issue, it is important to understand how the checks were issued. A typical way that the checks were issued is that Thomson would say to Varjabedian at the plant, "I want X amount of money" and sometimes Thomson would give Varjabedian a handwritten notation and then Varjabedian would prepare a check request for the funds. See Varjabedian direct,, 75; See, e.g., chart in Section XVIII, C., infra. Or, Varjabedian would prepare a typed letter phrased to request the funds. Varjabedian direct, 75. Thomson did not type. Thomson direct, day 1, 40. Testimony of Patricia Donnelly, former secretary to the Sewer Commission.

408. Varjabedian would choose the account, for example, capital account, repair and maintenance, etc., out of which the money would be drawn. Varjabedian direct, 75, 76, 77. -76. He would decide where the money should be drawn from by looking at the reports on how much money was in the specific accounts. Varjabedian direct, 76, 77.

409. A form would typically be filled out by Varjabedian or someone at PSG, and then the check request would be signed, or authorized, by typically two PSG people locally. Those who approved, or signed off, on the check requests included Varjabedian, Francis Cavalieri (who worked alongside Sausé in PSG's Norwell office and then who took Sausé's place in 1999 when he was moved to handle a different geographic area), Sausé, Kruger (Sausé's superior), Assistant Plant Manager Kotouch (also a PSG employee, who was supervised by Varjabedian). See, e.g., Ex. 234 (check requests). By far, the greatest number of approvals were by Varjabedian and Cavalieri. <u>See</u> Ex. 234 (aggregation of requests). The check requests were then forwarded to PSG's corporate offices by either Varjabedian, or from someone at PSG's Norwell office. See, e.g., Ex. 234.

410. The checks were requested to be sent overnight. See requests, Ex. 234 – as if there were some urgency. A check in the amount requested would then be typically sent by Federal Express from PSG's corporate offices to Varjabedian, at the wastewater treatment plant, who then would open the Federal Express envelope and put the check in an envelope and hand it to Thomson. Varjabedian direct, 75; see, e.g., Ex. 234.

411. There is no dispute that thousands of dollars in checks issued in response to check requests made in Thomson's name from December 1998 through to May 2002 were all taken by PSG from funds in the rebate accounts that were maintained by PSG as part of the 1998 contract with the Town.

412. What follows are descriptions of the ways in which PSG acted intentionally, recklessly, unfairly or deceptively in mishandling funds in rebate accounts earmarked for specific purposes, thus facilitating misuse and embezzlement of the funds by Gregory Thomson .

### A. The Checks Were Made Out In A Reckless, Unfair And Deceptive Manner

413. The checks were made out in an improper manner. They were made out in away that facilitated embezzlement of funds. Thousands and thousands of dollars in checks were drawn on funds from accounts that were holding Town money, and issued with the following line up of typed words in the space for the payee

Town of Rockland
Rockland Sewer Commission
Gregory Thomson, Superintendent

See, e.g., checks at Ex. 234.

414. Under the applicable Uniform Commercial Code provisions governing interpretation of checks, this choice of wording by PSG in issuing these checks with Town money meant that any of the three parties to whom the checks were made out would be able to endorse them and cash them. This was true under either Massachusetts law, where the checks were received, or Texas law, where PSG was based and the checks were issued. M.G.L. 106 § 3-110 (added to Mass. General Laws February, 1998); Section 3-110, Uniform Commercial Code, 1190 Revision of Article 3, 2 Uniform Laws Annotated; Tex. Bus. & Commerce Code Ann. § 3.110

415. PSG was a sophisticated operation with multiple offices and multiple contracts serving municipalities and governmental entities. See Ex. 543, PSG proposal, at Chapter 2 (listing governmental clients). It was not a mom-and-pop operation. It claimed, at the time it submitted its proposal to Rockland in response to the 1997 RFP, to be "the nation's leading contract, operation, maintenance and management fo water and wastewater treatment systems," and to operate "more than 200 wastewater treatment facilities and more than 160 water facilities at over 115 projects in 35 states and Puerto Rico." Ex. 543 at 2-1. There was no justification or excuse for issuing the checks in this manner:

> Town of Rockland
> Rockland Sewer Commission
> Gregory Thomson, Superintendent.

416. John Sullivan, the forensic accountant who was hired by the Town to conduct an investigation in the matter, has reviewed "hundreds of thousands" of checks in the course of his investigations involving municipalities. Sullivan direct, 17.

417. PSG is in the business of having contracts with municipalities to operate their wastewater treatment systems. Sausé direct; Ex. 543..

418. Sullivan testified that based on his experience, "in the municipal sector, it's unusual to have a person's name as part of the check. It's what we call a 'red flag.'" Sullivan direct, 18.

419. Sullivan said it's a "red flag" in forensic accounting because "normally," the check is made to the Town. Sullivan direct, 18.

420. Sullivan has seen, in the course of his career, checks where the money was destined for a municipality or a government agency and there was an individual's name on it, but normally, under those circumstances, that's when "some sort of illegal activity that's been involved." Sullivan direct, 18.

421. Sullivan said he "can't think of any reason" why Gregory Thomson's name would legitimately be on the checks that were supposed to be for monies for the Town of Rockland or the Rockland Sewer Commission. Sullivan direct, 19. He said: "There are

lot of reasons why not to do that, but I can't think of any [legitimate] reason that that should be done." Sullivan direct, 19.

422.   As a result, Thomson had no difficulty taking thousands of dollars in checks that PSG issued and depositing them into a personal bank account that he had established in his own name, or, in two cases, signing them over to others. Thomson opened a bank account in his own name in 1999. Ex. 233.   PSG issued at least thirty three checks that included   "Gregory Thomson, Superintendent" as payee in the three-year period from April 1999, after the account was opened,   to May 2002, when a bank employee became suspicious and police were contacted.  The dates of the checks that PSG issued, and the amounts of the checks, are as follows. With the exceptions indicated, all of the checks below were deposited in a checking account that Thomson had in his own name, :

| Date of Check | Amount of Check | Exhibit Number |
|---|---|---|
| April 20, 1999 | $5,000.00 (endorsed by Thomson over to another party and deposited in Rockland Federal Credit Union) | 234, 651 |
| July 20, 1999 | $4,300.00 (endorsed by Thomson over to another party and deposited in Rockland Federal Credit Union) | 234, 652 |
| October 7, 1999 | $4,090.00 | 234, 653 |
| November 22, 1999 | $5,000.00 | 656 |
| December 13, 1999 | $4,000.00 | 234, 658 |
| January 27, 2000 | $976.00 | 234, 659 |
| March 30, 2000 | $2,499.96 | 234, 661 |
| May 5, 2000 | $2,100.00 | 234, 663 |
| June 28, 2000 | $908.73 | 234, 665 |
| August 11, 2000 | $5,000.00 | 234, 667 |
| October 19, 2000 | $2,300.00 | 234, 669 |
| December 12, 2000 | $3,800.00 | 234, 671 |
| January 12, 2001 | $2,442.23 | 234, 673 |
| January 29, 2001 | $1,800.00 | 234, 675 |
| February 21, 2001 | $15,000 | 234, 677 |

| April 18, 2001 | $8,200.00 | 234, 679 |
| May 30, 2001 | $4,020.00 | 234, 681 |
| July 3, 2001 | $2,700.00 | 234, 683 |
| July 27, 2001 | $4,492.00 | 234, 685 |
| September 5, 2001 | $5,354.34 | 234, 687 |
| September 25, 2001 | $15,000.00 | 234, 689 |
| October 29, 2001 | $8,928.98 | 234, 690 |
| November 28, 2001 | $8,000.00 | 234, 692 |
| December 13, 2001 | $7,000.00 | 234, 694 |
| January 3, 2002 | $6,983.00 | 234, 696 |
| January 30, 2002 | $3,197.50 | 234, 698 |
| February 12, 2002 | $5,873.22 | 234, 700 |
| March 14, 2002 | $6,804.03 | 234, 702 |
| April 4, 2002 | $7,049.63 | 234, 704 |
| April 4, 2002 | $1,625.62 | 234 |
| April 25, 2002 | $14,309.00 | 234, 706 |
| May 14, 2002 | $5,428.50 | 234, 708 |
| May 29, 2002 | $5,744.48 (check was issued by PSG from Town funds in a rebate account, but was not accepted for deposit by bank because bank became suspicious) | 234, 709 |

See also statements of Gregory Thomson's bank account set up to receive checks from PSG, Ex. 233

> **B.** **PSG Made No Effort To Ensure That The Monies It Was Pulling Out Of The Earmarked Accounts In Response To Check Requests Were Being Used For Purposes Consistent With The Purposes Of The Accounts**

423.    It is beyond dispute that accounts were required to be set up by PSG under the 1998 contract, as with the 1994 contract, for specific purposes. Varjabedian direct, 79, 80; Francis Cavalieri testimony. 1998 Contract, Ex. 160; 1994 Contract, Ex. 7.

424. Varjabedian acknowledged that he repeatedly allowed money to be pull out of those accounts for purposes that had nothing to do with the purposes of the accounts. Varjabedian direct, 80; see also testimony of Francis Cavalieri (also acknowledging that he approved requests for money to be taken out of accounts that had no relation to the specific purposes of account).

425. It was readily apparent, and clearly observable by a number of people at PSG that the requests for checks to be issued that were prepared by Varjabedian and submitted at Thomson's request typically had no demonstrated link to the specific account out of which the money was to be drawn, for example, repair and maintenance, capital account, electricity, labor. Varjabedian direct, 78 (acknowledging it was "clear" that in large number of cases, the requests that were submitted were for purpose that had nothing to do with the accounts out of which the money was being pulled

426. The Town paid the monthly fee each month, through the Town Treasurer, with the reasonable belief that the money it was paying was being used for purposes consistent with the contract, and that money was being set aside for the specific accounts of capital, repair and maintenance, electricity and labor as required by the contract and in the amounts specified in the contract. See Contract, Ex. 160; see, e.g., Ex. 777 (invoices); Testimony of Karen Sepeck, Treasurer. The amounts specified in the 1998 contract were: capital, $100,000; repair and maintenance, $75,000; labor, $400,000; pump station electricity, $15,000. Contract, Ex. 160.

427. By diverting funds from those accounts for purposes inconsistent with the purposes in the contract, PSG acted intentionally and recklessly, as well as unfairly and deceptively.

### C. Based On Flimsy Or Non-Existent Documentation, PSG Readily Issued Checks To Thomson As A Payee, Drawn From The Special Accounts Of Town Money For Capital Expenditures, Repair And Maintenance, Etc., Under The Contract

428. The way the accounts are described under the 1998 Contract, as with the 1994 contract before it, and the way the monies are paid to PSG to maintain the accounts, clearly contemplates that PSG is to make payments out of the accounts for the specific purposes, such as capital expenditures, repair and maintenance, electricity, and, in the case of the 1998 contract, labor. Ex. 160; Ex. 7.

429. Nevertheless, PSG issued thousands and thousands of dollars in checks -- not to vendors for equipment or services – but in the form of checks that included Thomson as payee, and no vendor or manufacturer or supplier who had furnished, or who was about to furnish equipment or services for the purposes consistent with the accounts.

430.   PSG has acknowledged that it made no attempt to see that the monies were being disbursed by check for the purposes for which the accounts had been set up, specifically, capital expenditures, maintenance and repair, pump station electricity, labor.  See, e.g., Varjabedian direct, 80; Testimony of Francis Cavalieri; see ex. 234 (aggregation of check requests processed).

431.   PSG did not require documentation of any purpose, let alone a purpose connected to the specific account, before issuing thousands and thousands of dollars in checks drawn from the designated accounts of funds that it was holding for the Town for capital expenditures, repair and maintenance, etc., for the wastewater treatment plant.  PSG issued thousands and thousands of dollars in checks from these accounts with Thomson as a payee without any invoices, receipts, etc., for back up of the expenditure, or even a contract committing to the expenditure.  See, e.g., Ex. 234 (aggregation of various check requests)..

432.   No receipts or invoices were demanded – or even requested -- by PSG before it disbursed the Town's money out of the rebate accounts and issued checks where Thomson was a payee.  PSG did not even care that no vendor – that is, a corporate entity or someone demonstrably performing services – be the payee.

433.   The way that PSG treated the money it was holding for the Town in the specific accounts for capital expenditures, repair and maintenance, etc., for the wastewater treatment plant deviated sharply from internal procedures for handling money at PSG. For example, a PSG expense report form used in 1995 states in bold print that

          "ANY SINGLE REIMBURSABLE EXPENSE TRANSACTION FOR MORE THAN $25"… "MUST BE SUPPORTED BY RECEIPTS.".

          Ex. 753, (expense report signed by Sausé, approved by Kruger).

