UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
PROFESSIONAL SERVICES                 )
GROUP, INC.,                                       )
                                                    )
                        Plaintiff,                 )
                                                    )
            v.                                         )
                                                    )
TOWN OF ROCKLAND, ROCKLAND    )
SEWER COMMISSION, GREGORY       )
THOMSON and MICHAEL SAUSE,       )
                                                    )
                        .                              )
_____)
                                                    )
TOWN OF ROCKLAND, ROCKLAND    )
SEWER COMMISSION,                        )
                                                    )
            Plaintiffs-in-Counterclaim      )        Civil No. 04-11131-PBS
            and Crossclaim                     )
                                                    )
v.                                                    )
                                                    )
PROFESSIONAL SERVICES               )
GROUP, INC.,                                      )
                                                    )
            Defendant-in-Counterclaim,    )
                                                    )
and                                                   )
                                                    )
MICHAEL SAUSE,                             )
                                                    )
            Crossclaim Defendant            )
_____)

**PROFESSIONAL SERVICES GROUP, INC.'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS**
**OF LAW REGARDING CHAPTER 93A CLAIM**

Plaintiff Professional Services Group, Inc. ("PSG") submits these proposed findings of fact and conclusions of law regarding the claim of the Town of Rockland ("Rockland") and Rockland Sewer Commission (the "Sewer Commission") (together the "Defendants") pursuant to Chapter 93A.

## I.   PROPOSED FINDINGS OF FACT

### A.   Introduction

1.      At all relevant times, Rockland owned a wastewater treatment facility (the "Sewer Plant") that treated and disposed of sewage for the towns of Rockland, Abington, Hingham and Hanover.  Ex.[1] 500 at 2-3.

2.      At all relevant times, the Sewer Commission, a three-member board elected by the voters of Rockland, was responsible for overseeing Rockland's wastewater treatment operations, including the Sewer Plant.  Thomson Test.,[2] Day 5 Pt. 2 at 10-11.

3.      At all relevant times, Rockland had an accounting department that included a Town Accountant with the authority to review the books and records of the Sewer Department. Chaffee Test., Day. 4.

4.      Beginning in 1982, Rockland contracted with Metcalf & Eddy Services, Inc. ("M&E") to operate and maintain the Sewer Plant.  Gallipeau Test., Day 1 at 84.

5.      Beginning in 1990, Michael Sause ("Sause") was employed by M&E to supervise the Rockland project and other wastewater treatment projects throughout New England and New York.  Sause Test., Day 8 at 26.

6.      In July 1996, as a result of a corporate acquisition, PSG assumed responsibility for M&E's contract with Rockland.  Ex. 236.  Sause began working for PSG and continued to

---

[1] "Ex." refers to Trial Exhibit.

[2] "Test." refers to Trial Testimony.

supervise the Rockland project as well as other wastewater treatment projects in the region. Sause Test., Day 8 at 27-28.

**B.    Sewer Commission Creates Superintendent's Position**

7.    In the mid-1990's, Rockland's sewer system experienced significant growth, including the addition of new pumping stations and sewer lines.  Ex. 500 at 2.

8.    During that period, the Sewer Commission was a part-time board with only a single secretary to provide administrative support.  Thomson Test., Day 5 Pt. 2 at 10-12.

9.    Commissioner William Stewart decided within a month or two after joining the Sewer Commission in April 1997 that the Sewer Department needed a full-time superintendent to manage its day-to-day functions, including operations, billing and customer issues because there was "so much to do … and there was nobody to do it."  Stewart Test., Day 5 Pt. 1 at 14-17.

10.    At a public meeting on December 12, 1996, the Sewer Commission voted to accept applications for the position of superintendent.  Ex. 10 at 1-2.

11.    After the vote, the Sewer Commission informed the Board of Selectmen that it intended to hire a superintendent.  Ex. 12.

12.    Town Meeting approved the superintendent's position in May 1997.  Ex. 116.

**C.    Thomson Pursues Superintendent's Position**

13.    Gregory Thomson ("Thomson") became a member of the Sewer Commission in 1994.  Thomson Test., Day 5 Pt. 2 at 9.

14.    At least as early as July 1996, Thomson sought advice from Anne-Marie Hyland ("Attorney Hyland"), an experienced attorney at the law firm of Kopelman & Paige, about how to become superintendent of the Sewer Department if such a position were established.  Ex. 83.

15.     Attorney Hyland advised Thomson in writing that members of the Sewer Commission interested in the superintendent's position should abstain from voting on the position and explained a thirty-day "step-down" rule.  Ex. 83.

16.     After Attorney Hyland gave Thomson advice about how to apply for the superintendent's position, Sause asked Attorney David Lurie ("Attorney Lurie") to advise him whether PSG could hire a member of the Sewer Commission pending Town Meeting's appropriation of funding for the superintendent's position.  Ex. 252.

17.     In a letter addressed to Sause's home – not to PSG's office – Attorney Lurie advised Sause that PSG should not hire any member of the Sewer Commission.  Ex. 252.

18.     After Attorney Lurie advised Sause that PSG should not hire any member of the Sewer Commission pending appropriation of funding, Attorney Hyland provided written advice to the Sewer Commission about using the unexpended portion of its personnel budget to fund the newly created position.  Ex. 87.

19.     Thomson did not ask for, use or rely on any of the advice that Sause obtained from Attorney Lurie.  Thomson Test., Day 6, Pt. 2 at 84-85.

20.     After providing this advice, Attorney Lurie changed law firms and was not aware whether his services had ever been billed by his prior firm.  Lurie Test., Day 11 at 98.  Attorney Lurie's work for Sause remained unbilled three months after it had been done according to the law firm's billing records and Sause had no memory of having received a bill.  Ex. 510; Sause Test., Day 8 at 66-67.

21.     At the December 1996 public meeting where the Sewer Commission voted to accept applications for superintendent, Thomson announced that he intended to apply for the job.

Ex. 10 at 2.  As he had been advised by Attorney Hyland, Thomson abstained from voting to establish the superintendent's position and resigned from the Sewer Commission.  Ex. 10 at 2.

22.     After Attorney Lurie advised Sause that PSG should not hire members of the Sewer Commission, Thomson entered into an interim contract with the Sewer Commission to provide consulting services pending approval of the superintendent's position by Town Meeting.  Ex. 15; Ex. 113.

D.     **The Rebate Accounts**

23.     Some PSG operation and maintenance contracts allocated certain categories of expenses to rebatable accounts (the "Rebate Accounts").  Kruger Test., Day 2 Pt. 1 at 45-46.  If PSG spent less than the budgeted amounts on those categories of expenses, the difference was subject to rebate.  Kruger Test., Day 2 Pt. 1 at 45-46.

24.     The first PSG contract with Rockland to include Rebate Accounts was a three-year contract entered into in 1994 (the "1994 Contract").  Ex. 7.

25.     The 1994 Contract included two Rebate Accounts totaling $120,000.  Ex. 3 at 22; Ex. 7 at 13-14.

26.     In 1995, the Sewer Commission signed an agreement directing PSG to hold the rebate monies from the Rebate Accounts in a new rebatable account earmarked for professional development and miscellaneous expenses (the "Professional Development Account").  Ex. 8.

