UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PROFESSIONAL SERVICES GROUP, INC., Plaintiff,<br><br>    v.<br><br><br>TOWN OF ROCKLAND, ROCKLAND<br><br>SEWER COMMISSION, GREGORY THOMSON and MICHAEL SAUSÉ,<br><br>       Defendants | Civil No. 04-11131-PBS |

)
)
)
)
)
)
)
)
)
)
)

TOWN OF ROCKLAND, ROCKLAND
SEWER COMMISSION,
        Plaintiffs-in-Counterclaim
        and Crossclaim,

v.

PROFESSIONAL SERVICES
GROUP, INC.,
        Defendant-in-Counterclaim,

and

MICHAEL SAUSÉ,
        Crossclaim Defendant

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**REPLY MEMORANDUM IN OPPOSITION TO PROFESSIONAL SERVICES GROUP'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE CHAPTER 93A CLAIM**

**A.    Rockland did not waive vicarious liability against PSG when it released Sausé**

        **1.    Rockland's release of Sausé did not release PSG**

                **a.    Background: The Original Stipulation Dated April 25, 2006 and the Amended Stipulation dated July 11, 2006**

In response to PSG's Complaint, on July 27, 2004 Rockland asserted a cross-claim against Michael Sausé and a Counterclaim against PSG. Docket Entry No. 11. On January 20, 2006, Sausé filed a petition in bankruptcy. As a result, all litigation pending against him, including Rockland's Cross-claim, became automatically stayed by operation of law. 11 U. S.C. §362(a).  Rockland needed discovery from Sausé to continue defending PSG's claims and to continue prosecuting its own Counterclaim against PSG.  In order to obtain that discovery, however, it was necessary to first obtain relief from the automatic stay. Accordingly, on April 25, 2006 Rockland and Sausé entered a Stipulation for a limited modification of the automatic stay.

The text of the original Stipulation dated April 25, 2006 ("Stipulation") provided, inter alia, that the automatic stay "is modified to permit Rockland to obtain discovery from [Sausé ] . . . that Rockland does or may need in asserting its defenses [in this action]  and its claims against other non-debtor parties [in this action] . . ." Stipulation, at ¶1. PSG was the only non-debtor party. In exchange for the modification of the stay that enabled Rockland to obtain discovery from Sausé for use in litigation with PSG, Rockland waived its claims against Sausé and his bankruptcy estate. Id., at ¶2.

The Stipulation clearly reflected Rockland's intent to not release PSG, but instead to continue to pursue its Counterclaim. This is evident from several of the recitals, as well as from the text of the Stipulation quoted above.  In each of these instances there is a reference to Rockland's "asserting its defenses [in this action] and its claims against other non-debtor parties [in this action] . . ." Stipulation, at Recital No. 5, 7, 8 and ¶1.

Although there can be no reasonable doubt that the release contained in the Stipulation expressly reserved Rockland's claims against PSG, on July 11, 2006

Rockland and Sausé entered an Amended Stipulation ("Amended Stipulation") that included a clarified reservation of rights to remove all doubt.[1] The Amended Stipulation, which is on file in the United States Bankruptcy Court for the District of Delaware, is attached hereto as Exhibit 2, entered on the docket as indicated on Exhibit 1, and was conspicuously missing from PSG's submission.[2] Essentially, the Amended Stipulation clarified the fact that Rockland had expressly reserved its rights to pursue its Counterclaim against PSG and that it had not waived its claims against PSG by entering the Stipulation with Sausé. The principal difference between the release contained in the Stipulation and the release contained in the Amended Stipulation was the addition of the following text concerning Rockland's reservation of rights against PSG:

> Notwithstanding this waiver of the Rockland Claims as to the Debtor and as to the Debtor's estate, Rockland specifically does not waive or release any claims it may have as and against any of Debtor's prior employers or other third parties, including, without limitation, Professional Services Group, Inc., and U.S. Filter Operating Services, Inc., Rockland specifically reserves all of its rights and the claims it has against Debtor's former employers, including Professional Services Group, Inc., and U.S. Filter Operating Services, Inc., and including, without limitation, those rights and the claims asserted against Professional Services Group, Inc. by Rockland in the Civil Action. Rockland and Debtor represent and agree that there was never an intention or an agreement between them to have Rockland waive its rights and claims against Debtor's former employers and other third parties, including, without limitation, Professional Services Group., Inc. and U.S. Filter Operating Services, Inc., and including, without limitation, all of

---

[1] On July 11, 2006, PSG had moved to dismiss Rockland's Counterclaim on the theory that it was barred by Rockland's release of Sausé. Docket Entry No. 74. This Court denied PSG's motion without a hearing on the following day.

