UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

)
PROFESSIONAL SERVICES                    )
GROUP, INC.,                             )
                                         )
                    Plaintiff,           )
                                         )
         v.                              )
                                         )
TOWN OF ROCKLAND, ROCKLAND               )
SEWER COMMISSION, GREGORY                )
THOMSON and MICHAEL SAUSE,               )
_____)
                                         )
TOWN OF ROCKLAND, ROCKLAND               )
SEWER COMMISSION,                        )
                                         )
          Plaintiffs-in-Counterclaim     )        Civil No. 04-11131-PBS
              and Crossclaim             )
                                         )
         v.                              )
                                         )
PROFESSIONAL SERVICES                    )
GROUP, INC.,                             )
                                         )
          Defendant-in-Counterclaim,     )
                                         )
and                                      )
                                         )
MICHAEL SAUSE,                           )
                                         )
          Crossclaim Defendant           )
_____)

**PROFESSIONAL SERVICES GROUP, INC.'S
SUR-REPLY TO DEFENDANTS' REPLY MEMORANDUM**

Plaintiff Professional Services Group, Inc. ("PSG") submits, with leave of the Court, this

sur-reply addressing certain issues raised in the Reply Memorandum filed by Defendants Town

of Rockland ("Rockland") and Rockland Sewer Commission on April 28, 2007 (the

"Defendants' Reply Memorandum") and at the hearing that same day.

I.      **Rockland Discharged PSG of Any Vicarious Liability for Sause's Conduct.**

In April 2006 Rockland discharged PSG of any vicarious liability for the conduct of its

former employee, Michael Sause, when it released Sause of all its claims but failed to expressly

reserve its right to proceed against PSG as the principal.  See Elias v. Unisys Corp., 410 Mass.

479, 484 (1991) ("the release of an agent precludes a claim against his principal who is liable

solely on the theory of respondeat superior"); Atlas Tack Corp. v. DiMasi, 37 Mass. App. Ct. 66,

71-72 (1994) ("a covenant not to sue or [a] release will not discharge a vicariously liable party if

the covenant contains an express reservation of rights against that party").  Rockland traded this

April 2006 release (the "Release") (attached at Exhibit ("Ex.") A) for Sause's consent to lift a

stay issued in Sause's bankruptcy proceeding that prevented Rockland from taking Sause's

deposition.  The Release was approved by the Bankruptcy Court and entered as a court order on

May 8, 2006.  On May 19, 2006, the bankruptcy case was terminated and closed.

On July 11, 2006, PSG alerted the Court to the fact of PSG's discharge from vicarious

liability by filing a motion to dismiss Rockland's respondeat superior claims.[1]  The very next

day, Rockland filed a motion with the Bankruptcy Court seeking to (1) reopen Sause's closed

bankruptcy proceeding, (2) vacate the Release approved by the court, and (3) approve an

"amended" release that contained the express reservation of rights Rockland failed to include in

the court-approved Release.  See Joint Expedited Motion to Reopen Chapter 7 Case (attached at

Ex. B).  Accompanying this motion was the "amended" release (attached at Ex. C).  The

Bankruptcy Court never acted on Rockland's motion, and thus the Release was never vacated

and the "amended" release was never approved.

---

[1] On July 12, 2006 the Court denied the motion without prejudice based on timeliness and did not reach
the merits of PSG's argument.

Rockland now claims that the "amended" release – which has never been approved by the Bankruptcy Court and which was entered into only *after* PSG brought the court-approved Release to the attention of this Court – somehow salvages its respondeat superior claims against PSG. Rockland is wrong for at least three reasons.

First, PSG was discharged of any vicarious liability for Sause's conduct at the moment the Release became effective. Rockland cannot unring the bell. To permit Rockland to reassert its respondeat superior claims against PSG *after* discharging PSG of those claims – and *after* PSG claimed the benefit of that discharge – would render utterly meaningless the well-established doctrine set forth in Elias. This is particularly true where the Release was entered as an order by a court, and Rockland conceded its binding force by filing a motion to vacate the order. See Ex. B.

