UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
───────────────────────────────
                               )
PROFESSIONAL SERVICES GROUP,   )
 INC.,                         )
          Plaintiff,           )
                               )
          v.                   )   CIVIL ACTION NO. 04-11131-PBS
                               )
TOWN OF ROCKLAND, et al.,      )
          Defendants.          )
───────────────────────────────
```

**MEMORANDUM AND ORDER**

September 26, 2007

Saris, U.S.D.J.

**INTRODUCTION**

The Town of Rockland claims that Professional Services Group, Inc. ("PSG") engaged in unfair and deceptive practices in procuring the renewal of the contract for the wastewater treatment plant, in violation of Mass. Gen. Laws ch. 93A. After review of all the evidence, the Court finds that PSG acted unfairly and deceptively in colluding with the Rockland superintendent to ensure that it received the contract in violation of Chapter 93A, and I award $116,250 in actual damages, and double the award for willful misconduct plus interest and attorneys' fees.

**FINDINGS OF FACT**

1. **Background**

The Rockland Sewer Commission is a part-time body consisting of three elected members who oversee the operation of the Town's

wastewater treatment plant.  The sewer plant treated and disposed of sewage for the towns of Rockland, Abington, Hingham and Hanover.

Gregory Thomson, an electrician by training, became a member of the Commission in 1994 and Chair in 1996.  While he was Chair, the Sewer Commission decided to create a full-time position of Superintendent in December 1996.  After resigning as Commissioner, Thomson applied for the position.  While his application was pending, he functioned as the full-time Superintendent under contract.  He was formally appointed in June 1997 after the Superintendent's position was approved at a town meeting in May.  The Commission only had one other full-time employee, a secretary.

Since 1982, Metcalf & Eddy Services, Inc. had been operating the sewer plant with seven or eight full-time employees. Beginning in 1990, the point man at Metcalf & Eddy was Michael Sause, who holds a Bachelor of Science in environmental health and a Wastewater Operator's License that enabled him to be the chief operator of the plant.  After experience in another firm, in 1990, Sause became Metcalf & Eddy's area manager, overseeing several different treatment facilities throughout New England and New York, including the Rockland plant, for treatment of sewage, water treatment, and ground water remediation.  Of significance here, he was responsible for assisting with "business development" including the acquiring of new contracts through

bidding and the renewal of existing contracts.  When PSG merged
with Metcalf & Eddy in 1996, PSG assumed responsibility for the
Rockland contract, and Sause became an employee at PSG, retaining
the responsibility for supervising the Rockland plant.  His
supervisor was Steven Kruger.  PSG opened an office in Norwell,
not far from Rockland, where Sause spent three partial days a
week.  Sause assumed management responsibility of several PSG
contracts in addition to the contracts that he had been managing
while an employee at Metcalf & Eddy.

The Metcalf & Eddy contract to operate the plant was renewed
in 1994.  Sause met Thomson in 1994 when Thomson began as a
Commissioner and after the 1994 Request for Proposal ("RFP") had
been issued.  On December 12, 1996, the Sewer Commission voted to
create the position of a full-time superintendent.  Sause, upon
learning that Thomson wanted the newly created job of
superintendent, consulted with Metcalf & Eddy's lawyer to get
advice on how Thomson should apply for the job without violating
state conflict of interest laws and how Thomson could be
compensated while his application was pending.  Sause wanted
Thomson to become superintendent in 1996 because he knew that the
contract would soon expire and if Thomson were superintendent,
PSG's chances of getting the contract would be greater.

Thomson became the superintendent.  One of his duties was to
manage the municipal procurement process for the Sewer
Commission.

2.  **Steering the New Contract**

PSG's three-year 1994 contract was scheduled to expire in 1997.  Although the engineering firm Tighe & Bond had been involved in preparing the RFP that had been used in the 1994 procurement, Sause was angling to have the RFP prepared in-house. To this end, with Kruger's knowledge, Sause recommended to Thomson that they attend a two-day seminar run by the Inspector General's Office together in May 1997 so that they would understand bidding procedures.  PSG paid for the meals.  Sause's goal was to control the procurement process himself.

With Sause's encouragement, Thomson decided not to use Tighe & Bond in 1997 to prepare the RFP.  Instead, Sause played the lead role in preparing and drafting the RFP that was issued on July 21, 1997 -- with input from Thomson.  Thomson relied on Sause's expertise in drafting the RFP.  Sause took the laboring oar because he wanted PSG to have the advantage of winning the job.  Thomson and Sause worked on the RFP both at the wastewater treatment plant offices and at PSG's Norwell offices.  At the time, it was acceptable industry practice for an incumbent operator of a facility to provide technical assistance to a municipality in preparing an RFP due to the operator's knowledge of that facility.  Still, Sause was so embedded in the procurement process that his participation went far beyond standard industry practice.

Sause sold Thomson on a number of new provisions advantageous to PSG that were not in the 1994 contract. First, Sause wanted a long-term contract of ten years so that PSG wouldn't have the risk of losing the contract every three years when it went back out to bid. At Sause's urging, Thomson had an article put in at the Rockland Town Meeting on May 19, 1997, authorizing the town to enter into a contract with a ten-year duration. While ten-year contracts were uncommon before 1997, certain changes in tax regulation gave an incentive to municipalities to enter into longer contracts.

