UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| PROFESSIONAL SERVICES GROUP, INC., | ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | CIVIL ACTION NO. 04-11131-PBS |
| TOWN OF ROCKLAND, et al., Defendants. | ) ) ) ) | |

.

**AFFIDAVIT OF JOANNE D'ALCOMO**

I, Joanne D'Alcomo, do depose and say:

1. I have been lead counsel on this matter since August 2004. All the work done on this matter since that time has either been done by me directly, or at my direction and under my supervision.

2. I have been an attorney licensed to practice in the Commonwealth of Massachusetts since January, 1985. I am a cum laude graduate of Boston University School of Law, where I was an editor of the Boston University Law Review. I was G. Joseph Tauro Scholar and a Paul J. Liacos Scholar at the law school.

3. During all of my years of practice, I have concentrated in the field of litigation in federal and state court. I worked in the litigation department of the Boston law firm Bingham, Dana & Gould (now known as Bingham McCutcheon) from 1984 until 1993. In 1993, I joined the litigation Schneider Reilly LLP, in Boston, where I was a partner, and I remained at that firm until we decided to close in 2003. At that point, I joined the law firm Jager Smith PC, where I am also a partner, and where I also concentrate in litigation.

4. I have handled a broad range of complex matters in federal and state court. I have tried numerous cases in state and federal court, and in proceedings before an American Arbitration Association panel. In the past ten years alone, I have tried more than a dozen cases lasting from one week to more than a month.

5. Some of the cases I have handled in the past several years have resulted in, at various stages of the case, published decisions or decisions available on Westlaw and Lexis. Examples are:

   a. Jasty v. Wright Medical Technology, Inc. 2006 WL 961456(D. Mass. April 6, 2006) and, 2007 WL 1031653 D.Mass. (D. Mass. March 31, 2007) (won affirmative summary judgment establishing breach of royalty contract on medical devices, defeating counterclaims for breach of contract; established damages in jury trial)

   b. Okerman v. VA Software Corp. 69 Mass.App.Ct. 771, 871 N.E.2d 1117 Mass.App.Ct.(2007)(won jury trial on claim for breach of covenant of good faith and fair dealing, affirmed on appeal; succeeded in reversing on appeal dismissals of Wage Act claims occurring prior to my representation)

   c. Lyon v. Triram Corp., 2004 WL 2451408 (Mass. Super. Oct. 29, 2004) (representation of plaintiff in wrongful death case; settled shortly before trial; succeeded in defeating motion to dismiss Chapter 93A claim)

   d. McBirney v. Paine Furniture Co., 2003 Mass. Super. WL 21094555 (Mass Super. March 31, 2003)(won month-long trial on fraudulent transfer claims arising out of transfer of stock and promissory note)

   e. Grant v. Mitchell, 2001 WL 221509 (Del. Ch. Feb. 23, 2001 ) (dispute over membership of Board of Directors of Delaware corporation; won after trial);

   f. McBirney v. Paine Furniture Co., 1999 WL 1411359 (Mass. Super. Dec. 10, 1999)(refers to win on jury trial of claim by terminated employee for fraud, tortious interference with contractual relations, slander)(related claim for breach of contract won after lengthy arbitration);

   g. Bradley v. Dean Witter Realty, Inc., 967 F. Supp. 19 (D. Mass. 1997)(handled claim by consultant for, inter alia , breach of contract and Chapter 93A)(settled shortly before trial after defeating summary judgment motion on Chapter 93A claim and contract claim);

   h. Lohnes v. Darwin Partners, Inc., 2002 WL 31187688 (Mass. Super. July 23, 2002)(claim by ex-employee under Wage Act and wrongful termination; defeated motion to dismiss; case settled shortly before trial)

   i. Meltzer v. Grant, 193 F.Supp.2d 373 (D. Mass. 2002)( handled claim arising out of business disputes by partners against ex-partner and against law firm; case established that law firm not protected by litigation privilege for sending particular letter with threat)

2

j.  LaVallee v. Parrot-Ice Drink Products of America, Inc., 193 F. Supp.2d (D. Mass. 2002) (handled claim by business person for breach of contract, fraud, breach of partnership agreement)

k.  Miller v. National City Processing Co., 1996 LEXIS 147 (Mass. Super. Dec. 11, 1996)(handled claims for tortious interference with contract, and claims against employer arising out of dismissal; settled day before trial).

