UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ———————————————————— | ) | |
| PROFESSIONAL SERVICES GROUP, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| TOWN OF ROCKLAND, ROCKLAND SEWER COMMISSION, GREGORY THOMSON and MICHAEL SAUSÉ, | ) ) ) ) | |
| Defendants. | ) ) | |
| ————————————————————) | | |
| | ) | |
| TOWN OF ROCKLAND, ROCKLAND SEWER COMMISSION, | ) ) ) | |
| Plaintiffs-in-Counterclaim and Crossclaim | ) ) ) | Civil No. 04-11131-PBS |
| v. | ) ) | |
| PROFESSIONAL SERVICES GROUP, INC., | ) ) ) | |
| Defendant-in-Counterclaim, | ) ) | |
| | ) ) ) | |
| ————————————————————) | | |

**ATTORNEYS' FEE PETITION OF TOWN OF ROCKLAND AND ROCKLAND SEWER COMMISSION**

Pursuant to the Court's ruling on the Chapter 93A claim of the Town of Rockland and the

Rockland Sewer Commission (collectively referred to as "Town"), the Town requests attorneys'

fees and costs as described herein, and as fully supported by the accompanying affidavits of

Joanne D'Alcomo, Howard Blatchford and Michael Fencer. Specifically, the town seeks $635,926 in fees, and $32,605.50 in reimbursement for some of its expenses. The Town's request for attorneys' fees and costs does <u>not</u> include billing or costs unrelated to the Chapter 93A; the Town has pored over its time charges and costs and removed or reduced charges to reflect only time and costs related to the Chapter 93A facts and claims. Affidavit of Joanne D'Alcomo, ¶ 23.("D'Alcomo Aff.").

A summary of the fees sought by the Town, and a breakdown of the expenses, is in Section B below, entitled Time and Labor required. The billing records are attached as Exhibits 1 through 12. <u>Id.</u> [1]Even though the amount of damages awarded under Chapter 93A was relatively small in this case, as this Court has stated: "Fees awarded pursuant to Massachusetts statutory authority must not necessarily be reduced because they are high in relation to the award of damages." <u>Arthur D. Little Intern., Inc. v. Dooyang Corp.</u> 995 F.Supp. 217, 225 (D. Mass. 1998). The justification for the fees and expenses is explained below.

Because the claim at issue was brought under Chapter 93A, "Massachusetts law controls the attorneys' fees question here." <u>Star Financial Services, Inc.,</u> v. <u>AASTAR Mortg. Corp.</u> 89 F.3d 5, 16 (1st Cir. 1996). The Supreme Judicial Court has said, in the context of Chapter 93A, that "a judge must examine a number of factors to determine whether an award of attorney's fees and costs is reasonable." <u>Twin Fires Investment, LLC,</u> v. <u>Morgan Stanley Dean Witter & Co.</u> 445 Mass. 411, 429-430, 837 N.E.2d 1121,1138 (2005). The Supreme Judicial Court has said that "a judge 'consider the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation, and

ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases.'" Id. quoting Lithicum v. Archambault, 379 Mass. 381, 388-89, 398 N.E.2d 482(1979).  The Supreme Judicial Court has further stated, in the context of Chapter 93A fee award analysis, "No one factor is determinative, and a factor-by-factor analysis, although helpful, is not required." Twin Fires Investment, LLC,  445 Mass. 411 at 430,  837 N.E.2d 1138, citing and quoting Berman v. Linnane, 434 Mass. 301, 303, 748 N.E.2d 466, (2001). As the First Circuit has stated, in describing Massachusetts law, the amount awarded should be determined by what the "services were objectively worth.[2]" Star Financial Services, Inc., v. AASTAR Mortg. Corp. 89 F.3d 5, 16 (1st Cir. 1996) (citing Heller v. Silverbranch, 276 Mass. 621, 382 N.E.2d 1065, 1071 (1978)).

The Town's request for fees is based directly on these factors recited by the Supreme Judicial Court:

### A.    The Nature of the Case and the Issues

This case was complex. Professional Services Group, Inc. ("PSG") brought suit seeking damages for the Town's termination of the contract. PSG claimed, in its initial disclosures, that its damages were more than $1 million.  See D'Alcomo Aff., Ex. 8 at 6.  The Town, in defense, contended that the conduct that was the core of its Chapter 93A claim – a tainted procurement process – justified the termination and, therefore, it was not liable for breach.  In response to PSG's suit, the Town also filed a counterclaim, which included a claim for Chapter 93A that was

---

[1] For the Court's convenience in understanding the billing records, the Town's lead litigation counsel reviewed the records,  and added descriptions  of individuals referenced in certain instances to make the descriptions more understandable, and added information to describe the nature and context of the work performed more thoroughly. D'Alcomo Aff., ¶ 23.

[2] Therefore, the amount the Town actually has paid for the services is irrelevant to the inquiry, particularly in this case since the Town was only able to proceed on a contingency basis.

primarily aimed at the impropriety of the 1997 procurement process and PSG's corporate liability for such impropriety.

The case represented a David versus Goliath battle. PSG, as indicated in its corporate disclosure statement, Docket No. 30, is part of the French conglomerate Veolia Environnement. Veolia Environnement describes itself on its website as a "world leader in environmental services" with "more than 270,000 employees."[3]  Excerpt from Veoliaenvironnement.com. website, D'Alcomo Aff., Ex. 9.

Rockland, meanwhile, as indicated by the testimony at trial of one of its selectman, Lawrence Chaffee, is a small town that has, according to its census figures only about 17,000 people – a fraction of a percentage of what Veolia has on its payroll.  Even though the Inspector General had encouraged the Town to terminate the contract and conduct a new procurement, which the Town did in 2004, the Inspector General did not initiate any proceedings against PSG. Instead, in 2004,  PSG brought a claim for damages. To defend itself and to prove its own counterclaim,  the Town was put in the difficult position of having to use its own resources to try to assemble the facts necessary to prove that the procurement process had been corrupt and that PSG was legally liable for the corruption.

