UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| PROFESSIONAL SERVICES GROUP, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | Civil No. 0411131-PBS |
| v. | ) ) | |
| TOWN OF ROCKLAND, et al, | ) ) ) ) | |
| . | ) ) | |

**TOWN OF ROCKLAND'S AND ROCKLAND SEWER COMMISSION'S REPLY TO PROFESSIONAL SERVICES GROUP, INC.'S OPPOSITION TO ATTORNEYS' FEE PETITION**

The Town of Rockland and the Rockland Sewer Commission (collectively referred to as "Town") hereby responds to the Opposition of Plaintiff Professional Services Group, Inc., to the Town's attorneys' fee petition:

1. **PSG's contention that the Town's litigation strategy was "almost a complete failure" blithely ignores the fact that the Town's primary litigation strategy was to try to prove that PSG improperly influenced the procurement process, and that strategy, in addition to leading to proof of a violation of Chapter 93A, was entirely successful in defending the Town against the claim that started this lawsuit in the first place: PSG's claim for lost profits of more than $1 million**

It is hard to imagine anyone with even a passing familiarity with this case, let alone a party such as PSG sitting through the 11-day trial, reaching any conclusion but that there was a single overriding issue in this case: whether PSG improperly influenced the procurement process. This issue indisputably pervaded both PSG's claim for breach

of contract, and the Town's counterclaims. Central to the issue of whether the Town breached its contract with PSG by terminating it in the spring of 2004 was the Town's defense that it was entitled to terminate the contract because of PSG's improper conduct during the procurement. PSG, in turn, took the position that even if Michael Sausé may have influenced the procurement process – which it denied – Sausé was on a "frolic" of his own. PSG claimed that if the procurement process was rigged, it was rigged by Sausé and Thomson solely so that they could obtain access to inflated rebate accounts and write checks using the monies. PSG's main evidence supporting this position was the checking accounts set up by Sausé and/or Thomson and the checks written on those accounts.

The Town's litigation strategy was so successful that PSG – in its opening statement, without waiting for the jury verdict on its contract claim – made the surprise announcement that it was no longer pursuing the very damages that it had brought the case to obtain in the first place: lost profits. In its initial disclosures, PSG stated that it was owed $1,048,000. D'Alcomo Aff., Ex. 8 at 6. On the first day of trial, however, PSG announced that it was seeking only a dollar. There was no injunctive relief at stake. It is a rare case, indeed, that a Defendant's litigation strategy is so successful that the Plaintiff, before a single witness takes the stand, gives up during the first day of trial virtually all the damages that caused the Plaintiff to launch the litigation.

Yet despite its announcement that it no longer wanted the lost profits that it had filed the suit to obtain, PSG did not waive its breach-of-contract claim, on which it had made a jury claim. Instead, PSG persisted in putting on a case in chief for breach of contract, thus burdening the Town with defending the claim before the jury. Defeating

PSG's breach of contract claim was a necessary corollary[1] to the Town succeeding in proving that PSG improperly influenced the procurement process. A jury finding that the Town had breached the contract and owed PSG any amount of damages – even $1 – would clash with the Town's position that its termination was justified by PSG's improper influence of the procurement.

The defense of the breach-of-contract claim was inextricably intertwined with the Town's primary theory in the case, and the theory on which the Town prevailed on its Chapter 93A claim: PSG's improper influence of the procurement process. The Town's litigation strategy succeeded in, first, causing PSG to reduce its monetary damages from more than $1 million to a token dollar on the first day of trial after intense discovery and pre-trial activity; second, causing the jury to defeat PSG's breach of contract claim in its verdict; and third, causing the Court to find a willful and knowing violation of Chapter 93A.