434.   Examples of the flimsy justifications, and lack of documentation, that caused PSG to issue checks with Thomson as a payee, follow:

| Date of Check Request | Amount of Check Requested | Reason Given for Check Requested | Ex. No. . |
|---|---|---|---|
| April 16, 1999 | $5,000 | None | 651 |
| July 19, 1999 | $4,300 | "project related expenses" | 652 |
| Oct. 5, 1999 | $4,090 | "project related expenses" | 654 |
| Nov. 18, 1999 | $5,000 | "project related expenses" | 655 |
| Dec. 9, 1999 | $4,000 | "project related expenses" | 658 |
| Jan. 9,2000 | $976 | "project related expenses" ; handwritten notes referring | 660 |

| | | to "flowers," "cold cuts" | |
|---|---|---|---|
| March 22, 2000 | $2,499 | Handwritten note from Thomson: "Please put in a check request to Gregg Thomson in the amount of $2,499.96 for expenses for 6 months" | 662 |
| May 1, 2000 | $2,100 | Handwritten note from Thomson: "Please issue check for 2100.00 payable to Gregg Thomson for Expenses Car Payoff." | 664 |
| June 26, 2000 | 908.73 | Handwritten note from Thomson: "Expenses to June 30th 2000 for Rockland Sewer Comm. Vehicle + Credit Card purchase Total Due 908.73 | 666 |
| Aug. 8, 2000 | $5,000 | Handwritten note from Thomson: "please issue a check request to Town of Rockland in the amount of $5,000. Capital Exp. Acct." | 668 |
| Oct. 13, 2000 | $2,300 | Handwritten note from Thomson: "Please expense a check in the amount of $2,300 for Expenses Sept. + Oct." | 670 |
| Dec. 5, 2000 | $3,800 | Handwritten note from Thomson: "Please issue a check in the amount of 3,800 for Expenses for Nov. + Dec 31 2000 Check to be issued R& M cap | 672 |
| Jan. 1, 2001 | $2,442.23 | Handwritten note from Thomson: "Please issue check from our R&M Capital Account in amount of $2,442.23 to Rockland Sewer Comm/Greg Thomson." "Sprague Fluid" | 674 |
| Jan. 22, 2001 | $1,800 | "project related expenses" | 676 |
| Feb. 14, 2001 | $15,000 | "project related expenses" | 678 |
| May 24, 2001 | $4,020 | "project related expenses" | 682 |

| June 21, 2001 | $2,700 | "project related expenses" | 684 |
|---|---|---|---|
| July 24, 2001 | $4,492 | "project related expenses" | 686 |
| Sept. 24, 2001 | $15,000 | "project related expenses" | 688 |
| Oct. 25, 2001 | $8,928.98 | "project related expenses" | 691 |
| Nov. 26, 2001 | $8,000 | "project related expenses" | 693 |
| Dec. 12, 2001 | $7,000 | "project related expenses" | 695 |
| Feb. 8, 2002 | $5,873.22" | "project related expenses" | 701 |
| March 11, 2002 | $6,804.03 | "project related expenses" | 703 |
| April 18, 2002 | $14,309.00 | "project related expenses" attaches "quotation" for equipment; typed letter requests that funds be "charged to the Rockland Labor Account" | 720 |
| May 23, 2002 | $5,744.48 | "project related expenses"; handwritten note "10 seats @ 20  200 "cash bar   100"<br><br>"RAD Jones As Built $3224.18 - Final Conservation Limited 2320.30 - Final" $5,744.48 | 711 |

435. If PSG was acting with anything other than, at minimum, recklessness, it would have prevented monies from being disbursed for such nonspecific purposes and without any back-up documentation.

436.  Furthermore, despite PSG's access to records, there were no records at trial demonstrating that the flurry of  check requests from Thomson from 1999 to 2002, for checks for nonspecific purposes with no back up, was anything other than highly unusual for PSG, not only in the context of PSG's dealings with Rockland in the past, but in its dealings with other municipalities. PSG had merged with Metcalf & Eddy in 1994, and Metcalf & Eddy had operated the plant since at least 1988.  If such behavior was ordinary or common in PSG's experience in Rockland, one would have expected PSG to come forward with a stream of similar check requests. It did not. Therefore, it is a fair inference that this type of behavior was not part of an ordinary business activity or practice in Rockland.

437.   In issuing the checks containing the Town's money under these circumstances, drawn from accounts earmarked for specific purposes, and whose purposes were supposed to be furthered by PSG's administration of the expenditure, PSG acted unfairly and deceptively .

> **D.   Even If, By Tortuous Logic, The Checks Issued Could Be Called "Rebate" Money, PSG Acted Improperly In Issuing The Checks For Purposes Unrelated To The Accounts *During The Course Of The Contract Year***

438.   If PSG attempts to claim that the checks issued amounted to "rebate" money, then such conduct was nevertheless unfair and deceptive, and PSG's conducted amounted to intentional and reckless mishandling of the funds in the specially designated rebate accounts.

439.   The contract was structured so that PSG was supposed to wait until the end of each contract year to determine if there were funds to rebate, or if there was a deficiency. PSG's Varjabedian acknowledged that if there was a surplus in the account, it was supposed to be rebated to the Town. Varjabedian direct, 81. If there was a deficiency, the Town would have to make up the difference. Contract, Ex. 160. PSG, however, pulled out thousands and thousands of dollars from the capital account, and from the repair and maintenance account, for example, throughout the contract years in order for purposes that had nothing to do with the purposes of the accounts.

440.   PSG did not wait until the end of the contract year as it was supposed to do in handling rebate money. Under the contract, PSG could not possibly determine if there was going to be unused money at the end of the contract year for such things as repair and maintenance and capital expenditures until the end of the contract year had arrived. Unanticipated situations arise which can create a need for a repair, or a replacement of equipment.

441.   PSG, however, ignored its mandate under the 1998 contract to hold onto the funds in the special accounts for such things as capital expenditures, and repair and maintenance until the end of the year, and instead blithely disbursed funds in response to check requests throughout the year, with no assurance or documentation that the checks had anything to do with the purposes of the specialized accounts.

442.   For example, Year 2 of the contract ran from March 1, 1999 through February 28, 2000. In July 1999, however, Varjabedian approved (and likely prepared and typed, as described above) a check request from Thomson for "project-related expenses" to be charged to the "capitol [sic] R&M account" in the amount of $4,300. Ex. 652. It is unclear whether the funds came out of the "capital" account or the "Repair and Maintenance," account, but either way the withdrawal was in the middle of the contract year before PSG could determine, under the contract, whether there was unused money and thus money that could be considered a "rebate." Contract, Ex. 160.

443.    Other examples of check requests by Thomson that were approved by Varjabedian (and likely prepared by him, too) before the end of Year 2 of contract year for unspecified "project related expenses, to be pulled from the "capitol [sic]R& M account"  include: early October 1999,  $4,080 (see Ex. 654);  November 1999,  $5,000 (Ex. 656); early December 1999 ($4,000). Therefore, even though the contract year did not end until February 28, 2000 for that year, PSG was busy pulling out monies in response to check requests from Thomson (prepared primarily by Varjabedian) in advance of the end of the contract year.

444.    Other examples of checks issued in response to check requests from Thomson, with Thomson as a payee, that were not at the end of a contract year and thus could not possibly be considered "rebate" money, include the following:

| Date of Check | Amount of Check | Exhibit Number |
|---|---|---|
| April 20, 1999 | $5,000.00 | 234, 651 |
| March 30, 2000 | $2,499.96 | 234, 661 |
| May 5, 2000 | $2,100.00 | 234, 663 |
| June 28, 2000 | $908.73 | 234, 665 |
| August 11, 2000 | $5,000.00 | 234, 667 |
| October 19, 2000 | $2,300.00 | 234, 669 |
| December 12, 2000 | $3,800.00 | 234, 671 |
| April 18, 2001 | $8,200.00 | 234, 679 |
| May 30, 2001 | $4,020.00 | 234, 681 |
| July 3, 2001 | $2,700.00 | 234, 683 |
| July 27, 2001 | $4,492.00 | 234, 685 |
| September 5, 2001 | $5,354.34 | 234, 687 |
| September 25, 2001 | $15,000.00 | 234, 689 |
| October 29, 2001 | $8,928.98 | 234, 690 |
| November 28, 2001 | $8,000.00 | 234, 692 |
| December 13, 2001 | $7,000.00 | 234, 694 |
| March 14, 2002 | $6,804.03 | 234, 702 |
| April 4, 2002 | $7,049.63 | 234, 704 |
| April 4, 2002 | $1,625.62 | 234 |
| April 25, 2002 | $14,309.00 | 234, 706 |
| May 14, 2002 | $5,428.50 | 234, 708 |
| May 29, 2002 | $5,744.48 (drawn but not cashed, because of bank's suspicion) | 234, 709 |

### E.    PSG's Apparent Motive For Issuing The Checks

445.    It is a fair conclusion from the circumstances shown by the evidence that PSG's motive for treating the Town's money that it was holding for specific purposes under the contract, in such a reckless, unfair and deceptive manner, was its   own self-interest, specifically its self-interest in pleasing, satisfying, and thus currying favor with, Thomson and/or the Commission.  It is a fair conclusion from the evidence that PSG wanted to curry favor with the Sewer Commission and, in particular, Thomson because he was in a position to help PSG obtain more work and make more money.  For example, in internal business planning documents that was working on PSG's corporate headquarters and for his superiors, plant manager Varjabedian wrote that, "The Sewer Commission superintendent [Thomson] and chairman are the keys to our continued presence and prosperity in the community." Ex. 772; Varjabedian direct, 70, 71, 72. The internal planning document was a draft from 2002 – well after the 1997 RFP, and well after the 1998 contract was entered into that resulted form the 1997 procurement.

446.    Varjabedian viewed Thomson and Chairman Robert Corvi as keys to PSG getting any additional work in Rockland. Varjabedian direct, 70.

447.    In addition to operating the wastewater treatment plant, PSG and its corporate predecessor Metcalf & Eddy Services which became PSG, provided other services to the Town for which it earned additional money.  Varjabedian direct, 64.  The Town ordered the additional services through "change orders."  Varjabedian direct, 64.  There were change orders for a sludge dewatering project, for a sandblasting project, a dechlorination project, an industrial pretreatment project, for example.  Varjabedian direct, 64.  Varjabedian kept track of the change orders of Metcalf & Eddy and then PSG, and the amounts billed to the Town on the change orders.  Varjabedian direct, 65; see Ex. 745 (list of amounts billed on change orders up to 1998, maintained by Varjabedian).

448.    It also is a fair inference from the facts that another reason PSG wanted to curry favor with Thomson is that he was in the position of negotiating with PSG annually on its fee, and negotiating with PSG on various "reconciliations" that had to be done of the contract on a yearly basis – in other words, how much money PSG could charge and how much money PSG could keep.

### XIX.   PSG -- INTENTIONALLY, RECKLESSLY, UNFAIRLY OR DECEPTIVELY -- MISHANDLED  FUNDS IN REBATE  ACCOUNTS EARMARKED FOR SPECIFIC PURPOSES, THUS FACILITATING MISUSE, MISAPPROPRIATION AND DIVERSION OF FUNDS (THROUGH CHECKS MADE OUT TO THIRD PARTIES OR DIVERSION OF CHECKS RECEIVED FROM THIRD PARTIES)

449.    The forensic accountant hired by the Town, Sullivan, examined, in the course of preparing his report for the Board of Selectmen in 2004, records that PSG had produced to document expenditures out of the capital account, which was one of the accounts that PSG was supposed to maintain in the 1998 contract. The contract required PSG to set $100,000 each year for capital expenditures for the wastewater treatment plant. Contract , 160.

450.    The 1997 RFP specifically provided:

> For emphasis purposes, the Rockland Sewer Commission must authorize the expenditure of funds from the $100,000 allowance.  1997 RFP, Ex. 500 at 21.

451.    Sullivan looked at the expenditures that were paid out of the capital account to see if they were consistent with the nature of the capital account and to see if they were authorized by the Sewer Commissioners. Sullivan direct, 24.

452.    The capital account is for equipment replacement. Sullivan direct, 23. Capital costs are supposed to be for the investment in equipment and infrastructure that extends the useful life of the plant. Sullivan direct, 26. Sullivan also looked at the other accounts that PSG was required to maintain under the 1998 contract: prevent maintenance; labor and electricity.  Sullivan direct, 24.

453.    Sullivan prepared a chart of the transactions that were inconsistent with the purpose of the capital account for the time periods in which he was able to obtain access to records from PSG.  Sullivan direct, 25 – 31.

454.    Sullivan did not include, in the chart, the funds that were pulled out of the accounts and turned into checks with Thomson as a payee. Those were also inconsistent with the purposes of the capital account, but he examined that issue separately in his report.

455.    All of the checks for the expenditures were issued by PSG. Sullivan direct, 27-28.

456.    Sullivan determined that there were $10,114.69 in transactions that were inconsistent with the purpose of capital account in Year 1 of the contract, from March 1, 1998 to February 28, 1999. Ex. 868; Sullivan direct, 26. These transactions consisted of expenditures for such items as Christmas Trees, a Christmas party work boots and pizza.

Ex. 868.  These were expenditures that Sullivan found were all paid out of the capital account. Sullivan direct, 26.

457.  Sullivan determined that there were $17,136.99 in transactions that were inconsistent with the purpose of the four rebate accounts in Year 2 of the contract, from March 1, 1999 to February 28, 2000. Ex. 868; Sullivan direct, 27. Sullivan found expenditures in the capital account in Year 2 consisting of sweatshirts, donations to a golf course and a police association, T-shirts, gift cards.  Ex. 868.   The inconsistent expenditures that Sullivan found in Year 2 amounted to $16,996.99.

458.  Sullivan also discovered that PSG deposited into the rebate accounts certain checks that were supposed to go to the Town of Rockland, specifically checks made by outside parties to the Town of Rockland. Instead of being sent to Town Hall, the checks were deposited by PSG, and put it into one of the rebate accounts that it controlled. Sullivan direct, 28-29.  Consequently, Town Hall lost the benefit of that money for its general purposes.  These types of inappropriate transactions found in the rebate accounts were described in Ex. 868 as "Checks to Rockland."  Sullivan direct, 29. For Year 2, the inappropriate money that PSG put into the rebate accounts amounted to $140.  For Year 3, it amounted to $15,033.43.

459.  Sullivan determined that there were $36,737.62 in transactions that were inconsistent with the purpose of the four rebate accounts in Year 3 of the contract, from March 1, 2000 to February 28, 2001. Ex. 868; Sullivan direct, 28. Sullivan found expenditures in the capital account in Year 3 consisting of such items as sweatshirts, jackets, Christmas trees, donations to the Sons of Italy, gift cards, work books.  Ex. 868.   The inconsistent expenditures that Sullivan found in Year 3 amounted to $21,704.19.  The remaining inconsistent transaction was $15,033.43, which consisted of funds that PSG inappropriately deposited into accounts it controlled instead of turning the money over to Town Hall for the town's use.  That type of deposit is described in the previous paragraph.