27.     The Sewer Commission spent some of its rebate monies on conferences and similar expenses, but as the end of the 1994 Contract term approached there was a significant balance of rebate funds being held by PSG on account for the Sewer Commission.  Ex. 141.1.

E.    **The 1997 RFP**

28.    Under the Uniform Procurement Act, a procurement initiated by a Request for Proposals ("RFP") permits a municipality to award a contract based on subjective evaluative criteria as well as cost, and the municipality is not required to accept the proposal with the lowest cost.  Gallipeau Test., Day 1 at 106-108.

29.    It is customary for the incumbent operator of a facility to provide assistance to a municipality in preparing an RFP due to the operator's knowledge of that specific facility, including providing language for the RFP, technical data and cost data.  Gallipeau Test., Day 1 at 109-110; Sause Test., Day 7 at 59-60; Sause Test., Day 8 at 74-75; Kruger Test., Day 3 at 65-66.

30.    The 1994 Contract had been procured through an RFP (the "1994 RFP") that had been prepared by the engineering firm of Tighe & Bond.  Ex. 3.

31.    The 1994 Contract was due to expire on June 30, 1997.  Ex. 7 at 11.

32.    One of Thomson's duties as newly appointed superintendent, as stated in the job description approved by Kopelman & Paige, was to manage the municipal procurement process for the Sewer Commission.  Ex. 85 at 1.

33.    Thomson informed the Sewer Commission that he would prepare the RFP. Stewart Test., Day 5 Pt. 1 at 34.

34.    Attorney Hyland provided advice to Thomson regarding the drafting of the RFP. Ex. 112 at 8, 10.

35.    PSG employees, including Steven Kruger and Aram Varjabedian ("Varjabedian") had no knowledge whether Sause drafted the RFP.  Kruger Test., Day 3 at 77; Varjabedian Test., Day 10 at 17-18.

36.     In July 1997 the Sewer Commission issued an RFP for a new contract (the "1997 RFP"). Ex. 500.

37.     The 1997 RFP was largely identical to the 1994 RFP, except in five respects.

### 1.    The Labor Account

38.     First, in the 1997 RFP the number of Rebate Accounts was increased from two to four. Ex. 500 at 23. These four accounts contained a total of $590,000, nearly five times the rebatable money under the 1994 Contract. Ex. 3 at 22; Ex. 7 at 13-14; Ex. 500 at 23.

39.     A single Rebate Account – the labor account – contained $400,000 of the $590,000 in rebatable money under the 1997 RFP. Ex. 500 at 23.

40.     The labor account was a new account that did not exist under the 1994 Contract. Ex. 3 at 22; Ex. 7 at 13-14. Thomson obtained advance approval for the labor account from the Massachusetts Office of the Inspector General ("OIG"). Ex. 542. The $400,000 labor account was the only aspect of the 1997 RFP for which Thomson requested advance approval from the OIG. Thomson Test., Day 6, Pt. 2 at 112-13.

### 2.    The Ten-Year Term

41.     Second, the 1997 RFP provided that the contract would have a ten-year term. Ex. 500 at 3.

42.     After 1997, contract terms of ten years or even longer were not uncommon in the wastewater industry due to changes in tax regulation which gave an economic incentive for municipalities to enter into longer contracts. Ex. 214; Gallipeau Test., Day 1 at 122; Kruger Test., Day 2, Pt. 1 at 83-84.

43.     The ten-year contract term was approved by Town Meeting in May 1997. Ex. 117.

### 3.    The Belt Filter Press

44.    Third, the 1997 RFP required all competitors to include in their proposals a belt filter press comparable to the one PSG operated at the Sewer Plant.  Ex. 500 at 14-15.

45.    The belt filter press PSG operated at the Sewer Plant was leased from a third party vendor.  Ex. 24.

46.    PSG leased the belt filter press because the 1994 RFP – drafted by the independent engineering firm of Tighe & Bond – required the successful competitor to install that particular belt filter press and to remove it at the end of the 1994 Contract term.  Ex. 3 at 13.

47.    The type of belt filter press used at the Sewer Plant was available to other competitors who submitted proposals in response to the 1997 RFP.  Bonomo Test., Day 11 at 138-39.

### 4.    The Five Years/Five Facilities Qualification

48.    Fourth, the 1997 RFP required the successful operator to have a minimum of five years of experience operating at least five comparable facilities.  Ex. 500 at 7.

49.    The exact same minimum experience qualification that appeared in the 1997 RFP also appeared in the RFP that was drafted by the independent engineering firm of Camp Dresser & McKee in 2004 after Rockland terminated its contract with PSG.  Ex. 193 at 13.

### 5.    The Records Requirement

50.    Fifth, the 1997 RFP included a records requirement that provided in part,  "A summary report regarding the payback accounts identified in the RFP shall be made available to the Rockland Sewer Commission upon request."  Ex. 500 at 20.

51.    The records requirement of the earlier 1994 RFP provided more broadly that, "A summary report and all accounting records shall be made available to the *town* upon request.

Further, the financial accounting structure shall be open-book, and the Board of Sewer Commissioners shall have the right to review the records." Ex. 3 at 17 (emphasis supplied).

52.     In contrast, the 1997 RFP did not provide that all accounting records shall be made available to the town upon request, did not require that financial records be open-book, and did not give the Sewer Commissioners the right to review all financial records. Ex. 500 at 20.

### F.     The 1997 Procurement Process

53.     Several firms indicated preliminary interest in the 1997 RFP, including Woodard & Curran, American Commonwealth Management Services Co., Inc. ("ACMS") and American Anglian.

54.     Woodard & Curran lacked the five years of experience needed to meet the 1997 RFP's minimum experience qualification. Ex. 615.

55.     Even though Woodard & Curran lacked the experience required in the 1997 RFP, this fact did not prevent Woodard & Curran from submitting a proposal. On August 19, 1997 the Sewer Commission issued an addendum to the 1997 RFP stating that the experience of a firm would only be one of the factors used in evaluating proposals. Ex. 527.

56.     Woodard & Curran then informed the Sewer Commission that it was interested in submitting a proposal that would deviate from the 1997 RFP's requirements in a number of material respects. Ex. 529. These deviations included substituting a different desludging technology for the belt filter press and reducing the number of staff at the Sewer Plant to seven. Ex. 529.

57.     The Massachusetts Department of Environmental Protection required a minimum of eight staff at the Sewer Plant. Ex. 2.

58.     Thomson discussed Woodard & Curran's alternate proposal with Attorney Hyland and a representative of the OIG.  Ex. 529.  Attorney Hyland and the OIG agreed that the Sewer Commission could not award the contract to a firm whose proposal did not conform to the 1997 RFP's criteria.  Ex. 529.

59.     Woodard & Curran decided not to submit a proposal in response to the 1997 RFP. Bonomo Test., Day 11 at 115.

60.     ACMS also decided not to submit a proposal in response to the 1997 RFP. ACMS wrote to Thomson that it was not submitting a proposal due to a "heavier than normal bidding schedule in the New England area" and Rockland's satisfaction with the incumbent operator's services.  Ex. 130.