[2] Although the Amended Stipulation was not entered in evidence, this Court can take judicial notice of it because it has been filed as a pleading in the United States Bankruptcy Court in Delaware. In Re: Michael Roys Sausé, U.S. Bankruptcy Court, D. Del., Case No. 06-10059-MFW, Docket Entry No. 19; See, e.g., Reyes-Vejerano v. U. S., 276 F.3d 94, 98 n2 (1st Cir. 2002) (judicial notice of pleadings filed in district court); Graham v. Smith, 292 F. Supp.2d 153, 155 n1 (D. Me. 2003) (judicial notice via internet of pleading filed in a related case in another district); Panico v. Whiting Milk Co., 335 F. Supp. 315, 316 n1 (D. Mass. 1971) (judicial notice of pleadings filed in a case that had been closed).

Rockland's rights and claims against Professional Services Group, Inc. in the Civil Action.

Amended Stipulation, at ¶2, Ex. 2 attached hereto..

### b. Rockland expressly reserved its rights to purse PSG in the stipulation and as clarified in the amended stipulation

Under Massachusetts law, the release of an agent will *not* result in the release of a principal whose liability is predicated solely under the doctrine of respondeat superior where the release contains an express reservation of rights against the principal. Atlas Tack Corp. v. DiMasi, 37 Mass. App. Ct. 66, 71-72, 637 N.E.2d 230, 233-234 (1994). In Atlas Tack, the plaintiff had granted a release to a lawyer who was alleged to have been a partner of other lawyers whom the plaintiff continued to pursue under a theory of vicarious liability. Id., at 67, 637 N.E.2d, at 232. The Superior Court granted the alleged partners summary judgment on the ground, among others, that the plaintiff's release operated to discharge them from liability by operation of law. Id. The Appeals Court reversed holding that the text of the release sufficiently reserved the plaintiff's rights against the other defendants. Id., at 71-72, 637 N.E.2d, at 233-234. The release that the plaintiff had given in Atlas Tack did not contain any elaborate reservation of rights. It consisted of nothing more than a single clause appearing at the end of the release. It merely recited that the plaintiff "specifically does not release and discharge any and all claims" that Atlas Tack Corporation had against the remaining defendants, and identified by name and docket number the case in which the claims were pending . Id., at 67 n3, 637 N.E.2d, at 232 n3. The Appeals Court held that this simple language was sufficient to constitute "an express reservation of rights" sufficient to prevent the release from barring

prosecution off the action against the parties alleged to be vicariously liable. Id., at 72, 637 N.E.2d, at 234.[3]

Judged against this standard, the release contained in the Stipulation satisfies the requirement that there be an express reservation of rights. Like the release in Atlas Tack, the Stipulation here identified by name and docket number the case in which the claims were pending. Stipulation, Recital No. 1. The Stipulation then makes four separate references to Rockland's "asserting its defenses [in this action] and its claims against other non-debtor parties [in this action] . . ." Stipulation, at Recital No. 5, 7, 8 and ¶1. The only reasonable interpretation of these provisions is that they reflect Rockland's reservation of rights to proceed against PSG. [4]

Even if the Stipulation in the present case could not be read to preserve the claim against PSG, because it did not contain any integration clause, the parties were free to clarify the agreement between the parties with a subsequent writing. Regardless of the specificity of the reservation of rights included as part of the release in the Stipulation, the text of the clarified reservation of rights in the Amended Stipulation goes far beyond

---

[3] In connection with its suggestion that the reservation of rights contained in the Stipulation fails to meet requirements of Atlas Tack, PSG cites Medeiros v. Middlesex Insurance Co., 48 Mass. App. Ct. 51, 716 N.E.2d 1076 (1999). Medeiros, however, presents decidedly different circumstances. In Medeiros, the plaintiff not only granted a general release, but also voluntarily stipulated to dismiss the claim against an agent with prejudice, and never sought to set aside the dismissal and the resulting judgment so that it would not have preclusive effect. This led the Appeals Court to observe that "[i]ndeed, the preclusive effect of the dismissal should, if anything, be entitled to presumptively greater force [than a release] since it was presented to a judge for approval and enshrined in the equivalent of a judgment." Id., at 55, 716 N.E.2d, at 1079. Rockland never executed a stipulation of dismissal of its cross-claim against Sausé either as a result of the initial Stipulation or the Amended Stipulation. Consequently, Medeiros has no relevance to this case.

[4] PSG knows full well that the Stipulation contained a reservation, and has acknowledged that. See PSG's Proposed Findings, at ¶164 (conceding only that the reservation was a "general implied reservation").

the simple reservation that <u>Atlas Tack</u> requires. The reservation of rights included in the Amended Stipulation recited that "Rockland specifically does not waive or release any claims it may have" against PSG;  that " Rockland specifically reserves all of its rights and the claims it has" against PSG " including, without limitation, those rights and the claims asserted against [PSG] by Rockland in the Civil Action"; and that "Rockland and [Sausé ] represent and agree that there was never an intention or an agreement between them to have Rockland waive its rights and claims against [Sausé ]'s former employers and other third parties, including, without limitation, [PSG], and including, without limitation, all of Rockland's rights and claims against [PSG] in the Civil Action." Amended Stipulation, at ¶2, Ex. 2 attached hereto.