An agreed order "is a contract between the parties which has a judicial approbation – *one to which the Court, as ultimate arbiter, has been made a signatory.* It is not to be ignored, and can be set aside only upon the same bases as any other judgment." In re Lafayette Dial, Inc., 92 B.R. 798, 800 (Bankr. N.D.Ind. 1988) (emphasis added). Here, too, the Bankruptcy Court was made a signatory to the Release when it entered the Release as an order of the court on May 8, 2006, and thus the Release now can be modified only with the approval of the Bankruptcy Court. The Bankruptcy Court has never approved the "amended" release, and thus the Release is the operative agreement.

Second, the "amended" release is not even evidence in this case. It was never admitted as an exhibit at trial and thus cannot be considered by the Court in ruling on Rockland's Chapter 93A claim.[2]

---

[2] PSG introduced the court-approved Release into evidence at trial. See Ex. 209.

Now, eight months after evidence closed in this case, Rockland attempts to effectively

reopen the evidence by asking this Court to take judicial notice of the "amended" release merely

because Rockland filed that document in an unrelated bankruptcy proceeding – two months after

that bankruptcy proceeding *itself* was closed.  The "amended" release is not subject to judicial

notice.  "A judicially noticed fact must be one not subject to reasonable dispute in that it is either

(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate

and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Fed. R. Evid. 201(b).  For this reason, where a court takes judicial notice of a pleading in another

court, it is "not for the truth of the matters asserted in the other litigation, but rather to establish

the fact of such litigation and related filings."  Liberty Mut. Ins. Co. v. Rotches Pork Packers,

969 F.2d 1384, 1388-89 (2d Cir. 1992).  The fact that Rockland filed the "amended" release in

an unrelated court action does not render that document "capable of accurate and ready

determination" because the Bankruptcy Court never approved or otherwise acted on it.  The

"amended" release is nothing more than a piece of paper drafted by Rockland and attached to a

motion Rockland filed in a *terminated* court proceeding, and thus has no evidentiary value.  See,

e.g., In re Kalantzis, 2001 WL 1757068, at *5 (Bankr. D.N.H. April 26, 2001) (denying debtor's

motion for court to take judicial notice of facts in pleadings because court "may not infer the

truth of the facts contained in documents, unfettered by rules of evidence or logic, simply

because such documents were filed with the court").

Third, there was no new consideration to support a modification of the Release.

Additional and independent consideration is an essential element of a valid contract

modification.  Tri-City Concrete Co., Inc. v. ALA Construction Co., 343 Mass. 425, 427 (1962).

Rockland claims that Sause's new benefit was the possibility that a judgment against PSG might

reduce his criminal restitution order, but that claim is completely at odds with its argument in the very same pleading that Sause had no motive to lie in testifying against PSG. See Defendants' Reply Memorandum at 21. Moreover, Sause's restitution – part of the terms and conditions of his state criminal court probation order – is based on the amount of money he and Thomson stole from Rockland by depositing rebate checks in their personal Wainwright Bank account. See Ex. 210 (certified copy of Sause's criminal conviction). With regard to the stolen Wainwright money, Rockland admits that it was compensated for that loss after a 2005 settlement with the Wainwright Bank, and now claims against PSG *only* the attorney's fees it paid to recover that money. See Defendants' Proposed Findings at 87, ¶ 25. If Sause decides to seek modification of his restitution order, the basis for such a request would be the restitution paid to Rockland in the Wainwright Bank settlement. No judgment against PSG could be a basis for requesting modification of Sause's restitution order, and thus does not satisfy the requirements of consideration for the "amended" release.

Furthermore, consideration must be bargained for by the parties. See United Beef Co. v. Childs, 306 Mass. 187, 190 (1940) ("[c]onsideration consists only of that which the contracting parties offer and accept as such"). It cannot be some theoretical benefit that one of the parties unilaterally conjures up after the fact in order to protect an agreement from challenge. On its face the "amended" release states that by entering into the agreement Sause was trading a lifting of the automatic stay for Rockland's release of its claims against him – the *exact same consideration* that supported the court-approved Release. See Ex. C at 2, ¶ 2. Without new, independent consideration bargained for by the parties at the time they entered into the "amended" release, their purported agreement fails to meet the requirements of a valid contract.