Second, Sause proposed a provision that would require all firms to bid a minimum of $400,000 for the labor component of the contract. The labor rebate account was one of four accounts totaling $590,000 -- nearly five times the rebatable money under the 1994 contract. I will discuss "rebate accounts" later. Sause knew that this provision (unprecedented in the industry) would stifle competition by requiring a minimum bid for labor, the single largest cost of operating the plant. Concerned that competitors would question the provision, Sause told Thomson that they should get the advance blessing of the Inspector General's Office. Thomson agreed. Significantly, Sause also discussed the minimum labor bid idea with his boss, Steve Kruger, before it was put into the RFP. Kruger approved the idea although he knew it would stifle competition in the bidding process. Sause drafted a letter in Thomson's name seeking clearance for the minimum labor

bid, claiming (falsely) that the plant needed ten workers.  An
agreement with the Department of Environmental Protection
provided that the plant only needed eight workers.  The plant has
never had ten workers (up until the time of trial, or since).
Thomson signed the letter and sent it on Sewer Commission
stationery.  The proposal was approved by the Inspector General.

Third, Sause proposed a provision in the RFP that contained
a minimum experience requirement that would exclude a competitor
firm Woodard & Curran, which was aggressively trying to expand
its client base.  The language in the RFP provided: "At minimum,
contract operators shall demonstrate that they have provided
successful contract operations at a minimum of five water
pollution control facilities similar in size and complexity to
the Rockland facility for at least five years."  In contrast, the
1994 RFP written by Tighe & Bond had required only three years
minimum experience without a specific number of facilities.
However, the same minimum experience qualification re-appeared in
the RFP that was drafted by the engineering firm of Carr, Dresser
& McGeen in 2004 after Rockland terminated its contract with PSG.

Finally, the RFP required a belt filter press, the major
piece of equipment used at the plant for dewatering of sludge.
It had also been required by the 1994 RFP.  PSG leased the belt
filter press, but the Town was paying for the lease payments.
While working on the RFP at PSG's Norwell office, Thomson had a
discussion with Kruger about having the Town take over the lease

payments or just buying the press outright so that the Town would own it.  Kruger refused, warning that if PSG didn't get the contract, the belt filter press (which is about four stories high) would be taken out of the plant.

After PSG won the contract, the Town bought the belt filter press in 1999.

### 3.  <u>The Bidding Non-War</u>

The RFP was made available to prospective bidders on July 21, 1997.  The mandatory pre-proposal briefing was held in August 1997.  Before the meeting, Sause prepped Thomson, who had never conducted one before.  Sause and PSG's plant manager, Aram Varjabedian, attended.

After this briefing, Sause responded to all questions and letters that the potential bid competitors would submit by preparing the written responses and then having Thomson mail them out to all the prospective bidders.  Sause prepared the addenda to the RFP that contained the answers to the bidders' questions. Sause had such control over the bidding process that Thomson left pre-signed Sewer Commission stationery at the Norwell office for Sause's use and convenience in the RFP process.  Thomson spent many days at the Norwell office working on the RFP.  While there, he would see Kruger and other employees.  It is not clear how much Steven Kruger and Aram Varjabedian knew about Sause's role. Both claimed they did not know that Sause had literally drafted

the RFP.  Still, I find that they both knew that Sause was
working closely with Thomson behind the scenes to influence the
requirements put in the RFP, and its outcome.

By a letter dated August 14, 1997, Woodard & Curran, the
much-feared competitor, sought a waiver of the RFP's requirement
that any prospective bidder have a history of operating five
facilities of equal complexity and size and five years of
operating experience, because its management team had averaged
more than twenty years of experience and had direct operations
experience at the Rockland Plant for ten years.  It was six
months short of the five years of experience required in the
operation of the water control facilities.  Sause advised that
the requirement not be relaxed, and Thomson agreed.  However, an
addendum stated that Woodard & Curran's experience would only be
one of the factors used in evaluating proposals.  On September
25, 1997, Sause prepared a final addendum announcing that no more
questions would be answered.

Not surprisingly, PSG, which submitted a bid in October
1997, was the only bidder.  Sause had the key role in the
preparation of PSG's proposal.  At the time he drafted PSG's
price proposal, Sause knew there would likely be no other
bidders.  In the certificate of non-collusion, a representative
of PSG certified under the penalties of perjury that PSG has not
"directly or indirectly entered into any agreement, participated
in any collusion, or otherwise taken any action in restraint of

8

free competitive bidding <u>in connection with this proposal</u>."
(Emphasis added).

Woodard & Curran had developed a proposal that had an
alternative to the use of the belt filter press and the minimum
labor requirements in the RFP.  Instead of ten employees, it
would only need seven.  Woodard & Curran's approach relied on a
sludge thickener (you don't want to know the details) rather than
a belt filter press.  At the time of the RFP, the Department of
Environmental Protection ("DEP") required a staff of eight under
a consent decree, but Woodard & Curran stated it would assume the
economic risk of persuading DEP that only seven were needed.
Interestingly, Varjabedian was also thinking of better ways to
run the plant with cost savers like sludge thickeners.  Woodard &
Curran asked Thomson to have the requirement of the belt filter
press removed, which was denied.  The difference between what the
Town paid PSG and what Woodard & Curran would have charged with
its alternative was approximately $250,000 annually.  In a letter
dated September 2, 1997, Woodard & Curran informed the Town it
would not submit a bid, complaining that the RFP "seems to be
heavily weighed in favor of your incumbent operator."  Two other
bidders also decided not to bid.

PSG's cost proposal was $1.269 million for the first year.
Thomson negotiated the price down to $1.2 million.  If Woodard &
Curran had submitted a bid meeting the specification, it would
have had the lowest bid.

The Town Administrator, who is the chief procurement officer, and the Town Counsel did not know about the collusion between Sause and Thomson and would not have approved had they understood Sause's role.