l.  Lawrence Savings Bank v. Garabedian, 49 Mass. App. Ct. 157(1999)(handled appellate brief on appellate procedure issue);

m.  Globe Newspaper Co. v. Bratton, 1993 WL 818904 (Mass. Super. Sept. 7, 1993)(won trial seeking access to police records, under Public Records Law, to investigation of police misconduct during Carol DiMaiti Stuart murder case), (decision later rev'd in part on appeal, which I did not handle, occurring after my departure from the firm, 419 Mass. 52(1995));

n.  McCue v. Starrett , 1999 WL 1063041 (Mass.Super. 1999)(handled fee dispute and dispute over scope of arbitration agreement and Chapter 93A claim)

o.  Globe Newspaper Co. v. MBTA Retirement Board, 412 Mass. 770(1992)(handled successful challenge to lower court procedure);

p.  Globe Newspaper Co. v. MBTA Retirement Board, 416 Mass. 1007(1993)(handled brief concerning application of state Public Records Law to quasi-public entity);

q.  MBTA Retirement Board v. State Ethics Commission, 414 Mass. 582 (1993)(handled writing of amicus brief concerning construction of statute establishing Ethics Commission);

s.  Globe Newspaper Co. v. Chief Medical Examiner, 404 Mass. 132(1989)(handled case concerning construction of Public Records Law as applied to autopsy reports);

t.  Disabled American Veterans v. U.S. Dep't of Veterans Affairs, 783 F. Supp. 187 (S.D.N.Y 1992) (nationwide class action challenging constitutionality of federal statute, resulting in preliminary injunction suspending enforcement of statute and in eventual settlement worth more than $70 million)(preliminary injunction later vacated in 962 F.2d 136 (1992));

6.  Examples of other cases in which I had shared responsibility during my litigation career, and which resulted in reported decisions include the following:

   a. Globe Newspaper Co. v. Fenton, 819 F. Supp. 89 (D. Mass. 1993)(successful federal constitutional challenge to provision of Criminal Offender Record Information Act "CORI" barring access to alphabetical indices of criminal cases in state courts, altering longstanding decision of Supreme Judicial Court);

   b. Camp, Dresser & McKee v. The Home Ins. Co., 30 Mass. App. Ct. 318(1991)(dispute over insurance coverage and duty to pay settlement; successfully co-tried insurance coverage dispute and prepared brief upholding decision on appeal);

   c. Globe Newspaper Co. v. FBI, 1992 WL 396327 (D. Mass. 1992)(challenge to FBI's withholding of documents under Freedom of Information Act);

   d. Globe Newspaper Co. v. Pokaski, 684 F. Supp. 1132 (D. Mass. 1989), aff'd in part, rev'd in part, 868 F. 2d 497 (1st Cir. 1989) and 677 F. Supp. 60(1988)( constitutional challenge to state statute sealing certain court records).

7. I am a frequent lecturer and chairperson for continuing legal education programs in Massachusetts Continuing Legal Education (MCLE) in Boston. For example, for several years, I have chaired a program on federal court practice, and another program on trying cases in Superior Court. Also panelist at seminars sponsored by Massachusetts Bar Association, Boston Bar Association and Massachusetts Academy of Trial Attorneys,

8. I have also written in the field of litigation. For example, I co-authored, along with two state court judges and another lawyer, a book on appellate practice published by Lawyers Co-op Publishing in 1997, Massachusetts Civil Practice: Appeals. I am a contributing author to Appellate Practice in Massachusetts, MCLE, (1995, 2000, 2004 eds). Have also written articles on single justice practice, insurance coverage and constitutional issues for publications of the Massachusetts Bar Association and the Massachusetts Academy of Trial Attorneys, and for Massachusetts Lawyers Weekly.