Proving corruption is rarely simple, and the hurdles facing the Town in this case were formidable.  The procurement at issue had occurred in 1997 – seven years before the start of the

---

[3] What was particularly striking about this David versus Goliath battle is that PSG had filed suit seeking damages for improper termination of the contract even though – as became apparent at trial during the testimony of Stephen Kruger – no one at PSG had ever done an internal investigation to determine whether there had been any undue influence or corruption in the procurement process as was alleged by the Town in canceling the contract.  In fact, before the contract was terminated, PSG had interfered with the effort by the forensic accountant to conduct his investigation into the contract.  As the Court found, "PSG did not fully cooperate with the investigation, balking at producing [Aram] Varjabedian," who had been plant manager. Decision at 13.  In other words, PSG was brazen in its litigation onslaught against the Town.

case and nine years before the trial. The Rockland Sewer Commission, as was explained at trial, consists of three elected, part-time commissioners, and there was only one staff person and thus minimal record-keeping.   The person who had been superintendent during the relevant events, Gregory Thomson, had left the job abruptly in 2002 and had left the plant office and papers in disarray.  Also complicating the fact-gathering efforts was that there were no computer records of any kind in the computer that was left at Thomson's former desk because Thomson -- the Town's litigation counsel discovered -- had not used a computer. D'Alcomo Aff., ¶ 12-13. In addition, the Town's litigation counsel discovered that PSG had wiped computers clean of data at the wastewater treatment plant and had removed a large quantity of documents upon its termination in 2004, thus eliminating another source of potential information about interactions between PSG and Thomson. Id., ¶ 4.  Further compounding the Town's litigation counsel's difficulties was the fact that by 2004, at the time of the filing of the litigation, neither Thomson nor Sausé had cooperated with the Town's efforts to uncover what had occurred during the procurement process. Id., ¶ 15.  By late 2004, through the Town's litigation counsel's efforts, Michael Sausé, the former PSG manager with responsibility for the area during the time of the procurement, had begun to provide information about the events that had occurred Id., ¶16. But, the Town's litigation counsel remained faced with the fact that Thomson – who was the Town employee who would have the most knowledge about what had occurred and who could conceivably corroborate or sharply disagree with  Sausé 's version of events --  was unwilling to answer questions or to provide any substantive information to the Town's litigation counsel.  It was not until June 2006, mere weeks before trial, that the Town's litigation counsel, after repeated efforts, was able to obtain information from Thomson and review materials in his possession that corroborated Sausé 's account of events.  Id., ¶ 18.

There were other obstacles, due to the passage of time since the procurement, that created impediments to gathering information to prove the Town's claim: changes in personnel. The Sewer Commissioners, with one exception, were different from the time of the procurement; the Sewer Commission assistant at the time of the procurement had left; the Town Administrator at the time of the procurement  had long since left the Town's employ; the Town Accountant, who kept track of Town expenditures and thus had potential information concerning payments made for the new procurement or for other damages, and financial procedures at the time, had left; and even certain members of the Board of Selectmen who had participated in terminating the contract, were no longer serving on the Board. Additional complications during the course of the litigation were the sudden death of Sausé's attorney Stephen Campobasso, his pro se status in this litigation, and eventual bankruptcy filed in Bankruptcy Court in Delaware where he retained another attorney, and which created questions about his status in this litigation and about the ability to depose him and discover information from him. Id., ¶ 20.

A further problem for the Town was its limited financial resources. As explained during the trial testimony by Town Accountant Eric Hart, the Town had to find a law firm willing to represent it on a contingency basis because it could not afford to pay hourly fees.

### B.    The Time and Labor Required

The time and labor expended on this matter to prove that PSG improperly influenced the 1997 RFP was substantial due to the formidable challenges that litigation counsel faced to piece together the evidence necessary to prove at trial that PSG improperly manipulated the 1997 procurement process and the precise manner in which it was manipulated. Id., ¶ 21.

 The intensity with which the litigation was fought added to the amount of time and labor expended on the case. For example, PSG brought a motion to compel the Town to produce

documents that it had obtained from Sause.   Docket No. 39. The Town claimed that the documents were protected by the common interest privilege and not subject to production, and prepared an opposition to the motion.  Docket No. 46.  A hearing was held before Magistrate Judge Collings, who later ruled that the common interest privilege applied, and that the Town did not have to produce the documents. Order on docket July 3, 2006. In another instance, PSG refused to produce numerous categories of documents during discovery. As a result, the Town had to spend time preparing a detailed motion to compel. Docket Nos. 32, 33.  A hearing was held before Magistrate Judge Collings, who ruled overwhelmingly in the Town's favor, and ordered PSG to serve superceding responses to its document request responses that the Magistrate Judge deemed inadequate. See entry dated June 28, 2006.  Another example of the intensity with which the case was fought can be seen in motions in limine. For example, before trial, PSG moved to preclude two of the expert witnesses designated by the Town, John Sullivan, the forensic auditor, and Ronald Michalski, of the engineering firm Tighe & Bond, from testifying.   The Town had to prepare oppositions to these motions. PSG did not succeed on these motions.  Although Michalski did not testify because of time considerations, the motion was not granted. Sullivan did testify and his testimony was largely allowed.   Both witnesses related directly to the Chapter 93A claim.

    As discussed above, the facts underpinning the  Town's main Chapter 93A claim – that the bidding process had been improperly manipulated by PSG – was also the core of  its defense to PSG's breach of contract claim.  Also, facts relating to the manner in which the procurement process was conducted formed the basis for the Town's claims under the Uniform Procurement Act and common law fraud, thus making the presentation of such facts-- as distinct from debates about whether a cause of action exists under the Uniform Procurement Act and the nature of this

cause of action -- inextricably intertwined with the facts forming the basis of the Town's Chapter 93A claim. For purposes of this submission, in order to avoid needless skirmishes, the Town's counsel has removed time spent on matters that PSG could argue was not related to the Chapter 93A claim.[4] D'Acomo Aff.,  ¶ 23.