The very same evidence that was developed and pursued in discovery to build a case showing PSG improperly influenced the procurement process, and was presented during trial to defeat the breach of contract claim, was used to prove a violation of Chapter 93A. It was also the same evidence that the Town had developed and used to present its case under the Uniform Procurement Act, the other major damages claim that

---

[1] Although, under Chapter 93A, the case law instructs that the Court is free to reach findings that conflict with a jury's determination, courts often try to reconcile their findings with the jury's, as the Court did here. A finding that the Town breached the contract by terminating PSG would be inconsistent with the Town's position that it was justified in terminating the contract because of PSG's improper influence in the procurement process.

it pursued. [2] The Court agreed that the evidence presented by the Town proved that the PSG had improperly influenced the procurement process in violation of the policies of the Uniform Procurement Act and had thus violated Chapter 93A:

> I find that the overwhelming evidence supports Rockland's claim that PSG via its employees acted unfairly to subvert the policies of an open and fair procurement process embedded in the Uniform Procurement Act.

Decision at 31.

Because PSG persisted in bringing its breach of contract claim to a verdict, PSG cannot complain about having to pay for both the time the Town spent in discovery and on pre-trial efforts, as well as during the trial, to defeat this factually intertwined breach of contract claim. Although the Town did pull out time and expenses from its fee petition on unrelated aspects of this case, as discussed below, the Town did not, and was under no obligation to, exclude all time spent on defense of the breach-of-contract claim. The time spent on such defense, since it was successful and "inextricably intertwined" with the theory of the Town's successful Chapter 93A counterclaim, is appropriately included in the attorneys' fee petition. "When the efforts relating to the defense of a plaintiff's claims are factually intertwined with the merits of the defendant's c. 93A counterclaim, the court is not required to segregate out 'more than a nominal portion of the total hours expended by defense counsel in arriving at an appropriate attorneys fee.'" R.W. Hatfield Co., Inc. v. Ceric Fabricating Systems Co., Inc. 2000 WL 33170690, *3 (Mass.Super. 2000)(Gershengorn, J.) citing Wasserman v. Agnastopoulos, , 22 Mass.App.Ct. 672, 682

---

[2] As it happens, the Town developed the same evidence to prove a violation of the Uniform Procurement Act, but the Court did not agree with the Town's interpretation of the Act, and the Court's instructions reflected that variance. The Court interpreted the private right of action provision narrowly, while the Town had a much broader view.

(1986) In R. W. Hatfield Co., Judge Gershengorn rejected the Plaintiff's assertion that "attorneys fees must be segregated and apportioned for defense of the plaintiff's unsuccessful claims." Id. at *3. Here, moreover, since the Town has already excluded work and expenses from its submission not even a nominal exclusion is justified.

In R.W. Hatfield Co., supra, even though the Defendants succeeded in proving only nominal damages of $2 on their Chapter 93A counterclaim, which were doubled for a willful and knowing violation, to $4, the Court awarded more than $192,000 in attorneys fees' and costs. Id at *1, *6. The attorney's fee award was thus 96 times the single damages found, and 48 times the double damages awarded.

The Plaintiff in R.W. Hatfield Co. had brought claims for breach of contract, tortious interference with contract, and related claims against the defendant Ceric. Ceric had responded with chapter 93A claims and common law claims. The Defendants defeated the Plaintiff's claims, and prevailed on their own claims, but succeeded in obtaining only $4 in damages. The Plaintiff in R.W. Hatfield Co. claimed that the Defendants should not be awarded any attorneys' fees, or at most $16,000 in attorneys fees for a $4 recovery. The Plaintiff argued that there were no "complex, obscure or arcane" issues." Id. at *4. Nevertheless, Judge Gershengorn found it totally appropriate in 2000 – seven years ago-- to award $192,000 in attorneys fees and costs in a case in which the Plaintiff's claims and the defendants' Chapter 93A claim rested on a central factual issue and were decided after only a five-day bench trial. In this case, several years later, after a trial that lasted 11 days, and involved jury and well as jury-waived claims, numerous witnesses and complicated facts, the Town's request for $635,926 in

fees and $32,605.50 in expenses, based on detailed descriptions of the activity involved, is justified.