460.  Sullivan determined that there were $12,604.21 in transactions that were inconsistent with the purpose of the four rebate accounts in Year 4 of the contract, from March 1, 2001 to February 28, 2002. Ex. 868; Sullivan direct, 28. Sullivan found expenditures in the capital account in Year 3 of logo clothing and Christmas trees. Ex. 868.

461.  Sullivan was only able to obtain partial documentation from PSG for Year 4 of the contract, even though the contract year was over for a considerable period of time by the time he was conducting his investigation. Sullivan direct, 28, 31-32.

462.  The total amount of inappropriate transactions that Sullivan found that PSG made that were inconsistent with the purposes of the four rebate accounts under the 1998 contract for the limited time period for which records were disclosed by PSG was:  $76,593.51. Of that total dollar value of transactions, $61,420.08 were expenditures and $14,173.43 were inappropriate deposits in the accounts which were diverted from the Town's general fund. Ex. 868.

463. A compilation of the transactions that Sullivan found, in the records that PSG was willing to provide him, is as follows (except for checks issued with Thomson as a payee):

**Year 1 –** March 1, 1998- Feb. 28, 1999

| | |
|---|---|
| **Staff Christmas Party** | **$1,185.00** |
| **Work Boots** | **$1,249.93** |
| **Christmas Trees** | **$7,259.00** |
| **Pizza** | **$420.76** |
| | **$10,114.69** |

**Year 2** - March 1, 1999- Feb. 28, 2000

| | |
|---|---|
| **Rockland Police Assn** | **$200.00** |
| **Rockland Golf Course** | **$175.00** |
| **Checks to Rockland** | |
| **(improperly deposited by PSG in a rebate account rather than being turned over to Town Hall for general expenditures)** | **$140.00** |
| **Christmas trees** | **$9,495.00** |
| **Tee shirts** | **$2,597.25** |
| **Logo** | **$902.00** |
| **Sweatshirts with Logo** | **$992.00** |
| **Canopy Tent** | **$1,285.74** |
| **Gift Cards** | **$1,350.00** |
| | **$17,136.99** |

**Year 3** - March 1, 2000- Feb. 28, 2001

| | |
|---|---|
| **Sweatshirts with Logo** | **$2,293.50** |
| **Jackets with Logo** | **$1,798.00** |
| **Christmas trees** | **$9,630.85** |
| **Rockland High School** | **$1,000.00** |
| **Sons of Italy** | **$1,500.00** |
| **Checks to Rockland (improperly deposited by PSG in a rebate account rather than being turned over to Town Hall for general expenditures)** | **$15,033.43** |
| **Workboots** | **$1,906.84** |
| **Gift Cards** | **$3,575.00** |
| | **$36,737.62** |

**Year 4 -** March 1, 2001- Feb. 28, 2002

| | |
|---|---|
| **Logo Clothing** | **$3,477.00** |
| **Christmas Trees** | **$9,127.21** |
| | **$12,604.21** |

**Total Documented**                    **$76,593.51**

Ex. 868.

### XX.   PSG-- INTENTIONALLY, RECKLESSLY, UNFAIRLY AND DECEPTIVELY --ESTABLISHED AND MAINTAINED A "PROFESSIONAL DEVELOPMENT ACCOUNT" TO CONCEAL MONIES FROM TOWN HALL, WHICH DEPRIVED THE TOWN OF USE OF THE FUNDS FOR THE TOWN TREASURY, AND WHICH FACILITATED MISUSE AND EMBEZZLEMENT OF TOWN FUNDS

464.   PSG's plant manager Varjabedian knew that the only way the Sewer Commission could spend money, other than through a contract, was by asking that a bill be paid and sending it to Town Hall. Varjabedian direct, 37.

465.   Varjabedian, the plant manager, acknowledged there was nothing in the 1994 contract that the Town had with PSG, or in the 1998 contract, that created an ability of PSG to maintain a "Professional Development Account" containing Town funds. Varjabedian direct, 44.

466.   Nevertheless, an account on the books in Houston, at PSG's corporate headquarters, was designated as a Professional Development Account. Varjabedian direct, 45.

467.   The Sewer Commission had no authority to establish such an account. All Town money was supposed to be spent by invoices or requests being submitted to the Town Accountant at Town Hall, and then, after being approved by the Town Accountant, a check would be issued by the Town Treasurer.  Testimony of Treasurer Karen Sepeck, Testimony of Town Accountant Eric Hart; Thomson direct, day 1, 14-17. The way that the Town keeps track of how money is being spent is through the Town Accountant and the Town Treasurer. Testimony of Karen Sepeck, town treasurer; Testimony of Lawrence Chaffee, Selectmen; Testimony of Eric Hart, Town Treasurer.

468.   The monies in the Professional Development Account set up by PSG came from various rebate accounts that were set up as a result of PSG's 1994 contract with the Town. Sausé direct, 126, 128. Under its 1994 contract with the Town, PSG was supposed to hold monies that were earmarked for specific purposes.  These were called rebate accounts.

469.   Under PSG's contract with the Town resulting from the 1994 contract,  certain funds paid to PSG by the Town were earmarked for specific categories of expenses: maintenance and repair; capital expenses and utilities.  See 1994 Contract, Ex. 7; Francis Cavalieri testimony.

470.   Each month, the Town paid PSG a monthly fee under that contract, and out of that fee, funds were to be set aside for these specific accounts. Testimony of Karen Sepeck, Town treasurer; Testimony of Francis Cavalieri; 1994 Contract, Ex. 7; see also, 1998

contract, Ex. 160; see, e.g., Ex. 777 (invoices from PSG for monthly fee, out of which money was to be set aside for the specific accounts).

471.   If funds earmarked for those purposes were left over at the end of the contract year, PSG was supposed to rebate the funds to the Town at the end of the contract year.  1994 Contract, Ex. 7; 1998 Contract, Ex. 160.

472.   The "Professional Development Account" was set up by PSG in 1995 as PSG's effort to help the Sewer Commission keep "Town Hall" from receiving, for the general purposes of the Town, rebate monies at the end of the year.  Sausé direct, 128.  The reference to "Town Hall" is an apparent reference to the Town Accountant, the Town Treasurer – about the existence of the funds.  Sausé direct, 128, 129.

473.   Members of the Sewer Commission, according to Sausé, in particular member Robert Corvi or member Michael McDonald, expressed to him that they did not want money from the rebate accounts to be turned back over to the Town at the end of the year. Sausé direct, 128, 125.

474.   In other words, the Professional Development Account -- which, as far as the records show, was an account on which PSG paid no interest  -- was set up and maintained by PSG to help the Sewer Commission conceal  funds from Town Hall and prevent the monies from going into the Town's treasury.  See Sausé direct, 128-29.

475.   Sausé, in a letter dated July 11, 1995, said that at the Commission's request, he pursued the option of  transferring unused balances from various contract accounts, including repair and maintenance, and electricity, into a new account for the purpose of "professional development and miscellaneous expenses.  Ex. 8. PSG knew that the professional development account was specifically set up instead of the Town receiving a rebate, or payback, of various monies left over in the rebate accounts under the 1994 contract.  The letter stated that "M& E Services [then taken over by PSG] will open this account as you have requested in lieu of a payback as set forth in the existing contract for operations and maintenance." Ex. 8.

476.   At the time, in 1995, the Sewer Commission wanted to use money from rebate accounts to pay for a trip to Miami.  Sausé direct, 125.

477.   From that point in 1995 forward, PSG acted to conceal from Town Hall the existence of the "Professional Development Account," and the sources of funds for the account.  In 1997, for example, Thomson recalled that he complained to Sausé about having to go through Town Hall for expenditures.   He complained to Sausé that he was being questioned by the Town Accountant. Thomson direct, 71. Sausé assured Thomson that PSG would let him use the Professional Development Account that was being maintained on PSG's books – but not the Town's books – for whatever he chose. Sausé told Thomson: "We can just use the professional development account to purchase whatever you need, just sign a letter and, and we'll issue a check for whatever the purpose is."  Thomson direct, day1, 71.

478.    Thomson said Sausé had "no problem" when Thomson told him that he didn't want Town Hall to know about the Professional Development Account. Thomson direct, day 1, 71.

479.    While the Professional Development Account was concealed from Town Hall – specifically the Town Accountant, the Town Treasurer, also the governing board of the Town, the Board of Selectmen -- it was no secret at PSG.   Cindy Solomon, PSG's business manager in Norwell, would report to Varjabedian about how much was in the professional development account.  Varjabedian direct, 46.

480.    Varjabedian admitted at trial that PSG withdrew money from the Professional Development Account to pay for a variety of expenses and he had prepared a chart itemizing expenses.  See Ex. 734, Varjabedian direct, 38 -39.

481.    Varjabedian admitted that PSG had taken money out of the "Professional Development account" money to reimburse him for an expense report of his own and an expense report of Sausé. Varjabedian direct, 38.

482.    Varjabedian acknowledged that PSG took money from the "Professional Development Account" to pay a turf farm for turf for a field, even though the field was not even at the Sewer Department. Varjabedian direct, 40. Varjabedian also acknowledged that PSG had taken from the professional development account money to pay for some kind of clothing. Varjabedian direct, 40.

483.    Sausé said that the Professional Development account maintained by PSG of Town funds was used for "entertainment." Sausé direct, 147. Sausé would submit expense for reimbursement . Sausé direct, 146-47. Varjabedian also submitted expenses for reimbursement. Sausé direct, 146-47.

484.    Sausé does not know of any way that Town Hall would have known about the monies that PSG kept in the Professional Development Account. Sausé direct, 131.

485.    Aram Varjabedian, the plant manager, did not include in his monthly reports to the Sewer Commission any itemization of the professional development account. Varjabedian direct, 47.  The monthly reports he provided to the Sewer Commission did not have anything to do with the financial accounts on the books at PSG's headquarters in Houston. Varjabedian direct, 47. He never reported to the town accountant or the town treasurer as to what was in the professional development maintained at PSG's headquarters in Houston. Varjabedian direct, 47.

486.    Varjabedian said he viewed the Professional Development Account as an account "to be used at the Commission's discretion." Varjabedian direct, 42.

487.    PSG's business manager, Cindy Solomon, would report to Varjabedian from time to time on how much was in the professional development account. Varjabedian direct, 46.

488. He didn't view it as his "place" to question any expenses they chose to make out of the account. Varjabedian direct, 42. He said it "It wasn't my money…" Varjabedian direct, 43. From time to time Varjabedian would report to Thomson about how much was in the account. Varjabedian direct, 45.

489. Kruger, Sausé's superior, was certainly aware of the Professional Development account as well as Varjabedian, Solomon, Sausé, and individuals at PSG's headquarters in Houston, where the accounting was based. . For example, in 1995, Kruger approved an expense for a car rental to be taken out of the "professional development account." See Ex. 753; Ex. 752.   In September 1997, well before the new contract in 1998 that resulted from the 1997 RFP, Kruger approved a "cash advance" in the amount of $3,000 to be taken out of the "Professional Development Account" in order for the Sewer Commission to attend a conference in Chicago. Ex. 133.

490. Sausé, Varjabedian and Thomson all made decisions about how money in the Professional Development Account was spent.   Sausé direct, 147.

491. In December 1997, PSG in Houston issued a check in the amount of $50,000 in response to a written request signed by Thomson (discussed in Section XXI infra) to take the $50,000 out of the "Rockland Sewer Commission's Professional Development Account."  Ex. 641. This money was used to fund a new bank account that Sausé and Thomson opened up at Wainwright Bank to take the place of the Professional Development Account. See infra Section XXI.

492. The $50,000 check from the Professional Development Account that was used to open the Wainwright Bank account represented funds that never should have been in something called a "Professional Development Account" in the first place. It was rebate money, representing unused monies in accounts under the 1994 contract that were earmarked for specific purposes.  It was supposed to be returned to the Town directly, not diverted to something called a Professional Development Account. This account was totally outside of any contract that PSG had with the Town.

493. By the Professional Development Account, PSG aided and abetted the Sewer Commission to conceal the existence of the funds from Town Hall.

### XXI.   PSG -- INTENTIONALLY, RECKLESSLY, UNFAIRLY OR DECEPTIVELY --  MISHANDLED  FUNDS IN REBATE ACCOUNTS EARMARKED FOR SPECIFIC PURPOSES, THUS FACILITATING MISUSE, MISAPPROPRIATION AND DIVERSION OF FUNDS (THROUGH CHECKS MADE OUT TO THIRD PARTIES OR DIVERSION OF CHECKS RECEIVED FROM THIRD PARTIES)

494. Sausé decided with Thomson to open a bank account for the Sewer Commission in November 1997 when expenses for the Professional Development Account became an

issue for Sausé's boss, Kruger. Kruger, Sausé's supervisor, became upset when he saw the expense report that Sausé was planning to submit for reimbursement from the Professional Development Account for certain expenses. Sausé direct, 123-24. Sausé talked with Kruger about submitting expenses for a night of celebration with Varjabedian, Thomson and a relative of Thomson's at the Foxy Lady, which was a strip club, Bella's, which was a restaurant, and a limousine. They were celebrating the night that PSG submitted its bid in connection with the RFP and was officially determined to be the only bidder, and thus the winner of the contract the RFP.   Sausé direct, 121 – 124.

495.   Sausé quoted Kruger as saying "make it go away." Sausé direct, 124.

496.   Sausé said that he felt he was in a bind because his client, Thomson, wanted to continue to be entertained. Ex. 134.

497.   Therefore, Sausé conceived of the idea of transferring Professional Development Account money to a new checking account in the Sewer Commission's name, that would, like the Professional Development Account, be unknown to Town Hall, but still be available for use for the Sewer Commission's discretion. Sausé direct, 134. He told Varjabedian that Kruger no longer wanted PSG to hold the money. Sausé direct, 156.