61.     In addition, American Anglian declined to submit a proposal in response to the 1997 RFP.  It expressed interest only in pursuing an "innovative" proposal to jointly operate Rockland's water and wastewater systems, even though such a proposal was not feasible because the Sewer Commission did not run Rockland's water system.  Ex. 131.

62.     During the procurement process Attorney Hyland provided advice to Thomson. Ex. 112 at 16, 18, 21.

**G.     PSG's Proposal And The 1998 Contract**

63.     On October 3, 1997, PSG was the only firm to submit a proposal in response to the 1997 RFP.  Ex. 137; Ex. 544.  The proposal consisted of a technical proposal and a cost proposal.  Ex. 137; Ex. 544.

64.     PSG's technical proposal included a certificate of non-collusion which stated that PSG had not "directly or indirectly entered into any agreement, participated in any collusion, or

otherwise taken any action in restraint of free competitive bidding *in connection with this proposal*." Ex. 137 at 83 (emphasis supplied).

65.     There was no evidence suggesting that the proposal PSG submitted in response to the 1997 RFP was the product of collusion.

66.     When PSG submitted its proposal, Thomson contacted the OIG to inquire whether the contract could be awarded even though only one proposal had been received and, if so, whether the Sewer Commission could negotiate a lower price. Ex. 138. The OIG responded in the affirmative. Ex. 138.

67.     The Town Administrator and Chief Procurement Officer, Kevin Donovan, then opened PSG's cost proposal and the contract was subsequently awarded to PSG. Ex. 544; Ex. 138.

68.     During the award process Attorney Hyland provided advice to Thomson. Ex. 112 at 21-22.

69.     PSG's cost proposal priced the first year of the ten-year contract at $1.269 million. Ex. 544.

70.     If Woodard & Curran had submitted a proposal that conformed to the 1997 RFP, it would have succeeded in underpricing PSG's proposal. During the 1997 procurement process Woodard & Curran priced the cost of meeting the specifications of the 1997 RFP at $1.228 million, which turned out to be $41,000 less than PSG's cost proposal. Bonomo Test., Day 11 at 144-45.

71.     Even though PSG was the only firm to submit a proposal in response to the 1997 RFP, Thomson negotiated PSG's price down to $1.2 million. Ex. 262. Thomson reduced PSG's profit and overhead but did not reduce the Rebate Accounts. Ex. 262; Ex. 544.

72.    In February 1998, PSG and the Sewer Commission entered into a new contract for a ten-year term commencing March 1, 1998 (the "1998 Contract"). Ex. 160. Attorney Hyland was involved in the contract negotiations and approved the final document as to form by signing the agreement. Ex. 112 at 28-30; Ex. 160.

73.    The 1998 Contract was signed by PSG and the Sewer Commission, but not by the Town of Rockland. Ex. 160 at 11. The 1998 Contract also provided that rebates were to be paid to the Sewer Commission, not to the Town of Rockland. Ex. 160 at 7. The 1998 Contract did not specify how PSG could make disbursements on behalf of the Sewer Commission, nor did it specific that money in the Rebate Accounts could be used only for the purposes of those accounts. Ex. 160.

### H.    Thomson And Sause Steal Money From The Rebate Accounts

74.    After PSG learned that it was to receive the 1998 Contract, Sause and Thomson began diverting rebate monies for their own personal use.

75.    In November 1997, Thomson sent a letter to Sause requesting that PSG release $50,000 in rebatable funds under the 1994 Contract by issuing a check for that amount payable to the "Town of Rockland, d/b/a Rockland Sewer Commission." Ex. 141.1.

76.    Because Thomson was the authorized agent of a client seeking rebate money to which the client was entitled, PSG issued the rebate check as requested. Ex. 141.1. Thomson endorsed the check by stamping the Sewer Commission's name on the back and writing his own name and position as superintendent below. Ex. 141.1.

77.    On December 1, 1997, Sause opened an account in the Sewer Commission's name at Wainwright Bank (the "Wainwright Account"), with Thomson and Sause as joint

signatories. Ex. 18.1. Thomson then deposited the $50,000 rebate check into that account. Ex. 18.1; Ex. 141.1.

78.    Over the next several months, Thomson directed more written check requests to PSG. Ex. 141; Ex. 234. The 1998 Contract required PSG to pay rebate money to the Sewer Commission, not to the Town, Ex. 160 at 7, and thus PSG continued to process these requests as a matter of course with the understanding that the rebate monies were the Sewer Commission's funds and that the Sewer Commission could use those funds however it wished.

79.    After Thomson deposited the rebate checks into the Wainwright Account, he and Sause withdrew funds to pay for their personal expenses, including meals, trips and illegal drugs. Ex. 18; Ex. 233.

80.    The Chairman of the Sewer Commission, Robert Corvi, was aware that Thomson claimed to have set up an account in the Sewer Commission's name. Varjabedian Test., Day 11 at 7-9.

81.    PSG did not know that the rebate checks were being deposited into a personal account controlled by Thomson and Sause. Kruger Test., Day 3 at 78; Varjabedian Test., Day 11 at 7-9.

**I.    Thomson Continues The Scheme After Sause Withdraws**

82.    In 1999 Sause lost responsibility for the Rockland project after he was transferred to PSG's New York region. Kruger Test., Day 2 Pt. 1 at 84-85.

83.    In February 1999 Thomson opened a new account in his name only at North Abington Co-Op Bank and two days later closed down the Wainwright Account. Ex. 167; Ex. 18.15.

84.     Thomson continued his rebate check diversion scheme for the next three years without further participation by Sause.  Ex. 233; Ex. 234.

**J.     Thomson Instructs PSG To Pay Some Sewer Commission Expenses Directly**

85.     During this period, Thomson also directed PSG to issue checks to directly pay for miscellaneous expenses of the Sewer Plant.  Ex. 264.

86.     Thomson's directives to PSG were issued in writing and thus subject to audit by Rockland's auditor.  Ex. 264.

87.     PSG complied with Thomson's written directives because he was the authorized agent of a client seeking to use its money as it wished.  Varjabedian Test., Day 11 at 15, 25-26.

88.     The expenditures were made with the knowledge and approval of the Sewer Commission.  Ex. 264; Ex. 716 at 27.

**K.     Thomson And Sause's Scheme Is Revealed**12.

89.     In late May 2002 the North Abington Co-Op Bank informed the Rockland Police Department that Thomson had attempted to deposit a check payable to the Sewer Commission into his personal account.  Thomson Test., Day 6, Pt. 2 at 5.

90.     Thomson confessed to stealing the Sewer Commission's rebate money and resigned as superintendent but did not immediately reveal Sause's participation, and Sause initially denied involvement.  Kruger Test., Day 2 Pt. 1 at 86-87.

91.     In 2003, PSG learned that Sause had written two personal checks to Thomson and asked him for an explanation.  Ex. 235; Kruger Test., Day 2 Pt. 1 at 92-94.  He refused to answer PSG's questions about these checks and was forced to resign.  Kruger Test., Day 2 Pt. 1 at 94-97.