PSG cannot argue that the Town and Sausé were somehow barred from acting in July 2006 to clarify the intent of the stipulation signed in April 2006.[5] The Supreme Judicial Court has held that a release may be reformed by restricting its scope so as to avoid the unintended consequence of releasing a party whose release was not intended. <u>See</u> <u>Century Plastic Corp. v. Tupper Corp.</u>, 333 Mass. 531, 533-535, 131 N.E.2d 740, 741-743 (1956).

In sum, any argument that the Town has waived its rights to pursue PSG must fail. It was never the Town's and Sausé's intent in entering into such a release, and to the extent the parties' intent was unclear, it was quickly clarified and must be honored.

> **2.    Even if the Amended Stipulation could be not considered a clarification of the parties' original intent, but rather a modification, the Town reserved its rights to purse PSG from a valid modification of the release contained in the stipulation**

---

[5] PSG cannot make some kind of "unfairness" argument since it cannot show that it detrimentally relied on the original stipulation in between April 2006 and  July 2006, when the Amended Stipulation was filed on the docket.

The release contained in the Stipulation constituted a contract between Rockland and Sausé. See, e.g. Sharon v. Newton, 437 Mass. 99, 105, 769 N.E.2d 738, 744 (2002). Like other contracts, the release was subject to modification by mutual agreement of the parties. E.g., Eck v. Godbout, 444 Mass. 724, 731, 831 N.E.2d 296, 303 (2005)   (" A release may be rescinded or modified based on a mutual mistake of the parties, but not on one party's unilateral 'mistake'… ."); Separation Technologies, Inc. v. Unger, 1994 WL 879881 *1 (Mass. Super., May 18, 1994) (summary judgment denied because of a "genuine issue of material fact on the extent to which the release agreement may have been modified by written, oral or implied agreements between the parties."); See also Zemco Manufacturing, Inc. v. Pecoraro, 703 N.E.2d 1064, 1072 (Ind. App. 1998) ("Modification of a release, because it is also a contract, requires all the requisite elements of a contract, including an offer, acceptance, and consideration.").

A contractual modification occurs where the parties to a contract mutually agree to change one or more terms and where there is consideration to support the modification. Cochran v. Quest Software, Inc., 328 F.3d 1, 9 (1st Cir. 2003) (Massachusetts law).[6] When a contract is modified, the later agreement supersedes the original agreement. A. Leo Nash Steel Corp. v. Southern New England Steel Erection Company, Inc., 9 Mass.

---

[6] There can be no question about mutual assent because both Rockland and Sausé signed the Amended Stipulation. If the Amended Stipulation is considered a contract modification, rather than simply a written expression of the parties' earlier intent and agreement, then consideration would be mutual. Under this analysis, Sausé would have granted Rockland a broader reservation of rights. In turn, Sausé received the benefit of Rockland's ability to pursue claim PSG because recovery by Rockland against PSG on the claims relating to the recovery of monies disbursed through Wainwright Bank would potentially reduce the amount of Rockland's loss for which Sausé was to make restitution under the terms of the plea agreement that disposed of criminal charges brought against him by the Commonwealth. See Docket Entry dated October 21, 2004 in the matter of Commonwealth v. Michael R. Sausé, Superior Court, Plymouth Co., No. PLCR-2003-00408, Ex. 210 (containing restitution order).

App. Ct. 377, 402 N.E.2d 71, 75 (1980). "[W]here the subject matter of one contract is subsequently entirely subsumed in another, the latter becomes the exclusive medium of ascertaining the contract by which the parties bound themselves. . . .The earlier contract disappears. It does not remain to exert some wraith-like influence on what otherwise would be clear, unambiguous meaning of the subsequent contract." <u>Puretest Ice Cream, Inc. v. Kraft, Inc</u>., 806 F.2d 323, 325 (1st Cir. 1986) (Indiana law) (internal citations omitted); <u>see also</u> <u>Uncle Henry's Inc. v. Plaut Consulting Co., Inc</u>., 399 F.3d 33, 44 (1st Cir. 2005) (Maine law) (Subsequent agreement will govern contractual relationship "as a binding, written modification that superseded the [earlier] contract.").

Accordingly, upon execution of the Amended Stipulation, the more comprehensive reservation of rights contained in that document became the operative release.[7] There can be no doubt but that the release contained in the Amended Stipulation meets, and exceeds the requirement of an express reservation of rights called for by <u>Atlas Tack</u>. The Amended Stipulation recited that "Rockland specifically does not waive or