II.    **Sause's Supervisor at PSG Was Unaware of Sause's Purported Role in Writing the 1997 RFP.**

The uncontroverted testimony at trial – from witnesses for both parties – was that it is appropriate and often necessary for the incumbent operator of a sewer facility to assist a municipality in drafting a request for proposal ("RFP") by, for instance, providing language templates, technical data and cost data. Sause Testimony ("Test."), Day 7 at 59-60; Sause Test., Day 8 at 74-75; Gallipeau Test., Day 1 at 109-110; Kruger Test., Day 3 at 65-66. Accordingly, Rockland concedes that "PSG, as the incumbent operator, had a limited legitimate role in providing some technical and factual information that would be necessary in preparing the RFP …." Defendants' Proposed Findings of Fact, Rulings of Law and Conclusions ("Defendants' Proposed Findings") at 74, ¶ 23. For this reason, Rockland's theory of liability in this case rests on the proposition that Sause did not merely assist Sewer Superintendent Gregory Thomson in preparing the 1997 RFP, but that he actually wrote it, and that he did so in such a way as to steer the 1998 contract to PSG with the knowledge and support of his supervisor, Steven Kruger. The evidence at trial, viewed as a whole, does not support that proposition.

A.    **Kruger Consistently Testified That He Was Unaware of Sause's Purported Role in Writing the 1997 RFP.**

The jury concluded that Rockland failed to prove that Sause "or any other PSG employee" – including Kruger – caused or conspired to cause a violation of the Uniform Procurement Act. See Special Verdict Form, No. 1(b) (Docket No. 149). Indeed, Kruger himself consistently testified on both direct and cross-examination that he believed Thomson, the Sewer Superintendent, wrote the 1997 RFP:

> Q. And at some point – well, let me ask you. In July of 1997 when the RFP was issued, did you know who wrote it?
>
> A. The RFP for 1997?

6

Q. Right, the RFP for 1997, do you know who – in 1997, in July of 1997 when it was issued, did you know who prepared that RFP?

A. Greg Thomson.

Q. And who told you that?

A. That's who I thought wrote it.

Q. No, I didn't ask you that. That was not my question, Mr. Kruger. I said, did you know who wrote it?

A. I – I think Mike Sause told me Greg Thomson wrote it.

Q. That's your memory?

A. Yes.

Kruger Test., Day 2 Pt. 2 at 29-30; see also Kruger Test., Day 2 Pt. 2 at 38.[3]

Kruger also testified that he was not aware whether other PSG employees, including

Aram Varjabedian and Frank Cavaleri, participated in drafting the 1997 RFP. Kruger Test., Day

2 Pt. 2 at 33-34. At most, Kruger assumed – but did not know for a fact – that Sause might have

provided Rockland with a template of an RFP (a practice that Sause himself acknowledged was

customary in the industry and not unfair or unlawful):

Q. All right. Now, did you ever learn that Michael Sause had participated in the preparation of the RFP that went out in July of 1997?

---

[3]
Q. Okay. Now, is it your contention today that you believe Gregory Thomson prepared the July, 1997 RFP for the Town of Rockland?
A. Yes.
Q. And your belief – and that's, just so we're clear, this is –
MS. D'ALCOMO: I'm going to just approach, your Honor.
THE COURT: Yes.
Q. Let me just show you what's been marked as 500. Do you recognize that as the July, 1997 RFP?
A. Yes.
Q. And it's your contention as of this day that Gregory Thomson wrote that document?
A. Yes.

A. Had he participated in the preparation?  I think he might have provided a template.

Q. And did you see this supposed template that he provided?

A. It was not uncommon for us to provide a template.

Q. Excuse me, excuse me, sir.  I'm going to ask you to answer my question, please.  Did you see the so-called template that you say you believe Michael Sause provided?