### 4. **Rebate Accounts**

Mention must be made of the rebate accounts for operation and maintenance which were set up in the three-year contract in 1994 between PSG and Rockland (the 1994 Contract).  Under the contract, if PSG spent less than the budgeted amounts on various categories of expenses (like maintenance), the difference was subject to a rebate back to the town.  The 1994 Contract included two rebate accounts totaling $120,000.

In 1995, the Sewer Commission signed an agreement directing PSG to hold the rebate amounts in a new rebatable account earmarked for professional development and miscellaneous expenses (the "Professional Development Account").  This was supposed to be used for conferences and similar expenses.  As the end of the contract term approached, a significant balance of fund was still unused.

In the 1997 RFP, the number of rebate accounts was increased from two to four.  These four accounts contained a total of $590,000.  Significantly, the new labor account alone contained $400,000 per the contract.

In addition, the 1997 contract gave less oversight to the

Town over the rebate accounts.  Unlike the 1994 contract, it did not provide that all accounting records be made available to the Town upon request and did not require the financial-accounting structure to be open-book.  The 1997 contract provided only that a summary report regarding the payback accounts would be made available to the Sewer Commission upon request.  In other words, the contract provided less oversight of larger amounts of money in the rebate accounts.

5.  **Party Time**

In February 1998, PSG and the Sewer Commission entered into a new contract for a ten-year term commencing March 1, 1998.

Even prior to the formal signing, after PSG learned that it was to receive the 1998 contract, Sause and Thomson began to party in celebration.  They went out in a limousine to a strip club.  But Kruger put his foot down and wouldn't allow this sordid sortie to be paid out of the professional development account.  This marked the beginning of a joint plan to divert the amounts in the professional development account for their personal use.  No members of the Sewer Commission or manager at PSG knew about this corruption.  Specifically, I find that Kruger did not know about this corruption.  In November 1997, Thomson sent a letter to Sause requesting that PSG release $50,000 in rebatable funds under the 1994 contract by issuing a check in that amount payable to the "Town of Rockland, d/b/a Rockland

Sewer Commission." PSG issued the check and Thomson endorsed it. On December 1, 1997, Sause opened an account in the Sewer Commission's name at Wainwright Bank with Thomson and Sause as joint signatories. Thomson deposited $50,000 into the account. Over the next several months, Thomson directed more written check requests to PSG; PSG processed them, believing that the rebate monies were the Sewer Commission's funds and would be used for authorized purposes. In fact, the rebate checks were being deposited into a personal account controlled by Thomson and Sause.

Thomson and Sause withdrew the funds to pay for their personal expenses like extravagant meals, exotic trips and illegal drugs. Sause did not engage in this crime to advantage PSG. This was a personal frolic.

In 1999, Sause lost responsibility for the Rockland project after he was transferred to PSG's New York region. Thomson continued with the corrupt scheme after Sause's departure. In February 1999, he opened a new account in his name at North Abington Co-Op Bank and closed the Wainright account. He continued siphoning the rebate monies into his personal account for drugs and other personal expenses over the next three years without further participation by Sause.

6. **The Gig is Up**

In late May 2002, the North Abington Co-Op Bank informed the

Rockland Police Department that Thomson had attempted to deposit a check payable to the Sewer Commission into his personal account. Thomson confessed to the theft and resigned as superintendent. He did not immediately reveal Sause's participation, and Sause initially denied involvement. In 2003, PSG learned that Sause had written two personal checks to Thomson. When he refused to answer PSG's questions about these checks, he was forced to resign in a steamy meeting with Kruger. Both Thomson and Sause were convicted of larceny in Plymouth Superior Court.

Meanwhile, the Town hired a forensic auditor, John Sullivan, to investigate the matter. Sullivan began his investigation in October 2002 and completed it with a report dated February 25, 2004. PSG did not fully cooperate with the investigation, balking at producing Varjabedian. Sullivan's forensic audit found:

> The Board of [Sewer] Commissioners have not provided oversight of the Sewer Commission adequate to protect the Town from fraud and abuse of public funds. The Board hired a full time Superintendent and then did not provide the supervision to prevent him from opening unauthorized accounts and converting for personal use money that was due back to the Town.

The forensic audit cost the Town $36,250.

By a letter dated January 30, 2004, the Inspector General's Office recommended to the Town that the contract with PSG be terminated and that a new procurement process be conducted. The Inspector General wrote that it is "sound public policy" and

13

"fiscally prudent to exercise your legal rights to abandon a contract you have determined as tainted by scandalous activity, poorly serves the financial interests of your community and has given rise to an appearance of misfeasance in the use of public funds."  The Inspector General's Office further wrote:

> It is the expectation and recommendation of this office that, consistent with the opinion of your counsel and the advice of your forensic auditor, you will now act to establish a new contract for sewer operations services that is properly procured, consistent with the best interest of your citizens, and untainted by its association with allegation to criminal wrongdoing that have engulfed the relationship between Rockland and US Filter.

As a result of the Inspector General's recommendation, and what the forensic accountant had reported to it, the Town terminated the contract with PSG, which it did by letter dated April 9, 2004.  An engineering firm, Camp Dresser & McKee, was hired to conduct a new procurement in place of the 1997 procurement.  The contract to operate the sewer plant was subsequently awarded to another company, Aquarion.  The new procurement cost the Town $80,000.