9. I have specific experience and background in the area of Chapter 93A.

   a. For example, while I was at Bingham Dana & Gould, I co-tried with Attorney Joseph Kociubes a month-long jury-waived case involving a single issue: whether our client, the defended, violated Chapter 93A by allegedly unduly influencing a public official to win a public contract. The case was brought by a competitor of the client. The matter settled following trial.

b.  I successfully defeated a motion to dismiss a Chapter 93A claim in the novel context of a complaint that also included a wrongful death claim. <u>Lyon v. Triram Corp.</u>, 2004 WL 2451408 (Mass. Super. Oct. 29, 2004) o

c.  I successfully defeated a motion for summary judgment on a Chapter 93A claim in <u>Bradley v. Dean Witter Realty, Inc</u>., 967 F. Supp. 19 (D. Mass. 1997).

d.  I successfully tried a Chapter 93A claim with treble damages (along with a Lanham Act claim) before Judge Young, in <u>Capital Electric Corp. v. Capital Light & Supply Company,</u> No. 96-CV-10177-WGY. After Judge Young issued an injunction, and while he was Judge Young was deciding whether to award further damages under Chapter 93A, the case settled.

10. I have written and lectured in the area of Chapter 93A.

   a.  I am an author of a chapter entitled, chapter, "Business Remedies Under Chapter 93A," <u>Business Torts in Massachusetts</u> (MCLE 2002)

   b.  From 1999 to 2002, I was a panelist on seminars presented by MCLE on Chapter 93A. In 2001 and 2002, I also lectured in the Chapter 93A segments in the Practical Skills Program of MCLE.

   c.  I also did research on Chapter 93A while on Law Review, for my note, "Resolving the Conflict Between Arbitration Clauses and Unfair and Deceptive Practices Acts, " 64 <u>Boston University Law Review</u> 377 (1984).

11. I have served on committees of bar associations. I was chair of the Tort Committee of the Boston Bar Association, from 1998-2000, and a member of the Litigation Steering Committee from 1998-2002. I was a member of Civil Litigation Section Council of the Massachusetts Bar Association from 1997-2000, and Vice Chair, from 1998 to 1999. I was a member of the Massachusetts Bar Association Committee to investigate lawyer advertising, the Advertising Committee, from 1994-1995. I served as a member of the Massachusetts Academy of Trial Attorneys' Public Education Committee from 1994 to 1995.

12. The hurdles facing the Town in this case were formidable. The person who had been superintendent during the relevant events, Gregory Thomson, had left the job abruptly in 2002 and had left the plant office and papers in disarray. When I went to Thomson's old office to look for documents, it was a mess. There was no replacement superintendent, and there were documents all over his desk and over file cabinets.

13. When I tried to see if Thomson had left any communications on the computer that was at his desk, I discovered that he had not used a computer.

14. When I tried to locate other possible sources of communications between Thomson and PSG, I learned that PSG had wiped the computers at the wastewater treatment plant clean of any documents, and had removed boxes and boxes of documents. I learned later in discovery that documents had been taken by Aram Varjabedian and stored at his home, and when I discovered this during his deposition, I demanded to see them and eventually obtained access to them late in discovery.

15. Further compounding the difficulties in obtaining information to prove the Town's theory that the procurement was corrupt was the fact that by the time I took over the case late in the summer of 2004 – seven years after the procurement – neither Thomson nor Sausé had cooperated with the Town's efforts to uncover what had occurred during the procurement process.

16. By the fall of 2004, I had made contact with Sausé 's counsel, Stephen Campobasso, and through my efforts, Michael Sausé began to provide information about the events that had occurred.

17. I arranged for him to provide me with a personnel records authorization so that I could make a request under Massachusetts law for his personnel records and start to learn about what PSG's records said about his role at PSG, his evaluations, his salary, his responsibilities, and any reasons for his separation from PSG.

18. A major hurdle in the case for some time was the fact that Thomson, who was the Town employee who would have the most knowledge about what had occurred and who could conceivably corroborate or sharply disagree with Sausé's version of events, was unwilling to answer my questions or provide any substantive information to me. I contacted him from time to time to see if he would speak to me substantively about the case. Finally, in mid-June 2006, weeks before the trial, Thomson agreed to meet with me and to answer all my questions and to provide me with materials that he had that, in part, corroborated what Sausé had told me. The first marathon meeting was the first of several substantive communications that I had with Thomson to prepare for the trial, and to prepare him for his testimony at trial.

19. There were other obstacles, due to the passage of time since the procurement, that created impediments to my gathering information to prove the Town's claim: changes in personnel. The Sewer Commissioners, with one exception, were different from the time of the procurement; the Sewer Commission assistant at the time of the procurement had left; the Town Administrator at the time of the procurement had long since left the Town's employ; the Town Accountant, who kept track of Town expenditures and thus had potential information concerning payments made for the new procurement or for other damages, and financial procedures at the time, had left; and even certain members of the Board of Selectmen who had participated in terminating the contract, were no longer serving on the Board.