Detailed billing records to document the time spent, and the time for which the Town seeks fees relating to the Chapter 93A claim, are attached at Exhibits 1-11.  D'Alcomo Aff., ¶ 23. Additional time records for time spent in preparing the fee petition, and in anticipation of having to prepare a defense to the fee application from a challenge by PSG, are attached at Exhibit 12. Id., ¶ 24.  See  Stratos v. Department of Public Welfare, 387 Mass. 312, 325,  439 N.E.2d 778, 787 (1982)  ("As a general rule, time spent in establishing and defending a fee…should be included in the final calculation of the award").  A summary of the hours for which attorneys fees are being sought in Exhibits 1-12 is set forth below:

## SUMMARY OF HOURS AND RATES

| | | | | |
|---|---|---|---|---|
| Joanne D'Alcomo | Partner | 1067.1 | $400.00 | $426,840.00 |
| Howard P. Blatchford | Partner | 195.4 | $325.00 | $63,505.00 |
| Michael J. Fencer | Associate | 12.1 | $250.00 | $3,025.00 |
| Seth E. Nesin | Associate | 417.9 | $250.00 | $104,475.00 |
| Phyllis Jones | Paralegal | 251.1 | $135.00 | $33,898.50 |
| John F. Lynch | Accountant | 23.9 | $175.00 | $4,182.50 |
| Totals | | 1967.5 | | $635,926.00 |

---

[4] For example, the Town deleted certain charges for time spent on research of the Uniform Procurement Act and the Conflict of Interest Law, and jury instructions regarding those areas, even though – in the Town's view – liability under such claims was directly  related to the Chapter 93A claim because, if proved,  such findings would have helped establish violations of Chapter 93A. The Town has also removed time and costs related to the testimony of Stephen Gunzburger, whose testimony related to the Town's claim for disgorgement of profits under the Uniform Procurement Act, the damages aspect of the Uniform Procurement Act claim.

The largest number of hours for which the Town is seeking recovery were worked by Joanne D'Alcomo, the lead and primary counsel on this matter. She personally handled most of the fact-gathering activity to avoid duplication of effort in order to piece together the complicated and multi-faceted chronology of events and cast of characters involved in such events. She closely supervised and coordinated all activity that she did not handle personally Id., ¶ 28. By centering the analysis of documents and assimilation of facts and the bulk of the fact-gathering activity in the lead counsel who was to take all the depositions noticed by the Town and interview witnesses and conduct the trial, the Town avoided the extensive duplication of effort and hundreds of internal conferences that would have been necessary to share information and make multiple lawyers equally knowledgeable about the complicated facts and about the many individuals and entities involved. D'Alcomo Aff., ¶ 28.

To pursue the Chapter 93A claim, as well as to defend against PSG's breach of contract claim using the same position --  that the termination was justified because the procurement process had been improperly manipulated by PSG -- D'Alcomo had to become familiar with, and conduct and supervise extensive fact-gathering about, such subjects as:

1.      The role of Michael Sausé at Metcalf & Eddy and then at PSG and then US Filter, and the scope of his duties and responsibilities;

2.      The structure and workings of the Rockland Sewer Commission, the wastewater treatment plant,  and  the role of the Sewer Commission and Superintendent and the contractor in the operation of the plant;

3.      What was  "Professional Services Group," and how did it differ from or relate to the company "Metcalf &Eddy", whose contract it had assumed prior to 1997, and how did it relate to "US Filter," which was the name used by the contractor when the contract was terminated in 2004;

4.      The procedures in the 1997 procurement;  the development of the 1997 RFP and the provisions in the 1997 RFP, including the role of the belt filter press and the

significance of the press in the operation of the plant, and the role of minimum labor requirements and their use or non-use in other procurement processes, and the use of minimum experience requirements and the contours of such requirements;

5.     The addenda to the 1997 RFP and the development of such addenda; the participants in the 1997 procurement process;

6.     The differences between the 1994 RFP and the 1997 RFP;

7.     The differences in the procurement process from the previous procurement in 1994 and the process in 1997;

8.     The roles of outside Town counsel, the Town administrator, the Board of Selectmen and other town officials in the procurement process and negotiation of the contracts to operate the wastewater treatment plant in 1994 and, in comparison, 1997;

9.     Whether, and to what extent, there were any prospective bidders in 1997 other than PSG and what happened to their interest, and the other technology proposed by any competitor;

10.    The persons involved in the operation and management of the Rockland Sewer Commission during the 1997 procurement;

11.    The evolution of the creation of the position of Superintendent;

12.    The role of Gregory Thomson at the Rockland Sewer Commission and how he became Sewer Superintendent after being a Sewer Commissioner;

13.    Gregory Thomson's functions and involvement in the procurement process;

14.    The Town Meeting's role in approving a change that allowed a 10-year contract to operate the wastewater treatment plant;

15.    The events that led to the termination of the contract with PSG in 2004, including the police investigation and the district attorney's investigation;

16.    The role of the forensic auditor and the basis of his investigation;

17.    The involvement of the Inspector General's office in the procurement process, the conducting of a procurement seminar and consultations about RFP provisions;

18.    The damages suffered by the Town as a result of the skewed procurement process, and the steps taken by the Town to conduct a new procurement and the manner in

which the replacement procurement was conducted in contrast to the 1997 procurement.

As demonstrated in the billing records, litigation counsel's extensive and intensive activities to develop facts in support of the Town's position were undertaken both through formal methods of discovery such as detailed document requests, depositions and document subpoenas to non-parties, and informal methods, such as interviews with prospective witnesses, searches for and examination of Town records, Public Records law requests to government agencies with potential information, and examination of tens of thousands documents generated by such efforts. Among the work engaged in by lead counsel reflected in the billing records, and related to fact-gathering for the Chapter 93A claim, were the following:

1.  Initiated contact with the attorney for Sausé, and worked to have Sausé authorize the Town's litigation counsel to have access to his personnel file at PSG to understand his position at PSG and responsibilities at PSG; worked to have Sause provide information to the Town informally to aid the Town in understanding what had occurred in the procurement process, who the figures were at PSG with knowledge, and related issues, and communicated with Sausé in person or on the telephone for numerous hours to develop an understanding of what had occurred during the procurement process, to provide insight into PSG's operations to formulate discovery requests, to provide insight into individuals' various roles at PSG during the relevant period in order to determine whom to depose and what areas to question about, and to prepare for trial;

2.  Prepared for and took all the depositions noticed by the town (a list of which is contained in the list of the expenses);

3.  Developed the discovery strategy and plan for the town's discovery, including preparing all written discovery;

4.  Prepared the Town's automatic disclosures and formulation of the Town's responses to written discovery by PSG;

5.  Reviewed thousands of documents produced in discovery by PSG, including the 13 boxes of documents produced by PSG late in the discovery process, which had to be reviewed on an expedited basis, after the Town's litigation counsel learned – while deposing Aram Varjabedian – that Varjabedian had stored at his house 13 boxes of materials, including computer data, that had been removed from the