2. **PSG's assertion that that the Town has submitted all its attorneys' time, and all its expenses, with no deductions for activities unrelated to Chapter 93A, is incorrect**

Contrary to the arguments of PSG, the Town does not seek to recover for all the time spent and expenses incurred in this litigation. The Town made it quite clear that in submitting its fee petition, its lead counsel made reductions for activities and expenses that in her judgment were not related to its Chapter 93A claim. The Town does not seek to recover for work or expenses that did not relate to the central issue that PSG improperly influenced the procurement process. See Fee petition at 8, n.4, D'Alcomo Aff., at ¶¶23, 25, 26, and 27. For example, activities connected to the issue of whether there was a private right of action under the Uniform Procurement Act, and issues relating to the Conflict of Interest law were eliminated. However, not all time which counsel spent becoming familiar with the Uniform Procurement Act was eliminated from the billing records because the procedures of the Uniform Procurement Act were relevant in establishing a standard of conduct in public procurements, and, in turn, relevant in establishing a violation of Chapter 93A. This Court specifically cited the Uniform Procurement Act in finding a violation of Chapter 93A, finding that the PSG employees had subverted "the policies of an open and fair procurement process embedded in the Uniform Procurement Act." See Decision at 31.

Similarly, although the Town did not prevail on its theory that PSG should be held liable for conduct relating to the writing of the checks out of rebate funds, not all litigation activity related to the rebate accounts and check-writing was excluded from the

attorneys' fee submission since PSG had specifically pointed to the set-up of the checking accounts and the check-writing as evidence that Sausé's motive in influencing the procurement process was purely personal and that Sausé's conduct in influencing the procurement was a "frolic" for which PSG was not responsible. The Town had to sort through the evidence concerning the timing of the checks and the set-up of the checking accounts and the handling of the rebate funds through those accounts to demonstrate how implausible PSG's theory was that the checks and rebate accounts from December 1997 to 2002 were the motivation for the influencing of the procurement process beginning in 1996 until the summer of 1997. The Town had to show, by careful analysis of the timing of the checks and setting up of the accounts, and the manner in which such accounts and mechanisms worked, how disconnected such activity was from Sausé's conduct in attempting to influence the procurement process by, inter alia, contacting Attorney David Lurie in September, 1996 to investigate how Thomson could apply for the Superintendent's position without violating conflict of interest laws; working on extending the contract term in the spring of 1997 for the new contract to be put out for bid in July 2007; arranging to attend a procurement seminar with Thomson in May 2007; writing the RFP; writing the RFP addenda, etc.

      PSG's tactic during the trial was to try to blur the timeline as if these events occurred at the same time, or close to, the checkwriting and use of funds in checking accounts. PSG, in other words, sought to intertwine the facts involving the rebate account monies and the check-writing involving those funds, with the central issue of the corruption in the procurement process. Only by carefully presenting evidence of the timing of the checks and the accounts, and the mechanisms of the process, could the

Town make clear how unlikely PSG's theory was. Consequently, although some time and expenses related to the check-writing issues was segregated and excluded, other time in which counsel became familiar with the issues and had to present such issues, was included. Since PSG raised this complex factual area in claiming it was not responsible for Sausé's conduct, it should not be allowed to escape responsibility for the hours of labor needed to assemble, analyze and present the evidence needed to rebut such a contention.

3.  **PSG's contention that the Town's "aggressive" litigation strategy justifies a drastic reduction in the fee request should be disregarded since it was PSG's aggressive and sometimes outright obstructionist tactics that necessitated considerable activity by the Town to accomplish the formidable task of building, brick by brick, its case that PSG had improperly influenced the procurement process**

It is nothing short of ironic that PSG should complain about the Town's "aggressive" litigation strategy and "excessive" litigation strategy. PSG initiated the litigation. The Town, therefore, "had no choice but to be in court," and PSG "accepted the risk associated with counterclaims when it filed its law suit." R.W. Hatfield Co., Inc. v. Ceric Fabricating Systems Co., Inc. 2000 WL 33170690, *5 (Mass.Super. 2000). PSG interfered with the pre-litigation information-gathering process by removing boxes and boxes of documents from the Wastewater Treatment plant and wiping computers clean, and the Town did not discover the whereabouts of the materials until it was conducting the deposition of Aram Varjabedian not long before the trial was scheduled, and then the Town immediately made a motion to compel access to the materials. See Docket No. 36. It was PSG who also interfered with the pre-litigation information gathering process by

inhibiting the forensic accountant's access to Varjabedian, the former plant manager, as was found by the Court in its Chapter 93A ruling.