498.   As a result, Sausé and Thomson opened up the checking account in the name of Town of Rockland d/b/a Rockland Sewer Commission. Both Sausé and Thomson were signatories.

499.   The checking account was not a secret to PSG.  Sausé prepared a letter for Thomson to sign dated November 21, 1997, that informed PSG of the creation of the checking account and asked PSG to issue a check for $50,000 out of the "Professional Development Account" to fund it.  Ex. 534. The letter openly stated:

500.   "[T]he Rockland Sewer Commission is opening a checking account for the Commission's use."

            ***

501.   Please send a check made payable to the Town of Rockland d.b.a. The Rockland Sewer Commission in the amount of $50,000. The funds should be taken out of the Rockland Sewer Commission's Professional Development Account.

            Ex. 534.

502.   The letter, along with a check request form approved by Sausé, was sent to PSG's corporate headquarters in Houston for processing. The words "Houston office" are plainly stamped on the check request. Ex. 641.

503.  As a result of the check request, in December 1997, PSG in Houston issued a check in the amount of $50,000. The check was made out in the same fashion as discussed with respect to the other checks:

> Town of Rockland
> Rockland Sewer Commission
> Gregory Thomson, Superintendent.
>
> Ex. 640.

504.  The $50,000 check from the Professional Development Account – which consisted of funds from the 1994 contract since the 1998 contract had not yet been signed – thus became the first deposit to fund the Wainwright Bank account. See Ex. 640 (check); Ex. 18 (statements).

505.  The $50,000 check from the Professional Development Account that was used to open the Wainwright Bank account represented funds that never should have been in something called a "Professional Development Account" in the first place. It was rebate money, representing unused monies in accounts under the 1994 contract that were earmarked for specific purposes. It was supposed to be returned to the Town directly, not diverted to something called a Professional Development Account. This account was totally outside of any contract that PSG had with the Town.

506.  Through the Professional Development Account, PSG had been helping the Sewer Commission to conceal the existence of the funds from Town Hall. The issuance of the $50,000 check containing monies from the Professional Development Account only compounded PSG's unfairness and deception to the Town.

507.  There were only five deposits of PSG-issued checks in the Wainwright Bank Account.

508.  The next check request for a PSG check that landed in the Wainwright Account of a PSG check was dated March 16, 1998. Ex. 642. The check was in the amount of $9,964.05. Ex. 118.

509.  That check was the result of scant documentation. The only documentation for that request is a single page "check request form" singed by Kruger and bearing Sausé's name, with initials beside it to indicate that Sausé did not sign himself. Ex. 642. The "reason" given for the check request is simply "close out account." There is no documentation of any kind from anyone from the Town or the Sewer Commission – even Thomson – authorizing release of the funds.

510.  It is unfair and deceptive, and at the very least reckless, for PSG to have so blithely dispensed Town funds in its possession, with no documentation for any purpose or reason or authority for the disbursement of the funds.

511.   The next check request that resulted in a PSG being deposited in the Wainwright account was dated the very next day, on March 17, 1998. That request was for $78,139.56.  Ex. 645; Ex. 18.

512.   The $78,139.56 check was the largest deposit in the Wainwright Bank account. Ex. 18

513.   PSG has only the scantest documentation for the issuance of the $78,139.56 check. There is nothing signed by Thomson or anyone else at the Commission or the Town. The only document is a single page called a "check request form", approved by Kruger and Sausé (although obviously not in Sausé's handwriting since it is so different from all of the signatures on the Wainwright Bank checks that he signed, see Ex. 18). Ex. 644; see Sausé direct, 141 (stating Cynthia Solomon, PSG's business manager, signed his name).

514.   The only explanation given for the check request is "close Rockland Engineering Project Per Client." Ex. 644. The so-called Rockland Engineering Project was an apparent reference to PSG holding based on a June 28, 1996 letter signed by Sausé and Thomson, under which PSG accepted $100,686 supposedly to procure "engineering services", monitoring the work and paying for the work. PSG was to be paid 7.5 percent of the money as a fee.  Ex. 539.

515.   PSG tooks its profit of $7,025 "off the top". Sausé direct, 143-146. At the time PSG took its profit "off the top" of the engineering services money, it had performed no services in connection with the funds.  Sausé direct, 146.

516.   There is no evidence that Thomson even had the authority to enter into an agreement hiring PSG to procure, supervise and pay for "engineering services," and transferring $100,686 of the Town's money to do so. See Ex. 539.

517.   It is clear, however, from the evidence, that no such engineering services were procured or performed.  In an internal memo in 2003, from Varjabedian to PSG's business manager in Norwell, Cindy Solomon and Sausé's replacement, Francis Cavalieri, Varjabedian gave his analysis of what he thought happened to the money.  Ex. 757. He said he believed the engineering services account was set up to "set aside" the "$$" that the Sewer Commission had.  Ex. 757 at 1.  Varjabedian said that although it may have been set aside for "engineering services," he has records showing that he used the engineering money to pay for such things as a "temp agency, "Pat Donnelly's overtime [the secretary to the Sewer  Commission]"," "some R& M" [Repair and Maintenance], Area Mgr's Exp. Rpts" [an apparent reference to expense reports], "legal fees." Ex. 757 at 1.  In other words, the money was used by PSG for purposes other than engineering services.

518.   Varjabedian said that the last "cost detail" or record he had was from October 1997. Ex. 757. He attached it, and it showed "engineering services" as having only $75,000. Ex. 757 at 3.

519.    It now appears that whatever was left of the account after PSG took out monies for various expenses that Varjabedian identified in Ex. 757 was the subject of the $78,139.56 check that PSG issued in March 1998.  Ex. 644; Ex. 645.

520.    Therefore, from 1996, when PSG first received the "engineering services" funds, until March 1998, when it issued a check for what was left of them, PSG took money from the engineering services account it was holding for the Town without the slightest concern that the money was to be used for the purpose for which it had accepted it. All of the disbursements it made from the engineering account were concealed from Town Hall because they were off the Town Hall books. The Town Accountant or the Town Treasurer could not have known what PSG was doing with the money because PSG was just keeping it in accounts that it had, concealed from the Town.

521.    PSG acted unfair and deceptively in taking monies out of engineering services account for non-engineering services purposes and in issuing the $78,139.56 check out of the engineering services account in March 1998, nearly two years later, for non-engineering services.  Assuming that the June 28, 1996 letter between Sausé and Thomson was a binding contract, Ex. 539, it was unfair and deceptive, and a reckless, and at least grossly negligent handling of funds, for PSG to use the funds for the purposes described in Varjabedian's letter. Ex. 757. Assuming Ex. 539 was a binding contract, PSG had no authority to disburse the funds in March 1998 for an undocumented purpose  – let alone a purpose unrelated to engineering services.  See check request, Ex. 644. PSG had no right to disregard the purpose of the contract and blithely issue a check.

522.    If the June 28, 1998 letter between Sausé and Thomson was NOT a binding contract, then there is even more reason to conclude that PSG acted unfairly and deceptively, and recklessly, in connection with the handling of funds it kept on its books for "engineering services" and the disbursement of the balance of the "engineering services" funds in March 1998 in the form of a check in the amount of $78,139.56. Ex. 644, Ex. 645.

523.    In that case, PSG had no authority to accept the "engineering services" funds in the first place in 1996, and never should have been in a position to hold funds for the Town, and then dispense them to Thomson as the result of the one page "check request" singed by Kruger and also with Sausé's name. See Ex. 644.

524.    The next check request that resulted in a PSG check being deposited in the Wainwright Account is dated only nine days later, on March 26, 1998. Ex. 646.

525.    That request was for $193.97, and resulted in a check being issued in that amount. Ex. 646. ex. 118.

526.    Once again, there is only the scantest documentation for the check. The only document that exists is a singe page "check request form" purportly signed by Varjabedian and Sausé. Ex. 646. The reason given was simply "rebate unspent monies." There is no explanation as to what rebate account the money was from, for example, capital expenditures, repair and maintenance, etc.

527. Nor is there any documentation showing any authority from the Town or from anyone at the Sewer Commission for disbursement of the funds in the form of a check at that time. Ex. 646.

528. PSG acted unfairly and deceptively, and recklessly, in disbursing Town funds on this basis.

529. The fifth and final check issued by PSG that landed in the Wainwright Account was the result of a check request for $10,000dated December 8, 1998 and signed by Sausé and Kruger. Ex. 648. Attached to the request is a typed letter signed by Thomson asking that the check be issued because the Commission "has decided to pursue the design and construction of new laboratory and administrative facilities of the Rockland wastewater treatment plant." Ex. 648.

530. PSG, in response, issued a check in the amount of $10,000 made out to, "Town of Rockland, Rockland Sewer Commission,  Gregory Thomson, Superintendent." Ex. 647. (Thomson had asked that the check be made out to "Town of Rockland d/b/a Rockland Sewer Commission"). Ex. 648.

531. PSG acted unfairly and deceptively, and recklessly,  in issuing the check.  There is no indication out of which account the $10,000 was to be taken. If for a capital expenditure, to be taken out of the capital account under the 1998 contract, then such expenditure should have been approved by the Sewer Commission. The 1997 RFP specifically provided:

> For emphasis purposes, the Rockland Sewer Commission must authorize the expenditure of funds from the $100,000 allowance.

532. 1997 RFP, Ex. 500 at 21. There is no indication that the Sewer Commission authorized such an expenditure.

533. Even more fundamentally, however, there is not the barest documentation concerning the supposed expense associated with the "design and construction" referenced in the letter on which the check request was based. There are no invoices, there is no contract for services, for example.  Most significantly is the fact that the letter does not request that the money be paid to a vendor – something that should raised concerns with PSG about where the Town's money was going if PSG had not been reckless.

534. As a result of PSG's unfair and deceptive acts, and its reckless conduct in handling the checks of Town money that were deposited into the Wainwright Bank account – beyond the control of the Town – the Town suffered a loss of the funds represented by those checks.

535. The money was spent for a variety of purposes, but the Town had no control or use of the funds. See Ex. 18.

536.   The Town, to mitigate its damages, sought reimbursement from Wainwright Bank and reached a settlement. Consequently, it seeks the litigation costs it incurred in obtaining the recovery.   Testimony of Eric Hart, Town Accountant; Testimony of Lawrence Chaffee, Selectmen; Ex. 879.

## XXII.  DAMAGES SUFFERED BY THE TOWN

### A.    Damages Suffered Because Of The Improper And Undue Influence That PSG Had In Influencing The Procurement Process And Steering The Contract to PSG

#### 1.   The Difference In What The Town Paid PSG Under The 1998 Contract And What It Likely Would Have Paid A Competitor If Had Not Been For The Undue And Improper Influence Of PSG

537.   If it had not been for PSG's efforts to influence, unfairly and deceptively, the procurement process, the Town likely would have had a procurement process that yielded a lower bid from Woodard & Curran. Woodard & Curran's proposal would have saved the Town approximately $250,000 per year, for the six years and 1 ½ months that the contract was in effect.  The 1998 contract was in effect from March 1998, until April 21, 2004.  Ex. 192.  See Section XI, supra.

538.   Consequently, the Town paid approximately $250,000 more a year than it likely would have paid without the unfair and deceptive conduct by PSG.  The total damages on this element amount to $1,531,250. See Section XI supra.

### 2.  Cost Of New Procurement In 2004

539.   Because in 2004, the Inspector General determined that the 1997 procurement was likely tainted – which is borne out by the evidence presented at trial – and because the Town came to the same conclusion, the Town was put in the position of having to cancel the contract and conduct a new procurement.  The Town had no choice in order to preserve the public's faith in the bidding system.

540.   The cost of the new procurement, which was the result of the unfair and deceptive conduct of PSG in improperly influencing the procurement, was $80,000. See Section XV, supra.

### B.    Other Damages Suffered By The Town

### 1.  Cost Of Forensic Audit

541.   Because of the information that surfaced about Thomson depositing checks from PSG into a personal bank account in his name, the Town hired a forensic accountant to

investigate the financial dealings between PSG and the Sewer Department, and the 1998 contract. This expense was a result of PSG's unfair and deceptive conduct in the handling of funds, which was also reckless.  See Sections XVIII-XXI, supra.

542.   The cost to the Town of the forensic audit was $36,250. Sullivan direct, XV.

### 2. Cost To Town To Recover Funds Misappropriated By PSG's Issuance of Checks To Thomson, Which He Deposited Into His Personal Account, And The Deposits of Checks Into An Account At Wainwright Bank

543.   The Town, in an effort to mitigate its damages, pursued claims against the banks to recover some of the money that PSG had improperly handled, and, as a result, was misappropriated in the form of checks deposited into Thomson's personal bank account and in the Wainwright Bank. The Town does not seek to recover for those checks, but it does seek to recover the attorneys' fees it spent to recover funds. The Town incurred $164,645 in attorneys' fees. Testimony of Eric Hart, accountant; Testimony of Lawrence Chaffee Selectman; Ex. 879.

### 3. Cost of Improper Transactions (Other than Checks Issued to Thomson as Payee) in Special Rebate Accounts that Were Supposed to be for Capital Expenditures, Repair and Maintenance

544.   Based on the examination of the forensic accountant, the improper transactions in the time period for which he was able to analyze records of the rebate accounts in the 1998 contract amounts to $76,593. See Section XIX supra.

### 4 . Improperly Withheld Rebate Money From 1998 Contract

545.   The town has also suffered damages of $158,122 in the form of the rebate money that was improperly withheld by PSG for the final contract year in which it performed services.   Testimony of Cynthia Solomon; Testimony of Eric Hart.   There is no justification for PSG refusing to pay the rebate money.

## XXIII. THE TOWN MADE DEMAND ON PSG

546.   By letter dated May 14, 2004, the Town, by and through its counsel, demanded relief from PSG pursuant to G.L. c.93A, §(3).   The Town included this allegation in its counterclaims.   See Defendants Town of Rockland Sewer Commission's Answer, Counterclaim, and Crossclaim against Michael Sausé (Docket No. 11) at Counterclaim ¶49.