92.     Thomson and Sause subsequently were convicted of larceny in Plymouth Superior Court.  Ex. 210; Ex. 212.  No other individuals or entities were charged in connection with Thomson and Sause's scheme to embezzle public funds.

93.     Throughout the investigation of this matter, PSG cooperated with Rockland and produced documents.  Kruger Test., Day 2 Pt. 1 at 87-88.

94.     John Sullivan ("Sullivan"), the forensic accountant hired by Rockland to investigate this matter, did not interview Varjabedian as part of his investigation because Varjabedian's counsel was on maternity leave at the time Sullivan expressed interest in interviewing Varjabedian.  Mr. Sullivan did not attempt to contact Varjabedian's attorney directly or the law firm with which she was associated.  Sullivan Test., Day 9 Pt. 1 at 59-60; Varjabedian Test., Day 11 at 71-72.

95.     The forensic audit prepared by Sullivan concluded:

> The Board of [Sewer] Commissioners have not provided oversight of the Sewer Commission adequate to protect the Town from fraud and abuse of public funds. The Board hired a full time Superintendent and then did not provide the supervision to prevent him from opening unauthorized accounts and converting for personal use money that was due back to the Town.

Ex. 716 at 26.

96.     Rockland eventually recovered $410,000 from Wainwright Bank and North Abington Co-Op Bank for negligently processing a total of $320,000 in rebate checks stolen by Thomson.  Ex. 242; Ex. 243; Ex. 265; Ex. 266.


**L.      The 1998 Contract Is Terminated Over Objections Of Sewer Commission**

97.     The Sewer Commission and the Board of Selectmen jointly voted on whether to terminate the 1998 Contract.  Stewart Test., Day 5 Pt. 1 at 42-43.  All three members of the

Sewer Commission voted against termination and the five members of the Board of Selectmen voted in favor of termination. Stewart Test., Day 5 Pt. 1 at 42-43.

98.     On or about February 10, 2004, PSG received a letter from Rockland stating that the 1998 Contract was terminated by operation of law because the actions of Thomson and Sause violated the Uniform Procurement Act.

99.     PSG continued to operate the Sewer Plant on an interim basis pursuant to the terms of the 1998 Contract. Ex. 160 at 10.

100.     While PSG continued to operate the Sewer Plant on an interim basis, Sewer Commission Chairman Robert Corvi wrote to PSG:

> It is unfortunate that our contract had to end and will need to be rebid due to the actions of two former employees. You have been an excellent and dependable partner for wastewater treatment services for more than twenty years.
>
> Be assured that in no way did the actions of two former employees impugn the integrity of your company's management of our wastewater treatment operations. Since 1982, your company has performed stellar operations, maintaining an excellent safety and compliance record. Your team has been a valuable partner.

Ex. 191.

101.     On April 12, 2004, Rockland directed PSG to vacate the Sewer Plant and turn over its operation to an interim operator. Ex. 192.

102.     The Sewer Commission issued a new RFP, and the contract to operate the Sewer Plant was subsequently awarded to another company, Aquarion. Ex. 193; Gallipeau Test., Day 1 at 125.

103.     PSG invoiced Rockland over $150,000 for the interim operation of the Sewer Plant but was not paid as required by the 1998 Contract. Ex. 268; Ex. 160 at 10; Solomon Test., Day 3, Pt. 2 at 148. Accordingly, PSG offset this account receivable by an account payable to Rockland for $158,122. Solomon Test., Day 3, Pt. at 148-49.

16

M.    **This Action is Commenced**

104.    PSG filed suit against the Defendants, Sause and Thomson in May 2004.  See Complaint (Docket No. 1).

105.    The Defendants brought counterclaims against PSG for fraud, misrepresentation, violation of the Uniform Procurement Act, violation of the Conflict of Interest Law, breach of contract, breach of the implied covenant of good faith and fair dealing, conversion and civil conspiracy.  See Answer to Complaint (Docket No. 11).  The Defendants also brought claims against Sause but no claims against Thomson.  See Answer to Complaint (Docket No. 11).

N.    **Rockland Waives Its Claims Against Sause**

106.    In January 2006, while this case was pending before this Court, Sause filed a voluntary bankruptcy petition in the U.S. Bankruptcy Court for the District of Delaware.  Sause Test., Day 8 at 9.  As a result of filing for bankruptcy, the proceedings in this case were stayed as to Sause.  Sause Test., Day 8 at 14-15.

107.    On April 25, 2006, Rockland granted a general waiver to Sause for its claims against him in this case.  Sause Test., Day 8 at 16-17; Ex. 209.  The general waiver was part of a stipulation (the "Stipulation") that Rockland entered into with Sause for a limited modification of the automatic stay in bankruptcy.  Ex. 209.

108.    The Stipulation states:

> **WHEREAS,** the Debtor and Rockland, among others, are parties to a certain civil action pending in the United States District Court for the District of Massachusetts and styled as Professional Services Group, Inc. et al. v. Town of Rockland, et al., Civil Action No. 04-11131-PBS initiated by summons and complaint on or about May 28, 2004 (the "Civil Action"); and

> **WHEREAS,** Rockland holds one or more civil claims against the Debtor that it asserted in the Civil Action (the "Rockland Claims") ….

17

Ex. 209.

109.    The Stipulation also states that Rockland wanted to obtain discovery from Sause

and that, in order to do so, the automatic stay in bankruptcy required modification.  Ex. 209.

Therefore, the Stipulation states:

> 2.  <u>Waiver of Rockland Claims</u>:  In exchange for the modifications
> of the Automatic Stay provided for herein, Rockland agrees to, and
> hereby does waive the Rockland Claims, both as to the Debtor and
> as to the Debtor's estate.

Ex. 209.

110.    The Stipulation makes no explicit reference to any claims against PSG, to

allegations of PSG's liability, or to PSG generally.  Ex. 209.  Apart from its reference to the

name of this case, the Stipulation does not explicitly mention PSG at all.  Ex. 209.

### O.    **Thomson And Sause Testify At Trial**

111.    A jury trial in this matter began on July 31, 2006.

112.    Thomson and Sause both testified at trial on behalf of Rockland and the Sewer

Commission.

113.    Thomson testified that he did not know about the Professional Development

Account until a year after it was created, and that he did not see the agreement that created it

until a month and a half before trial.  Thomson Test., Day 6, Pt. 2 at 27-28.

114.    Sause testified that Thomson knew about the Professional Development Account,

attended a public meeting at which he and two other members of the Sewer Commission

discussed it, and approved the agreement that created it.  Sause Test., Day 8 at 45-47.

115.    Thomson testified that he never asked Sause to get him legal advice about the superintendent's job and never used any of the legal advice he obtained from Sause.  Thomson Test., Day 6, Pt. 2 at 84.

116.    Sause testified that Thomson and the two other sewer commissioners asked him to get legal advice about creating the superintendent's position and that they met to discuss this issue at the PSG office in Norwell and again at the Sewer Plant in order to avoid the open meeting law.  Sause Test., Day 8 at 54-55.  Like Thomson, Sewer Commissioner William Stewart testified that he never spoke to Sause about hiring a lawyer to find a way to create the superintendent position and never attended a meeting of the Sewer Commission at the sewer plant to avoid the open meeting law.  Stewart Test., Day 5 at 26-28.