---

[7] The fact that the Amended Stipulation was not subsequently approved and entered as an Order of the Bankruptcy Court is immaterial to issues concerning the release, as opposed, hypothetically, to issues concerning the automatic stay. By entering the Amended Stipulation, Rockland and Sausé bound themselves to the terms of the modified release, which exists as an independent covenant between them. Approval of the Bankruptcy Court was only necessary to the extent that the Amended Stipulation further modified the automatic stay, about which there is no current issue, and the lack of such approval does not render the release provisions void as between the parties because Bankruptcy Court approval of any change to the release was not required. <u>See</u>, <u>e.g.</u>, <u>Trans World Airlines, Inc. v. Texaco Inc</u>. (<u>In Re: Texaco Inc</u>.), 81 B.R. 813, 818 (Bankr. S.D.N.Y. 1988) ("[P]rior court approval of the Stipulation was not required [by the Bankruptcy Code] and the lack of such prior court approval did not render the Stipulation unenforceable or void."); <u>see also</u>, <u>Biggs, Inc. v. Glosser Bros., Inc</u>. (<u>In Re: Glosser Bros., Inc</u>), 124 B.R. 664, 668 (Bankr. W. D. Pa. 1991) (agreement had legal effect notwithstanding lack of court approval because approval was not necessary). This concept is analogous to that encountered in Massachusetts domestic relations practice where agreements that are not merged by the Court into its judgment retain independent legal significance as contracts for which the parties can maintain actions for breach but not for contempt. <u>See</u>, <u>e.g.</u>, <u>Foster v. Hurley</u>, 444 Mass. 157, 159 n2, 826 N.E.2d 719, 721 n2 (2005) (Agreement that did not merge into divorce decree "surviv[ed] as a contract of independent legal significance.").

release any claims it may have" against PSG;  that " Rockland specifically reserves all of its rights and the claims it has" against PSG " including, without limitation, those rights and the claims asserted against [PSG] by Rockland in the Civil Action"; and that "Rockland and [Sausé ] represent and agree that there was never an intention or an agreement between them to have Rockland waive its rights and claims against [Sausé ]'s former employers and other third parties, including, without limitation, [PSG], and including, without limitation, all of Rockland's rights and claims against [PSG] in the Civil Action." Amended Stipulation, at ¶2, Ex. 2 attached hereto.

**B.      Even if Rockland had not reserved its rights against PSG, PSG would not be released from liability to the extent it was otherwise liable as a joint tortfeasor**

The common law rule providing for the exculpation of a principal for vicarious liability upon the release of an agent, except where the release contains a reservation of rights against the principal, has no application where the principal is liable otherwise as a joint tortfeasor. The statute providing for contribution among joint tortfeasors provides, inter alia, that "[when a release …is given in good faith to one of two or more persons liable in tort for the same injury…it shall not discharge any of the other tortfeasors from liability for the injury unless its terms so provide… ." G. L. c. 231B § 4; Cf. Elias v. Unisys Corp., 410 Mass. 479, 481, 573 N.E.2d 946, 947 (1991) (statute would not be applied where liability was "based *solely* on the theory of respondeat superior.") (emphasis added). Consequently, even if this Court were, for some reason, to conclude that the Town had released PSG from vicarious liability for the acts of Sausé , there are acts of other employees for which PSG would be liable, such as Kruger, Varjabedian,

Cavalieri, and Solomon who knew of, participated in or assisted in various acts that form the basis of the Town's Chapter 93A claim.

**C.    The applicable section of Chapter 93A is Section 9, not Section 11**

Section 11 creates a cause of action for damages for "any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal," as the result of an unfair or deceptive act or practice, or an unfair method of competition, committed by another party who engages in trade or commerce. Mass. Gen. Laws ch. 93A, §11. "Trade or commerce" is defined by Mass. Gen. Laws. ch. 93A, §1(b), as:

> the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security as defined in subparagraph (k) of section four hundred and one of chapter one hundred and ten A and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth .

The Supreme Judicial Court has found that a governmental entity may not bring an action under Section 11 if during the transaction or conduct at issue it is acting in its "governmental capacity." <u>Clean Harbors of Braintree, Inc. v. Board of Health of Braintree</u>, 409 Mass. 834, 841, 570 N.E.2d 987, 991 (1991).

Moreover, just because PSG was engaging in "trade or commerce" does not mean that the governmental entity on the other side of the transaction was engaging in "trade or commerce." "One who deals with a public entity, as for instance in providing it with goods or services may very well be engaged in trade or commerce without the entity

being so engaged as well."[8] <u>Lafayette Place Associates v. Boston Redevelopment Authority</u>, 427 Mass. 509, 535-36, 536 n.29, 694 N.E.2d 820, 836-37, 836 n.29 (1998).