A. No, no.

Q. All right.  This is an assumption you're making?

A. It's the way the process went.

Q. Excuse me, Mr. Kruger.

A. Yes.

Q. I'm going to – okay.  Did you see Michael Sause provide any language for the RFP –

A. No.

Q. – before it went out?

Kruger Test., Day 2 Pt. 2 at 34.

The only aspect of the 1997 RFP that Kruger recalled Sause discussing with him was a minimum labor amount.  Kruger Test., Day 2 Pt. 2 at 34-35.  It was appropriate for Sause to discuss the labor account with Kruger because, as Rockland acknowledges, PSG had a "legitimate role" in providing the Sewer Commission with cost details – such as labor costs – needed to prepare the 1997 RFP.  Kruger testified that Sause told him the Inspector General's Office had been asked to "sign off on the concept," Kruger Test., Day 2 Pt. 2 at 34, but did not tell him that he drafted a letter to the Inspector General's Office on Thomson's behalf:

8

Q. Do you recall testifying or being asked on cross-examination whether you knew if the Office of Inspector General had approved the minimum labor requirement in the 1997 RFP in this case?

A. I believe it approved, yes.

Q. And did you ever learn, Mr. Kruger, whether or not Michael Sause had written a letter to the OIG requesting approval?

A. Yes.

Q. Michael Sause wrote that letter?

A. It was either – I thought it – I'm drawing a blank. I think a letter went from the town.

Q. But did Michael Sause ever tell you he wrote that letter from the town?

A. No.

Q. And at the time you learned that the OIG had approved the minimum labor, did that raise any red flags for you, sir?

A. No.

Q. In 1997?

A. No.

Q. And did you believe at the time that the inclusion of a minimum labor provision gave PSG an unfair advantage in the procurement process?

A. No.

Q. Did Michael Sause ever tell you he had written the 1997 RFP?

A. No.

Kruger Test., Day 3 at 68; see also Kruger Test., Day 2 Pt. 2 at 37.[4]

---

[4]    Q. Now, did you know that Michael Sause prepared a letter for Gregory Thomson to sign to submit to the Office of Inspector General in order to justify this concept of a minimum labor cost?
A. No.

Kruger's belief that the minimum labor provision did not give PSG an unfair advantage in the procurement process – and thus did not "raise any red flags" – was shared by the Inspector General's Office, the very agency in charge of interpreting and enforcing the state procurement laws. It is undisputed that the Inspector General's Office reviewed the provision to determine whether including it in the 1997 RFP might have any anti-competitive effects and concluded that it would not. If the Inspector General's Office did not believe that a minimum labor provision would give PSG an unfair advantage in the procurement process, there was no reason for Kruger to believe it.[5]

Finally, Kruger testified that he was aware Sause and Thomson attended a seminar sponsored by the Inspector General's Office regarding state procurement procedures. Kruger Test., Day 2 Pt. 2 at 32. Rockland wants the Court to infer from this fact that Kruger must have known Sause was writing the 1997 RFP. Such a dramatic inferential leap would be wrong, both factually and as a matter of public policy. The purpose of the seminar sponsored by the Inspector General's Office was to teach *compliance* with the state's procurement laws, not their violation. There was nothing suspect about Sause's interest in learning how the procurement laws worked, especially since preparing RFP responses was a significant part of his job. Indeed, other PSG area managers attended the same seminar as part of PSG's efforts to comply with contracting laws. For instance, Jim Gallipeau, a PSG area manager, testified that he also attended the seminar during the 1990's in order to ensure that PSG complied with the state's procurement laws. Gallipeau Test., Day 1 at 105-06. Gallipeau's attendance at the seminar

---

[5] Further evidence that the provision was not anti-competitive is the fact that Woodard & Curran, a PSG competitor, priced the 1997 RFP as written at $1.228 million, or more than $40,000 *less* than PSG's cost proposal of $1.269 million. Bonomo Test, Day 11 at 143-44.

surely did not mean he planned to write an RFP for one of his clients in violation of the law.