**7.   The Denouement**

The Sewer Commission and the Board of Selectmen jointly voted on whether to terminate the 1998 contract.  All three members of the Sewer Commission voted against termination and the five members of the Board of Selectmen voted in favor.  On

14

February 10, 2004, PSG received a letter from Rockland stating that the 1998 contract was terminated by operation of law because the actions of Thomson and Sause violated the Uniform Procurement Act.  PSG continued to operate the plant on an interim basis.  On April 12, 2004, Rockland directed PSG to vacate the sewer plant and turn over the operation to an interim operator.

The Sewer Commission issued a new RFP and the contract was awarded to Aquarion.  The RFP required the use of a belt filter press.  PSG invoiced Rockland over $150,000 for the interim operation of the sewer plant, but was not paid.  PSG offset this account receivable by an account payable to Rockland for $158,122.  It has never repaid Rockland the additional $8,122.

### 8.  Litigation

PSG filed suit against Rockland, Sause, and Thomson. Rockland counterclaimed against PSG for fraud, misrepresentation, violation of the Uniform Procurement Act, violation of the Conflict of Interest Law, breach of contract, breach of the implied covenant of good faith and fair dealing, conversion and civil conspiracy.  Rockland also brought claims against Sause, but not Thomson.

In January 2006, while the case was pending, Sause filed a voluntary bankruptcy petition in the U.S. Bankruptcy Court for the District of Delaware, and the proceedings (including his deposition) were stayed as to Sause.  On April 25, 2006, Rockland

15

granted a waiver to Sause for its claims against him in this case.  A stipulation states the reason for the waiver:

> WHEREAS, the Debtor and Rockland, among others, are parties to a certain civil action pending in the United States District Court for the District of Massachusetts and styled as <u>Professional Services Group, Inc. et al.,</u> <u>v. Town of Rockland, et al.,</u> Civil Action No. 04-1131-PBS initiated by summons and complaint on or about May 28, 2004 (the "Civil Action"); and

> WHEREAS, Rockland holds one or more civil claims against the Debtor that it asserted in the Civil Action (the "Rockland Claims")

The Stipulation also explains that Rockland wanted to obtain discovery from Sause in the mentioned litigation and that, in order to do so, the automatic stay in bankruptcy required modification.  Therefore, the Stipulation states:

> 2.   <u>Waiver of Rockland Claims</u>: In exchange for the modification of the Automatic Stay provided for herein, Rockland agrees to, and hereby does waive the Rockland Claims, both as to the Debtor and as to the Debtor's estate.

The release was approved by the Bankruptcy Court and entered as a court order on May 8, 2006.  On May 19, 2006, the bankruptcy case was terminated and closed.

After being alerted to PSG's claim that it was discharged from vicarious liability because of the release of Sause, Rockland filed a motion with the bankruptcy court to amend the release to file an express reservation of rights.  An amended stipulation clarified that Rockland had expressly reserved its rights to pursue its counterclaim against PSG and that it had not waived its claims against PSG by entering into the stipulation.

16

The bankruptcy court never acted on the motion.

In litigation in state court with the Wainright Bank and North Abington Co-op Bank, Rockland recouped $410,000 for the rebate checks and attorneys fees purloined by Thomson and Sause via settlement.

A jury trial commenced on July 31, 2006.  Both Thomson and Sause testified at trial on behalf of Rockland.  On August 25, 2006, the jury entered a verdict rejecting both sides' claims.

## CONCLUSIONS OF LAW

Rockland argues that Sause engaged in unfair and deceptive conduct in violation of Chapter 93A by (1) improperly influencing the 1997 procurement process; (2) deceiving the town into believing that the procurement process was honest and open competitive bidding; (3) mishandling Rockland's monies under the 1998 contract; and (4) aiding and abetting Thomson's breach of his duties as a public official to conduct an open and honest procurement process.

### a.  The Release

PSG argues it is not liable for the misdeeds of Sause because Rockland released Sause from all its claims, but failed to expressly reserve its right to proceed against PSG as the principal.  It also argues that Rockland cannot "unring the bell" by reasserting its respondeat superior claims against PSG after discharging PSG of those claims, and that the amended release is

17

invalid as without consideration or approval of the Bankruptcy
Court.

As a general matter, "the release of an agent precludes a
claim against his principal who is liable solely on the theory of
respondeat superior." Elias v. Unisys Corp., 410 Mass. 479, 484,
673 N.E.2d 946, 949 (1991). However, "a covenant not to sue or
[a] release will not discharge a vicariously liable party if the
covenant contains an express reservation of rights against that
party." Atlas Tack Corp. v. DiMasi, 37 Mass. App. Ct. 66, 71-72,
637 N.E.2d 230, 234 (1994). "The basis for the rule allowing a
reservation against a party derivatively or vicariously liable,
appears to be that the law should encourage settlements, the
terms of which should be controlled by the intent of the
parties." Id. at 72; cf. Pelo v. Franklin Coll. of Ind., 715
N.E.2d 365 (Ind. 1999) ("When parties sign an agreement releasing
one defendant with the clearly expressed expectation that they
will be able to proceed against others, that expectation should
be given effect."). "To take advantage of the principle stated
in Atlas Tack, the document must contain an express reservation
of the covenantor's rights . . . in very specific language."
See Medeiros v. Middlesex Ins. Co., 48 Mass. App. Ct. 51, 55 n.3,
716 N.E.2d 1076, 1079 n.3 (1999) (citations and quotations
omitted).

The question, then, is whether Rockland's release of Sause

18

in the bankruptcy proceeding contained an express reservation of rights against PSG.  It is true that the release does not contain an express reservation of rights against PSG *in haec verba*. However, when the release is fairly read in its entirety, it is clear that the intent of the parties was that Rockland would pursue its claims against PSG.  The expressly stated purpose of the release was to induce Sause to cooperate in discovery conducted by Rockland in its effort to pursue claims against PSG, the only other defendant named in Rockland's counterclaims. Indeed, the release specifically references the ongoing litigation.  I find that the language in the release is sufficiently specific to reserve Rockland's rights against PSG.