20. Another complication in the course of the case was the sudden death of Sausé's attorney Stephen Campobasso, that resulted in Sausé being pro se and at sea about his representation. Another complication was Sausé 's decision to file bankruptcy in Bankruptcy Court in Delaware, where he retained another attorney. This raised questions about his status in the case, because of the automatic stay, and about my ability to depose him due to the automatic stay, even if the purpose was to preserve his testimony for trial.

21. The time and labor expended on this matter to prove that PSG improperly influenced the 1997 RFP was substantial due to the complicated nature of what had to be done to assemble the evidence necessary to prove that PSG improperly manipulated the 1997 procurement process and the exact manner in which it was manipulated, and that PSG was, as a matter of law, responsible for the manipulation.

22. The amount of time on matters relating to the Chapter 93A facts was also substantial because the litigation was hard-fought, with numerous motions, disputes about discovery, production of documents, etc.

23. Attached as Exhibits 1 through 11 of the petition are excerpts from billing records kept in this matter by the timekeepers who worked on this case. The records were made at or near the time worked. The billing records are excerpts, because I went through the billing records and deleted time that, in my judgment, did not relate to the Chapter 93A claim and the issue of the procurement or did not relate to the defense of PSG's claim, since the defense also related to the procurement. For purposes of the submission, I removed time spent on matters that PSG could argue was not related to the Chapter 93A claim such as the issue of whether there was a cause of action under the Uniform Procurement Act. I also went through the billing records and added descriptions of individuals referenced or added information to more fully describe the nature of the work performed so that the Court would have a better understanding of the billing entries.

24. I also estimated time for responding to any objections by PSG about the fee submission. That anticipated time is on the bill that is Exhibit 11.

25. I also examined the costs for submission in this matter. All of the costs for which recovery is sought are listed in the chart in the submission under Section B, Time and Labor Required, and, with the certain exceptions specifically cited to my affidavit, are backed up by invoices. I have examined all of them and made judgments about the costs that I believe were connected to the central issue in the case, the issue of the corrupt nature of the procurement.

26. I have examined office records for charges related to postage, telephone, Westlaw research, transportation, messenger service and Federal Express, and I determined that there were $37.55 in telephone charges on this matter, $228.20 in postage, approximately $150 in transportation charges related to transportation to the

        courthouse and parking, $456.99 in Federal Express charges, and $283.83 in messenger services. I determined that all of these charges are fairly connected to the central issue in this case, the corrupt nature of the procurement. I also determined from examining our office records that there were 30,676 pages of in-house copying done at a charge of 20 cents a page, regardless of size, stapling or unstapling, color or black or white. I determined that a fair and reasonable allocation of the in-house copying charges associated with the pursuit of the theory that the procurement was manipulated by PSG and corrupt, was one-half. Therefore, the submission reflects one-half the expenses.

27. I determined that there were $6,815 in Westlaw charges, and I made a judgment that it is reasonable and fair to attribute one-quarter of those charges to the issues related to Chapter 93A, and other related issues, such as bankruptcy issues, and the common interest privilege on which the Magistrate Judge favorably ruled that the Town need not turn over documents that it had obtained from Michael Sausé.

28. I made the decision to handle personally most of the fact-gathering activity to avoid duplication of effort in order to piece together the complicated and multi-faceted chronology of events and cast of characters involved in such events. I closely supervised and coordinated all activity that I did not handle personally. By centering the analysis of documents and assimilation of facts and the bulk of the fact-gathering activity in my own efforts, I believe I avoided the extensive duplication of effort and hundreds of internal conferences that would have been necessary to share information and make multiple lawyers equally knowledgeable about the complicated facts and about the many individuals and entities involved.

29. The other counsel who provided extensive assistance were partner Howard Blatchford, and associate Seth Nesin. Attorney Blatchford performed extensive work in the area of the Town's production of documents under its automatic discovery obligations, and also in response to wide-ranging requests from PSG. Attorney Blatchford also had to screen documents for attorney-client privileged material or material discussed in executive session for which confidentiality was still required. In addition, Attorney Blatchford did considerable research in a number of areas, primarily concerning corporate liability and on the issue of waiver, the latter an issue raised by PSG in an effort to avoid liability under Chapter 93A. Attorney Blatchford also assisted in the fee petition and in other areas.