Rockland wastewater treatment plant and had not been produced earlier in discovery by PSG. [5]

6.      Reviewed thousands of documents produced by third parties in response to document subpoenas from PSG and informal requests for information, such as from Camp Dresser and McKee, Woodard & Curran, Aquarion (current operator of the plant);

7.      Reviewed thousands of documents produced by cities and towns with contracts with PSG, in response to document subpoenas from the Town, to search for, in part, evidence concerning PSG's position that the certain provisions at issue in the 1997 RFP were not uncommon (the result of which failed to substantiate PSG's arguments and were ready to counter PSG's position if PSG attempted to refer to any specific contract or RFP);

8.      Reviewed thousands of pages of the workpapers of the forensic accountant John Sullivan, the back up for his forensic report that concluded that the RFP was skewed;

9.      Reviewed and analyzed hundreds of pages of the Rockland police department's investigation that led to the forensic accountant's investigation, and the eventual termination of the PSG contract in 2004;

10.      Pored through Town files and records looking for references or records relating to the procurement process, to interactions between Sausé and Thomson, to interactions with the Inspector General's office during the time of the procurement, for information concerning negotiations over the contract;

11.      Formulated public records law requests to the inspector general's office for records relating to the procurement seminar that Sausé and Thomson attended in 1996, and proof that they attended, and review of such records;

12.      Formulated Public Records Law requests to the Department of Environmental Protection, for communications relating to  PSG and the Department, or Rockland and the Department, to determine what PSG was stating as to the number of personnel being used to staff the plant over a period of time, and the number of personnel that DEP was requiring to staff the plant;

13      Persisted in making contact with Gregory Thomson during the course of the case, and eventually, in June 2006, succeeded in having Thomson provide information orally and also documents to the Town over the course of many hours and eventually,  days,  to aid in understanding what had occurred in the course of the rocurement process;

---

[5] PSG produced the documents for inspection after the Town filed a motion to compel. See Docket No. 36.

14.     Handled a discovery skirmish with the law firm  Mintz Levin over access to records of work performed by former member  David Lurie, and billing records for such work,  on behalf of PSG in connection with the Rockland Sewer Commission and the superintendent's position;

15.     Handled  all key communications with prospective witnesses and with all potential sources of key information,  meeting and/or conferring with, for example, beyond the witnesses identified above,  the Inspector General's office, town officials,  Jack Bonomo formerly of Woodard & Curran; Kevin Donovan, the Town Administrator during the time that the procurement occurred; Anne Marie Hyland, the town counsel at the time of the procurement and negotiations over the contract; the engineering firm Tighe & Bond, and specifically Ronald Michalski, who drafted the 1994 RFP; John Franey, the former town accountant during the time of the procurement, who was identified as a person with information in PSG's automatic disclosures;  June Pat  Donnelly, who was an assistant to Gregory Thomson at the time of the procurement; and individuals who wrote communications to the Rockland sewer commission during the time of the procurement.

During the pre-trial and trial phase of the case, lead counsel engaged in the following activities, among others, as reflected in the billing records, to present the Town's theory that the procurement process had been corrupted by PSG:

1.     Developed the plan for presentation of the case,

2.     Worked on the pretrial memorandum;

3.     Selected exhibits and determined which witnesses to list for trial, including lining up an expert Ronald Michalski, to prepare a report and to testify about how the 1997 RFP was unusual and did not conform with standards[6];

4.     Prepared the opening;

5.     Prepared detailed annotated exhibit chart listing all exhibits to be offered and the significance of each, key excerpts from each, and through whom such exhibit was to be offered, or with whom the exhibit was to be used in cross-examination

---

[6] Because of time limitations at trial, Michalski was not called, even though he had been disclosed as an expert, and was a potential fact witness as well due to his involvement in preparing the 1994 RFP.

6.      Prepared witnesses for their testimony, and decided which witnesses to call;

7.      Prepared direct examinations of all witnesses called by the Town and prepared cross examinations of all witnesses called by PSG. Excluding Plaintiff's expert on damages, Stephen Gunzburger, whose testimony did not bear in any way on the Chapter 93A claim, the following witnesses testified at trial, demonstrating the number of witnesses for which preparation was necessary and the amount of work involved:

| James Galipeau | Current PSG Area Manager |
|---|---|
| Steven Kruger | Current PSG Vice President of Operations; former PSG regional manager |
| Cynthia Solomon | PSG Business Manager in Norwell Office |
| Frank Cavaleri | Former PSG Area Vice President |
| Gerald Eichman | Veolia Water Controller |
| Lawrence Chaffee | Member of Rockland Board of Selectmen |
| William Stewart | Rockland Sewer Commissioner |
| Gregory Thomson | Former Rockland Sewer Superintendent |
| Michael Sause | Former PSG Area Vice President |
| John Sullivan | Forensic Auditor |
| Karen Sepeck | Rockland Town Treasurer |
| June Patricia Donnelly | Former Rockland Sewer Commission Administrative Assistant |
| Kevin Donovan | Former Rockland Town Administrator |
| Aram Varjabedian | PSG Plant Manager at Rockland |
| David Laurie | Counsel for PSG (while at Mintz Levin) |
| John Bonomo | Former Partner at Woodard & Curran |
| Anne-Marie Hyland | Rockland Town Counsel (Kopelman & Paige) |
| Eric Hart | Rockland Town Accountant |

8.      Handled all objections and evidentiary arguments at trial;

9.      Prepared detailed proposed findings of fact and conclusions of law on the Chapter 93A claim, to document the complicated chronology of events, the testimony of various witnesses to bolster the town's position that the procurement was improperly influenced by PSG, and to establish PSG's liability for Sause's conduct;

10.      Prepared a chronology and witness list for the Court's use in reviewing the proposed findings of fact and conclusions of law;

11.    Prepared for and handled closing argument on chapter 93A claim;

12.    Directed research for, wrote in part, and edited reply to PSG's proposed findings of fact and conclusions of law.

The other counsel who provided extensive assistance were partner Howard Blatchford, and associate Seth Nesin. D'Alcomo Aff., ¶ 29; see Affidavit of Howard Blatchford; see D'Alcomo Aff., Ex. 1 (Nesin resume[7]).  Attorney Blatchford performed extensive work in the area of the Town's production of documents under its automatic discovery obligations, and also in response to wide-ranging requests from PSG.  Attorney Blatchford also had to screen documents for attorney-client privileged material or material discussed in executive session for which confidentiality was still required. In addition, Attorney Blatchford did considerable research in a number of areas, primarily concerning corporate liability and on the issue of waiver, the latter an issue raised by PSG in an effort to avoid liability under Chapter 93A. Attorney Blatchford also assisted in the fee petition and in other areas. See Bills at Exhibits 1-12.