It was PSG who burdened the Town with discovery requests that required the Town to search through tens of thousands, if not hundreds of thousands, of documents to produce tens of thousands of documents to PSG. It was PSG that made such wholesale unresponsive responses to document requests that the Town was forced to prepare a detailed motion to compel, which was granted by Magistrate Judge Collings. See Docket Nos. 32, 33, Order of June 28, 2006. It was PSG that forced the Town to prepare an opposition to a motion seeking access to documents protected by a common interest litigation privilege, and the Town prevailed. Docket Nos. 39, 46, Order of July 3, 2006. It was PSG that fiercely litigated both before the trial and after the trial in proposed finding the issue of whether the Town had given up its claim against PSG by reaching an agreement with Michael Sausé on discovery.

It was PSG that forced a jury trial on its breach of contract claim, even after it had announced its intention to seek no more than $1 in damages, imposing upon the Town the burden of litigating the claim. PSG called six witnesses in its case in chief on what had been reduced to a $1 breach-of-contract claim – James Galipeau, Steven Kruger, Cynthia Solomon, Frank Cavaleri, Gerald Eichman and William Stewart. Yet, as explained previously, because of the potential ramifications of an adverse ruling to the Town's central claim – that PSG improperly influenced the procurement process – the Town had to defend such a claim vigorously. It was PSG who had three lawyers (two litigation counsel and one in-house counsel), a paralegal and a full-time technician attend the trial daily, while the Town had two lawyers and sometimes, but not always, a

paralegal. It was PSG who intensely fought, from every angle both during the trial and in proposed findings and rulings, the complicated and multi-faceted issue of when a corporation is liable for the acts of its employees.

As this Court has observed, "a litigant's staffing needs and preparation time will often 'vary in direct proportion to the ferocity of [its] adversaries' handling of the case." Arthur D. Little Intern., Inc. v. Dooyang Corp. 995 F.Supp. 217,225 (D.Mass.1998) (citations and quotations omitted). PSG intensely fought the fact-gathering that led up to this case, as well as during the case, and the Town had to pull together the resources necessary to respond to, and overcome, the hurdles. The Town persevered and assembled, bit by bit, the evidence necessary to prove that PSG improperly influenced the procurement process, and to disprove PSG's defense, that is, that Sausé's conduct was a mere frolic to gain him access to rebate monies in checking accounts. The Town also persisted in conducting and presenting the legal research and argument necessary to fend off PSG's challenges and to hold PSG responsible under Chapter 93A for improperly influencing the procurement process.

4. **Despite having a detailed description of the activities for which the Town seeks attorneys' fees, and detailed expense records, PSG has failed to identify a single activity or expense described in the fee petition as being unconnected to the Town's contention that PSG improperly influenced the procurement process -- which formed the main defense to PSG's breach-of-contract claim as well as the dominant issue in its counterclaim under Chapter 93A**

In its fee petition, the Town has described in detail its litigation strategy as well as the activities in which it engaged in pursuit of the strategy and the rationale for the activities. Time records back up the description of activities; expense records back up the costs listed. As explained, the central theory the Town pursued in this case, both in

defense of PSG's breach-of-contract claim, and in pursuit of the Town's counterclaims, was that PSG improperly influenced the procurement process. Despite having these detailed descriptions, PSG has not pointed to a single activity or a single expense submitted in the fee petition that did not relate to this central issue, which is the issue on which the Town prevailed.

5. **In making a fee award, the Court should consider the importance of the result in this case to the taxpayers of Rockland, whose rights were vindicated, as well as to the taxpaying public at large, which benefits from having private contractors being on notice that corrupt conduct in the public bidding process can expose such contractors to liability under Chapter 93A for both damages and attorneys fees**

The purpose of the Chapter 93A attorney fee provision is "to deter businesses from engaging in unfair and deceptive trade practices where those trade practices have adverse effects." NASCO v. Public Storage, Inc., 127 F.3d 148, 154 (1st Cir.1997) (citing Commonwealth v. Fall River Motor Sales, Inc., 409 Mass. 302, 316, 565 N.E.2d 1205 (1991)). In this case, PSG filed suit shortly after the Town terminated its contract, and attempted to use the considerable litigation resources at its command to steamroll the Town into paying claimed PSG profits it claimed to have lost as a result of the termination. In other words, as is now known from the unfolding of the evidence, PSG was attempting to make the Town pay profits PSG would have earned in the future on a corruptly procured contract if the contract had not been canceled.