547.   In answering the allegation, PSG responded that "PSG states that the referenced document speaks for itself." Professional Services Group, Inc.'s Answer to Counterclaim, Affirmative Defenses and Jury Demand (Docket No. 12) at ¶ 49.

### XXIV. PSG'S DEFENSE – ASSERTED AT TRIAL – THAT THE MANIPULATION OF THE PROCUREMENT PROCESS IN 1997 WAS A PERSONAL SCHEME HATCHED BY SAUSÉ AND THOMSON TO STEAL TOWN FUNDS  IS TOTALLY BELIED BY THE FACTS, THE TIMING OF EVENTS, AND THE APPLICATION OF COMMON SENSE TO THE FACTS

548.   Kruger, Sausé's boss, admitted that Sausé told him that he and Thomson were going to the Inspector General's seminar in May 1997 so that they would be "doing it right" and Kruger admitted he understand that Sausé was referring to him – Sausé – and Thomson working on the upcoming RFP.  Consequently, Kruger admitted that he knew in advance of the RFP that Sausé was planning to work on it with Thomson.   Kruger's admission is *totally inconsistent* with PSG's argument at trial that Sausé was a "rogue" employee and that  Thomson were secretly working on the RFP so that PSG would win the bid and they would have the ability to steal money.  If Sausé was a "rogue" employee and wanted to keep his plans to work on the RFP a secret from PSG, he would not have told his boss, Kruger, that he and Thomson were going to the Inspector General's seminar so they would know how to do it right.   Sausé telling Kruger, however,  is *perfectly consistent* with Sausé wanting Kruger to know that he was using the client relationship skills that  he was known for (according to his personnel evaluations)  to maneuver to work on the RFP with Thomson and thus give PSG an advantage in the procurement process. The evidence thus supports the conclusion that Sausé was working on the RFP in an effort to give his employer, PSG, an advantage in the bidding process and help PSG win the bid.

549.   Kruger, Sausé's boss, admitted that he discussed with Sausé – in advance of the RFP's release – Sausé wanting to include the anticompetitive provision requiring a minimum bid for labor. If Sausé was a "rogue" employee and wanted to keep his work on the RFP a secret from PSG, he would not have told his boss, Kruger, that he wanted to include a minimum labor bid in the RFP before the RFP came out.. Sausé telling Kruger is perfectly consistent, however, with Sausé wanting his boss Kruger to know that he was working on a way to include in the RFP a way to help deter competitors in the procurement process and obtain the contract renewal for PSG.

550.   Kruger, Sausé's boss, testified that he believes Sausé told him about getting the Inspector General's approval to include the minimum labor bid in the RFP. Once again, if Sausé were trying to keep his involvement in the procurement process a secret, and if he were not acting in the interest of PSG, he likely would not have bothered to discuss the issue with Kruger.

551.  PSG's argument at trial that the $400,000 minimum labor bid was not to deter competition, but to boost the amount of money available under the next contract as rebate money – for the sole purpose of Sausé and Thomson stealing the labor account rebate money makes no sense when the facts are examined

552.  PSG tried to argue that the Wainwright Bank account opened up by Sausé and Thomson was simply the fulfillment of the RFP scheme to steal town money. It is clear when the facts are examined, however, that the Wainwright Bank account money was not an outgrowth of the 1997 RFP or the 1998 contract that resulted from it.  The Wainwright Bank account, instead, had everything to do with the way that PSG had improperly created in July 1995 and maintained since that time a "Professional Development Account," improperly handled funds supposedly designated for "engineering services" under a 1996 letter, and improperly disbursed funds in accounts without proper documentation. See Section XXI; see also Sections XVIII-XX, supra.

553.  The rebate accounts referenced in the 1997 RFP and the 1998 Contract also had no special connection to the stealing of funds.  What facilitated the embezzlement of funds was not the existence of the special accounts for capital expenditures, repair and maintenance, etc., but PSG's actions beginning in December 1998 (see Ex. 648) to issue checks from the accounts earmarked for special purposes without proper documentation of purposes consistent with the  – indeed, in most cases, without any documentation of any purpose.  See supra Section XVIII.

554.  It makes no sense whatsoever that Sausé and Thomson would have conspired to steer the RFP to PSG beginning in the spring of 1997 (or as early as 1996 when Sausé was trying to help Thomson become superintendent) for the purpose of getting PSG to write checks out of rebate accounts that could be deposited in Wainwright Bank (or any other bank) for their use, when they had no reason to believe – based upon what had occurred by the time of the RFP – that PSG would issue a check so cavalierly.  Indeed, there is not a single check in the record in this case made out to "Town of Rockland, Rockland Sewer Commission, Gregory Thomson, Superintendent" until November 25, 1997 – well after the RFP had been issued and after the PSG had submitted its winning bid. Sausé and Thomson could not possibly have known prior to that date that PSG would have been so cavalier, so reckless in the disbursement of funds by check.

555.  If Sausé and Thomson had been primarily interested in obtaining checks from PSG of Town funds, it is demonstrated by the evidence that there was no reason for them to wait until the RFP was issued and PSG won the bid.  For example, the "engineering services" money that became the single largest deposit in the Wainwright Bank account, had been available since 1996. See supra, Section XXI.. If Thomson and Sausé had been interested in stealing that money, they could have sought to obtain the money earlier.

556.  Similarly, there is no reason to believe that the $50,000 that was pulled out of the "Professional Development Account" in November 1997 and put into the Wainwright Bank had suddenly accumulated in November 1997. If Thomson and Sausé had been

primarily interested in stealing money, they could have acted well before the RFP was issued and before PSG won the bid to obtain the $50,000.  See supra, Section XX.

557.   The contract resulting from the 1997 RFP was not even signed until February 1998. Consequently, there was no link between the new contract and the opening of the Wainwright Bank account, which was in November 1997 with its first deposit in December 1997.

558.   Furthermore, the evidence is that Sausé and Thomson did not try to conceal from PSG the existence of the checking account at Wainwright Account. If their collaboration on the RFP had been a secret plan to open the account and steal money, they would not have been so open about the checking account's existence. For example, the letter requesting the $50,000 in Professional Development money in November 1997 to PSG specifically refers to the Commission's plans to open a "checking account."  Ex. 534.

559.   Varjabedian admits that he knew of the existence of the checking account and that Sewer Commission Robert Corvi and Thomson discussed it with him. Varjabedian direct, 81-82.

560.   Thomson even wrote Varjabedian a check out of the Wainwright Bank checking account, Varjabedian admitted. Varjabedian direct, 82;  Ex. 712 (check to Arm Varjabedian signed by Thomson in the amount of $1,600).

561.   Further evidence that Thomson and Sausé did not have some scheme in 1997 during the procurement process that a new contract or the 1997 RFP would help them steal money, and to use a checking account at Wainwright Bank or any other bank to do so, is the fact that as late as April 2, 1998 Thomson wrote a check out of the Wainwright Bank account to the Inspector General's office for some purchase he had made. See Ex. 866 (Check signed by Thomson out of Wainwright Bank account to Office of the Inspector General).  It defies logic to believe that Thomson would have written a check to the Inspector General's office out of an account that bore the Town of Rockland's name on the check, and his signature on the check, if his intention with the account at the time was to steal money.

## PROPOSED RULINGS OF LAW

**XXV.          THE TOWN'S ACTION IS BROUGHT UNDER SECTION 9**

1.     Mass. Gen. Laws ch. 93, § 9(1) provides:  Any person, *other than a person entitled to bring action under section eleven of this chapter,* who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two … (Emphasis added).

2.     The Town is not entitled to bring to bring an action under Section 11. See Clean Harbors of Braintree, Inc. v. Board of Health of Braintree, 409 Mass. 834, 841, 570 N.E.2d 987, 1991 (1991)

3.     Consequently, the Town is entitled to bring an action under Section 9. See Republic of Turkey v. Oks Partners, 97 F.Supp. 64, 68 (D. Mass. 1992) (holding that Republic of Turkey could bring an action under 93A § 9); Spence v. Boston Edison Co., 390 Mass. 604, 615, 459 N.E.2d 80, 87(1983) (permitting the Boston Housing Authority to bring an action under Chapter 93A.); United States v. United States Trust Co., 660 F. Supp, 1085, 1090(D. Mass. 1986) (holding that United States was a "person" under 93A and stating that "I see no reason why a public body may not have the advantage of the provisions of the Consumer Protection Statute as a plaintiff."); Pierce v. Dew, 626 F. Supp. 386, 387, 388 (D. Mass. 1986)(holding that secretary of housing and urban development was a person under G.L. c.93A s9(1)).

**XXVI.          NO DEMAND LETTER IS NECESSARY BECAUSE ACTION IS BROUGHT AS A COUNTERCLAIM**

4.     Because the Town's Chapter 93A claim against PSG is by counterclaim, the Town need not have made a demand on the claim against PSG. Mass. Gen. Laws ch. 93A, § 9(3) ("The demand requirements of this paragraph shall not apply if the claim is asserted by way of counterclaim or cross-claim").  (As it happens, the Town made a demand on PSG, but it is unnecessary in this matter).

**XXVII.          A JUDGE AND JURY MAY REACH INCONSISTENT RESULTS**

5.     This Court is not bound by any rulings of the jury in this case. Judges and juries may reach inconsistent results in the context of a Chapter 93A claim. Where, as here, the Court has reserved the issue of Chapter 93A liability for itself, the Court is not bound by any decision of the jury.  For example, a judge's independent finding on a 93A claim may be contrary to the findings of the jury on a parallel common law claim; the judge is free to draw different conclusions from the same evidence. See Guity v. Commerce Insurance Co., 36 Mass. App. Ct. 339, 631 N.E. 2d 75(1994).

6.     "…[T]he broader scope and more flexible guidelines of c. 93A permit a judge to make

his or her own decisions under c. 93A without being constrained by the jury's findings." Chamberlayne School v. Banker, 30 Mass. App. Ct. 346, 354-355, 568 N.E.2d 642, 648-649 (1991) (internal citation omitted) (affirming judgment in which trial judge found damages under c. 93A in the amount of $60,000 (prior to being doubled) after jury had awarded $20,000 in damages under a common law misrepresentation claim "based on the same fact pattern").

7.      For example, Simas v. House of Cabinets, Inc., a homeowner sued a contractor both for breach of contract and under Chapter 93A. 53 Mass.App.Ct. 131, 134, 757 N.E.2d 277, 279 (Mass. Ct. App. 2001). The jury found that the contractor had not breached. Id. at 135, 757 N.E.2d at 280. Nonetheless, the Court found that the contractor had committed numerous violations of 93A, and awarded damages of $33,472.30, including costs and attorney's fees, as well as prejudgment interest. Id. The Appeals Court affirmed, holding that "the judge was permitted to make his own decision on the more expansive c. 93A claim without being constrained by the jury's finding, and was entitled to reach his own conclusions on the import of Simas's actions." Id. at 141, 757 N.E.2d at 284.

8.      "[T]he subject matter of a c.93A claim is sufficiently distinct so that a judge sitting independently on the c.93A claim may arrive at findings different from those of the jury sitting on the non-93A claims, even though there is evidence which, if believed, would support the jury verdict." Wyler v. Bonnell Motors, Inc., 35 Mass. App. Ct. 563, 567, 624 N.E.2d 116, 118 (1993) (holding that the punitive component of a judge's award for a knowing and willful violation of c. 93A was not subsumed within a jury's finding of damages on an abuse of process claim).

9.      " '[A] judge may make independent and, therefore, different findings on the c. 93A aspect of a case that arises from the same facts which gave rise to parallel common law claims.'" Poly v. Moylan, 423 Mass. 141, 151, 667 N.E.2d 250, 257 (1996), quoting Wyler v. Bonnell Motors, Inc., 35 Mass. App. Ct. 563, 567, 624 N.E.2d 116, 118 (1993); See also Fredette v. Allied Van Lines, Inc., 66 F.3d 369, 375 (1st Cir. 1995).

## XXVIII.      THE CONDUCT PROHIBITED BY CHAPTER 93A IS BROAD - AND NOT BOUND BY CONVENTIONAL DEFINITIONS

10.      Section 2 of Chapter 93A prohibits "acts" and "practices" that either "unfair" or "deceptive".

11.      This language prohibiting "unfair or deceptive" conduct is broad enough to enough to include some reprehensible acts committed in business contexts that elude conventional definitions and common law claims. Doliner v. Brown, 21 Mass. App. Ct. 692, 489 N.E.2d 1036 (1986);Nei v. Burley, 388 Mass. 307, 446 N.E.2d 674 (1983)

12.      Chapter 93A is "sui generis," "neither wholly tortious nor wholly contractual in nature," and "not subject to the traditional limitations of preexisting causes of action." Kattar v. Demoulas, 433 Mass. 1, 12-13, 739 N.E.2d 246, 257 (2000).

13. Since Chapter 93A does not define "unfair" or "deceptive," liability "is best discerned from the circumstances of each case.". <u>Kattar v. Demoulas</u>, 433 Mass. 1, 13-14,739 N.E.2d 246, 257 (2000). <u>VMark Software v. EMC Corp</u>, 37 Mass. App. 610, 622 n14, 642 N.E.2d 587, 595 n. 14 (1994) (Whether particular conduct establishes liability under Chapter 93A "always depends on the unique facts of each case").

### A.    Conduct May Be "Unfair" Without Being "Deceptive"; The Evidence Proves "Unfair" Conduct By PSG

14. A practice may be "unfair" without being deceptive or fraudulent. <u>Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc.,</u> 403 Mass. 722, 532 N.E. 2d 660 (1989). The focus in determining "unfairness" is on the nature of the challenged conduct and on the purpose and effect of that conduct. <u>Massachusetts Employees Ins. v. Propac-Mass., Inc.,</u> 420 Mass. 39,648 N.E.2d 435 (1995).