117.    Thomson testified that he did not know the money in the Wainwright Account was being used for anything other than Sewer Commission expenses, that he was surprised to learn that Sause had spent all the Wainwright money on drugs and credit card expenses, and that he himself was forced to steal money but not earlier than the fall of 1999 after he developed an Oxycontin addiction in the summer of 1999.  Thomson Test., Day 6, Pt. 2 at 149-50.

118.    Sause testified that Thomson knew from the very beginning that the money in the Wainwright Account was being used to pay for their illegal drugs and exotic vacations and that Thomson's drug use was out of control in 1997, if not earlier.  Sause Test., Day 8 at 144, 148.

119.    Thomson testified that he did not remember asking Sause to arrange for PSG to issue rebate checks to Thomson personally.  Thomson Test., Day 6, Pt. 2 at 168.

120.    Sause testified that Thomson asked him to arrange for PSG to issue rebate checks to Thomson personally and that he told Thomson that "PSG will never do that."  Sause Test., Day 8 at 145.

**P.    Jury Returns Verdict In Favor Of PSG On All Of The Defendants'
Claims**

121.    On August 24, 2006, the jury began deliberating with a Special Verdict Form that
included the Defendants' Uniform Procurement Act, fraudulent misrepresentation, breach of
contract, Conflict of Interest Law, and negligent misrepresentation claims.  See Special Verdict
Form (Docket No. 149).

122.    On August 25, 2006, the jury returned a verdict in favor of PSG on all of the
Defendants' claims.  See Special Verdict Form (Docket No. 149).

## II.    PROPOSED CONCLUSIONS OF LAW

### A.    The Defendants Failed To Prove That PSG Violated Chapter 93A.

123.    The Defendants' claim that PSG is liable for violating Chapter 93A is predicated
on the following alleged acts by PSG:  (1) improperly influencing the 1997 procurement process;
(2) making reckless or negligent misrepresentations by "deceiv[ing] the Town into believing that
the procurement process was honest and open competitive bidding;" (3) mishandling Rockland's
monies under the 1998 Contract; and (4) aiding and abetting Thomson's breach of his duties as a
public official to conduct an honest and open procurement process.  See Town of Rockland and
Rockland Sewer Commission's Proposed Findings of Fact, Rulings of Law and Conclusions
("Defendants' Brief") at 72-75.

124.    The Defendants' Chapter 93A claim fails for the following reasons.

#### 1.    The Defendants' Chapter 93A Claim Is Wholly Derivative Of Other
Claims That Were Rejected By The Jury.

125.    The Defendants' theories of liability under Chapter 93A are all derivative of
common law or statutory claims that were considered and rejected by the jury.  The allegation
that PSG improperly influenced the 1997 procurement process is derivative of the Defendants'

Uniform Procurement Act claim.  The allegation that PSG made reckless or negligent misrepresentations about the procurement process is derivative of the Defendant's Uniform Procurement Act, fraudulent misrepresentation and negligent misrepresentation claims.  The allegation that PSG mishandled Rockland's monies under the 1998 Contract is derivative of the Defendants' breach of contract claim.  The allegation that PSG aided and abetted Thomson's breach of his duties as a public official is derivative of the Defendants' Uniform Procurement Act and Massachusetts Conflict of Interest Law claims.

126.    The jury specifically rejected each and every one of the theories upon which the Defendants' Chapter 93A claim is based.  See Special Verdict Form (Docket No. 149) at No. 1(a) (rejecting Defendants' claim that PSG violated Uniform Procurement Act by certifying that proposal was made in good faith and without collusion or fraud), No. 1(b) (rejecting Defendants' claim that Sause or other PSG employees conspired with Thomson to cause 1998 Contract to be procured in violation of Uniform Procurement Act), No. 1(c) (rejecting Defendants' claim that Sause or other PSG employees conspired with Thomson to make fraudulent misrepresentations), No. 5 (rejecting Defendants' claim that PSG breached 1998 Contract in handling of rebate accounts), Nos. 8(a)-(b) (rejecting Defendants' claim that Sause or other PSG employees violated Massachusetts Conflict of Interest Law), No. 11 (rejecting Defendants' claim that PSG made negligent misrepresentation in submitting non-collusion affidavit).

127.    Where a claimant's Chapter 93A claim is derivative of an underlying common law or statutory claim and the evidence fails to support the underlying claim, the Chapter 93A claim, too, must fail.  See Cytologix Corp. v. Ventana Medical Systems, Inc., WL 2042331, at *2 (D. Mass. July 20, 2006) (allowing motion to dismiss 93A claim "because the underlying claims – misappropriation of claimant's business plan and trade secrets – were extinguished by virtue of

the jury's verdict and a 93A claim must fail where the underlying claims fail"); Levin v. Dalva

Brothers, Inc., 2005 WL 352863, at *1 (D. Mass. Feb. 14, 2005) (finding no violation of Chapter

93A where jury found no breach of warranty or intentional misrepresentation).

128.    The Defendants have offered no reason for this Court to disturb the conclusions

that the jury arrived at after a three-week trial at which all of the evidence cited by the

Defendants in support of their Chapter 93A claim was presented.

### 2.    The Evidence At Trial Did Not Support The Defendants' Claimed Factual Bases For Finding A Chapter 93A Violation.

129.    Regardless of the jury's assessment of the facts, the evidence at trial did not

support the Defendants' four claimed factual bases for finding a Chapter 93A violation for the

following reasons.

### a.    PSG Did Not Improperly Influence The Procurement Process.

130.    The Defendants claim that PSG violated the Uniform Procurement Act because

Thomson and Sause drafted the 1997 RFP to steer the 1998 Contract to PSG.  The evidence at

trial did not support this claim.

131.    While the 1997 RFP differs from the 1994 RFP in a few respects, those

differences did not ensure that PSG would receive the 1998 Contract.  The fixed labor account

required all competitors to allocate the same amount of money for labor and thus did not favor

PSG over other companies.  To the contrary, it provided a level playing field.  The ten-year

contract term had tax advantages for Rockland and benefited all competitors equally.  The five-

year experience qualification did not prevent competitors which did not meet the qualification

from submitting a proposal; rather it was simply a factor to be considered in assessing an overall

proposal.  The experience qualification was reasonable to ensure the proper operation of the

Sewer Plant and was identical to the experience qualification that was included in the 2004 RFP

prepared by an independent engineering firm after allegations of Thomson's criminal conduct came to light and Rockland terminated its contract with PSG. The belt filter press requirement reflected the technology desired by the Sewer Commission in the earlier 1994 RFP – a document that had been drafted by an independent engineering firm – and could be met by any competitor because comparable belt filter presses were available for lease.

132. Thomson and Sause's self-serving testimony that their actions during the procurement process were intended to steer the 1998 Contract to PSG was not credible. Sause had a motive to implicate PSG in wrongdoing because PSG forced Sause to resign after Sause refused to cooperate in PSG's investigation. Moreover, both Sause and Thomson had a motive to implicate PSG in wrongdoing because PSG named both of them as defendants in this litigation.