In the context of this case, PSG's contention the Town and the Rockland Sewer Commission were engaged in "trade or commerce" under Section 11 has no merit. The Town and the Commission were taking steps to ensure that wastewater from public sewers was treated and made safe for discharge, a typical governmental activity. Therefore, Section 11 is not applicable to this case, but Section 9, with its lower threshold for establishing a violation of Chapter 93A.[9]

**D.    Even if the applicable section of Chapter 93A were Section 11, the facts of this case establishes conduct in violation of the statute**

For many years, the language most often quoted by courts in describing the standard of conduct for proving a case brought by a business plaintiff was that which is used by PSG, referring to conduct that "must attain a level of rascality that would raise the eyebrow of someone inured to the rough and tumble of the world of commerce. <u>Levings v. Forbes & Wallace, Inc., 8 Mass. App.</u> Ct. 498 (1981). The "rascality" language, however, has been disfavored in recent years, since it has been criticized as "uninstructive" by the Supreme Judicial Court. <u>Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc.,</u> 420 Mass. 39, 42 (1995).Instead, it has been said that, in

---

[8] There may be occasions in which a governmental entity may be found to be engaging in "trade or commerce" in connection with a particular activity and thus allowed to bring an action under Section 11. <u>See, e.g., Boston v. Aetna Life Ins. Co.,</u> 399 Mass. 569 (1987) (city of Boston found to be engaging in "trade or commerce" and thus allowed to bring action under Section 11, when it was acting as assignee of patients at city hospital); <u>Spence v. Boston Edison Co.,</u> 390 Mass. 604, 615, 459 N.E.2d 80, 87(1983) (allowing Chapter 93A claim by city housing authority to proceed against utility company for overcharging for steam at public housing).

[9] As a policy matter, that result makes sense, since governmental agencies have a responsibility to the public, and should not be put into the same position as those commercial enterprises that operate in the business world, with profit as a motive.

determining whether conduct is "unfair," "courts should rather focus on the nature of the challenged conduct and on the purpose and effect of that conduct." <u>Stagecoach Transportation, inc. v. Shuttle Inc.</u>, 50 Mass. App. Ct. 812,817 n.6, 741 N.E.2d 862, 867 n.6 (2001)(citing <u>Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc.</u>, 420 Mass. 39, 42 (1995). The type of conduct at issue in this case – conduct including, inter alia, PSG's exploitation of its access to a Town official by virtue of its status as the incumbent operator of the plant to influence improperly the procurement process; outright manipulation of the procurement process; concealment of Town rebate monies and other monies from Town Hall to curry favor with the Rockland Sewer Commission; flagrant, and reckless disregard of legitimate check writing procedures and as well as the purposes of specialized accounts in its control which led to misuse of hundreds of thousands of dollars in Town funds – is the type of offensive conduct that establishes a violation under either Section 9 or Section 11.

Unethical, unscrupulous or bad faith conduct, for example, can form the basis of a Chapter 93A violation under Section 11, and that is the type of conduct at issue here, even if such conduct does not fit the criteria for fraud or breach of contract. <u>See, e.g.</u>, <u>J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc.</u>, 365 F.Supp.2d 119, 144 (D. Mass. 2005) (defendants committed "unfair business practices" under Chapter 93A in the context of Any Willing Provider Law, whose purpose in part, "was to level out the playing field for contracting parties with differing bargaining power, "when they "used their position to make it appear there was fair and open dealing, while in actuality, CVS was given one advantage after another); <u>Bradley v. Dean Witter Realty, Inc.</u>, 967 F.Supp. 19, 29 -30 (D.Mass. 1997)("unethical" conduct alleged, specifically assertion by

hotel consultant that client persuaded him to lower his regular rates with the lure of an incentive fee, and that it subsequently refused to pay him the promised fee because the hotel property was so profitable, could support Chapter 93A claim even if no breach of contract, or even any enforceable contract were found); <u>Sears, Roebuck & Co. v. Goldstone & Sudalter</u>, 128 F.3d 10, 19 -20 (1st Cir. 1997)(where lawyer acted unethically, it did not matter whether his conduct was "knowingly fraudulent" for purposes of establishing liability under Chapter 93A, since his conduct fell "within at least the penumbra of some common-law, statutory, or other established concept of unfairness").

**E.    PSG is incorrect in stating that the Town's Chapter 93A claims are wholly derivative of its common law claims and statutory claim under the Uniform Procurement Act and Conflict of Interest Law;  there is no need for Chapter 93A conduct to be based on common law claims or other statutory violations, and  PSG's conduct separately fits the concepts of "unfair" or  "deceptive" that have developed under Chapter 93A**

PSG is simply mistaken when it says that all of the Town's Chapter 93A claims are derivative of its common law and statutory claims. The conduct of PSG that the Town describes as violative of Chapter 93A cannot be so pigeonholed; is  far broader than the common law and statutory claims that it brought.

Moreover, there is no requirement that Chapter 93A claims be based on common law or statutory claims.  As stated by the Supreme Judicial Court:

> Chapter 93A is "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." The relief available under c. 93A is "sui generis. It is neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action." It "mak[es] conduct unlawful which was not unlawful under the common law or any prior statute." Thus, a cause of action under c. 93A is "not dependent on traditional tort or contract law concepts for its definition." ("[A]nalogies between common law claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate because c. 93A

dispenses with the need to prove many of the essential elements of those common law claims").