Similarly, no such inference can be drawn from Sause's own attendance at the seminar.

**B.      In Light of All the Evidence at Trial, Kruger's Testimony Was Credible.**

The jury apparently found Kruger to be credible when he testified that he was not

aware of Sause's purported role in writing the 1997 RFP because, as previously noted, it

determined that Rockland failed to prove that Sause "or any other PSG employee" –

including Kruger – caused or conspired to cause a violation of the Uniform Procurement

Act.  The jury's finding is amply supported by the evidence at trial when viewed in its

totality.

First, Kruger's belief that Thomson wrote the 1997 RFP is entirely credible

because the Sewer Commission – Thomson's *own employer* – itself believed that

Thomson wrote the 1997 RFP without the help of an engineering firm.  Stewart Test.,

Day 5 Pt. 1 at 34.

Second, there was abundant evidence that Sause concealed his wrongdoing from

his supervisor and others at PSG.  To the extent key documents implicating Sause can be

traced to a particular location, that location is not the PSG office where Kruger worked,

but Sause's condominium on Sleeper Street in Boston.  The letter from Attorney David

Lurie to Sause was sent to Sause's home, see Ex. 252, the draft letter to the Inspector

General's Office regarding a minimum labor requirement was faxed from Sause's home,

see Ex. 541, the draft letter to Rockland's Chief Procurement Officer was faxed from

Sause's home, see Ex. 723, and the Wainwright Bank statements were mailed to Sause's

home.  See Ex. 18.1.

Moreover, despite extensive testimony from witnesses who worked at PSG and the Sewer Plant, there is no evidence to corroborate the self-serving claims of Sause and Thomson – two witnesses with every motive to lie – that they flagrantly and in plain view engaged in wrongdoing for everyone to see. The contrary conclusion is warranted – that Sause and Thomson did not want others to know what they were doing because they did not want to risk that their scheme would be stopped.

**III.    Rockland Failed to Prove That as a Direct Result of the Alleged Unfair Procurement Process It Suffered Damages "Capable of Proof to a Reasonable Degree of Certainty."**

At the April 28, 2007 hearing, the Court questioned the parties about the proper measure of damages if the Court concludes that PSG's purported involvement in the 1997 procurement process violated Chapter 93A. The parties agreed that the measure of damages could not be the difference between eight employees (the Sewer Plant's staffing level under the 1994 Contract) and ten employees (the staffing level called for by the 1997 RFP) because Rockland never paid for ten employees. The 1997 RFP's labor account was rebatable, and thus Rockland only paid for the employees who actually worked at the Sewer Plant.

Through this question, the Court has identified a key problem with Rockland's case. Proof of monetary damages is an essential element of a Chapter 93A claim. Mass. Gen. L. ch. 93A, §§ 9, 11. Rockland's burden at trial was to show that, as a direct result of the alleged unfair procurement process, it suffered damages that "are capable of proof to a reasonable degree of certainty." Herbert A. Sullivan, Inc. v. Utica Mutual Ins. Co., 439 Mass. 387, 413 (2003). A damage award must be based on fact, not speculation. See Snelling & Snelling of Mass., Inc. v. Wall, 345 Mass. 634, 635-36 (1963); see also Connolly v. Suffolk Cty. Sheriff's Dept., 62 Mass. App. Ct. 187, 198 (2004) ("damages cannot be recovered when they are remote, speculative,

hypothetical, and not within the realm of reasonable certainty"). "If the plaintiff's proffered

evidence permits no more than 'pure speculation and guesswork,' then the damage evidence is

insufficient as a matter of law." Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850

F.2d 803, 816 (1st Cir. 1988).