Even if the release did not clearly enough reserve the Town's rights with respect to PSG, PSG's liability can also be derived from the actions of Sause's supervisor, Kruger.[1]  I find that Kruger knew that Sause and Thomson were colluding in preparing the RFP and handling the procurement process.  Kruger testified that he only knew that Sause may have provided a template for the RFP, adding that it was not uncommon for PSG to provide a template.  However, that testimony was not fully

---

[1] I note that Aram Varjabedian was not credible when he said that he did not know the degree of Sause's involvement.  Sause said he told him that he was preparing the RFP and that Varjabedian saw them working together all the time during the RFP period. However, the evidence does not establish that Varjabedian himself assisted in the procurement other than in ways appropriate in the industry (like providing technical or cost assistance).

19

credible.  Kruger knew that the two went to the seminar together, and that Sause had persuaded Thomson to insert a minimum labor cost in the contract.  He saw the two of them working closely together on the RFP in the Norwell office, and was aware that labor was typically a line item that competitors would openly bid on.  Kruger thought a minimum labor cost was a good idea, and approved Sause's efforts to insert that provision into the RFP. This evidence is troubling because there is no persuasive evidence that anyone at PSG ever believed the plant needed two more employees than called for in the sewer plant's staffing level under the 1994 contract, or as set by the DEP under the consent decree.  While Kruger may not have literally known that Sause was drafting the RFP word-for-word and was actually responding to competing bidders' inquiries, I find that he well knew that Sause's level of involvement in proposing provisions for the RFP was not ethical or consistent with industry practice.

Because Sause's supervisor substantially supported and knew about one key aspect of Sause's unethical conduct in the procurement process, the release does not bar this suit even if the reservation-of-rights is not express enough.[2]

### b.  **Liability**

Rockland contends that PSG's conduct in influencing the RFP

---

[2] Any ambiguity about the parties' intent was clarified by the amendment.  PSG makes much of the fact that the Bankruptcy Court did not approve the amendment but does not explain why the amendment was material to the bankruptcy proceedings.

and its role in the procurement process was "unfair or deceptive"
under Chapter 93A, § 2.  A practice may be "unfair" without being
deceptive or fraudulent.  <u>Mass. Farm Bureau Fed'n, Inc. v. Blue
Cross of Mass., Inc.</u>, 403 Mass. 722, 729, 532 N.E. 2d 660, 664
(1989).  Liability under Chapter 93A, § 9[3] requires two elements:
(1) "the conduct must be an unfair or deceptive act or practice,"
and (2) "the act or practice must be a foreseeable cause of
injury to the plaintiff."  <u>Gossels v. Fleet Nat. Bank</u>, 69 Mass.
App. Ct. 797, 809, 2007 Mass. App. LEXIS 917 (Aug. 22, 2007)
(holding that a negligent misrepresentation of fact is an unfair
or deceptive act or practice within the meaning of Chapter 93A).
Unfairness is "determined from all the circumstances."
<u>Duclersaint v. Fed. Nat'l Mortgage Ass'n</u>, 427 Mass. 809, 814, 696
N.E.2d 536, 540 (1998).  Factors in determining unfairness
include: (1) "whether the practice is within at least the
penumbra of some common-law, statutory, or other established

---

[3] The parties dispute whether § 9 or § 11 of Chapter 93A applies.
The better argument is that § 9 applies because the Town was
pursuing its primary function of treating sewage for the Town.
<u>See</u> <u>Park Drive Towing, Inc. v. City of Revere</u>, 442 Mass. 80, 86,
809 N.E.2d 1045, 1051 (2004) (holding that city's arrangements
with towing company for towing services was not trade or commerce
because the service contracted for was integral to city's primary
function of maintaining public order in the streets); <u>see also
Milford</u>, 21 Mass. L. Rptr. 439, 2006 WL 2848119, at *2-3 (Mass.
Super. Sept. 20, 2006) (holding municipality as a § 9 claimant
despite selling water services to neighboring towns because such
sharing "is as much a traditional municipal function as is
procuring water from a water company, or supplying it to the
town's inhabitants").  Thus, the Town of Rockland did not engage
in trade or commerce within the definition of Section 11 and its
claim is properly brought under Section 9.  In any event, the
dispute does not make any difference in this case.

concept of unfairness;" (2) "whether it is immoral, unethical, oppressive, or unscrupulous," (3) whether it causes substantial injury to consumers or competitors or other businesses. PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596, 321 N.E.2d 915, 918-19 (1975). Other factors include whether the conduct is "oppressive" or "unconscionable in any respect." Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778, 489 N.E.2d 185, 196 (1986).

A public official of a municipality acts as a trustee for the citizens and the town and owes them a fiduciary duty of a trustee -- honesty and loyalty. United States v. Silvano, 812 F.2d 754, 759 (1st Cir. 1987). Aiding and abetting a breach of fiduciary duty may provide the basis for a Chapter 93A violation. Hanover Ins. Co. v. Sutton, 46 Mass. App. Ct. 153, 173, 705 N.E.2d 279, 293-94 (1991); Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172, 565 N.E.2d 415 (1991). Aiding and abetting a breach of fiduciary duty requires proof that: (1) there was a breach of fiduciary duty; (2) the defendant knew of the breach; and (3) the defendant actively participated or substantially assisted in or encouraged the breach to the degree that he or she could not reasonably be held to have acted in good faith. See Arcidi v. Nat'l Ass'n of Gov't Employees, Inc., 447 Mass. 616, 623-24, 856 N.E.2d 167, 174 (2006).