30. Attorney Nesin, an associate, did a variety of work on the case related to the Chapter 93A issues. For example, he did considerable back-up work on discovery issues; coordinated with PSG counsel on discovery issues; and acted to try to resolve discovery and procedural disputes and document production issues; performed research on various evidentiary issues; represented the Town at depositions taken by PSG; second-chaired the trial and assisted in preparing for each trial day in terms of coordinating use of exhibits, location of exhibits, and interactions with witnesses because of the amount of juggling needed due to

scheduling issues, kept updated exhibit lists to keep track of what exhibits were admitted/excluded daily; helped prepare pretrial memorandum; helped prepare memorandum in opposition to PSG's motion to compel production of documents that Town had obtained as a result of common interest privilege with Sausé, successfully defeating motion to compel.

31. Attorney Nesin is no longer with the firm, but his resume is attached as Exhibit 1.

32. Another associate, Michael Fencer, provided support specifically in the area of bankruptcy once Sausé declared bankruptcy. <u>See</u> Affidavit of Michael Fencer. Because this raised an issue as to the posture of the case, and the ability of the Town to depose Sausé, Attorney Fencer, whose area of concentration at the firm is bankruptcy, was brought in to assist in the analysis of the issue and the handling of this aspect.

33. Paralegal Phyllis Jones, who is also a law school graduate, performed work through the discovery phase of the case, assisting in discovery logistics, interacting with process servers, following up on document subpoenas to cities and towns, preparing subpoenas, tracking down addresses, following up on obtaining records from PSG counsel that PSG had subpoenaed from third parties, handling logistics of copying, organizing deposition exhibits in binders and making a chart of exhibits for use during depositions. Ms. Jones also assisted in trial preparation and during trial. For example, she helped organize exhibits and keep track of exhibits; worked with PSG's paralegal to coordinate communications between plaintiff and defendants; and took notes on testimony for use in subsequent cross-examinations. After trial, she helped organize exhibits and obtain and organize transcripts for use in preparing the proposed finding of fact and conclusions of law.

34. The only other person for whom the Town is seeking recovery of fees is John Lynch, an accountant who works for Jager Smith, who was involved in preparation of the fee petition.

35. The bulk of the work in this matter was performed in 2005, 2006 and 2006, and there was some limited work in 2004. During that period of time, I most often worked on cases on a contingency fee. However, during that period of time, on those cases on which I worked on an hourly basis, my hourly fees typically ranged from $350 to $460. Consequently, the rate at which recovery is sought is in the mid-range at $400. Based on my familiarity with the rates charged in the Boston market during period, I believe the $400 rate is comfortably within the range charged by litigation partners in the Boston market for the relevant period, particularly the relevant period for the time period during which most of the work was performed, 2005 – 2007.

36. I am familiar with the rates charged by partners with litigation experience in the Boston market during this period. Excerpts from Massachusetts Lawyers Weekly

      Surveys showing rates reported as being charged by partners in Boston firms are attached at Exhibits 3, 5, and 7 of my affidavit. Ex. 3 (excerpts showing Boston firms in 2005 survey), Ex. 5 (excerpts showing Boston firms in 2006 survey), Ex. 7 (excerpts showing Boston firms in 2007 survey).

37. In addition, excerpts from National Law Journal surveys in which Boston firms participated, for the years 2005 and 2006, are attached to Exhibits 4 and 6. See D'Alcomo Aff., Ex. 4 (excerpt showing Boston firms in 2005 survey), Ex. 6 (excerpt showing Boston firms in 2006 survey).

38. I believe that the rate of $400 being sought is comfortable within the range of rates charged by Boston firms for comparable work during this period.

39. These same materials demonstrate that the hourly rates sought for the other attorneys, Attorney Blatchford at $350, Attorneys Fencer and Nesin at $250, are comfortably within the range charged by Boston firms. I am familiar with Attorney Blatchford's rates for complex matters during this period, and they ranged from $300 to $375. Attorney Nesin's ranged from $200 to $275, and Attorney Fencer's ranged from $200 to $300. Paralegal Phyllis Jones' time was billed during the period at $135.

Signed under the pains and penalties of perjury this 11th day of October, 2007.

                                              _/s/ Joanne D'Alcomo

                                              JOANNE D'ALCOMO

JS#189721v1