Attorney Nesin, an associate, did a variety of work on the case related to the Chapter 93A issues. For example, he did considerable back-up work on discovery issues; coordinated with PSG counsel on discovery issues; and acted to try to resolve discovery and procedural disputes and document production issues;  performed research on various evidentiary issues; represented the Town at depositions taken by PSG;  second-chaired the trial and assisted in preparing for each trial day in terms of coordinating use of exhibits, location of exhibits, and interactions with witnesses because of the amount of juggling needed due to scheduling issues,  kept updated exhibit lists to keep track of what exhibits were admitted/excluded daily; helped prepare pretrial

---

[7] Attorney Nesin is no longer with the firm; his credentials and background are reflected in his resume, which is attached as Exhibit 1 to the D'Alcomo Affidavit.

memorandum; helped prepare memorandum in opposition to PSG's motion to compel production of documents that Town had obtained as a result of common interest privilege with Sausé, successfully defeating motion to compel. <u>See</u> Bills at Exhibits 1-11; D'Alcomo Aff., ¶ 30

Another associate, Michael Fencer, provided support  specifically in the area of bankruptcy once Sausé declared bankruptcy. D'Alcomo Aff., ¶ 32; <u>See</u> Affidavit of Michael Fencer. Because this raised an issue as to the posture of the case, and the ability of the Town to depose Sausé,  Attorney Fencer, whose area of concentration at the firm is bankruptcy, was brought in to assist in the analysis of the issue and the handling of this aspect. <u>See</u> Exs. 4,5.

Paralegal Phyllis Jones, who is also a law school graduate, <u>see</u> D'Alcomo Aff., Ex. 2,[8] performed work through the discovery phase of the case, assisting in discovery logistics, interacting with process servers, following up on document subpoenas to cities and towns, preparing subpoenas, tracking down addresses, following up on obtaining records from PSG counsel that PSG had subpoenaed from third parties, handling logistics of copying, organizing deposition exhibits in binders and making a chart of exhibits for use during depositions. Ms. Jones also assisted in trial preparation and during trial. For example, she helped organize exhibits and keep track of exhibits; worked with PSG's paralegal to coordinate communications between plaintiff and defendants;  and took notes on testimony for use in subsequent cross-examinations. After trial, she helped organize exhibits and obtain and organize transcripts for use in preparing the proposed finding of fact and conclusions of law. <u>See</u> Exhibits 1-11; D'Alcomo Aff., ¶ 33.

The only other person for whom the Town is seeking recovery of fees is John Lynch, an accountant who works for Jager Smith, who was involved in preparation of the fee petition. <u>See</u> Exhibit 12. D'Alcomo Aff., ¶ 34.

The time and labor necessary to pursue the Town's claim that the procurement was improperly influenced by PSG are also reflected in the expenses for which reimbursement is sought.[9] The expenses are itemized below, and are backed up by invoices or references in the D'Alcomo Affidavit. See D'Alcomo Affidavit, ¶¶ 25-27.

EXPENSES

| TRANSCRIPTS OF DEPOSITIONS AND PROCEEDINGS[10] | |
|---|---|
| | |
| Transcript of Deposition of David E. Laurie (Town noticed) (Ex 19) | $284.50 |
| | |
| Transcript of Deposition of Frank J. Cavalieri, former PSG area manager, (Town Noticed) (Ex 20) | $586.00 |
| | |
| Transcript of Deposition of Aram Varjabedian, former PSG area manager (Town noticed) (Ex 21) | $947.10 |
| | |
| Transcript of Anne-Marie Hyland (PSG noticed) (Ex 22) | $408.30 |
| | |
| Transcript of Deposition of Kevin R. Donovan, (PSG noticed) (Ex 23) | $255.30 |
| | |
| Transcript of Deposition of Walter J. Byrne III, (PSG noticed) (Ex 24) | $240.00 |
| | |
| Transcript of Deposition of Susan M. Keenan, former office worker at PSG Norwell office (Town noticed) (Ex 25) | $336.00 |
| Transcript of 30(b)(6) Deposition of Cynthia Solomon ($56.00) (town noticed) and Transcript of Deposition of Cynthia Solomon ($822.50) (Town noticed) (Ex 70) | $878.50 |
| Transcript of Deposition of Michael R. Sause, (Town noticed) (Ex 26) | $1,070.00 |
| Transcript of Deposition of William Stewart, (PSG noticed) (Ex 27) | $558.75 |

---

[8] Ms. Jones is no longer with the firm, but her resume is attached to the D'Alcomo affidavit as Exhibit 2.

[9] The Town is not seeking reimbursement for all expenses, but only for those that litigation counsel believes are fairly and reasonably allocated to defending PSG's claim against it, and the Town's theory that PSG improperly influenced the procurement.

[10] The chart indicates the party which noticed the deposition.

| | |
|---|---|
| Transcript of Pre-trial conference containing various rulings (Ex 28) | $121.00 |
| | |
| Trial Transcript: Day 2-Cross of Kruger; Day 3-Cross of Kruger; Day 5-Direct of Thomson; Day 6-Direct of Thomson; Day 7-Direct of Sause (for use in preparing proposed findings of fact) (Ex 30) | $965.67 |
| | |
| Trial Transcript: Day 3-Testimony of Solomon (for use in preparing proposed findings of fact) (Ex 29) | $63.08 |
| | |
| Trial Transcript: Direct of Sullivan; Testimony of Kruger; Direct and Redirect of Varjabedian; Testimony of Bonomo; Direct of Thomson; Continued Direct of Thomson; Direct of Sause (for use in preparing proposed findings of fact) (Ex 31) | $1,846.88 |
| | |
| Trial Transcript: Day 11-Lurie Direct; Day 12-Hyland Direct and Redirect (for use in preparing proposed findings of fact) (Ex 32) | $143.00 |
| | |
| | |
| | |
| **Subtotal** | **$8,419.58** |