In awarding attorneys' fees under a fee-shifting statute such as Chapter 93A, and weighing the results achieved, the Court should not only consider the financial interests at stake for the claimant but also other interests sought to be protected by the statute. "The financial benefit to the Plaintiff, and the general benefit to public interests, are

relevant considerations." <u>Stratos</u> v. <u>Department of Public Welfare</u>, 387 Mass. 312, 323, 439 N.E.2d 778, 786 (1982). In this vein, the First Circuit has observed that, in cases when a Plaintiff's victory is "*de minimis*" in terms of relief, but serves an important public purpose, the fee award need not be proportionate to the damages recovered. <u>Diaz-Rivera</u> v. <u>Rivera-Rodriguez,</u> 377 F.3d 119, 125 (1st Cir.2004)(in context of 42 U.S.C. § 1988).

In this case, there was more than *de minimis* recovery, and there was also a public interest served. If the Town had not fought back and ultimately succeeded in piecing together evidence that showed that the procurement was improperly influenced by PSG, the company undoubtedly would not have dropped its claim for damages at trial, and the Town would not have vindicated its rights in terminating the contract because of a corrupt bidding procedure. The Town would have been stuck paying damages, in the form of lost profits, to a contractor who wanted to continue to profit from undue influence over the bidding process. In this litigation, the Town prevented itself from being bulldozed by a well-financed corporate plaintiff, who had unfairly manipulated the bidding process.  This case, and the fee award that accompanies it, should serve as a deterrent to contractors who attempt to manipulate public bidding processes and then think they can use litigation to bully the municipality into continuing pay profits if the public entity uncovers it and cancels the contract.  This case, and the fee award, should also make clear to contractors and to governmental entities that governmental entities have a remedy to vindicate their rights under Chapter 93A, and thus serve as a further deterrent to those contemplating tampering with the public bidding process.

**6**.    **The Supreme Judicial Court has made it clear that the mere fact that a fee requested under Chapter 93A is significantly disproportionate to the amount of damages recovered does not mean that it is unwarranted, and none of the cases relied upon by PSG justifies reduction of the fees requested by the Town in this case**

One of PSG's chief arguments is that the amount of fees requested is disproportionate to the results achieved. But, as pointed out, the Supreme Judicial Court has made clear that the mere fact a fee is greatly disproportionate to the damages recovered does not mean that it is inappropriate. In Twin Fires Investment, LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 837 N.E.2d 1121 (2005), the Court expressly upheld an award of $1 million in fees and costs even where the damages awarded under Chapter 93A were $118,950. In this case, the Town succeed in beating back PSG's claim for more than $1 million in damages, and it reasonably believed that it had a reasonable prospect of obtaining, from the missed opportunity of the alternative bid from Woodard & Curran, damages amounting to $1.53 million, with significant prejudgment interest, which would have yielded significantly more than $3 million. Thus, even though the Town's ultimate recovery in terms of damages was relatively small, it reasonably believed that the amount of damages at stake if it proved that PSG improperly influenced the procurement process was well above $3 million.

None of the cases to which PSG attempts to point as "similar" involved even remotely similar fact patterns. There were no cases where, as here, there was a complicated public procurement process and even the underlying technology involved was complex. For example, the case of Sorenson v. H.& R. Block, Inc., 2005 WL 2323196 (D. Mass. 2005) on which PSG relies, does not aid PSG's efforts to attack the Town's fee petition because that case involved a scenario radically different than at issue