15. Unfairness is "determined from all the circumstances." <u>Duclersaint v. Federal Nat'l Mortgage Association,</u> 427 Mass. 809, 814, 696 N.E.2d 536, 540 (1998). Factors in determining unfairness include: (1) " whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness;" (2) " whether it is immoral, unethical, oppressive, or unscrupulous," (3) whether it causes substantial injury to consumers or competitors or other businesses. <u>PMP Associates v. Globe Newspaper. Co.,</u> 366 Mass. 593, 321 N.E.2d 915 (1975). Other factors include whether the conduct is "oppressive" or "unconscionable in any respect." <u>Datacomm Interface, Inc. v. Computerworld, Inc.,</u> 396 Mass. 760,778, 489 N.E.2d 185, 196 (1986).

16. Applying these standards, PSG's conduct in influencing the RFP and its role in the procurement process was "unfair" within the meaning of Chapter 93A. See Sections II-XVII.

17. Applying these standards, PSG's conduct in the mishandling of Town monies was "unfair" within the meaning of Chapter 93A. See Sections XVII-XXI.

**B.    Negligent Or Reckless Deceptive Conduct May Be The Basis Of A Chapter 93A Violation; PSG's Deceptive Conduct Violated Chapter 93A**

18.    A practice can be "deceptive" if it can reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted. Fraser Engineering Co., Inc. v. Desmond, 26 Mass. App. Ct. 99, 104, 524 N.E.2d 110, 113 (1988). No reliance need be shown. Heller Financial v. Ins. Co. of North America, 410 Mass. 400, 409, 570 N.E.2d 8, 13 (1991).).

19.    Common law fraud or misrepresentation may be the basis for an unfair or deceptive practice claim under Chapter 93A. McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 714, 563 N.E.2d 188, 194 (1990); VMark Software v. EMC Corp, 37 Mass. App. 610, 642 N.E.2d 587(1994). But, in order to prevail under Chapter 93A, a claimant does not need to show that that a misrepresentation was intentional. VMark Software v. EMC Corp, 37 Mass. App. 610, 620-21, 642 N.E.2d 587, 595 (1994).

20.    A reckless misrepresentation is sufficient to trigger liability. Briggs v. Carol Cars, Inc., 407 Mass. 391, 553 N.E.2d 930, 932 (1990) (upholding application of sections 9 of chapter 93A where defendant made "reckless" misrepresentations). Reckless misconduct is when an actor "should realize that there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless." Forbush v. City of Lynn, 35 Mass.App.Ct. 696, 625 N.E.2d 1370, 1372 (quoting Restatement (Second) of Torts § 500 comment f (1964).) "Reckless disregard" has been defined as "serious doubts as to the truth" of a statement. See Milgroom v. News Group Boston, Inc., 412 Mass. 9, 11, 586 N.E.2d 985 (1992). To be held liable for reckless conduct, "the actor must know, or have reason to know, the facts which create the risk . . . the risk must itself be an unreasonable one under the circumstances." Boyd v. National R.R. Passenger Corp., 446 Mass. 540, 547, 845 N.E.2d 356, 363 (2006) (quoting Restatement (Second) of Torts § 500 comment a).

21.    Deception that is the result of negligence may be the basis for a Chapter 93A violation. Linthicum v. Archambault, 379 Mass. 381, 388, 398 N.E.2d 482, 487 (1979)(noting that is "no defense" to a Chapter 93A claim that conduct was negligent and not intentional); Glickman v. Brown, 21 Mass. App. Ct. 229, 235, 486 N.E.2d 737, 741(1985). See Swanson v. Bankers Life Co., 389 Mass. 345, 349, 450 N.E.2d 577, 580 (1983) ("We agree that recovery may be had for a deceptive act that is the result of a defendant's negligence."); Linthicum v. Archambault, 379 Mass. 381, 388, 398 N.E.2d 482, 487 (1979) ("it is not a defense to a c. 93A claim that the defendant's conduct was negligent rather than intentional"); MacGillivary v. W. Dana Bartlett Ins. Agency of Lexington, Inc., 14 Mass.App.Ct. 52, 58-61 (1982) ("a negligent violation by a broker of G.L. c. 175, s 160, must be taken to constitute a violation of G.L. c. 93A, s 2, for which recovery under s 11 is allowable.");

73

22.    Misrepresentation refers to "not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth." <u>Boston Five Cents Sav. Bank v. Brooks</u>, 309 Mass. 52, 55-56, 34 N.E.2d 435, 437 (1941); <u>Kannavos v. Annino</u>, 247 N.E.2d 708, 712, 356 Mass. 42, 48 (Mass. 1969); <u>Restatement (Second) of Torts</u>, which uses <u>Restatement: Torts</u> § 525.

23.    Applying these standards, PSG's conduct in influencing the RFP and its role in the procurement process was "deceptive" within the meaning of Chapter 93A. For example, PSG deceived the Town into believing that the procurement process was honest and open competitive bidding. While PSG, as the incumbent operator, had a limited legitimate role in providing some technical and factual information that would be necessary in preparing the RFP, and answering bidders' questions at the pre-proposal briefing about certain technical information, PSG did not disclose its true behind-the-scenes role in influencing the RFP and the procurement process in order to try to win the contract for PSG. PSG orchestrated a sham competitive bidding process, ghost-writing even the addenda to the RFP while it was preparing its own proposal for submission to the RFP in which it had played such a pivotal role.

24.    PSG 's conduct in representing, with its, proposal, under penalties of perjury that it had not taken any action in "collusion" or to restrain competition, was also deceptive, since PSG's Sausé had been actively colluding with Thomson, and was had taken and was taking steps to restrain competition.

25.    PSG's deceptive conduct in connection with the procurement process is described in fuller detail in Sections II-XVII, supra.

26.    Applying these standards, PSG's conduct in the mishandling of Town monies was "deceptive" within the meaning of Chapter 93A. For example, PSG deceived the Town into believing that it was handling the monies that were given to it for specific purposes under its contracts *for those purposes.* PSG deceived the Town about the use of, existence of, unused money from the special rebate accounts earmarked for specific purposes. PSG acted deceptively by disbursing the money for inconsistent purposes and with no documentation or legitimate justification.

27.    PSG acted deceptively in participating in a scheme to conceal from "Town Hall" the existence of monies available for public use by creating special accounts into which it deposited the money.

28.    PSG's deceptive conduct in connection with the mishandling of Town funds is described in Sections XVIII-XXI.

     **C.**    **Bad Faith Can Be Basis for Violation of Chapter 93A; PSG's Bad Faith Conduct Violated Chapter 93A**

29.    Bad faith may form the basis of a Chapter 93A violation.  A breach of the implied covenant of good faith and fair dealing has been found to be sufficient to establish a violation of Chapter 93A.  <u>Massachusetts Employees Ins. v. Propac-Mass, Inc.</u>, 420 Mass. 39, 43,  648 N.E.2d 435, 438 (1995)(upholding violation based on finding of breach of  covenant of good  faith and fair dealing); <u>see  Cherick Distributors v. Polar Corp</u>, 41 Mass. App. Ct. 125, 128, 669 N.E.2d 218(1996) .

30.    PSG acted in bad faith, when, among other things, while working under contract as the incumbent operator of the wastewater treatment plant, it used its access to Thomson to induce, and then aid and abet Thomson in breach of his duty as a public official in his role as Superintendent. See Section D below.

     **D.**    **Aiding And Abetting Can Be A Basis For Chapter 93A Liability; PSG's Aiding And Abetting Thomson's Breach Of His Responsibility As A Public Official To Conduct An Honest And Open Bidding Process Violated Chapter 93A**

31.    The act of "aiding and abetting" may provide the basis for a Chapter 93A violation. <u>Kattar v. Demoulas</u>, 433 Mass. 1, 15, 739 N.E.2d 246(2000); <u>Hanover Ins. Co. v. Sutton</u>, 46 Mass. App. Ct. 153, 173, 705 N.E.2d 279, 293-94 (1991)(corporate defendant liable for aiding and abetting corporate officer of plaintiff  breaching his fiduciary duty).

32.    Although "aiding and abetting" was not relied upon explicitly in <u>Augat, Inc. v. Aegis, Inc.</u>, 409 Mass. 165, 172-73, 565 N.E.2d 415, 419-20(1991), the Court found Chapter 93A liability against individual defendants by virtue of their participation in a high-level employee's breach of fiduciary duty to the corporate plaintiff.

33.    Thomson had a duty as a public official handling the procurement to conduct the procurement in good faith, and in accordance with Chapter 30B, the Uniform Procurement Act. The  purpose of competitive bidding statutes is, in addition to ensuring that the bidding authority awards public contracts to the lowest responsible bidder, "to establish an open and honest procedure for competition for public contracts." <u>Modern Constr. Co., Inc. v. City of Lowell</u>, 391 Mass. 829, 840 (1984).  G.L. c. 30B, as well as other bidding statutes, is intended "'to prevent favoritism, to secure honest methods of letting contracts in the public interest, to obtain the most favorable price, and to treat all persons equally.'" <u>Mangano v. Wilmington</u>, 51 Mass.App.Ct. 857, 859 (2001) (quoting <u>Phipps Prods. Corp. v. Massachusetts Bay Transp. Authy.</u>, 387 Mass. 687, 691-692 (1982)).  <u>Phipps Prods. Corp.</u>, 387 Mass. at 691, 443 N.E.2d 115.

34.   PSG acted unfairly and deceptively by aiding and abetting Thomson to breach his obligation as a public official handling the procurement for the operation of the Town's wastewater treatment plant. See Sections II-XVI.

### XXIX.     THE CHECK PAYEE RULES DEMONSTRATE, AT THE VERY LEAST, THE RECKLESSNESS OF PSG'S CONDUCT IN HANDLING FUNDS

35.   Under the law, if a check is made payable to two or three people or entities, alternatively, any of them may cash it, deposit it or endorse it.  If a check made out to three people or entities, but not in the alternative, it may only be cashed, deposited or endorsed by all three together.  If a check is made payable to three people or entities and it is ambiguous as to whether it is payable to the payees alternatively, then the check can be cashed, deposited or endorsed by any one of them. M.G.L. 106 § 3-110 (added to Mass.General Laws February, 1998); Section 3-110, Uniform Commercial Code, 1190 Revision of Article 3, 2 Uniform Laws Annotated.

36.   During the times applicable to this case, PSG's headquarters and US Filter's headquarters, were in Texas, and its controller was based in Texas. It has been the law of Texas at least since 1996, and during all of the period 1997 through 2002, that  if a check is  made payable to three people or entities and it is ambiguous as to whether it is payable to the payees alternatively, then the check can be cashed, deposited or endorsed by any one of them Tex. Bus. & Commerce Code Ann. § 3.110.

37.   PSG was reckless in making out thousands and thousands of dollars in checks in a manner that would allow Thomson, under these rules,  to cash them personally, and indeed, Thomson did deposit thousands of dollars in checks in his personal account, when such funds were supposed to be those of the Town. See Section XVIII.A.

### XXX.     BY ITS CONDUCT, PSG SHOWED CONSCIOUSNESS OF LIABILITY

PSG's shielding of plant manager Varjabedian from questioning by the Town's forensic accountant, before this lawsuit began, and its withholding of documents from him concerning the expenditures for certain years in the rebate accounts, is evidence of  PSG's consciousness of liability.  See McNamara v. Honeyman, 406 Mass. 43, 54 n. 10, 546 N.E.2d 139 (1989) (fact that a physician inserted a back-dated note indicating a patient was doing well after she committed suicide could be considered as "consciousness of liability"); Sheehan v. Goriansky, 317 Mass. 10, 16-17 (1944) (whether evidence of defendant's conduct indicated consciousness of liability was for the fact finder to decide); Bennett v. Susser, 191 Mass. 329, 331 (1906) ("the suppression of important evidence is a fact to be weighed against the party suppressing it").

**XXXI.     PSG IS VICARIOUSLY LIABLE FOR ACTS OF SAUSÉ IN INFLUENCING THE PROCUREMENT PROCESS IN 1997, AND IN ITS EMPLOYEES' HANDLING OF TOWN FUNDS UNFAIRLY, DECEPTIVELY, AND RECKLESSLY**

38.     Corporations may be held liable under Chapter 93A for the conduct of employees acting within the scope of their employment. Principles of agency apply. See Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854, 858, 501 N.E.2d 1163, 1167(1986); Makino, U.S.A., Inc. v. Metlife Capital Credit Corp., 25 Mass. App. 302, 312-13, 518 N.E.2d 524-25(1988)(company liable for acts of regional branch manager in falsifying documents, concealing information and other conduct); see Int'l Brotherhood of Police Officers, Local 443 v. Memorial Press, Inc., 31 Mass. App Ct. 138, 140-41, 575 N.E.2d 376, 378-79(1991)(describing test for vicarious liability).

39.     Applying the principles below, PSG is liable for the acts of its employees for the unfair and deceptive conduct found above.  Facts supporting the conclusion that PSG is liable for the unfair and deceptive acts of its employees in connection with the procurement process are in  Sections III-XXI. Facts supporting the conclusion that PSG is liable for the acts of its employees in connection with the mishandling of funds are, additionally, in Sections XVIII-XXI..

### A.     Vicarious Liability – Employees As Agents

40.     An employee is an agent of his employer. See Kansallis Finance Ltd., v. Fern, 421 Mass. 659, 662 (1996) ("servants…are categorized as agents of their principals"), citing Restatement (Second) of Agency § 218 Title B, Torts of Servants, introductory note, fourth par. (1957) (servants are agents of their master); W.A. Seavey, Agency § 2(B) (1964) (master and servant included in agency relation).