133. Thomson and Sause also repeatedly contradicted each other's testimony on significant points, undermining the credibility of their testimony. Thomson testified that he did not know about the Professional Development Account until a year after it was created and that he did not see the agreement that created it until 2006, but Sause testified that Thomson not only knew about the account but attended the public Sewer Commission meeting where he and the other two members of the Sewer Commission voted on and approved the account. Thomson testified that he never asked Sause to get him legal advice about the superintendent's job and never used any legal advice obtained from Sause, but Sause testified that Thomson and the two other sewer commissioners asked him to get legal advice about creating the superintendent's position. Thomson testified that he had no idea the money in the Wainwright account was being used for anything other than Sewer Commission expenses, that he was shocked to learn that Sause had spent all the money from the Wainwright Account on drugs and credit card expenses,

and that he himself was forced to steal money not earlier than the fall of 1999, after he developed an Oxycontin addiction. Sause testified that Thomson knew that money from the Wainwright Account was being used to pay for their illegal drugs and exotic vacations together, and that Thomson's drug use was out of control at least as early as 1997. Thomson testified that he never asked Sause to get PSG to issue rebate checks to him personally, but Sause testified that Thomson made such a request to him, to which Sause replied that PSG would never do that.

134.    The evidence at trial supports the conclusion, not that Thomson and Sause drafted the 1997 RFP to benefit PSG, but that Thomson caused the 1997 RFP to be drafted in a way that would enable him and Sause to steal rebate money from Rockland. By adding an inflated $400,000 labor rebate account to the RFP, Thomson ensured that there would be rebate money to steal at the end of each contract year. Thomson also added a record-keeping provision to the RFP that helped him and Sause conceal the status of the rebate accounts from Rockland. Furthermore, Thomson and Sause did in fact steal over $320,000 in rebate money – a significant portion of which came from the labor rebate account – after the procurement was completed.

135.    Because the evidence at trial supports the conclusion that any participation by Sause in the procurement process was intended to benefit Thomson and Sause personally and not PSG, PSG is not liable under Chapter 93A for any participation by Sause in the procurement process. See Int'l Brotherhood of Police Officers, Local 433 v. Memorial Press, Inc., 31 Mass. App. Ct. 138, 140 (1991) (noting that "an employer cannot be held liable for the intentional conduct of an employee acting outside the scope of his employment," which requires finder of fact to "consider whether the conduct complained of is of the kind the employee is hired to perform, whether it occurs within authorized time and space limits, and whether it is motivated, at least in part, by a purpose to serve the employer").

b.    **PSG Did Not Make Any Misrepresentations About The Procurement Process.**

136.    The Defendants claim that the certificate of non-collusion that was included in PSG's technical proposal was false and misleading because it made misrepresentations about the procurement process. The plain language of the certificate makes it clear that it did not and the evidence at trial did not support Rockland's claim.

137.    The certificate of non-collusion affirmed only that the *proposal* submitted by PSG in response to the RFP was not the product of collusion or otherwise anti-competitive – that PSG did not conspire with a competitor to fix a price, for instance. The certificate contains no representations whatsoever about the procurement process itself. The Defendants failed to prove the proposal PSG submitted in response to the 1997 RFP – not the procurement process – was the product of collusion, and therefore the alleged falsity of the certificate non-collusion cannot be a basis for finding a violation of Chapter 93A.

138.    Accordingly, PSG is not liable under Chapter 93A for any misrepresentations about the procurement process.

c.    **PSG Did Not Mishandle Rockland's Monies.**

139.    The Defendants claim that PSG mishandled Rockland's funds by (1) making rebate checks payable to "Town of Rockland, Rockland Sewer Commission, Gregory Thomson, Superintendent; (2) failing to ensure that monies were pulled out of "earmarked accounts" consistent with the purpose of those accounts; and (3) not requiring documentation for expenditures from Rockland's accounts. The evidence at trial did not support this claim.

140.    The Sewer Commission, not Rockland, signed the 1998 Contract, and the 1998 Contract provided that PSG was to pay rebate funds to the Sewer Commission, not Rockland. PSG appropriately understood the Sewer Commission to be its client and made rebate and other

payments exactly as its client – through Thomson, the Sewer Commission's authorized representative acting with the Sewer Commission's knowledge – wanted them to be made. With regard to rebate checks, these were made payable to the Sewer Commission consistent with the terms of the 1998 Contract, and not to Thomson personally. In fact, Sause testified that at one point Thomson asked him to arrange for PSG to make rebate checks payable to Thomson personally but Sause refused, telling Thomson that PSG would never agree to do that. With regard to other disbursements PSG made on behalf of the Sewer Commission, the 1998 Contract contains no language limiting PSG's ability to make such disbursements or requiring backup documentation. Moreover, PSG only processed the Sewer Commission's disbursement requests on the written authorization by Thomson.

141.    Accordingly, PSG is not liable under Chapter 93A for its handling of Rockland's funds under the 1998 Contract.

### d.    PSG Did Not Aid And Abet Thomson's Breach Of His Official Duties.

142.    The Defendants claim that PSG aided and abetted Thomson's breach of his official duty to conduct an honest and open procurement process. The evidence at trial did not support this claim.

143.    Aiding and abetting the breach of a fiduciary duty requires proof that: (1) there was a breach of fiduciary duty; (2) the defendant knew of the breach; and (3) the defendant actively participated or substantially assisted in or encouraged the breach to the degree that he or she could not reasonably be held to have acted in good faith. Arcidi v. National Ass'n of Government Employees, Inc., 447 Mass. 616, 623-24 (Mass. 2006). The only proof that Thomson breached his duty to conduct an honest and open procurement process was the self-

serving testimony of Thomson and Sause themselves, which was not credible for the reasons discussed in paragraphs 111 through 120 above.

144.    Even if the Defendants had proved that Thomson breached his official procurement duties, they failed to prove that PSG either knew of Thomson's breach or actively participated in that breach beyond the bounds of good faith.  Various PSG employees all testified that they were unaware of any participation by Sause in the procurement process beyond that which the Defendants themselves acknowledge was the "legitimate role" of the incumbent operator in assisting the procurement process.  See, e.g., Defendants' Brief at 74.  Sause's purported knowledge and conduct are not attributable to PSG because Sause was acting outside of the scope of his employment for the reasons discussed in paragraphs 74 through 81 above.

145.    Accordingly, PSG is not liable under Chapter 93A for aiding and abetting Thomson's breach of his official duty.

### 3.    The Defendants Failed To Prove That PSG's Conduct Met The Rascality Test Under Section 11 Of Chapter 93A.

146.    The Defendants' Chapter 93A claim is governed by Section 11, which requires business claimants to prove that the alleged conduct attained "a level of rascality that would raise the eyebrow of someone inured to the rough and tumble world of commerce." Levings v. Forbes and Wallace Inc., 8 Mass. App. Ct. 498, 504 (1979).  The Defendants failed to prove this essential element of their Chapter 93A claim.