Kattar v. Demoulas, 433 Mass. 1, 12-13, 739 N.E.2d 246, 257 (2000) (citations and quotations omitted). A Chapter 93A violation may be found even if a contract is at issue, and the Chapter 93A defendant conforms to all legal requirements of the contract. See Kattar, 433 Mass. at 3, 739 N.E.2d at 250. "Legality of underlying conduct is not necessarily a defense to a claim under c. 93A." As the Kattar court pointedly observed:

> Chapter 93A does not define what constitutes an "unfair or deceptive act or practice. Such a definition would be impossible, because, …[t]here is no limit to human inventiveness in this field.

Kattar, 433 Mass. at 13, 739 N.E.2d at 257.

**F.    Even if the Town's Chapter 93A claims were wholly derivative of the claims decided by the jury, the Court is not bound by the jury's verdict and can disagree with and reach results inconsistent with the jury's verdict**

Chapter 93A is not congruent with common law claims or other statutory claims. This language of Chapter 93A prohibiting "unfair" or "deceptive" practices includes reprehensible acts committed in business contexts that elude conventional definitions and common law claims. Doliner v. Brown, 21 Mass. App. Ct. 692, 489 N.E.2d 1036 (1986); Nei v. Burley, 388 Mass. 307, 446 N.E.2d 674 (1983). Therefore, while a jury verdict finding in the Town's favor on its claims against PSG for violation of the Uniform Procurement Act, breach of contract, or misrepresentation, may have had persuasive value in convincing the Court of the Chapter 93A violations, the jury's verdict by no means eliminates PSG's liability for "unfair" or "deceptive" conduct.

Moreover, it is well-established that the Court, which reserved the question of the PSG's liability on Chapter 93A to itself, is not bound by the jury's determinations. The

Court is free to sort through the evidence, weigh the credibility of the many witnesses, and reach its own, separate conclusions.  "'[A] judge may make independent and, therefore, different findings on the c. 93A aspect of a case that arises from the same facts which gave rise to parallel common law claims.'" <u>Poly v. Moylan</u>, 423 Mass. 141, 151, 667 N.E.2d 250, 257 (1996), quoting <u>Wyler v. Bonnell Motors, Inc.</u>, 35 Mass. App. Ct. 563, 567, 624 N.E.2d 116, 118 (1993); <u>see also</u> <u>Fredette v. Allied Van Lines, Inc.</u>, 66 F.3d 369, 375 (1st Cir. 1995).

**G.    The evidence demonstrates that the $400,000 minimum labor bid requirement in the RFP was not an effort by Sausé and Thomson to steal money – as PSG claims – but a device conceived of by Sausé and approved by his boss Kruger to interfere with true competitive bidding; moreover, PSG's claim that the labor account was a "significant portion" of the money stolen by Sausé and Thomson is contradicted by the record since there is no evidence that any money whatsoever from the Labor Account went into the Wainwright Bank account**

PSG persists in arguing that the $400,000 minimum labor cost requirement was hatched as part of a scheme by Thomson and Sausé  to steal money. But in making this argument, PSG apparently hopes that the Court will get confused by the many facts and the sequence of events, because a review of the documented facts – and the known events in chronological sequence – demonstrates how preposterous this argument is. See discussion in Proposed Findings, Section XXIV.  The  minimum labor cost concept was openly discussed by Sausé  with  Kruger as a device for deterring competition.  See Proposed Findings, Section XVII.D.  It had such an effect. See Proposed Findings, Section XI, ¶ 213.  It makes no sense that the purpose of the minimum labor cost was to steal money, since, if that was Thomson's and Sausé's intent in June and July 1997 when the RFP was being written, why wouldn't Thomson and Sausé have stolen some of the

tens of thousands of dollars that were in the engineering services account and the professional development account at that time?  See Proposed Findings, XX, XXI.

The bulk of the money that went into the Wainwright Bank account did not come from the Labor Account, but from the engineering services account left over from 1996, and from the Professional Development account. See Proposed Findings, Section XXI. There is no evidence that *any* money from the Labor Account created by the 1998 contract went into the Wainwright Bank account. See id.

The only evidence of any money "stolen" by Sausé' is through the Wainwright Bank account, and thus, contrary to the arguments of PSG, there is not the slightest evidence that a "significant portion" of,  let alone any of, that money came from the Labor Account established in the 1998 contract.

Once the Wainwright Bank account was closed, and Sausé transferred out of the region, and covered New York state, and  Thomson set up his own bank account, it was *PSG's Varjabedian* who typed up the requests for funds to be withdrawn from various accounts and who determined what accounts the checks made out to Thomson would be drawn from. Proposed Findings, ¶¶407-09. Thus, if a "significant amount" of any money stolen by Thomson after the Wainwright Bank account was closed in 1999 came from the Labor Account, it was Varjabedian who determined that the money should be taken out of the Labor Account for  non-Labor Account purposes, not Thomson.

Furthermore, if, as PSG contends, the $400,000 was inflated, then it was done with the approval and complicity  of PSG's plant manager, Varjabedian, who participated in the RFP process and who, as the plant manager since 1983, was most familiar with staffing requirements. See Proposed Findings, ¶¶ 380-381, 301, If the staffing required by

the RFP was unduly high, in his view, presumably there would have been evidence somewhere that he pointed out the exorbitant amount to his client, the Town of Rockland and the Commission, to whom he made monthly reports. ¶ 485. There was not the slightest indication he had done so, nor was there any testimony that he had ever done so.