The only proof of damages proffered by Rockland at trial was a rough estimate by a

competitor, Woodard & Curran, which priced a *non-conforming* proposal in response to the 1997

RFP at $950,000, or $250,000 less than the final 1998 contract price of $1.2 million. However,

it would be pure conjecture to award damages based on this price differential because it assumes

that Woodard & Curran would have received the 1998 contract had it submitted a proposal. No

proposal other than PSG's was submitted. It is impossible to know whether Woodard & Curran

would have prevailed over PSG – or any other competitor – because it is undisputed that, when a

municipality awards a contract pursuant to an RFP, cost is only one of several factors that must

be considered and the municipality does not have to accept the lowest price. See Mass. Gen. L.

ch. 30B, §§ 6(g) ("The chief procurement officer shall determine the most advantageous

proposal from a responsible and responsive offeror taking into consideration price and the

evaluation criteria set forth in the request for proposals"), 6(h) ("If the chief procurement officer

awards the contract to an offeror who did not submit the lowest price, the chief procurement

officer shall explain the reasons for the award in writing"). Woodard & Curran never prepared a

proposal addressing the non-price evaluation criteria that were an essential part of the

procurement process, and thus it is "pure speculation and guesswork" to assume that Rockland

would have paid $950,000 but for Thomson and Sause's purported manipulation of the

procurement process.

13

In fact, Woodard & Curran's $950,000 rough estimate simply *could not* have prevailed in the procurement process under any circumstances.  That rough estimate was based, in part, on a Sewer Plant staffing level of seven employees.  The uncontested evidence at trial – conceded even by Jack Bonomo, the former Woodard & Curran executive called as a witness by Rockland – was that the state Department of Environmental Protection ("DEP") *required* the Sewer Plant to have a minimum staffing level of eight employees.  Bonomo Test., Day 11 at 145-47.  Since Woodard & Curran's $950,000 rough estimate was based on a staffing level that would have violated DEP requirements, it could not have been accepted by Rockland and thus is not an appropriate measure of any purported damages.

Even if Woodard & Curran's rough estimate *had* prevailed in the procurement process, there is essentially no difference between the price Rockland actually paid to PSG and the price Rockland would have paid to Woodard & Curran.  The actual 1998 contract price of $1.2 million included a labor price of $400,000 based on a staff of ten.  But the parties agree that staffing at the Sewer Plant never reached that level, and under the terms of the 1998 contract PSG was required to rebate the excess money in the labor account back to Rockland (which was then diverted by Thomson and Sause for their own personal use).  Accordingly, PSG's actual first year fee net of rebates was $1,094,299, *not* $1.2 million.  See Ex. 240.  Furthermore, the evidence at trial was that Woodard & Curran's $950,000 rough estimate did not represent the true cost to Rockland because it was premised on elimination of the belt filter press, which Bonomo conceded would have increased Rockland's cost for transporting and disposing of sludge by a minimum of $20,000 annually and added amortized capital and transition costs of $81,000 annually.  Bonomo Test., Day 11 at 151-53.  When these additional costs – plus the cost of hiring an eighth employee to meet DEP staffing requirements – are taken into account, the

14

purported difference between the Woodard & Curran rough estimate and the actual PSG price

completely evaporates.

For all of these reasons, Rockland failed to prove it suffered damages that "are capable of

proof to a reasonable degree of certainty" and thus it cannot prevail on its Chapter 93A claim.

## CONCLUSION

For all of the foregoing reasons, for all of the reasons set for in PSG's Proposed Findings

of Fact and Conclusions of Law, and consistent with the jury's verdict, the Court should enter

judgment in favor of PSG on the Defendants' Chapter 93A claim.

Respectfully submitted,

PROFESSIONAL SERVICES GROUP, INC.,
By its attorneys,


/s/David M. Osborne_____
Maria R. Durant (BBO # 558906)
David M. Osborne  (BBO # 564840)
DWYER & COLLORA, LLP
Federal Reserve Bank
600 Atlantic Avenue, 12th Floor
Boston, MA  02210
(617) 371-1000


## CERTIFICATE OF SERVICE

I, David M. Osborne, hereby certify that a true and correct copy of this document filed through
the ECF system will be sent electronically to the registered participants as identified on the Notice of
Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on
May 7, 2007.

/s/David M. Osborne_____
David M. Osborne