As a town official, Thomson owed Rockland the fiduciary duty to the town of utmost good faith and loyalty in conducting an open, fair, and lawful procurement process. The purpose of

22

competitive bidding statutes is "to establish an open and honest procedure for competition for public contracts." <u>Modern Constr. Co., Inc. v. City of Lowell</u>, 391 Mass. 829, 840, 465 N.E.2d 1173, 1179-80 (1984). The Uniform Procurement Act, Mass. Gen. Laws ch. 30B, is intended "to prevent favoritism, to secure honest methods of letting contracts in the public interest, to obtain the most favorable price, and to treat all persons equally." <u>Mangano v. Wilmington</u>, 51 Mass. App. Ct. 857, 859, 748 N.E.2d 1052, 1054 (2001) (quoting <u>Phipps Prods. Corp. V. Mass. Bay Transp. Auth.</u>, 387 Mass. 687, 691-92, 443 N.E.2d 115, 117 (1982).

Rockland contends that PSG acted in bad faith when Sause knowingly aided and abetted a public official in breaching his fiduciary duty to the town in handling the procurement process. There is no dispute that Thomson breached his duty to the Town of Rockland during the procurement process, or that Sause aided and abetted this breach. PSG does dispute, however, that Sause aided and abetted this breach of fiduciary duty while acting within the scope of his employment.

I conclude that PSG engaged in unfair conduct under Chapter 93A because Sause was acting within the scope of his employment with PSG when he subverted an honest and open procurement process. Sause orchestrated a sham competitive bidding process by ghost-writing the RFP and the Addenda to the RFP while intending to prepare and submit PSG's own proposal, and by inserting unwarranted and anti-competitive terms into the RFP so that no one else would submit a bid. In particular, I find that

23

the minimum labor proposal and the minimum experience
requirements were inserted for this illicit, anti-competitive
reason.  Most concerning is the minimum labor proposal which had
no bona fide economic basis and was purely designed to scare off
competitors.  In addition, Sause unfairly caused Thomson to
insert a ten-year contract term, when most contracts at that time
had been much shorter.  While there may have been new tax
incentives for the ten-year term, these were poorly explained at
trial.  Even if these tax incentives played a role in the Town's
decision to provide for a much longer contract term, the
substantial motivational factor for Sause's and Thomson's
proposal to make the term longer was to benefit PSG.

PSG argues that it should not be liable for Sause's misdeeds
because he was a rogue employee acting from the getgo to set up
rebate accounts to benefit himself and Thomson in their drug-
dealing-strip-club type activities.  I disagree.  The Supreme
Judicial Court has held:

> To determine whether an employee's conduct is
> within the scope of his employment for
> purposes of employer liability under G.L. c.
> 93A, we may appropriately be guided by a
> consideration of the factors relevant to scope
> of employment determinations bearing on the
> imposition of vicarious liability on employers
> for the tortious conduct of their employees.
> In that context, conduct of an agent is within
> the scope of employment if it is of the kind
> he is employed to perform, if it occurs
> substantially within the authorized time and
> space limits, and if it is motivated, at least
> in part, by a purpose to serve the employer.
> The fact that the predominant motive of the

> agent is to benefit himself does not prevent
> the act from coming within the scope of
> employment as long as the act is otherwise
> within the purview of his authority.

Wang Labs., Inc. v. Bus. Incentives, Inc., 398 Mass. 854, 859-66, 501 N.E.2d 1163 (1986) (citations and quotations omitted).  At the time of the procurement, I find that Sause was acting primarily to benefit PSG –- to win the bid and to have the longest contract possible.  Later, the easy access to the money and the lack of oversight was too tempting and Sause became a rogue employee at year end.  At that latter point, contrary to Rockland's contentions, PSG was unaware of Sause's improper activities.  Sause was acting on his own.

### c.  **Effect of Jury Verdict**

PSG argues that Rockland's theories of liability under Chapter 93A are barred because they are derivative of the common law or statutory claims rejected by the jury.  To the extent a party's Chapter 93A claims are based only on failed common law or statutory grounds, several courts have refused to find Chapter 93A liability.  See, e.g., Wasylow v. Glock, Inc., 975 F. Supp 370, 382 (D. Mass. 1996) (granting summary judgment for defendant because plaintiff "advanced no facts in support of his Chapter 93A claim, other than the facts underlying his failed warranty and negligence claims"); Macoviak v. Chase Home Mortg. Corp., 40 Mass. App. Ct. 755, 760, 667 N.E.2d 900, 904 (1996) (affirming summary judgment for defendant on plaintiff's Chapter 93A claims

25

because it was "solely based upon his underlying claim for common law fraud," on which the court had also granted summary judgment).

PSG points out that the jury rejected the claims of violation of the Uniform Procurement Act and Rockland's other state-law claims.  Specifically, the jury answered the following questions in the negative:

> 1(a).  Did the Town of Rockland prove that PSG violated the Uniform Procurement Act when it certified under the penalties of perjury that PSG's bid proposal was made in good faith and without collusion or fraud with any other person to procure the 1998 contract?

> 1(b).  Did Rockland prove that Michael Sause or any other PSG employee, acting within the scope of his employment at PSG, caused or conspired with Gregory Thomson to cause the 1998 contract to be solicited or awarded in violation of a provision of the Uniform Procurement Act?