| COPYING | |
|---|---|
| | |
| Copy Services rendered by Ikon Office Solutions on 3-1-2005 (Ex 34) | $649.07 |
| | |
| Copy Services rendered by Ikon Office Solutions on 3-1-2005 (Ex 35) | $134.94 |
| | |
| Copy Services rendered by Ikon Office Solutions on 3-9-2005 (Ex 36) | $1137.95 |
| | |
| Copy Services rendered by Ikon Office Solutions on 3-9-2005 (Ex 37) | $601.69 |
| | |
| Copy Services rendered by Ikon Office Solutions on 5-8-2006 (Ex 38) | $173.18 |
| | |
| Copy Services rendered by Ikon Office Solutions on 5-9-2006 (Ex 39) | $100.80 |
| | |
| Copy Services rendered by Ikon Office Solutions on 5-9-2006 (Ex 40) | $342.01 |
| | |
| Copy Services rendered by Ikon Office Solutions on 5-9-2006 (Ex 41) | $84.68 |
| | |
| Copy Services rendered by Ikon Office Solutions on 5-9-2006 (Ex 42) | $222.21 |
| | |
| Copy Services rendered by Ikon Office Solutions on 5-10-2006 (Ex 43) | $566.75 |
| | |

| | |
|---|---|
| Copy Services rendered by Ikon Office Solutions on 7-3-2006 (Ex 50) | $195.10 |
| Copy Services rendered by Ikon Office Solutions on 7-5-2006 (Ex 44) | $553.18 |
| Copy Services rendered by Ikon Office Solutions on 7-5-2006 (Ex 45) | $361.80 |
| Copy Services rendered by Ikon Office Solutions on 7-12-2006 (Ex 46) | $827.19 |
| Copy Services rendered by Ikon Office Solutions on 7-14-2006 (Ex 47) | $51.60 |
| Copy Services rendered by Ikon Office Solutions on 7-21-2006 (Ex 48) | $60.41 |
| Copy Services rendered by Ikon Office Solutions on 7-24-2006 (Ex 49) | $1585.08 |
| Copy Services rendered by Ikon Office Solutions on 7-26-2006 (Ex 51) | $1070.07 |
| Copy Services rendered by Ikon Office Solutions on 7-26-2006 (Ex 52) | $791.78 |
| Copy Services rendered by Ikon Office Solutions on 8-8-2006  (Ex 15) | $31.50 |
| Copy Services rendered by Ikon Office Solutions on 8-9-2006 (Ex 53) | $253.31 |
| Copy Services rendered by Ikon Office Solutions on 8-18-2006 (Ex 55) | $129.40 |
| Copy Services rendered by Ikon Office Solutions on 8-24-2006 (Ex 17) | $226.80 |
| Copy Services rendered by Ikon Office Solutions on 8-24-2006 (Ex 54) | $56.70 |
| In-house copying 15,338 pages @ .20 a page, regardless of size, unstapling or stapling, color (one-half of total in-house copying charge of $6,135  (30,676 pages @ .20 a page)  (D'Alcomo Aff., ¶ 26) | 3,067.60 |
| **Subtotal** | **$13,218.10** |
| SERVICE OF SUBPOENAS FOR DEPOSITIONS, DOCUMENT SUBPOENAS | |
| Service of deposition subpoena to David Lurie (Ex 56) | $45.00 |
| Service of deposition subpoena to Mintz Levin (Ex 56) | $45.00 |
| Service of deposition subpoena to Mintz Levin (Ex 57) | $37.00 |
| Deposition witness fee advanced to Mintz Levin  (Ex 57) | $42.00 |

| | |
|---|---|
| Service of deposition subpoena to David Lurie (Ex 57) | $37.00 |
| Deposition witness fee advanced to David Lurie (Ex 57) | $42.00 |
| Service of document subpoena to Rockland Public Schools (Ex 58) | $42.00 |
| Service of document subpoena to Massasoit Community College (Ex 58) | $44.00 |
| Service of document subpoena to City of Lynn (Ex 59) | $39.00 |
| Service of document subpoena to City of Gloucester (Ex 59) | $54.00 |
| Service of subpoena to Susan Keenan (Ex 59) | $75.00 |
| Witness fees advanced to City of Taunton (Ex 59) | $57.00 |
| Service of document subpoena to Town of Plymouth (Ex 59) | $65.00 |
| Service of document subpoena to City of Brockton (Ex 59) | $55.00 |
| Service of document subpoena to City of Fall River (Ex 59) | $75.00 |
| Service of document subpoena to City of Cranston, RI (Ex 59) | $100.00 |
| Service of document subpoena to City of New Bedford  (Ex 59) | $75.00 |
| Service of document subpoena to Town of Southbridge (Ex 60) | $85.00 |
| Service of document subpoena to City of Leominster (Ex 60) | $75.00 |
| Service of document subpoena to Town of Hull (Ex 60) | $45.00 |
| Service of subpoena to Frank Cavaleri (Ex 61) | $55.00 |
| Witness fee advanced to Frank Cavaleri (Ex 61) | $51.00 |
| Service of subpoena to Aram Varjabedian (Ex 61) | $65.00 |
| Witness fee advanced to Aram Varjabedian (Ex 61) | $61.00 |
| Service of subpoena to Robert Arendell, was PSG employee at time of forensic audit (Ex 62) | $45.00 |
| Service of subpoena to Cynthia Solomon, former PSG office manager (Ex | $65.00 |