here. In Sorenson, as the Court tells it, the Chapter 93A claim was child's play to prove -- a far cry from the Chapter 93A claim at issue here. In Sorenson, the Court, in ruling on cross-motions for summary judgment on a series of 15 divergent claims, awarded $630 in total damages for breach of contract and violation of Chapter 93A. Id. at *1. The Court determined that the successful claims for breach of contract and Chapter 93A, the latter of which flowed from the breach of contract, were simple and easily factually severable from the remaining 13 claims. See id. at *4-6. The Court pointed out that the breach of contract – which involved a breach of confidentiality by disclosure of tax information -- was easily proved in summary judgment. Id. at *5-6. . The successful Chapter 93A claim, in turn, "rested entirely on that breach and the uncontested fact that the defendants never disclosed it." Id. at *6. The Court pointed out that the Plaintiff had failed to segregate the time spent on these easily proved, factually severable claims, from the remaining unsuccessful claims. The Court awarded fees and costs of $18,900 on an award of $630.

In this case, in contrast, the facts were complicated and difficult to prove; the Town did extensive factual investigation and preparation, conducting both formal and informal discovery, and won after a trial lasting 11 days and involving numerous legal and factual issues that were presented in detailed proposed findings and rulings, tied explicitly to the transcripts and exhibits from the trial.

Another case relied upon PSG as "similar," Polycarbon Industries, Inc. v. Advantage Engineering, Inc., 260 F. Supp.2d 296 (D. Mass. 2003), was a personal injury case stemming from an allegedly defective product, a temperature controller – which is totally different than the challenge faced by the Town. The facts of Industrial General

Corp., v. Sequoia Pacific Systems. Corp., 849 F. Supp 820 (D. Mass. 1994), another case that PSG should be compared with the case here, also have no resemblance to the situation faced by this Court. In that case, a business' failure to disclose to another business whom it was assisting in a transaction with a customer, the precarious financial state of a customer. In marked contrast to the case at hand, at no time did the potential damages at stake exceed $80,000. Id. at 827.

**7.    Contrary to PSG's arguments, under Massachusetts law, the contingent fee agreement between the Town and its counsel – which PSG incorrectly referenced described as a 30% contingency – has no bearing on the determination of a fee under Chapter 93A;   the standard is what the services are "objectively worth", not what fee agreement the Town was able to make**

The Supreme Judicial Court has made clear that, "as a general rule, .. the existence of "a [contingent] fee agreement is irrelevant to the issue of entitlement [to court-awarded fees] and should not enter into the determination of the amount of a reasonable fee. Cambridge Trust Co. v. Hanify & King Professional Corp. 430 Mass. 472, 480, 721 N.E.2d 1, 7 (1999). There is no reason to deviate from that "general rule" in this case. "A contingency fee agreement does not impose a ceiling on the amount of attorney's fees a court may properly award. Id., 430 Mass. at 479, 721 N.E.2d at 6. Consequently, PSG arguing as it did, about the reasonableness of a contingency – particularly where it got the fee arrangement all wrong – overlooking the minimum hourly amount that the Town has been paying for services all along, which  would be subtracted from any contingency recovered – is a pointless distraction and should have no bearing on the Court's determination.

PSG's argument about what is reasonable from a contingency fee point of view relates solely to the issue of what is reasonable between *lawyer and client*, not what is reasonable in calculating a reasonable fee award under a fee-shifting statute.  PSG mis-cites  Smith v. Consalvo, 37 Mass. Ct. 192, 197(1994) for establishing reasonableness in the context of a statutory fee award.

The Supreme Judicial Court has recognized that using a contingency fee to establish a statutory fee award would tend to be unfair because it "would not provide adequate compensation where the right sought to be vindicated is important but damages are modest." Fontaine v. Ebtec Corp.  415 Mass. 309, 326 n. 14, 613 N.E.2d 881, 892 n. 14(1993).

## CONCLUSION

For all the reasons above, as well as those set forth in the fee petition, the Town requests that it be awarded the fees and costs requested.

TOWN OF ROCKLAND AND
ROCKLAND SEWER COMMISSION,

By their attorneys:

/s/   Joanne D'Alcomo
_____
Joanne D'Alcomo (BBO # 544177)
Seth Nesin (BBO # #650739)
JAGER SMITH P.C.
One Financial Center
Boston, Massachusetts 02111
617-951-0500

Dated: December 10, 2007