41.     "[A corporation's] liability is 'necessarily vicarious.'"  A corporation cannot act on its own, except through human agents, and therefore corporations may be liable -- for the conduct of their agents, such as employees. Sarvis v. Boston Safe Deposit & Trust Co., 47 Mass. App. Ct. 86, 96 (1999), quoting Commonwealth v. L.A.L. Corp., 400 Mass. 737, 743 (1987) (internal citation omitted).

### B.     Employer Liable For Employee's Conduct Even If Unaware Of It

42.     The law allows for vicarious liability because of the premise that "as between two innocent parties—the principal-master and [another party]—the principal-master who for his own purposes places another in a position to do harm to [another]… should bear the loss." Kansallis Finance Ltd., v. Fern, 421 Mass. 659, 664 (1996)

43.    Under the law, "[a] principal who requires an agent to transact his business, and can only get that business done if [others] … deal with the agent as if [they were dealing] with the principal, cannot complain if the innocent third party suffers loss by reason of the agent's act."

44.    "[T]he master who must put an instrument into his servant's hands in order to get his business done, must also bear the loss if the servant causes harm to a stranger in the use of that instrument as the business is transacted." Id.

45.    Under the law of vicarious liability, a principal may be liable for conduct of which it is "totally unaware." See Kansallis Finance Ltd., v. Fern, 421 Mass. 659, 671 (1996).

46.    Under the law of vicarious liability, a principal may be liable for conduct in which it was "entirely uninvolved." Id.

### C.    Scope of Employment

47.    PSG is liable for the acts of Sausé and other employees if those acts were committed within the scope of the employees' employment. Worcester Insurance Co. v. Fells Acre Day School, Inc., 408 Mass. 393, 404 (1990)

48.    "[C]onduct of an agent is within the scope of employment if [1] it is of the kind [the person] is employed to perform…; [2] if it occurs substantially within the authorized time and space limits…; and [3] if it is motivated, at least in part, by a purpose to serve the principal… ." Worcester Insurance Co. v. Fells Acre Day School, Inc., 408 Mass. 393, 404 (1990), quoting Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854, 859 (1986)

49.    Even if the predominant motive of an employee is his or her own interest, rather than the employer's, does not inhibit vicarious liability. "The fact that the predominant motive of the agent [or employee] is to benefit himself does not prevent the act from coming within the scope of employment as long as the act is otherwise within the purview of his authority. Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854, 859 (1986) (Emphasis added).

50.    The evidence establishes that Sausé was acting within the scope of his employment when he was acting to influence the RFP and the procurement process. Sections II-XVII.. Under agency principles, PSG's contention that Sausé, in connection with work on the RFP, may have been motivated in part by the friendship he developed with his client Thomson does not alter the conclusion that PSG is vicariously liable.

51.    The evidence establishes that Sausé, Varjabedian, Cavalieri,  Kruger, and others at PSG were acting within the scope of employment in the mishandling of Town funds. See Sections XVIII-XXI.

### D.    Employer Liable Even If Conduct Is In Excess Of, Or Abuse of, Authority

52.    An employer is liable for an employee's conduct if it is within the scope of the employee's authority – even if the conduct "constituted an abuse or excess of the authority" given by the employer. The law  takes the position that the employer "is justly held responsible when the [employee] , through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority and inflicts an unjustifiable injury on [another] person." Pinshaw v. Metropolitan Dist. Com'n, 402 Mass. 687, 695, 524 N.E.2d 1351, 1356 (1988).

53.    By virtue of the position in which PSG had Sausé work, and the activities it had  Sausé perform, PSG is responsible for his zealousness-turned-impropriety in his role trying to get PSG a  long-term contract with the Town.

### E.    Employer Vicariously Liable For Intentional Conduct of Employees Within Scope of Employment

54.    An employer may be held liable for the intentional wrongful conduct of an employee if the conduct was committed within the scope of employment.  . See Worcester Insurance Co. v. Fells Acre Day School, Inc., 408 Mass. 393, 404 (1990) ("An employer may be held vicariously liable for the intentional tort of an agent if the tortious act or acts were committed within the scope of employment."). Therefore, regardless of whether the acts at issue are intentional, reckless or negligent, PSG may be vicariously liable.

### F.    An Employer is Liable For Acts of Employees With Actual or Apparent Authority

55.    In addition to imposing liability upon a principal for the acts of an agent committed within the scope of the agent's employment, liability may also be imposed upon a principal where the agent acted with the actual or apparent authority of the principal. This method of determining vicarious liability is particularly appropriate where the harm to the victim resulted from the voluntary transaction of business, as in the cases of contracts, and in cases of fraud and misrepresentation. Therefore, liability may be imposed upon PSG because Sausé, Kruger, Varjabedian, and others committed various acts with PSG's actual or apparent authority. Kansallis Finance Ltd., v. Fern, 421 Mass. 659, 664 (1996)

56.    The term "actual authority" means "the [a]uthority that a principal intentionally confers on an agent or the authority that the agent reasonably believes he or she has as a result of the agent's dealing with the principal. Actual authority can be either express or implied." Black's Law Dictionary (8th ed. 2004)

57.   Implied authority is "[a]uthority given by the principal to the agent as a result of the principal's conduct, such as the principal's earlier acquiescence to the agent's actions." Black's Law Dictionary (8th ed. 2004)

58.   Where an agent has "actual authority to transact the very business or to do the very act that causes the harm, the agent acts as the extension of the will of his principal and the case for vicarious liability is very clear." Kansallis Finance Ltd., v. Fern, 421 Mass. 659, 665 (1996)

59.   Apparent authority is "authority that a third party reasonably believes an agent has, based on the third party's dealings with the principal, even though the principal did not intend to confer the authority. Apparent authority can be created by law even when no actual authority has been conferred." Black's Law Dictionary (8th ed. 2004)

60.   A principal will deem to have conferred authority upon a person to act in the principal's behalf—even if he does not grant that person actual authority to act--when a principal has engaged in conduct that "causes a third person reasonably to believe that a particular person has such authority." Kansallis Finance Ltd., v. Fern, 421 Mass. 659, 665 (1996), quoting Neilson v. Malcolm Kenneth Co., 303 Mass. 437, 441 (1939)

61.   Even where the agent's authority is apparent, but not actual, the principal will still be vicariously liable because "vicarious liability recognizes that it is the principal who for his own purposes found it useful to create the impression that the agent [was] act[ing] with his authority." Kansallis Finance Ltd., v. Fern, 421 Mass. 659, 665 (1996) .

62.   Sausé, in working on the RFP and the procurement process, and as the representative of the incumbent operator, had actual and apparent authority of PSG. For example, he worked on the RFP at PSG's offices, printed out communications on Sewer Commission stationery at PSG's offices for Thomson to sign in connection with the procurement. Thomson, while working on the RFP with Sausé at PSG's offices, discussed the RFP with Sausé's boss, Kruger.

### G.    An Employer Is Liable For the Fraudulent Or Deceptive Acts Of Its Employees

63.   A principal is liable for the deceptive acts of an agent if the deceptive acts "were within the actual authority, implied authority or apparent authority, or, if not within {the agent's} authority were ratified by the principal." Makino, U.S.A., Inc. v. MetLife Capital Credit Corp., 25 Mass. App. Ct. 302, 312 (1988).

64.   "Generally, the fraud of an agent acting in the course of his employment binds his principal." Makino, U.S.A., Inc. v. MetLife Capital Credit Corp., 25 Mass. App. Ct. 302, 313 (1988), citing Bockser v. Dorchester Mutual Fire Insurance Co., 327 Mass. 473, 477 (1951)

65.  "[A] principal who puts an agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud on [another] …is subject to liability." Kansallis Finance Ltd., v. Fern, 421 Mass. 659, 668 (1996).

66.  A principal's liability for the fraud of an agent results if "the agent's position facilitates…the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." Makino, U.S.A., Inc. v. MetLife Capital Credit Corp., 25 Mass. App. Ct. 302, 313 (1988), quoting Restatement (Second) of Agency § 261 comment a (1958).

67.  Sause's acts in orchestrating a sham competitive bidding process, and the illusion created for the Town that there was a fair and open competitive bidding process underway, were done in the scope of his employment.  The affidavit submitted to the Town with PSG's proposal representing that PSG had not "colluded" with any person in connection with the procurement, and had not taken any steps that were anti-competitive in connection with the procurement process was deceptive, either deliberately or recklessly so.

### H.    An Employer Can Be Vicariously Liable Even For Criminal Acts Of An Employee

68.  Principles of vicarious liability are so strong that a corporation can be held liable for the conduct of an employee that amounts to a criminal offense. See Commonwealth v. Angelo Todesca Corp., 446 Mass. 128, 133-136 (2006).

69.  A corporation can be held liable for the criminal conduct of its employee where it is established that the employee "[1] was placed in a position by the corporation where he had enough power, duty, responsibility and authority to act for and in behalf of the corporation to handle the particular business or operation or project of the corporation in which he was engaged at the time that he committed the criminal act…and [2] that he was acting for and on behalf of the corporation in the accomplishment of that particular business or operation or project, and that he committed a criminal act while so acting." See Commonwealth v. Angelo Todesca Corp., 446 Mass. 128, 133-136 (2006), quoting Commonwealth v. Beneficial Finance Co., 360 Mass. 188, 256 (1971), cert. denied sub. nom. Farrell v. Massachusetts, 407 U.S. 910 (1972, and sub nom. Beneficial Finance Co. v. Massachusetts, 407 U.S. 914 (1972).

### I.    An Employer Is Liable For The Acts Of An Employee Outside The Scope Of Employment When There Is Ratification; At The Very Least, PSG Ratified Sausé's Efforts To Influence The RFP And Procurement Process

70.  An employer is not only liable for wrongful conduct committed by its employees acting

within the scope of their employment but, "by ratification may become responsible for such acts when committed in excess of their authority." <u>Pinshaw v. Metropolitan District Commission</u>, 33 Mass.App.Ct. 733, 735, 604 N.E.2d 1321 (1992).

71.    No formal act of ratification is required for an employer such as PSG to be held responsible for the employee's wrongful conduct.    An employer's knowledge of, and ratification of, an employee's wrongful activity may be inferred from the circumstances. <u>Id.</u>

72.    Evidence of ratification on the part of an employer may include "a failure to investigate and discipline an employee."   Evidence of ratification may also include "failure to disavow an employee's unauthorized action".  Evidence of an employer's ratification may also include failure "to mitigate the harm caused once the facts are ascertained." <u>Pinshaw v. Metropolitan District Commission</u>, 33 Mass.App.Ct. 733, 735, 604 N.E.2d 1321 (1992).

73.    In this case, PSG, through Kruger, ratified Sausé's efforts to influence the RFP by discussing his plans with him and, at the very least, tacitly allowing him to go forward. Similarly, by watching him work on the RFP at PSG's Norwell office and not stopping him or interfering, Kruger was tacitly ratifying Sausé's conduct.

74.    In this case, PSG ratified its employees' acts of mishandling funds by actually defending, at trial  the manner in which checks were made out to "Gregory Thomson, superintendent," as payee, by defending the issuance of checks for purposes inconsistent with the purposes for which they were earmarked by contract, by defending the issuance of checks from specialized accounts, based on flimsy or no documentation.

### J.    For Vicarious Liability, There Is Even No Requirement That Corporate Officials Had Knowledge

75.    For purposes of imposing liability upon a corporation even for the criminal acts of an employee, "there is no requirement that corporate officials had knowledge of their employees' criminal acts..."<u>See Commonwealth v. Angelo Todesca Corp.</u>, 446 Mass. 128, 133-136 (2006), citing <u>Commonwealth v. L.A.L. Corp.</u>, 400 Mass. 737, 743 (1987).

76.    For purposes of imposing liability upon a corporation for the criminal acts of an employee, there is no requirement that such conduct be " 'performed, authorized, ratified, adopted or tolerated by' corporate officials or managers.' " <u>See Commonwealth v. Angelo Todesca Corp.</u>, 446 Mass. 128, 133-136 (2006), quoting Commonwealth v. Beneficial Finance Co., 360 Mass. 188, 254 (1971), cert. denied sub nom. <u>Farrell v. Massachusetts</u>, 407 U.S. 910 (1972, and sub nom. <u>Beneficial Finance Co. v. Massachusetts</u>, 407 U.S. 914 (1972).

K. **A Principal Is Liable For An Employee's Conduct Regardless Of The Scope Of Employment When Principal Took Risk That Agent Would Misuse His Authority**

77. Although a principal ordinarily will not be held liable for the acts of an agent that exceed the scope of the agent's authority, there are some circumstances where liability will nevertheless be imposed vicariously upon a principal even where the agent has acted beyond the scope of his employment . For example, a principal will be vicariously liable without regard to whether the agent acted within the scope of his employment where the principal took an unreasonable risk that resulted in his agent misusing his authority— actual or apparent—to act on the principal's behalf. Kansallis Finance Ltd., v. Fern, 421 Mass. 659, 665-666, n6 (1996).

78. In this case, Sausé acted within the scope of his authority. Alternatively, however, if he did not, then PSG took an unreasonable risk that Sausé would use his position to influence the RFP and the procurement process, and thus PSG is vicariously liable.

79. In this case, Varjabedian, Sausé and the others at PSG who participated in the mishandling of Town funds were acting within their authority. Alternatively, however, if they were not, then PSG took an unreasonable risk that they would use their position to mishandle Town funds.

## XXXII. DAMAGES NEED NOT BE PROVEN WITH CERTAINTY

80. Damages in a Chapter 93A claim need not be proved with "mathematical certainty." Kitner v. CTW Transport, Inc., 53 Mass. App. Ct. 741, 762 N.E.2d 867 (2002). The award of damages is permissible even if only "meager" evidence is presented. BBF, Inc. v. Germanium Power Devices Corp. 430 N.E.2d 1221, 1227 (Mass.App. 1982)( "an element of uncertainty is permissible in estimating damages and the award of damages is permissible on meager evidence, in particular in business torts where the focus is on the wrongfulness of (the) defendants' conduct.") Damages are recoverable as long as reasonable damages calculations can be made. Augat, Inc. v. Aegis, Inc., 417 Mass. 484, 491 (1994) and cases cited.