147.    Section 11 applies to "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal …." Mass. Gen. L. ch. 93A, § 11.  The claims of consumer claimants, in contrast, are governed by Section 9, which applies only if the claimant cannot bring an action under Section 11.  See Mass. Gen. L. ch. 93A,

§ 9 (authorizing "[a]ny person, other than a person entitled to bring action under section eleven of this chapter," to bring action under Section 9).

148.    Whether Section 11 applies to interaction between two parties requires a dual inquiry:  first, the court assesses whether the interaction is "commercial" in nature, and second, it evaluates whether the parties were both engaged in "trade or commerce," and therefore acting in a "business context." Szalla v. Locke, 421 Mass. 448, 451-52 (1995).

149.    In determining whether the parties were acting in a business context, the court must

> assess the nature of the transaction, the character of the parties involved, and the activities engaged in by the parties.  Other relevant factors are whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons ... and whether the participant played an active part in transaction.

Begelfer v. Najarian, 381 Mass. , 191 (19 ).

150.    The Begelfer test applies to the activities of municipalities as well as to private actors.  See Park Drive Towing, Inc. v. City of Revere, 442 Mass. 80, 86 (2004) (applying Begelfer test).

151.    The activity between PSG and the Defendants was commercial in nature and occurred in a business context.  In 1997 and years prior, the Defendants issued sophisticated RFPs seeking proposals from outside vendors to run the town's multimillion dollar wastewater treatment plant.  The wastewater treatment services were not simply services for the residents of Rockland but also a source of revenue for the town, as Rockland sold treatment services to the neighboring communities of Abington, Hingham and Hanover.  See Ex. 500 at 3 (RFP stating that Sewer Plant accepts domestic septage from Abington, Hingham and Hanover in addition to Rockland).  See Milford Water Co. v. Ryan, WL 2848119, at *2-*3 (Mass. Super. Ct. Sept. 20,

2006) (allowing that town that sold water services to neighboring towns may be acting in trade or commerce if not pursuant to legislative enactment).

152.    Because the Defendants were engaged in the conduct of trade or commerce in operating the Sewer Plant, they were eligible to bring an action under Section 11, and thus Section 11, not Section 9, applies to the Defendants' Chapter 93A claim.[3] See Boston v. Aetna Life Ins. Co., 399 Mass. 569, 575 (1987) (holding that City of Boston "[s]urely … meets this test" under Section 11 as person engaged in trade or commerce); see also Berry v. City of Worcester, 1998 WL 1181727, at *10 (Mass. Super. Ct. Sept. 10, 1998) (where claimant sued city for premature termination of its parking management services agreement, city brought counterclaim under Mass. Gen. L. ch. 93A, § 11).

153.    The Defendants failed to prove that PSG's conduct met the rascality test under Section 11.  Rascality cannot be proven by unfairness or deceptive conduct, but requires at least a violation of conventional business ethical standards.  See Wasserman v. Agnastopoulos, 22 Mass. App. Ct. 672, 679 (1986).  The evidence at trial does not support the conclusion that PSG violated any business ethical standards.  PSG's understanding was that its involvement in the 1997 procurement process was within the bounds of assistance that incumbent operators customarily provide to municipalities, and there was no evidence that complying with a client's wishes regarding disbursement of rebates and expenses violated any business ethical standard.

---

[3] Clean Harbors of Braintree, Inc. v. Board of Health of Braintree, 409 Mass. 834 (1991) does not hold otherwise.  There the Board of Health claimed that the plaintiff violated Section 11 by failing to request that the Board grant it a site assignment for its hazardous waste facility.  The court concluded that the Board was not a person under Section 11 because "[a] board of a town acting in its governmental capacity may not bring an action for unfair or deceptive trade practices under § 11." Id. at  841.  Unlike in Clean Harbors, where the municipal body was acting purely in its regulatory capacity in the transaction at issue, here the Defendants were acting in a commercial context when they engaged PSG to operate the sewer plant.

154.     Because PSG's alleged conduct did not meet the rascality test under Section 11, it is not liable for violating Chapter 93A.

> **4.     Regardless Of Whether The Defendants' Chapter 93A Claim Is Governed By Section 11 Or Section 9, The Defendants Failed To Prove That PSG's Conduct Was Unfair Or Deceptive.**

155.     Regardless of whether the Defendants' Chapter 93A claim is governed by Section 11 or Section 9, the Defendants failed to prove that PSG's conduct was unfair or deceptive, an essential element of their claim.

156.     To prove any Chapter 93A claim, a claimant must show that the conduct at issue was unfair or deceptive.  Mass. Gen. L. ch. 93A, § 2.  Proof of a statutory or common law violation that does not involve unfairness or deception is insufficient to prove a violation.  See, e.g., Whittinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100-01 (1979) (breach of contract does not establish Chapter 93A violation); Walsh v. Chestnut Hill Bank & Trust Co., 414 Mass. 283, 288 (1993) ("not every negligent act is unfair or deceptive and thus unlawful under G.L. ch. 93A,§ 2").

157.      "Balancing the equities of the relationship between the parties [is] a major factor in determining unfairness."  Mechanics Nat'l Bank v. Killeen, 377 Mass. 100, 110 (1979).  As a result, unfairness must be analyzed taking into consideration factors that include what the claimant knew or should have known, see Swanson v. Bankers Life Co., 389 Mass. 345, 349 (1983), and whether the claimant was a defenseless consumer.  See Mechanics Nat'l Bank, 377 Mass. at 110.

158.     Here, the Defendants were not "defenseless consumer[s]" in the transactions at issue.  They were represented in both the 1997 procurement process and the 1998 Contract drafting process by experienced outside counsel, the law firm of Kopelman & Paige.  Rockland

had a Town Administrator and Chief Procurement Officer, Kevin Donovan, who was aware that

the procurement was ongoing in 1997 and approved the award of the 1998 Contract to PSG.

Rockland had an accounting department with the authority to review the books and records of

the Sewer Commission.  The Defendants' own employee, Thomson, was the chief perpetrator of

any wrongdoing.  A three-member Sewer Commission was charged with supervising Thomson's

activities, and Rockland's own forensic audit report concluded that the Sewer Commission was

at fault for "not provid[ing] oversight … adequate to protect the Town from fraud and abuse of

public funds."  In sum, the Defendants knew or should have known how the 1998 Contract was

procured and how Rockland's funds under that contract were being disbursed.

159.    Because the equities of the relationship between the Defendants and PSG support

the conclusion that PSG's conduct was not unfair or deceptive, PSG is not liable under Chapter

93A.

**B.    Even If The Defendants Had Proved That Sause Committed Acts Violative Of Chapter 93A While Acting As An Agent For PSG, The Defendants Waived Vicarious Liability As A Basis For Finding A Chapter 93A Violation.**

160.    The Defendants claim that, by purportedly helping Thomson steer the 1998

Contract to PSG, Sause engaged in conduct that violated Chapter 93A while acting as an agent

for PSG, and therefore PSG is liable for Sause's wrongdoing.  Even if the Defendants had proved

that Sause was the agent of PSG while engaging in conduct that violated Chapter 93A – which

they did not – PSG cannot be liable for that conduct under a vicarious liability theory because the

Defendants waived all of their respondeat superior claims against PSG.