**H. PSG's contention that the "records requirement" in the 1997 RFP was a device to help Thomson and Sausé conceal rebate monies from the Town makes no sense since PSG had already, as early as 1995 with the establishment of the Professional Development account, been actively helping to conceal expenditures and rebate monies from Town Hall by maintaining certain accounts off the Town's books and solely on its books**

PSG argues that a change in the records requirements from the 1994 RFP to the 1997 RFP was part of an alleged plot by Thomson and Sausé to "conceal the status of the rebate accounts from Rockland." PSG' Proposed Findings, at 24. See also PSG's Proposed Findings at 8. This contention is nothing short of absurd, given the factual record. <u>See, e.g</u>., XX, XVII.I Varjabedian, the plant manager, admitted that he did not include in his monthly reports to the Sewer Commission any itemization of the account or provide any reports at all to the Town Accountant. Proposed Findings, ¶ 495. <u>PSG, in fact, provided not a single record at trial of any "reports" given to the Town of Rockland under the 1994 contract of how the rebate monies were spent</u>. Rather, the uncontroverted evidence was that beginning in 1995, PSG *helped the Sewer Commission conceal from Town Hall the existence of* rebate monies and information about how rebate monies were to used by the creation of a Professional Development account that was formed to receive rebate monies, and would be overseen <u>not</u> by the Town's financial officers, but instead would be maintained on the books at PSG. See Findings, Sections XX. PSG knew that it was the purpose of

the account to prevent the money from going back to Town Hall and being overseen by the Town's financial officers. See Findings, Section XX.

Therefore, the notion that a change in the recordkeeping procedures in the 1997 RFP were designed to impede the Town's knowledge about the rebate monies is ridiculous, since it is hard to imagine how the Town's financial officers could have any *less* information: PSG had already acted under the 1994 contract to prevent the Town's financial officers from knowing about the existence of rebate monies and how they were being spent. The testimony at trial from the Town's officials and the forensic accountant is that PSG's help in concealing the existence of the rebate monies, and how the rebate monies were spent, was successful; the financial officers had no records of or information about the amount of the rebate monies and how they were used. Testimony of town treasurer Karen Sepeck; Town Accountant Eric Hart; see Proposed Findings, XX.[10]

I.  **Even if Sausé lacked actual authority to participate in the manipulation of the procurement process, PSG is still liable for Sausé's conduct because the evidence demonstrates that it acquiesced in, or at the very least, failed to disavow, the conduct PSG now claims was unauthorized**

Even if, as PSG now claims, Sausé was not authorized by PSG to participate in the drafting of the RFP and the manipulation of the procurement process, PSG nevertheless is liable for his improper conduct because the facts demonstrate that, at the very least, PSG ratified his conduct. Where an agent lacks actual authority to agree on behalf of his principal, the principal may still be liable if the principal acquiesces in the

---

[10] In fact, the Town's forensic accountant was unable to obtain from PSG any records of expenditures in particular designated accounts during certain contract years even when he repeatedly asked. See Proposed Findings, ¶¶ 361-73.

agent's action, or fails promptly to disavow the unauthorized conduct after learning of material facts. <u>Linkage Corp. v. Trustees of Boston University</u>, 425 Mass. 1, 16-19, 679 N.E.2d 191,203 - 205 (1997) "It is the instant duty of a principal, upon ascertaining the facts, at once to disaffirm an act done in his name by an agent in execution of a power conferred but in a mode not sanctioned by the terms of the agency or in excess or misuse of the authority given." <u>Boice-Perrine Co. v. Kelley</u>, 243 Mass. 327, 330-331, 137 N.E. 731 (1923). <u>See Irving Tanning Co. v. Shir</u>, 295 Mass. 380, 384, 3 N.E.2d 841 (1936) cited in Linkage, 679 N.E.2d at 204. "Ratification relates back, and has the same effect, as a prior grant of authority by the principal to the agent." <u>Linkage</u>, 679 N.E.2d at 204.

In this case, the facts demonstrate that PSG cannot distance itself from the preparation of the RFP because Kruger knew that Sausé was planning to work with Thomson on the RFP and planned to insert the minimum labor cost requirement, PSG was aware that no engineering firm had been hired to prepare the RFP, PSG's plant manager Varjabedian worked alongside Thomson and thus knew that Thomson had no experience preparing an RFP and couldn't even type and thus had to know that Thomson was not preparing the RFP himself, and Sausé and Thomson spent hours in PSG's small Norwell office working on the RFP or in close proximity to plant manager Varjabedian at the plant. See Proposed Findings, Sections XVII, A-F.