> 1(c).  Did Rockland prove that Michael Sause or any other PSG employee, acting within the scope of his employment at PSG, conspired with Gregory Thomson to make a fraudulent and material misrepresentation upon which the Town of Rockland actually and reasonably relied in awarding PSG the contract?

The jury found that PSG did not prove that Rockland committed material breaches of the 1998 contract when it terminated it on April 12, 2004 (Q.2) and that Rockland did not prove that PSG violated the provisions in the contract governing the maintenance of accounts (Q.5), that there was no conflict of interest violations (Q.8), and that PSG had no liability for negligent misrepresentation in submitting the non-collusion affidavit.  In essence, the jury was saying a pox on both your houses, or what's

26

"sause" for the goose is "sause" for the gander, and rejected all the claims and counterclaims.

Jury instructions were disputed and difficult because of the sparsity of caselaw on the Uniform Procurement Act. Section 17 provides in relevant part:

> (b) Subject to the provisions of section three A of chapter forty, a contract made in violation of this chapter shall not be valid, and the governmental body shall make no payment under such contract. Minor informalities shall not require invalidation of a contract.
>
> (c) A person who causes or conspires with another to cause a contract to be solicited or awarded in violation of a provision of this chapter shall forfeit and pay to the appropriate governmental body a sum of not more than two thousand dollars for each violation. In addition, the person shall pay double the amount of damages sustained by the governmental body by reason of the violation, together with the costs of any action. If more than one person participates in the violation, the damages and costs may be apportioned among them.
>
> (d) The inspector general shall have authority to institute a civil action to enforce paragraph (c) if authorized by the attorney general.

Mass. Gen. Laws ch. 30B, §17(d). One Superior Court judge has issued an opinion that a town has a private right of action to pursue a claim under the Uniform Procurement Act, but no Massachusetts appellate court has addressed the issue. <u>Town of Lunenburg v. Carlson</u>, 2005 WL 937730, at *3 (2005) (analyzing Mass. Gen. Laws ch. 30B, §17(d)). Based on the statutory language, I instructed the jury as follows:

27

Let me begin by discussing procurement law. It is a violation of law if PSG "cause[d] or conspire[d] with another to cause a contract to be solicited or awarded in violation of" the Uniform Procurement Act which you have heard referred to as Chapter 30B.

The Uniform Procurement Act requires that the contract be awarded, based on "the most advantageous proposal from a responsible and responsive offeror taking into consideration price and the evaluation criteria set forth in the request for proposals." Mass. Gen. Laws ch. 30B, §6(g).

A "responsive offeror" is one who has submitted a proposal which conforms in all respects to the request for proposals." Mass. Gen. Laws ch. 30B, §3.

A "responsible offeror" is "a person who has a capability to perform fully the contract requirements, and the integrity and reliability which assures good faith performance." Mass. Gen. Laws ch. 30B, §3.

Therefore, if you find that PSG "cause[d] or conspire[d] with [Gregory Thomson] to cause a contract to be solicited or awarded" to an offeror who did not have "the integrity and reliability which assures good faith performance," Rockland had the right to cancel the contract because the contract was invalid, and Rockland cannot be liable for breach of contract. Mass. Gen. Laws ch. 30B, §§ 2, 17(c).

In submitting a proposal, an offeror must certify "under penalties of perjury that this bid or proposal has been made and submitted in good faith and without collusion or fraud with any other person." Mass. Gen. Laws ch. 30B, §10. A person who signs a written statement under penalties of perjury is guilty of perjury is [sic] that statement is "willfully false in a material manner." Mass. Gen. Laws. ch. 268, § 1A.

28

Therefore, if you find that PSG made a willfully false certification that PSG's bid was made in good faith and without collusion or fraud with any other person, Rockland had the right to cancel the contract because the contract was invalid and Rockland cannot be liable for breach of contract.

If the contract was invalid, Rockland can collect any damages "sustained by the governmental body by reason of the violation," and neither party can be liable for breach of contract, and you must skip over those questions (Questions 2  through 8) on the verdict form.

The question, then, is whether this jury verdict precludes a finding that PSG violated Chapter 93A.  Under state law, there is no right to a trial by jury in an action under Chapter 93A given the equitable nature of the relief permitted.  Nei v. Burley, 388 Mass. 307, 315, 446 N.E.2d 674, 679 (1983).  A judge's "independent findings may be contrary to those found by the jury."  Guity v. Commerce Ins. Co., 36 Mass. App. Ct. 339, 340, 631 N.E.2d 75, 76 (1994); see Poly v. Moylan, 423 Mass. 141, 151, 667 N.E.2d 250, 257 (1996) ("[A] judge may make independent and, therefore, different, findings on the c. 93A aspect of a case that arises from the same facts which gave rise to parallel common law claims.") (internal quotations omitted).  The trial court has the right to decide a jury was "dead wrong."  W. Oliver Tripp Co. v. Am. Hoechst Corp., 34 Mass. App. Ct. 744, 753, 616 N.E.2d 118, 125 (1993); see Perdoni Bros. v. Concrete Sys., 35 F.3d 1 (1st Cir. 1994) ("[I]n the Chapter 93A context, the court has recognized that judge and jury, sitting as independent triers of fact, may reach conflicting conclusions.") (citing Wallace

29

Motor Sales v. Am. Motor Sales Corp., 780 F.2d 1049, 1063-67 (1st
Cir. 1985)).  Nonetheless, a trial judge has discretion to
consider a jury's findings in making an independent determination
of a Chapter 93A claim.