| | |
|---|---|
| 62) | |
| | |
| Service of subpoena to Susan Keenan, formerly of PSG (Ex 62) | $54.00 |
| | |
| Service of subpoena to David Lurie (Ex 62) | $27.00 |
| | |
| Service of subpoena to Aram Varjabedian (Ex 62) | $54.00 |
| | |
| Service of subpoena to Frank Cavaleri, former PSG area manager (Ex 63) | $43.00 |
| | |
| Service of subpoena to Aram Varjabedian (Ex 63) | $55.00 |
| | |
| Service of subpoena to Jack Bonomo (Ex 63) | $90.00 |
| | |
| Service of subpoena to Gregory Thomson (Ex 63) | $50.00 |
| | |
| Service of subpoena to Bruce Haskell, Camp Dresser & McKee (Ex 64) | $67.00 |
| | |
| Witness fees advanced to Bruce Haskell, Camp Dresser & McKee (Ex 64) | $42.00 |
| | |
| Service of subpoena to Joseph Ridge, Camp Dresser & McKee (Ex 65) | $37.00 |
| | |
| Witness fee advanced to Joseph Ridge, Camp Dresser & McKee (Ex 65) | $42.00 |
| | |
| Witness fee advanced to Aram Varjabedian (Ex 66) | $61.00 |
| | |
| Witness fee advanced to Jack Bonomo (Ex 67) | $62.00 |
| | |
| Witness fee advanced to Gregory Thomson (Ex 67) | $53.00 |
| | |
| Witness fee advanced to Aram Varjabeian (Ex 68) | $61.00 |
| | |
| Witness fee advanced to David Lurie (Ex 68) | $42.00 |
| | |
| Witness fee advanced to S. Keenan, formerly of PSG (Ex 68) | $57.00 |
| | |
| Witness fee advanced to C. Solomon, former PSG office manager (Ex 68) | $63.00 |
| | |
| Witness fee advanced to R. Arendell, was PSG employee at time of forensic audit (Ex 68) | $52.00 |
| | |
| Witness fee advanced to F. Cavaleri (Ex 68) | $51.00 |
| | |
| **Subtotal** | **$2,539.00** |
| | |

| MISCELLANEOUS | |
|---|---|
| | |
| Trial prep for forensic auditor, John Sullivan of Lelanson, Heath & Company and time for testimony at trial (Ex 18) | $2340.00 |
| | |
| Fee for mediator Thomas Maffei of Griesinger, Tighe & Maffei, LLP (Ex 69) | $1224.00 |
| | |
| Computerized legal research: Westlaw (25% of $6,815 in computerized research used in case) (Ex 27) | $1703.75 |
| | |
| Graphic design services for office layout graphics of trial, Sulier Associates, LLC (Ex 13) | $1658.75 |
| | |
| Graphic design services for sewer plant office layout chart, Sulier Associates, LLC (Ex 14) | $345.75 |
| | |
| Telephone fees (D'Alcomo Aff., ¶ 26) | $37.55 |
| | |
| Postage fees (D'Alcomo Aff., ¶ 26) | $228.20 |
| | |
| Parking and transportation to courthouse for trial and pretrial (D'Alcomo Aff., ¶ 26) | $150.00 |
| | |
| Federal Express (D'Alcomo Aff., ¶ 26) | $456.99 |
| | |
| Messenger service (D'Alcomo Aff., ¶ 26) | $283.83 |
| **Sub-total** | **$8,428.82** |

TOTAL:    $32,605.50

C.    **The Amount of Damages Involved**

Although the amount of damages actually awarded was small, the amount of damages involved in the case was significant. The mere fact that the amount of damages actually awarded was relatively low does not mean that the attorneys' fees awarded should be low as well. For example, in Twin Fires Inv., LLC, v. Morgan Stanley Dean Witter & Co. 445 Mass. 411, 427-

433, 837 N.E.2d 1121,1137 -1140 (2005), the Supreme Judicial upheld an award of $1 million in attorneys' fees under Chapter 93A when the claimant had recovered only $118,950. See Twin Fires, 445 Mass. at 427, 427-432, 837 N.E.2d at 1137, 1137-1139.

In this case, the damages at stake are reflected in PSG's claim against the Town as well as the Town's claim against PSG. According to its initial disclosures, PSG "calculate[d] it is owed $1,048,000.00" See D'Alcomo Aff., Ex. 8 at 6. It was not until the first day of trial – literally the opening statement – that PSG took the position that it was not seeking any more than $1 in damages. Indeed, in its expert disclosures shortly before trial, it had continued to seek lost profits. Since it was PSG that initiated the litigation, it is a fair inference that the efforts that the Town made during the case up to that point led to PSG's decision to reduce its claim for damages to one dollar. The success --or lack of success--of PSG's contract claim related directly to the Town's position that the procurement process was tainted by PSG. A win by PSG on the contract claim – and any damages award, even a dollar -- would have been inconsistent with the Town's claim that the Town had properly terminated the contract because of PSG's manipulation of the procurement process. Even with PSG's reduction of its claim to one dollar at the start of trial, the Town successfully defeated PSG's claim on the same factual foundation that it had pursued throughout the case: the procurement was improperly influenced by PSG and thus the contract was properly terminated. The Town's success in defeating the breach of contract claim thus made it perfectly consistent for this Court to conclude, under Chapter 93A, that the procurement had been corrupted by PSG. A finding by the jury that the Town had breached the contract by terminating PSG would have been hard to reconcile with a finding that PSG was liable for having manipulated the procurement (even though the Court is not bound, under Chapter 93A, to the jury's finding).

When, as here, the facts justifying rejection of PSG's breach of contract claim were relevant to the Court's finding on the Chapter 93A claim, attorneys' fees are warranted for work in defending the claim. See Arthur D. Little Intern., Inc., v. Dooyang Corp. 995 F.Supp. 217, 223 (D.Mass.,1998). In Dooyang, this Court faced a similar issue. The losing party tried to argue that Arthur D. Little, which had prevailed on its Chapter 93A claim, was not entitled to attorneys' fees for work in defending the claim brought by Dooyang – a defense which was successful. This Court rejected that argument, finding that the same conduct that warranted a rejection of Dooyang's claims was "relevant to the court's ultimate conclusion that Dooyang engaged in unfair and deceptive acts or practices." Id. at 223. Consequently, it awarded fees for defense of the claim.

Thus, the Town's exposure from the outset of the case until the very first day of trial, was, according to PSG, at least $1 million without interest, and the Town had to work hard to defend itself in the litigation and avoid the exposure while at the same time, on the same facts, pursue its own counterclaims primarily based on the tainted procurement. The value to the Town in getting PSG to reduce its claim to $1 by the first day of trial was to end the Town's exposure to PSG's claimed damages of at least $1 million.

Furthermore, the Town developed evidence that the procurement as manipulated by PSG caused the Town to lose the ability to have a fair and open procurement and have a PSG competitor, Woodard & Curran, put in a bid at a considerably lower cost. The Town argued that the loss of the opportunity to have such a bid cost it $1,531,250. See Sections XI; XXII, A.1 of Town's Proposed Findings of Fact.