81. The Town has provided sufficient evidence of its damages.

## XXXIII. MULTIPLE DAMAGES FOR "WILLFUL OR KNOWING CONDUCT"

82. Chapter 93A provides up to three, but not less than two, times actual damages if the violation is "willful" or "knowing" Mass. Gen. Laws Ch. 93A, § 9(3).

83. A reckless, and therefore willful, violation exists "where the defendant knew that he did

not know whether the conduct was unfair, and acted with reckless disregard for whether it was unfair." Michael C. Gilleran, The Law of Chapter 93A (1989); see also Dahlborg v. Middleborough Trust Co., 16 Mass.App.Ct. 481, 486, 452 N.E.2d 281, 284 (Mass. App. 1983) (affirming "willful or knowing" finding with respect to bank that permitted former trustee to withdraw trust funds to discharge personal obligations to the bank); Linkage Corp. v. Trustees of Boston University, 425 Mass. 1, 27, 25, 679 N.E.2d 191, 209, 208 (1997)(affirming finding that university acted willfully or knowingly by terminating original contract with plaintiff, repudiating a renewal agreement, and hiring the plaintiff=s employees in contravention of a contractual prohibition); Dowd v. Iantosca, 27 Mass.App.Ct. 325, 334-35, 538 N.E.2d 33, 38-39 (Mass.App.Ct.,1989) (affirming finding of willfulness where broker prevented his client from purchasing property and purchased it himself at a favorable price)

84.     The Town need not prove that PSG actually knew of its misrepresentations for the violation to be considered "willful or knowing." A "willful or knowing" violation is one where either the defendant knew that a material representation was false or that the defendant made the representation with reckless disregard of its truth or falsity. See Shaw v. Rodman Ford Truck Center, Inc., 19 Mass.App.Ct. 709, 711-12, 477 N.E.2d 413 (1985) (affirming award of multiple damages, and holding that it is "willful" under the statute to make a "representation without knowing whether it was true or false and with reckless disregard for whether it was true or false."; Briggs v. Carol Cars, Inc., 407 Mass. 391, 396-397, 553 N.E.2d 930 (1990) (affirming a determination that car dealer had committed "willful" violation of 93A by misrepresenting condition of car with reckless disregard of truth or falsity of statement, because the defects in the vehicle were "readily ascertainable" by the defendant);

85.     Reckless conduct can be the basis for an award of multiple damages. See Shaw v. Rodman Ford Truck Center, Inc., 19 Mass.App.Ct. 709, 711-12, 477 N.E.2d 413 (1985); (affirming award of double damages under 93A for statements that may not have been knowingly false); Kattar v. Demoulas, 433 Mass. 1, 15-16, 739 N.E.2d 246 (2000) (affirming double damages award for conduct "in reckless disregard of the truth"); Still v. Commissioner of the Dep't of Employment & Training, 423 Mass. 805, 812-813, 672 N.E.2d 105 (1996) ("decisions construing the multiple damages provisions of G.L. c. 93A have imposed such damages for 'willful' or 'knowing' violations, equating the former with reckless conduct and the latter with intentional acts").

**CONCLUSIONS**

**XXXIV.    PSG VIOLATED CHAPTER 93A IN CONNECTION WITH THE RFP AND THE PROCUREMENT PROCESS**

1.    PSG acted unfairly and deceptively when it influenced the RFP and the procurement process. <u>See</u> Sections V-XVI, XIII.

2.    There is ample evidence that Sausé was acting within the scope of his employment when he influenced the RFP and the procurement process. <u>See</u> Sections III, IV, XVII.

3.    There is ample evidence that PSG was aware of efforts by Sausé to influence the RFP and the procurement process. <u>See</u> Section XVII.

4.    PSG acted unfairly and deceptively when it acted covertly – without the knowledge of Town officials other than Thomson with whom it was collaborating – to manipulate the RFP and the procurement process.

5.    PSG acted unfairly and deceptively when it submitted, during the procurement process in 1997, a non-collusion affidavit that certified that its bid was not the result of any collusion.  See Section XIII.

6.    PSG's conduct in connection with influencing the RFP and the procurement process, as described more particularly in Sections V, VI, VII, VIII, X, and XIII, XIV, XVI, XVII, was unfair and deceptive.

7.    PSG subverted and undermined the bidding procedures of Mass. Gen. Laws Ch. 30B, which governed the 1997 RFP.

8.    PSG influenced Thomson, aided and abetted Thomson, to act in bad faith in the conduct of the procurement.

9.    PSG caused Thomson and the Town not to conduct an honest and open competitive bidding procedure.

10.    PSG's conduct violated Chapter 93A.

11.    If  the Town's counsel had known that PSG, a bidder, was involved in influencing and manipulating the  RFP and the procurement process,  she would have recommended that the procurement be cancelled – an act that likely would have led to a more open and fair procurement.  See Section XIV.

12.    If the Town Administrator had known that PSG was involved in influencing and manipulating the RFP and the procurement process, he would have tossed out PSG's bid and had a new procurement process conducted.  See Section XIV.

13.    PSG's unfair and deceptive conduct caused the Town not to have an honest and open competitive bidding procedure.

14.    PSG's unfair and deceptive conduct, which skewed the procurement process, caused the Town to lose the ability to have a competitor, Woodard & Curran, at a considerably lower cost, operate the wastewater treatment plant. See Section XI.

15.    The Town is entitled to recover its damages resulting from such conduct, which have been shown to be $1,531,250. (Section XI; XXII, A.1).

16.    PSG' unfair and deceptive conduct in connection with the RFP and the procurement process, as well as its conduct in handling Town funds, (as described in Section XVIII, caused the Town to have to cancel the contract and conduct a new procurement.

17.    The Town is entitled to recover its damages for having to conduct a new procurement to replace PSG, which amount to $80,000.  (Section XV)

### XXXV.  PSG VIOLATED CHAPTER 93A IN CONCEALING TOWN FUNDS, IN IMPROPER USE OF TOWN FUNDS PLACED IN ACCOUNTS FOR SPECIFIC PURPOSES, AND IN FACILITATING AND AIDING MISAPPROPRIATION OF FUNDS

18.    Myriad ways in which PSG's mishandled Town funds is documented in detail in Sections XVIII, XIX, XX, and XXI above.

19.    PSG's conduct, as described in Sections XVIII,XIX, XX and XXI above, was unfair and deceptive and violated Chapter 93A..

20.    The Town reasonably believed that PSG was maintaining Town funds in accordance with its contracts with the Town and ensuring that the funds were spent consistent with the purposes of the contracts.   PSG, however, disregarded obligations in the contract concerning the use of funds. See XVIII.

21.    PSG acted to conceal the existence of, and use of, Town monies from the Town.  PSG acted to facilitate, and to aid and abet, Thomson and others at the Sewer Commission who wanted to conceal from the Town Accountant funds that could have been put to use in the Town treasury if they had not been concealed. See, e.g., Section XX.

22.    PSG mishandled transactions in rebate accounts earmarked for specific purposes through checks made out to third parties, and diversion of checks that were intended for the Town. The mishandling of funds in rebate accounts in this manner was unfair and deceptive. (Section XIX). The Town's damages resulting from this conduct not including checks where Thomson was a payee, amounted to $76,593.  See Section XIX.

23.    PSG's improper handling of funds in rebate accounts earmarked for specific purposes facilitated misuse and embezzlement of the funds by Thomson, through checks made out to Thomson as payee. Section XVIII.

24.    PSG mishandled Town funds by establishing and maintaining a "Professional Development Account" to conceal monies from the Town and deprive the Town of the use of the funds for the Town treasury. See Section XX.  The Professional Development Account also facilitated misuse and embezzlement of Town funds. See Section XXI.

25.    The Town suffered damages as a result of checks being issued by PSG with Thomson as payee, which he deposited into his personal bank account. The Town suffered damages as a result of PSG improperly issuing and mishandling monies from the "Professional Development Account," which were made available to Thomson for deposit into Wainright Bank and misused by Thomson and Sausé.  (Sections XVIII, XX, XXI). The Town acted to mitigate its damages; thus, rather than seeking  full recovery for the PSG checks that went into Thomson's personal bank account or Wainright Bank, and misused, is seeking as damages only those  attorneys' fees it incurred in pursuing recovery of the monies in those checks.  Those costs amount to $164,645. See XXII, B.2.

26.    Town mishandled funds in the rebate accounts by refusing to return unused monies in those accounts at the end of the 2003-2004 contract year, the last year for which PSG performed services. PSG has been holding the monies without justification.

27.    The amount of the rebate money owed the Town from the 2003-2004 contract year is $158,122. See Section XXII.B.4.

## XXXVI.    PSG'S UNFAIR AND DECEPTIVE CONDUCT IN CONNECTION WITH THE RFP AND THE PROCUREMENT WAS "WILLFUL" OR "KNOWING"

28.    PSG's unfair and deceptive conduct in connection with the 1997 RFP and the procurement process is extensively documented.

29.    PSG's unfair and deceptive conduct in connection with the 1997 RFP and the procurement process is extensively documented.

30.    PSG must have known that efforts to influence the RFP and the procurement process to give PSG an advantage and deter competitors was improper.

31.    PSG must have known that causing or assisting a public official, specifically Thomson, to act in bad faith and dishonestly, in the conduct of a procurement process, was improper.

32.    PSG's conduct infected the procurement process of a relatively small town which, by virtue of its form of government and size, depends largely on part-time government officials, such as Sewer Commissioners and members of the Board of Selectmen, to

govern it. It was not large enough to have on staff someone who specialized in procurements, or who had the technical expertise to prepare an RFP of the type that was needed for public bidding of the Town's wastewater treatment plant.

33. PSG exploited the situation,[1] and improperly influenced the RFP and the procurement process. This conduct was done "knowingly" and "willfully" as those terms are used in Chapter 93A. As a result, the Town's citizens were deprived of an open and honest competitive bidding process.

34. That type of conduct, so deeply offensive to citizens who pay taxes to keep their Town governments operating, justifies the maximum recoverable damages that Chapter 93A will allow – treble the economic damages.

35. Consequently, the following damages should be trebled:

> $1,531,250 – the difference in what the Town paid PSG and what it likely would have paid a competitor (Woodard & Curran)

> $80,000 – the cost of conducting the new procurement in 2004;

### XXXVII. PSG'S UNFAIR AND DECEPTIVE CONDUCT IN CONNECTION WITH THE HANDLING OF TOWN FUNDS AS "WILLFUL" OR "KNOWING"

36. PSG's improper handling of Town monies which it was assigned to use for specific purposes was extensive and involved conduct by several employees of PSG. It is well-documented in the record. See Sections XVIII, XIX, XX, XXI.

37. Much of the mishandling of money in this case stemmed from PSG's blatant disregard of its contractual obligations to use money that the Town had paid to PSG to set aside and administer for specific purposes such as capital expenditures, and repair and maintenance at the wastewater treatment plant *for purposes consistent with those obligations*. Sections VIII, XIX.

38. Such conduct was knowing and willful.

39. Other mishandling of Town money was an outgrowth of PSG's active participation in efforts to prevent "Town Hall" from learning about, and gaining access to, Town of Rockland funds that would have been available for use in the Town treasury. The

---

[1] PSG took advantage of its access to Thomson, developed while being the incumbent operator. It took advantage of Thomson's lack of knowledge and inexperience about competitive bidding procedures and RFPs. In 1997, he had just taken on the job of full-time superintendent. He had believed that he simply take the earlier RFP from 1994 and use it as "boilerplate," and he told the Sewer Commission that was his plan. Thomson direct, day 1, at 36. But, Sausé soon used that opportunity to move in on the drafting of the RFP and used the client relationship skills for which he was continuously recognized by his PSG to advance PSG's interests and to deter other competitors in the bidding

reference to "Town Hall" was an apparent reference to the Town Accountant and other individuals whose jobs were to keep track of public money in Rockland and try to make sure that public funds are spent for the purposes intended.  According to the evidence in this case, PSG participated in, facilitated and assisted efforts by Thomson and others on the Sewer Commission at the time to prevent Town Hall from gaining access to thousands and thousands of dollars in funds that were paid to PSG for specific purposes under contract, and were supposed to be "rebated" to the Town if unused.  Section XX, XXI.

40.    PSG's conduct in helping to deprive the citizens of Rockland of use of Town monies – for what appears to have been its own self-interest in currying favor with Thomson or others at the Sewer Commission at the time  -- was willful and knowing. See e.g., Section XVIII. E.

41.    PSG's cavalier disregard for how it disbursed the Town of Rockland's public money, and how it concealed the public's money from Rockland public officials who were entitled to know about it, such as the Town Accountant, justifies the highest recovery that Chapter 93A will allow: treble economic damages.

42.    Consequently, the Town's damages from PSG's mishandling of funds should be trebled:

> The cost of the forensic audit --$36,250(Section XXII.B.1)
>
> The fees incurred in pursuing recovery of embezzled funds -- $164,645 (Section XX. B.2)
>
> Improper expenditures and transactions in rebate accounts (other than checks where Thomson was a payee) - $76,593 (Section XXII.B.3)
>
> Improperly withheld rebate money from end of 2003-2004 contract year -- $158,122. (Section XXII.B.4)

## XXXVIII.    ATTORNEYS' FEES IN THIS ACTION

43.    The Town should submit, by affidavit, proof of its attorneys' fees recoverable pursuant to Chapter 93A.

Respectfully submitted,

TOWN OF ROCKLAND and
ROCKLAND SEWER COMMISSION,

By their attorneys,
/s/Joanne D'Alcomo
Joanne D'Alcomo BBO No.  544177
Seth Nesin BBO No. 650739
JAGER SMITH  P.C.
One Financial Center
Boston, MA  02111
(617) 951-0500