161.    The evidence at trial established that in April 2006 the Defendants released Sause

of his liability for all claims in connection with this litigation by executing the Stipulation in

Sause's bankruptcy case.  In Massachusetts, "the release of an agent precludes a claim against

31

his principal who is liable solely on the theory of respondeat superior." Elias v. Unisys Corp.,

410 Mass. 479, 484 (1991); see also Richmond v. Schuster Express, Inc., 16 Mass. App. Ct. 989,

990 (1983). In Elias, the Supreme Judicial Court distinguished respondeat superior liability from

joint tortfeasor liability under the Uniform Contribution Among Tortfeasors Act.[4] Under a

theory of joint tortfeasor liability, the Court stated, a claimant "may settle with one joint

tortfeasor and still have recourse against remaining joint tortfeasors." Elias, 410 Mass. at 481-82

(citing Mass. Gen. L. c. 231B). In contrast, the Court explained, "established case law holds that

a general release given to an agent will preclude a subsequent action against his principal." Id. at

482. The SJC stated that this distinction is appropriate because, in contrast to joint tortfeasor

liability,

> the principles of vicarious liability apply where only the agent has
> committed a wrongful act. The principal is *without fault*. The
> liability of the principal arises simply by the operation of law and
> is only derivative of the wrongful act of the agent.

Id. at 481 (emphasis in original).

162.    "[A] covenant not to sue or [a] release will not discharge a vicariously liable

party *if the covenant contains an express reservation of rights against that party*." Atlas Tack

Corp. v. DiMasi, 37 Mass. App. Ct. 66, 71-72 (1994) (emphasis supplied). Such an express

reservation, however, must be "*very specific*." See id. (emphasis supplied); see also Medeiros v.

Middlesex Ins. Co., 48 Mass. App. Ct. 51, 55 n.3 (1999) (citing Atlas and noting that "the

supposed reservation of rights" at issue did not save vicarious liability claim because it was not

"very specific"). Moreover, the waiver rule has only been expressly applied in "the derivative

---

[4] In some states, unlike Massachusetts, adoption of the Uniform Contribution Among Tortfeasors Act has
led to the abandonment of this common law rule. See, e.g., Yates v. New South Pizza, Ltd., 412 S.E.2d
666, 669-70 (N.C. 1992).

tort liability context in which it was grounded."  See Medeiros, 48 Mass. App. Ct. at 56

(applying rule in tort context but not extending to "actions based upon contract").

163.    In Atlas, for example, the court held that an action against an employer was not

precluded by a general release of the agent "because of the *very specific language in the release*

*which reserve[d] claims*" against the principal.  See 37 Mass. App. Ct. at 71 (emphasis supplied).

In Atlas, plaintiff had brought malpractice claims against an attorney and the putative legal

partnership for which he allegedly worked.  Plaintiff executed a release of the individual

attorney, which stated:

> Atlas Tack Corporation … does hereby release and discharge …
> Ralph A. Donabed … from … any claim whatsoever on account of
> or in any way growing out of … a certain action entitled [Atlas
> Tack Corp. v. DiMasi] … *and specifically does not release and*
> *discharge any and all claims that Atlas Tack Corporation has*
> *against the Law Offices of DiMasi, Donabed, and Karll, Salvatore*
> *F. DiMasi and Stephen P. Karll*, stated in [that action] ….

Id. at 67 n.3 (emphasis supplied).  Even with such an explicit and specific reservation, the Court

of Appeals was hesitant to allow plaintiff to proceed against the firm.  The Court of Appeals in

Atlas acknowledged "the unfairness of imposing liability on a blameless party when the party at

fault has been released."  Id. at 71.  However, the court was "constrained" to allow the action

against the principals to proceed, if only because of the very specific express reservation of

action against those parties.  Id. at 71-72; cf. Medeiros, 48 Mass. App. Ct. at 54-55 & n.3

(language in plaintiff's motion for voluntary dismissal that she was "pursuing her claims" against

vicariously liable party was insufficiently specific to reserve those claims).

164.    As noted above, the Defendants executed a general waiver of claims against

Sause in the Stipulation.  However, the Stipulation contains no express reservation of the right to

pursue claims against PSG – let alone a very specific express reservation.  At best, the

Stipulation contains a vague and general implied reservation of Rockland's right to proceed against PSG. Such a reservation – if there is one – must be inferred from the Stipulation as a whole and from the context in which Sause and Rockland effected the Stipulation. As such, the Stipulation falls well below the <u>Atlas</u> standard. The Defendants, then, waived every claim against PSG in their counterclaim that is based upon PSG's respondeat superior liability for Sause's conduct, including their claim under Chapter 93A. <u>See</u> <u>Elias</u>, 410 Mass. at 484; <u>Atlas</u>, 37 Mass. App. Ct. at 71; <u>Medeiros</u>, 48 Mass. App. Ct. at 55 n.3.

165.    This result is particularly appropriate in this case, where the "unfairness of imposing liability" on PSG is especially pronounced. <u>See</u> <u>Atlas</u>, 37 Mass. App. Ct. at 71. The Defendants waived their claims against Sause in exchange for Sause providing discovery that the Defendants could use in pursuing their claims against PSG. In other words, Defendants provided a release to PSG's agent who, as discussed below, committed most of the "wrongful acts" alleged in the counterclaim and cross-claim, to obtain discovery that the Defendants then used at trial against a principal who was "without fault" directly for those wrongful acts. <u>See</u> <u>Elias</u>, 410 Mass. at 481-82.

166.    The Defendants easily could have included a very specific express reservation of their claims against PSG in the Stipulation. <u>See</u> <u>Medeiros</u>, 48 Mass. App. Ct. at 55 (holding that a voluntary dismissal, a general release, and a covenant not to sue are comparable bases for waiver because "the terms and conditions [of each] are within the discretion of the parties" (quoting <u>Tuite & Sons, Inc. v. Shawmut Bank, N.A.</u>, 43 Mass. App. Ct. 751, 755 (1997)). They chose not to do so, and therefore have waived their respondeat superior claims against PSG, including their Chapter 93A claim to the extent it is based on a respondeat superior theory. This result plainly is required under Massachusetts law. <u>See</u> <u>Elias</u>, 410 Mass. at 484; <u>Atlas</u>, 37 Mass.

App. Ct. at 71-72; see also Medeiros, 48 Mass. App. Ct. at 54 (holding claim precluded despite allegedly "draconian impact").

167.    Because the Defendants waived their vicarious liability claims against PSG as Sause's principal, PSG is not liable under Chapter 93A.

Respectfully submitted,

PROFESSIONAL SERVICES GROUP, INC.,
By its attorneys,


/s/Maria R. Durant_____
Maria R. Durant (BBO # 558906)
David M. Osborne  (BBO # 564840)
DWYER & COLLORA, LLP
Federal Reserve Plaza
600 Atlantic Avenue, 12th Floor
Boston, MA  02210
(617) 371-1000


**CERTIFICATE OF SERVICE**

I, Maria R. Durant, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on April 12, 2007.

/s/Maria R. Durant_____
Maria R. Durant