**J.     PSG clearly benefited from Sausé's participation in the development of the RFP – about which Kruger and Varjabedian knew – and his ability to influence the RFP by including the minimum labor cost requirement, which provides further justification for PSG being held liable**

Another factor justifying PSG being held liable for Sausé's manipulation of the procurement process is that PSG "clearly benefited" from the provisions that he was able

to weave into the RFP and into the addenda. See Linkage Corp. v. Trustees of Boston University, 425 Mass. 1, 19, 679 N.E.2d 191, 204 (1997)(Boston University, the principal, liable for its agent's conduct since it benefited from agent's conduct).  "It is settled that one cannot accept the benefits of a transaction purporting to be done in his behalf and afterwards repudiate it." Shoolman v. Wales Mfg. Co., 331 Mass. 211, 216, 118 N.E.2d 71 (1954), cited in Linkage Corp. v. Trustees of Boston University, 425 Mass. 1, 19, 679 N.E.2d 191, 204 (1997)

**K.    Contrary to the PSG's argument, its bid was submitted at a time when it knew it would not face any competition; thus the fact the bid was higher than a draft number worked up by Woodard and Curran -- a firm which didn't have the experience required by the RFP and which never submitted a bid -- cannot be used by PSG to try to prove there was open competition**

PSG claims that the cost proposal that it submitted was lower than the draft cost proposal developed by Woodard & Curran, a potential competitor, and attempts to use that to justify its position that there was a level playing field and open competition in the process.    However, PSG conveniently overlooks two key facts that eviscerate this argument: first, when PSG actually submitted its cost proposal it did so at a time when it already knew it wouldn't be facing any competition from Woodard &Curran or anyone else, Proposed Findings, Section XII, and second, Woodard & Curran was out of the running because PSG manager Sausé had inserted eligibility criteria in the RFP that he knew would exclude Woodard & Curran. See Proposed Findings, Section VII, ¶¶ 214-19.

**L.    Thomson and Sausé had no motive to lie about how the procurement process was manipulated and how the contract was steered to PSG; moreover, their key testimony was corroborated by witnesses or documents**

Thomson had no motive to lie about how the procurement process was manipulated and steered to PSG.  He was a defendant in the case and he openly spoke

about his active participation in helping to ensure that PSG received the contract, acknowledging that it was wrong. He had already served time in prison for his involvement in taking Town money. If anything, his testimony was further embarrassment to him, not helpful.

Similarly, Sausé had no motive to lie about how the procurement process and manipulated and steered to PSG. He also had already suffered the consequences of his actions, and had pleaded guilty to charges stemming from his involvement in taking Town money, making himself a convicted felon. He had already filed a petition in bankruptcy, and since PSG had not objected to his discharge and sought to pursue its claim, PSG's claims against him were discharged in bankruptcy by May 19, well before his trial testimony. See discharge on Bankruptcy docket, Ex. 1 hereto (bankruptcy docket of Michael Sausé, showing no objection to discharge filed by PSG, and showing discharge occurred May 19, 2006).[11]

More significant, however, is the fact that the key elements of Thomson's and Sausé's testimony are corroborated by documents, witnesses or the mere timing of events. Here are some key examples:

- Thomson's and Sausé's testimony about how they went together to the Inspector General seminar on procurement to learn how RFPs were prepared in order to work on the procurement process was corroborated by documents and the testimony of Kruger. See Proposed Findings, Section XVII.C; ¶¶ 95-96.

---

[11] In contrast, PSG's employees Kruger and Solomon, and ex-employee Varjabedian had ample reason to lie or shade their testimony. Kruger and Solomon still work for the company that was facing millions in potential liability. Varjabedian, an engineer who worked for PSG or its predecessor companies for many years, is dependent upon PSG's management as a reference for the major portion of his career, and, in addition, he faces potential criminal liability for his conduct.

- Their testimony that Michael Sausé conceived of the idea of the minimum labor cost for inclusion in the RFP in order to deter competitors was corroborated by Kruger and correspondence prepared by Sausé. Specifically, their testimony that Sausé prepared the letter to the Inspector General's office seeking clearance from the Inspector General about the minimum labor cost idea because of concerns that it might create a stir among potential competitors was corroborated by a fax from Sausé to Thomson, without Thomson's signature and without the Sewer Commission letterhead, and then another fax from Thomson to the Inspector General's office with the exact same text, but with letterhead and Thomson's signature. See Proposed Findings, Section VI.

- Their testimony that the purpose and effect of the RFP provisions, including the $400,000 minimum labor cost, was to restrict competition was corroborated by Jack Bonomo, an executive from the company that was, potentially, PSG's strongest competitor for the contract. See Proposed Findings, Sections XVI, XI, ¶ 213.

Respectfully submitted,

TOWN OF ROCKLAND and
ROCKLAND  SEWER COMMISSION
By their attorneys,

/s/Joanne D'Alcomo
_____

Joanne D'Alcomo (BBO # 544177)
Seth Nesin (BBO # #650739)
JAGER SMITH P.C.
One Financial Center
Boston, MA 02111
(617) 951-0500

Dated: April 27, 2007