It is true that some of Rockland's theories of Chapter 93A
liability are derivative of the state law claims rejected by the
jury, for example the claims that the PSG certification was
fraudulent or that this certification was a negligent
misrepresentation.  However, in PSG's own words, "[t]he
certificate of non-collusion affirmed only that the *proposal*
submitted by PSG in response to the RFP was not the product of
collusion or otherwise anti-competitive -- that PSG did not
conspire with a competitor to fix a price, for instance.  The
certificate contains no representations whatsoever about the
procurement process itself.  The Defendants failed to prove the
proposal PSG submitted in response to the 1997 RFP – not the
procurement process -- was the product of collusion, and
therefore the alleged falsity of the certificate non-collusion
can be a basis for finding a violation of Chapter 93A."  (PSG's
Proposed Conclusions of Law #137 (Docket 178) (emphasis added).)

Here, the primary theory of liability under Chapter 93A is
that PSG was liable for aiding and abetting a breach of fiduciary
duty by Thomson in conducting the procurement process in a way
that PSG unfairly controlled it behind the scenes and controlled
Thomson as a puppeteer controls the puppet.  Accordingly, PSG's
claims are not solely derivative of claims rejected by the jury.

Even though the jury found there was no violation of a specific provision of the Uniform Procurement Act, I find that the overwhelming evidence supports Rockland's claim that PSG via its employees acted unfairly to subvert the policies of an open and fair procurement process embedded in the Uniform Procurement Act.

**4.   Damages**

Rockland must prove that as a direct result of the alleged unfair procurement process, it suffered damages that are capable of proof to a reasonable degree of certainty.  Rockland's main problem is proving the amount of damages caused by the unfair and deceptive procurement practices.  Rockland seeks as damages the amount it would have saved under the Woodard & Curran contract, which priced a non-conforming proposal in response to the 1997 RFP at $950,000 or $250,000 less than the final 1998 contract price of $1.2 million.  Remember that Woodard & Curran's proposal did not have the belt filter press but provided a less labor intensive alternative to desludging.  However, Rockland failed to prove that PSG's insertion of the requirement of a belt filter press was anti-competitive.  The belt filter press had been instituted under the 1994 contract, and it was required and maintained in the 1998 contract.  While Woodard & Curran may have been able to devise more innovative approaches to sludge management, there is no persuasive evidence that the use of belt filter presses was unacceptable in the industry.  As such, Rockland did not prove that Woodard & Curran would have received

the contract if it did not use a belt filter press even without
the anti-competitive minimum labor and experience requirements.
Accordingly, Rockland's request for damages based on the Woodard
& Curran contract fails.

Rockland properly seeks the $80,000 it cost to conduct a new
procurement and the cost of the forensic audit.  Conducting an
audit and a new procurement was reasonable once the collusion was
discovered.  Accordingly, I award only the $80,000 for the new
procurement plus the $36,250 for the forensic audit, making
$116,250.

Next, I must determine whether there was a knowing or
willful violation of the Act and whether to double or treble the
damages under Mass. Gen. Laws ch. 93A, §9(3A).  See Grand Pac.
Fin. Corp. v. Brauer, 57 Mass. App. Ct. 407, 422, 783 N.E.2d 849
(2003).  Chapter 93A requires multiple damages if a fact-finder
determines that "a willful or knowing violation occurred."
Anderson v. Comcast Corp., ___ F.3d ___, 2007 WL 2389669 (1st
Cir. Aug. 23, 2007).  To establish a "willful or knowing"
violation, plaintiff must prove that defendant had a
"subjectively culpable state of mind."  Anthony's Pier Four, Inc.
v. HBC Assocs., 411 Mass. 451, 575 (1991).  I find that Sause
knowingly and willfully violated Chapter 93A in order to benefit
PSG in the procurement process.  Therefore, I double the award.
However, because I find PSG had no knowledge of the corruption of
Sause and Thomson after the award of the contract, I decline to

treble for, as the forensic auditor found, the Sewer Commission is not without fault here.

###    5.    Declaratory Relief

Plaintiff requests declaratory relief in Count III that PSG breached the 1998 contract.  I **DENY** the motion for declaratory judgment on the ground that the jury found the 1998 contract was not breached, and that the certification was not fraudulent. Moreover, PSG has demonstrated that it performed adequate services under the 1998 contract.  Even if this contract were invalid because of the Chapter 93A violations in the procurement process, PSG was still entitled to compensation under the doctrine of quantum merit.  There is no evidence that $153,419.11 was an unreasonable payment.

###    6.    Miscellaneous

Rockland also seeks damages for PSG's failure to oversee the rebate accounts.  In addition, Rockland contends that PSG was reckless in making out checks for thousands of dollars in a manner that would allow Thomson to cash them personally.  There was evidence that PSG's handling of funds was negligent not only in the way the checks were made payable, but also in the way it paid checks without requiring paperwork justifying the payment from a particular rebate account.  However, mere negligence is generally not unfair and deceptive conduct, see Darviris v. Petros, 442 Mass. 274, 279, 812 N.E.2d 1188 (2004); nor is mere breach of contract.  See Arthur D. Little Inc. v. Dooyang Corp.,

147 F.3d 47, 55-56 (1st Cir. 1998).  I do not find that these other breaches of contract trigger Chapter 93A liability. Moreover, to the extent these 93A claims are merely derivative of the state law claims, the jury verdict disposed of them.

### ORDER

I order entry of judgment in favor of Rockland for $232,500 ($116,250 x 2), plus attorneys' fees and interest at the state rate on $116,250 from April 2004.  Rockland's request for declaratory judgment on Count III (Docket No. 182) is **DENIED**.

**S/PATTI B. SARIS**
United States District Judge