Although the Court did not accept the Town's argument, it was not unreasonable for the the Town's counsel to believe that pursuing such a claim for damages was a viable strategy, and

as a result, "to have expended effort in the litigation commensurate with that potential." <u>Twin Fires Inv., LLC</u>, v. <u>Morgan Stanley Dean Witter & Co.</u> 445 Mass. 411, 427-433, 837 N.E.2d 1121,1137 - 1140 (2005).(upholding award of attorneys' fees under Chapter 93A). The Town Counsel's Anne Marie Hyland testified that if she had known that PSG was involved in manipulating the procurement, she would have recommended that the procurement be cancelled – an act that likely would have led to a more open and fair procurement. See Section XIV, Town's Proposed finding. The Town Administrator at the time of the procurement, Kevin Donovan, testified that if he had known that PSG was involved in influencing and manipulating the RFP and the procurement process, he would have tossed out PSG's bid and had a new procurement process conducted. <u>See</u> Section XIV, Town's Proposed Findings. Furthermore, Aram Varjabedian, PSG's plant operator, was considering the very same technology that was the basis of the lower proposal that Woodard &Curran was prepared to make if the RFP had not been limited by use of the belt filter press. See Court Decision at 9. It would have been a rational move for the Town to issue an RFP that was technologically viable that would save it $1.5 million.

Against this backdrop, the Town's litigation counsel considered the case law that states that "the award of damages is permissible on meager evidence, in particular in business torts where the focus is on the wrongfulness of (the) defendants' conduct." <u>BBF, Inc.,</u> v. <u>Germanium Power Devices Corp.</u> 430 N.E.2d 1221, 1227 (Mass.App. 1982). The Town further considered the case law that provides that damages are recoverable as long as reasonable damages calculations can be made. <u>Augat, Inc.,</u> v. <u>Aegis, Inc.,</u> 417 Mass. 484, 491 (1994) and cases cited.

It was also not unwarranted for the Town's counsel to believe that if the Court concluded that PSG was responsible for corruptly influencing the procurement, it was likely to find such

conduct "willful and knowing" and treble damages under Chapter 93A, which would have meant potential damages of $4.59 million.

### D.    The Result Obtained

Although the amount of money awarded was relatively small, the result was significant to the Town.   The Town avoided any liability for PSG's claim for lost profits, which was inextricably tied to the Town's counterclaim under Chapter 93A.   At the same time, the Town succeeded in establishing, in a highly visible case in the Town and in an intensely fought battle with PSG, that PSG, the plaintiff, was the wrongdoer, not the Town.   Furthermore, as a public policy matter, the result was significant beyond the boundaries of Rockland. The Court's decision sent a message to contractors working in the public bidding arena that they face liability under Chapter 93A if they tamper with public bidding processes, which may have a deterrent effect. In addition, the decision gave a message to public entities that they have a potential remedy in Chapter 93A if such tampering should occur.

### E.    The Experience, Reputation, and Ability of the Attorney

Details of the background and experience, of the Town's primary counsel, Attorney D'Alcomo, are described in the accompanying affidavit. D'Alcomo Aff., ¶¶ 1-11.  She is a cum laude graduate of Boston University School of Law, where she was an editor of the Law Review. She has been practicing more than 20 years exclusively in the area of litigation. D'Alcomo Aff., ¶ 2.   She has significant trial experience, having tried a variety of complex cases in state and federal court, both jury and jury-waived, and in arbitration. Id., ¶   4-6.   She has particular experience in the area of Chapter 93A; she has lectured and written on the subject and  handled cases involving Chapter 93A claims. Id., ¶ ¶9-10.   She has specific experience trying a month-long case involving Chapter 93A in a public bidding context and allegations of improper

influence in the procurement process. Id., ¶ 9.  The experience and credentials of Attorneys Blatchford and Fencer are described in their affidavits. The experience and credentials of Attorney Nesin and Paralegal Phyllis Jones are described in their resumes "D'Alcomo Aff., Ex 1 (Nesin Resume), Ex. 2 (Jones Resume).

      **F.**      **The Usual Price Charged for Such Services**

      The Chapter 93A claim that is the subject of this fee petition was based, as described above, on complex and difficult-to-investigate facts, with numerous witnesses, thousands of documents, and fiercely fought litigation. The largest number of hours for which the Town seeks recovery were worked by Attorney D'Alcomo. Attorney D'Alcomo most commonly worked on contingency during that period of time. However, on those cases on which she worked on an hourly basis, her hourly fees during that period of time for generally ranged from $350 to $460. Consequently, the rate at which recovery is sought is $400, in the middle of this range. The $400 rate is comfortably within the range charged by experienced litigation partners in the Boston market for the relevant period, particularly the relevant period for the time period during which most of the work was performed, 2005 – 2007. See Exs. 1-12; D'Alcomo Aff., ¶ 36.  Excerpts from Massachusetts Lawyers Weekly Surveys showing rates reported as being charged by partners in Boston firms are attached at Exhibits 3, 5, and 7 of the D'Alcomo Affidavit., Ex. 3 (excerpts showing Boston firms in 2005 survey), Ex. 5 (excerpts showing Boston firms in 2006 survey),  Ex. 7 (excerpts showing Boston firms in 2007 survey).  In addition, excerpts from National Law Journal surveys in which Boston firms participated, for the years 2005 and 2006 are attached to the D'Alcomo Affidavit as Exhibits 4 and 6. See D'Alcomo Aff., Ex. 4 (excerpt showing Boston firms in 2005 survey, Ex.  6 (excerpt showing Boston firms in 2006 survey).

These same materials demonstrate that the hourly rates sought for the other attorneys ($350 and $250), the paralegal ($135), and the accountant ($175), are also comfortably within the ranges charged in the Boston market  D'Alcomo Aff., ¶ 39.

CONCLUSION

For all these reasons, the Town requests that it be awarded attorneys' fees in the amount of  $635,926, and costs in the amount of  $32,605.50 .


TOWN OF ROCKLAND AND
ROCKLAND SEWER COMMISSION,
By their attorneys:

/s/ Joanne D'Alcomo
Joanne D'Alcomo (BBO # 544177)
Howard P. Blatchford, Jr. (BBO #045580)
JAGER SMITH P.C.
One Financial Center
Boston, Massachusetts 02111
617-951-0500

Dated:  November 7, 2007